# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Barzel Industries Inc., *et al.*, | : | Case No. 09-_____ (___) |
|  | : |  |
| Debtors.[1] | : | (Joint Administration Requested) |
|  | : |  |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) APPROVING POSTPETITION FINANCING AND REPAYMENT OF CERTAIN PREPETITION OBLIGATIONS, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY AND (VI) SCHEDULING A FINAL HEARING

Barzel Industries, Inc. ("BII") and its affiliated U.S. debtors and debtors in possession (collectively, the "Debtors") in the above-captioned bankruptcy cases (the "Cases"), by and through their undersigned counsel, hereby submit this motion (the "Motion") pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure for entry of an interim order (the "Interim Order")[2] and a final order (the "Final Order"): (i) approving postpetition financing and the repayment of the Prepetition Credit Agreement Obligations (as defined below), (ii) authorizing use of Cash Collateral (as defined below), (iii) granting liens and providing superpriority administrative expense status, (iv) granting adequate protection, (v) modifying the automatic stay and (vi) scheduling a final hearing (the "Final Hearing"). In support of the Motion, the Debtors rely upon

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number are: Barzel Industries Inc. (0836), Barzel Holdings Inc. (1107), Barzel Finco Inc. (1010), Barzel Industries U.S. Inc. (6382), American Steel and Aluminum Corporation (2435), Nova Tube and Steel, Inc. (1790), Novamerican Tube Holdings, Inc. (3740) and Nova Tube Indiana, LLC (8275).

[2] A copy of the proposed Interim Order is attached hereto as Exhibit A.

and fully incorporate by reference the Declaration of Karen G. Narwold in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (the "Narwold Declaration"). In further support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.        The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.        The statutory predicates for the relief sought herein are sections 105(a), 361, 363, 362, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## FACTUAL BACKGROUND

3.        On September 14, 2009 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate their business and manage their assets as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.        On September 15, 2009 (the "Canadian Filing Date"), Barzel Canada Inc. ("Barzel Canada" and, together with Barzel Industries Canada and the Debtors, "Barzel"), one (1) of the Debtors' Canadian affiliates, will file an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA") (the case commenced under the CCAA by Barzel Canada, the "Canadian Proceedings") seeking protection from its creditors in Canada. Barzel Canada will continue to manage its properties and operate its business under the supervision of the Canadian

Court. Barzel Canada will move for an initial Order of the Canadian Court which, inter alia, (i) declares that Barzel Canada is entitled to relief under the CCAA; (ii) appoints Deloitte & Touche Inc. as monitor of Barzel Canada; (iii) grants a stay of proceedings in respect of Barzel Canada; (iv) approves the DIP Agreement in respect of Barzel Canada; and (v) approves a cross-border insolvency protocol between the Canadian Court and the Court (the "CCAA Initial Order"). After a twenty-one (21) day appeal period, provided that there are no objections to the CCAA Initial Order (or, to the extent there are objections, that such objections are overruled or otherwise resolved), the Canadian Court will enter an order granting the relief provided in the CCAA Initial Order on a final basis (the "CCAA Final Order").

5.    The DIP Facility (as defined below) will provide the Debtors and Barzel Canada with additional liquidity to fund operations during the Cases and the Canadian Proceedings in an amount not to exceed $30,000,000 at any one time outstanding. The loans advanced under the DIP Facility will be divided between the Debtors and Barzel Canada.[3] As described in greater detail below, the Debtors are seeking authority to roll-up all Prepetition Credit Agreement Obligations (as defined below) into the DIP Facility.[4] During the Interim Relief Period (as defined below), the aggregate commitments under the DIP Facility that will be available to the Debtors and Barzel Canada shall be limited to the lesser of (a) $17,500,000 and (b) the sum of (i) $7,000,000, (ii) an amount equal to the aggregate Interim Reimbursed Amounts applied to repay the Prepetition Credit Agreement Obligations (each as defined below), and (iii)

---

[3]    The allocation of the proceeds of the loans advanced pursuant to the DIP Facility between the Debtors and Barzel Canada during the Interim Relief Period cannot be determined at this time, as such allocation is dependent on their respective business needs. All borrowings under the DIP Facility by the Debtors will be used solely in respect of the Debtors' operations in the US. All borrowings under the DIP Facility by Barzel Canada will be used solely in respect of Barzel Canada's operations in Canada.

[4]    During the Interim Relief Period, any and all Cash Collateral (or any consideration received in respect of the Prepetition Credit Agreement Obligations) other than up to $2,000,000 of cash on hand on the Petition Date (other than cash in the payroll accounts) shall be applied first on account of the Prepetition Credit Agreement Obligations until they have been repaid in full.

the amount of any loan deemed requested by the Debtors on the Petition Date, to be applied to repay the Prepetition Credit Agreement Obligations, which shall be equal to the aggregate amount of funds on deposit in any account of the Debtors (other than payroll accounts) in excess of $2,000,000 (the "Petition Date Loan"), in each case, to the extent authorized by the Interim Order and CCAA Initial Order.

## A.    Overview of Barzel's Business

6.        A more detailed description of Barzel's business operations is set forth in the Narwold Declaration. Barzel is a leading, one-stop metal manufacturing and service provider headquartered in Norwood, Massachusetts. Barzel operates an integrated system of fifteen (15) strategically located metal processing, manufacturing, and distribution facilities throughout the Northeastern, Mid-Atlantic and Mid-Western United States and the Canadian provinces of Ontario and Québec. From these locations, Barzel employs approximately 570 people, who serve over 3,800 customers with speed, quality and reliability.

7.        Barzel operates as one integrated system governed by the Decalogue™ operating methodology.[5] The Decalogue™ is founded on proven management philosophies that require the close statistical monitoring of Barzel's operations and focus on maximizing the speed at which Barzel can replenish steel. Barzel's ability to replenish steel quickly is driven by unprecedented supplier agreements that provide for daily raw material deliveries with extremely short lead times. Barzel's streamlined replenishment system enhances Barzel's operating performance by reducing excess inventory, mitigating raw material price risk and accelerating the time from customer order to delivery to receipt of payment.

---

[5]        The Decalogue™ trademark is owned by Barzel's President, Dr. Domenico Lepore. Barzel uses the Decalogue™ trademark pursuant to a license agreement between BII and Dr. Lepore dated September 15, 2006.

8.     Barzel has four (4) primary business lines:  (a) tube and pipe production, (b) manufacturing, (c) processing and (d) distribution:

(a)     Tube and Pipe Production:  Barzel is a leading North American producer of hollow structural section ("HSS") tubes and A53 electric resistance welded ("ERW") pipes.  Collectively, the HSS tube and A53 ERW pipe markets represent a $5 billion market in North America.  Barzel operates five (5) state-of-the-art tube and pipe facilities—including the only A53 ERW pipe facility in the U.S.—that have total annual capacity of 700,000 tons.  In 2008, tube and pipe production accounted for approximately 16% of Barzel's total consolidated revenue.

(b)     Manufacturing:  Barzel's manufacturing operations are located in Québec, Canada and consist primarily of the production of custom light and heavy fabricated components.  Manufacturing services include roll-forming, welding, punching, cutting and assembly.  In 2008, manufacturing generated approximately 5% of Barzel's total consolidated revenue.

(c)     Distribution:  Barzel is also a leading distributor of steel, aluminum and stainless products, including hot and rolled carbon, aluminum, stainless and alloys and coated products in sheet, coil, bar, shapes, tubular and plate forms.  Barzel operates five (5) distribution facilities that are strategically located in close proximity to major customers and transportation routes.  Distribution services generated approximately 33% of Barzel's total consolidated revenue in 2008.

(d)     Processing:  Barzel operates the largest independent continuous process-pickling facility in Canada and offers a range of other metal processing services including slitting, cutting-to-length, shearing, leveling and blanking.  While the majority of Barzel's processing business involves direct processing, *i.e.* the processing of raw materials purchased directly by Barzel for sale to its customers, Barzel also provides toll processing services, *i.e.* the processing of raw materials purchased directly by Barzel's customers.  In 2008, processing generated approximately 46% of Barzel's total consolidated revenue.  Because the majority of Barzel's processing business relates to the automotive industry, processing revenues will comprise only a small fraction of Barzel's consolidated revenue in 2009.

**B.    Barzel's Prepetition Capital Structure**

9.       As discussed below, as of the Petition Date, Barzel had secured debt totaling approximately $333,439,000, consisting of (a) not less than $315,000,000 due on account of 11.5% Senior Secured Notes due 2015 (the "Notes") that Barzel Finco, Inc. ("Barzel Finco") issued on or about November 15, 2007; and (b) not less than $18,439,000 which includes the outstanding face amount of all letters of credit (which was not less than $883,000) due under a revolving asset based lending facility (the "ABL Facility") Barzel obtained on or about November 15, 2007.[6]

*The Notes*

10.      On or about November 15, 2007, Barzel Finco issued the Notes pursuant to that certain Indenture dated as of November 15, 2007 (the "Indenture") among BII, Barzel Finco, as issuer of the Notes, Bank of New York Mellon (f/k/a The Bank of New York), as Trustee, and BNY Trust Company of Canada, as Canadian Collateral Agent. The Notes have a maturity date of November 15, 2015, and they bear interest at an annual rate of 11.5%, payable semi-annually in arrears on each May 15 and November 15.

11.      The Notes are guaranteed by all other Debtors, and they are secured by:

(a)       a first priority security interest in or pledge of (i) all of the Debtors' owned real property (subject to one exception), fixtures, equipment, instruments, investment property, intellectual property, contract rights, other general intangibles and other assets that do not constitute first-priority collateral, (ii) 100% of the equity interests in all US subsidiaries of BII and a pledge of 66% of the equity interests in Barzel Canada, (iii) intercompany receivables,

---

[6]    The DIP Lenders (as defined below) are also two of the prepetition lenders under the Credit Agreement (as defined below): JPMorgan Chase Bank, N.A. and CIBC Inc. JPMorgan Chase Bank, N.A. is also one of the Holders (as defined herein), along with CIBC World Markets Inc. In addition, the outstanding letters of credit issued under the ABL Facility were and continue to be issued by Bank of America, N.A., who is a party to the Credit Agreement solely in the capacity of issuer of such outstanding letters of credit.

including the receivables owed by Barzel Canada that are secured by Barzel Canada's assets of the types described in clause (i) above and 100% of the capital stock of each existing and future subsidiary of Barzel Canada except non-wholly owned subsidiaries (and certain special purpose subsidiaries) where pursuant to the organizational documents of such subsidiary and any related joint venture or similar agreement such pledge is prohibited, and (iv) proceeds of the foregoing; and

(b)     a second priority security interest in all of the Debtors' and Barzel Canada's and 632422 N.B. Ltd.'s (i) accounts receivable and related records, chattel paper, deposit accounts, cash, checks and other negotiable instruments, funds and other evidences of payment, (ii) inventory, (iii) documents, general intangibles, instruments, investment property and letter of credit rights evidencing assets in clauses (i) or (ii), and (iv) books and records evidencing, and proceeds of, including insurance proceeds, the foregoing.

12.     For U.S. corporate income tax purposes, Barzel Canada did not guaranty the Notes. On or about November 15, 2007, Barzel Finco loaned Barzel Canada $125,000,000 of the net proceeds of the Notes (the "Intercompany Loan"). The Intercompany Loan is evidenced by notes issued by Barzel Canada to Barzel Finco dated November 15, 2007 (the "Intercompany Notes") and is secured by substantially all of the assets of Barzel Canada. On or about November 15, 2007, Barzel Finco assigned all of its rights and interests under the Intercompany Notes to a collateral trustee as collateral security for the benefit of the Holders (as defined below). As a result, the assets of Barzel Canada also secure Barzel's obligations under the Notes.

13.     Two-thirds of the Notes are held by JPMorgan Chase Bank, N.A., and one-third is held by CIBC World Markets Inc. (together, in their capacity as noteholders, the "Holders").

*The ABL Facility*

14.     On or about November 15, 2007, Barzel obtained additional financing pursuant to that certain Credit Agreement dated as of November 15, 2007 (as amended, the "Credit Agreement"), by and among BII, Barzel Finco and Barzel Canada as borrowers, the "Loan Parties" party thereto, various lenders party thereto (collectively, the "Prepetition Lenders"), CIT Business Credit Canada Inc. and the CIT Group/Business Credit, Inc., as Syndication Agents, JPMorgan Chase Bank, N.A., as Administrative Agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian Agent, and Bank of America, N.A., The Bank of Nova Scotia and General Electric Capital Corporation, as Co-Documentation Agents.

15.     Pursuant to the Credit Agreement, the Prepetition Lenders extended to Barzel a five (5) year revolving credit facility of up to $175,000,000 (the "ABL Facility"), availability under which was subject to a borrowing base.

16.     The ABL Facility is guaranteed by each of the non-borrowing Debtors; Barzel Canada's obligations under the ABL Facility are also guaranteed by 632422.

17.     The ABL Facility is secured by:

(a)     a first priority security interest in all of the Debtors' and Barzel Canada's and 632422 N.B. Ltd.'s (i) accounts receivable and related records, chattel paper, deposit accounts, cash, checks and other negotiable instruments, funds and other evidences of payment, (ii) inventory, (iii) documents, general intangibles, instruments, investment property and letter of credit rights evidencing assets in clauses (i) or (ii), and (iv) books and records evidencing, and proceeds of, including insurance proceeds, the foregoing; and

(b)     a second priority security interest in or pledge of (i) the Debtors' owned real property (subject to one exception), fixtures, equipment, instruments, investment property, intellectual property, contract rights, other general intangibles and other assets that do not constitute first-priority collateral, (ii) 100% of the equity interests in all US subsidiaries of BII and a pledge of 66% of the equity interests in Barzel Canada, (iii) intercompany receivables,

including the receivables owed by Barzel Canada that are secured by Barzel Canada's assets of the types described in clause (i) above and 100% of the capital stock of each existing and future subsidiary of Barzel Canada except non-wholly owned subsidiaries (and certain special purpose subsidiaries) where pursuant to the organizational documents of such subsidiary and any related joint venture or similar agreement such pledge is prohibited, and (iv) proceeds of the foregoing.

18.     As of September 10, 2009, the applicable interest rate in effect for (a) U.S. dollar borrowings under the ABL Facility was 5.47%, and (b) Canadian dollar borrowings was 6.5%.

19.     From mid-April 2009 through May 30, 2009, but for approximately $883,000 of letter of credit obligations associated with Barzel's workers compensation insurance program, there were no outstanding draws under the ABL Facility. Due to certain conditions to borrowing, Barzel was not able to borrow under the ABL Facility at that time.

20.     As of the Petition Date, the outstanding indebtedness under the ABL Facility was not less than $18,439,000, which includes the outstanding face amount of all letters of credit (which was not less than $883,000).

## C.     Circumstances Leading to the Commencement of the Cases

21.     Barzel has suffered mounting operating losses and liquidity issues during 2008 and 2009. Barzel's losses are due, in large part, to the current global economic recession and credit crisis, and the resulting dramatic downturn in the automotive, transportation, manufacturing and construction industries in the United States and Canada—which account for many of Barzel's customers. Barzel's losses have been exacerbated by an unprecedented increase in customer inventories through mid-2008 due to a run-up in steel prices through that time, which, upon the onset of the recession, led to an inventory overhang that depressed demand over and above that caused by the recession. In addition, Barzel's losses have been exacerbated

by the unprecedented reduction, subsequent to mid-2008, in the overall price of steel, which was exacerbated by a decrease in consumer confidence resulting from the global financial crisis and recessionary environment.

22. The reduced demand and lowered prices for Barzel's goods and services resulted in a significant decrease in revenue. Barzel's declining operating performance reduced liquidity and limited Barzel's ability to borrow under the ABL Facility or obtain new financing to fund operations.

23. To offset these factors, Barzel has taken numerous steps over the past eighteen (18) months to reduce expenses and improve operations. Among other things, Barzel closed or sold six (6) redundant distribution and processing facilities, reduced its workforce by approximately 350 people, lowered annual operating expenses by approximately $33,000,000 and reduced inventory levels by approximately $110,000,000.

24. Despite these efforts, due to borrowing restrictions under the ABL Facility and Barzel's declining operating performance, in or about April 2009, it became clear that Barzel would not be able to pay the $18,100,000 interest payment due under the Notes on May 15, 2009. Accordingly, on May 14, 2009, Barzel Finco, BII and the Holders entered a Deferral Agreement (as amended, the "Deferral Agreement") with respect to the Notes. Pursuant to the Deferral Agreement, the interest payment due on May 15, 2009 has been deferred until October 13, 2009.

25. Under the Deferral Agreement, Barzel also agreed to use its best efforts to consummate (a) a recapitalization or restructuring of a substantial portion of the equity and/or debt securities and/or other indebtedness of Barzel, (b) a disposition of all or a majority of the outstanding equity securities of Barzel and/or all or a majority of the assets or operations of

Barzel, or (c) a refinancing of Barzel and/or the placement, raising or issuance of equity, equity-linked or debt securities in connection with Barzel (each or any of the foregoing, a "Transaction").

26.     To facilitate Barzel's ability to pursue and consummate a Transaction, the ABL Facility was amended on June 1, 2009 and again on July 17, 2009 to provide Barzel with limited liquidity. The ABL Facility was also amended to terminate the commitments of any Prepetition Lenders other than JPMorgan Chase Bank, N.A. and CIBC Inc.[7]

## D.     The Debtors' Need for Postpetition Financing

27.     On May 14, 2009, the Debtors engaged Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan") to assist them in marketing Barzel's business and soliciting bids for a Transaction. During the ensuing weeks, Houlihan identified and contacted over 220 potential strategic and financial buyers/investors. Concurrently, Barzel's management contacted a significant number of additional potential strategic and financial buyers/investors known to it.

28.     After several rounds of bidding and negotiations with various interested parties, the Debtors and Barzel Canada, in consultation with their retained professionals, selected Chriscott USA Inc. and 4513614 Canada Inc. (the "Buyers") to serve as a stalking horse purchaser of substantially all of Barzel's assets pursuant to section 363 of the Bankruptcy Code. On September 13, 2009, Barzel and the Buyers executed an asset purchase agreement pursuant to which the Buyers agreed to purchase substantially all of Barzel's assets for $65,000,000, subject to certain adjustments and assumption of certain liabilities.

29.     The Debtors do not have sufficient sources of working capital, including Cash Collateral (as defined below), to operate their business while they implement a

---

[7] As stated above, the outstanding letters of credit issued under the ABL Facility were and continue to be issued by Bank of America, N.A., who remains a party to the Credit Agreement solely in the capacity of issuer of such outstanding letters of credit.

section 363 sale process without the financing requested in this Motion. The Debtors' ability to obtain sufficient working capital to operate through an auction and closing is critical to preserving the Debtors' going concern value and maximizing the value of the Debtors' assets for the benefit of the Debtors' estates and creditors.

## **RELIEF REQUESTED**

30.     By this Motion, the Debtors seek entry of an order:

(i)     Authorizing the Debtors to obtain secured postpetition financing from JPMorgan Chase Bank, N.A. and CIBC Inc. (the "DIP Lenders") on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of the Senior Secured Super-Priority Debtor-in-Possession Revolving Credit Agreement dated as of September 14, 2009 (the "DIP Agreement"), by and among the DIP Lenders, JPMorgan Chase Bank, N.A., as administrative agent (the "DIP Agent") and Barzel Finco and Barzel Canada, as borrowers );

(ii)    Authorizing the Debtors to execute and deliver the DIP Agreement and the other related loan and security documents (collectively, and together with the Interim and Final Orders, the "DIP Loan Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iii)   Authorizing the Debtors to roll-up (the "Roll-Up") all outstanding obligations under the Credit Agreement into the DIP Facility, including, without limitation, any amounts that have been drawn but not repaid, interest on the obligations accrued and unpaid prior to the Petition Date, as well as any amounts owing under the Credit Agreement that are currently contingent and unliquidated and subsequently become liquidated (the "Prepetition Credit Agreement Obligations"), as more fully in described in paragraph 31 below;

(iv)    Authorizing the Debtors to use the proceeds of loans advanced under the DIP Loan Documents in a manner consistent with the terms and conditions of, and for the expenditures set forth in, the budget attached to the DIP Agreement as Exhibit A (the "Approved Budget"), the DIP Loan Documents, the Interim Order, and the Final Order;

(v)     Authorizing the Debtors to use "Cash Collateral" as such term is defined in Section 363(a) of the Bankruptcy Code (the "Cash Collateral") in a manner consistent with the terms and conditions of, and for the expenditures set forth in, the Approved Budget and the Interim and Final Orders;

(vi)     Granting the DIP Agent, for the benefit of itself and the DIP Lenders, automatically and properly perfected security interests in and liens on all of the DIP Collateral (as defined below), subject to the priorities set forth in the DIP Agreement and the Interim and Final Orders;

(vii)     Granting the DIP Facility and all DIP Obligations (as defined below) allowed superpriority administrative expense claim status in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code;

(viii)     Authorizing the Debtors to pay the fees, costs and expenses of the DIP Agent and the DIP Lenders (including all reasonable, out-of-pocket fees, expenses and disbursements of their professionals, including, without limitation, their financial advisor and primary, Delaware and Canadian counsel) in connection with (a) the preparation, execution and delivery of the DIP Loan Documents and the funding of all loans under the DIP Facility, the administration of the DIP Facility, and any amendment or waiver of any provision of the DIP Loan Documents and (b) the enforcement of any of their rights and remedies under the DIP Loan Documents (collectively, the "DIP Lender Expenses"), in each case to the extent provided in and in accordance with the terms of the DIP Loan Documents and the Interim and Final Orders;

(ix)     Providing adequate protection to the Prepetition Lenders and Holders for any diminution in value of their respective interests in the collateral securing the ABL Facility and the Notes, including, without limitation, the Cash Collateral;

(x)     Modifying the automatic stay to the extent set forth in the DIP Agreement and the Interim and Final Orders; and

(xi)     Scheduling the Final Hearing.

## **Terms of the DIP Facility**

31.     Subject to the approval of this Court, and corresponding approval by the Canadian Court, the Debtors propose to enter into the DIP Loan Documents and use Cash

Collateral. Assuming that the Roll-Up is approved, the DIP Facility will provide the Debtors and Barzel Canada with additional liquidity to fund operations during the Cases and the Canadian Proceedings in an amount not to exceed $30,000,000 at any one time outstanding. Prior to the occurrence of both (a) the date on which the Final Order is entered and (b) the date on which the CCAA Final Order is entered (the "<u>Interim Relief Period</u>"), the aggregate commitments available to the Debtors and Barzel Canada under the DIP Facility shall be limited to the lesser of (i) $17,500,000 and (ii) the sum of (A) $7,000,000, (B) an amount equal to the aggregate Interim Reimbursed Amounts applied to repay the Prepetition Credit Agreement Obligations, and (C) the amount of the Petition Date Loan, to be applied to repay the Prepetition Credit Agreement Obligations, in each case, to the extent authorized by the Interim Order and CCAA Initial Order. The DIP Facility includes a roll-up of the Prepetition Credit Agreement Obligations.

During the Interim Relief Period, any and all Cash Collateral (or any consideration received in respect of the Prepetition Credit Agreement Obligations) other than up to $2,000,000 of cash on hand (and other than cash in the payroll accounts) on the Petition Date shall be applied first on account of the Prepetition Credit Agreement Obligations until they have been repaid in full (collectively, the "<u>Interim Reimbursed Amounts</u>" and each, an "<u>Interim Reimbursed Amount</u>") and then on account of all obligations under the DIP Agreement. The DIP Lenders are authorized to advance, as necessary, loans under the DIP Facility in an amount that is equal to an Interim Reimbursed Amount during the Interim Relief Period. To the extent that the Interim Reimbursed Amounts are insufficient to fund the Debtors' and Barzel Canada's working capital needs, Chapter 11 and CCAA expenses and adequate protection payments during the Interim Relief Period, the DIP Lenders shall advance additional funds, up to an aggregate principal amount not to exceed $7,000,000 at any one time outstanding under the DIP

Facility, which the Debtors and Barzel Canada shall use to make such payments (collectively, the "Interim DIP Advances"). Upon entry of the Final Order, all Prepetition Credit Agreement Obligations (including any reimbursement obligations with respect to letters of credit issued thereunder) that had not been rolled up into the DIP Facility during the Interim Relief Period shall be immediately rolled up into the DIP Facility.

32.     Consistent with this Court's requirements under Local Rule 4001-2(a)(ii), the significant terms of the DIP Facility are:[8]

(a)     Borrower(s): Barzel Finco and Barzel Canada.

(b)     Guarantor(s): BII and the other non-Borrower Debtors.

(c)     Administrative Agent: JPMorgan Chase Bank, N.A.

(d)     Lenders: JPMorgan Chase Bank, N.A. and CIBC Inc.

(e)     Closing Date: On or before September 16, 2009.

(f)     Type and Amount of the DIP Facility: The DIP Facility is a non-amortizing super-priority secured revolving credit facility in an aggregate principal amount not to exceed $30,000,000 at any one time outstanding. The Debtors may draw on the DIP Facility during the Availability Period only for the purposes specifically set forth in the Interim Order, the Final Order, and the DIP Loan Documents and in compliance with the Approved Budget. The commitments available to the Debtors and Barzel Canada under the DIP Facility during the Interim Relief Period shall be limited to the lesser of (i) $17,500,000 and (ii) the sum of (A) $7,000,000, (B) an amount equal to the aggregate Interim Reimbursed Amounts applied to repay the Prepetition Credit Agreement Obligations, and (C) the amount of the Petition Date Loan, to be applied to repay the Prepetition Credit Agreement Obligations, in each case, to the extent authorized by the Interim Order and CCAA

[8]     This summary is qualified in its entirety by the terms and provisions of the DIP Agreement and Interim Order. If there is any conflict between this summary and the DIP Agreement, the terms of the DIP Agreement shall control. Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the DIP Agreement, a copy of which is attached hereto as Exhibit B.

Initial Order. Upon entry of the Final Order, all Prepetition Credit Agreement Obligations (including any reimbursement obligations with respect to letters of credit issued thereunder) that had not been rolled up into the DIP Facility during the Interim Relief Period shall be immediately rolled up into the DIP Facility.

(g) <u>Availability Period</u>: The period from the Closing Date up to but excluding the Revolving Maturity Date. The DIP Lenders' commitment will expire at the earlier of (i) the Revolving Maturity Date and (ii) the date on which all commitments to extend credit under the DIP Facility terminate.

(h) <u>Use of Proceeds</u>: In each case subject to the Approved Budget, to (i) provide for the Debtors' and Barzel Canada's working capital needs, (ii) pay Chapter 11 and CCAA expenses, including professional fees and expenses, (iii) pay adequate protection payments, and (iv) repay all Prepetition Credit Agreement Obligations.

(i) <u>Revolving Maturity Date</u>: The earliest of (i) in any case, December 11, 2009; (ii) if either the Final Order or the Canadian Financing Order has not been entered, the date thirty (30) days after the Filing Date, or (iii) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code (the "<u>363 Sale</u>").

(j) <u>Conditions to Closing</u>: The DIP Lenders' obligation to close on the DIP Facility is conditioned on, among other things (i) the Interim Order having been entered by no later than five (5) days after the Petition Date; (ii) the Debtors' "first day" motions being in form and substance reasonably acceptable to the DIP Agent; (iii) all initial applications and filings in the Canadian Proceedings being in form and substance reasonably acceptable to the DIP Agent; (iv) the Canadian Court having entered the Canadian Financing Order within five (5) days of the Canadian Filing Date; (v) the DIP Agent having received a valid and perfected lien on and security interest in the DIP Collateral on the basis and with the priority set forth in the DIP Agreement, the Interim Order; and the Canadian Financing Order and (vi) Barzel having retained Wayne Day of Day Seckler LLP as Chief Restructuring Officer with the full authority generally vested in a chief restructuring officer, including without limitation, full authority and responsibility for all

aspect of the Cases, the Canadian Proceedings and the proposed 363 sale of the Debtors' assets.

(k)  Borrowing Conditions:  In addition to the Conditions to Closing, the Debtors' ability to draw on the DIP Facility is subject to, among other things, (i) compliance with the Approved Budget, (ii) entry of the Interim and Final Orders, as applicable, (iii) the absence of any Material Adverse Change and (iv) compliance with any then applicable Sale Milestones.

(l)  Security:  Subject to the Carve-Out, all DIP Obligations will be secured by (i) a first priority perfected lien on, and security interest in, all present and after acquired property of the Debtors not subject to a valid, perfected and unavoidable lien or security interest on the Petition Date; (ii) a junior perfected lien on, and security interest in, all property of the Debtors that is subject to a valid, perfected and unavoidable lien or security interest on the Petition Date or subject to a valid and unavoidable lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Section 546(b) of the Bankruptcy Code; and (iii) a first priority, perfected senior priming lien on, and security interest in, all property of the Debtors that is subject to a perfected lien or security interest on the Petition Date securing the ABL Facility and the Notes (all of the foregoing collectively, the "DIP Collateral").

(m)  Superpriority Claim:  Subject to the Carve-Out, the DIP Agent and DIP Lenders shall have claims entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code.

(n)  Carve-Out:  The "Carve-Out" means:  (i) quarterly fees required to be paid pursuant to 28 U.S.C. §1930(a)(6); (ii) any fees payable to the Clerk of the Bankruptcy Court; and (iii) after the first date on which the DIP Agent (at the direction of the Required Lenders) is entitled to exercise remedies under the DIP Facility (the "Carve-Out Event"), an amount equal to (X) the reasonable fees and expenses incurred in the Cases by professionals retained by the Debtors or any Creditors' Committee (as defined below) (the "Permitted Professional Fees") prior to the occurrence

of a Carve-Out Event but not paid on or before the date of such Carve-Out Event and (Y) $500,000 for payment of Permitted Professional Fees incurred after the occurrence of a Carve-Out Event, in each case, to the extent subsequently allowed by the Bankruptcy Court, and in each case subject to the rights of the DIP Administrative Agent, the DIP Lenders and any other party in interest to object to the allowance of any such fees and expenses. In no event shall the amount paid as part of the Carve-Out described in clause (iii)(X) above to any professional firm retained by either the Debtors or any Creditors' Committee (A) exceed the pro rata portion of the amount set forth for such firm in the "Total Fees" column in the Fee Schedule (as defined below) (calculated by dividing (i) the number of weeks covered by the Approved Budget taking place prior to the Carve-Out Event by (ii) 13) or (B) cause the amount borrowed prior to the date of the Carve-Out Event plus the amount advanced on account of the Carve-Out Event to exceed the aggregate amount budgeted through the date of the Carve-Out Event. For the avoidance of doubt, notwithstanding anything contained herein, in no event shall the Carve-Out apply in the case of a consummated 363 Sale.

(o)    <u>Interest Rate</u>: U.S. dollar advances under the DIP Facility with bear interest at the Alternate Base Rate[9] plus the Applicable Rate.[10] Canadian dollar borrowings will bear

---

[9]    Alternate Base Rate is defined as follows:

[F]or any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) 3%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

[10]    Applicable Rate is defined as follows:

[F]or any day, with respect to any Loan, or with respect to the commitment fees payable hereunder, as the case may be, the applicable rate per annum set forth below under the caption "ABR/Canadian Prime Spread" or "Commitment Fee Rate", as the case may be, per annum:

| ABR/Canadian Prime Spread | Commitment Fee Rate |
|---|---|
| 7.0% | 0.50% |

interest at the Canadian Prime Rate[11] plus the Applicable Rate.

(p) <u>Default Interest Rate</u>: During the continuance of an Event of Default, Loans will bear interest at an additional 2.00% *per annum*.

(q) <u>Sale Milestones</u>: The Debtors' ability to obtain Loans under the DIP Facility is subject to the Debtors' compliance with certain milestones for the 363 Sale, including (i) a motion pursuant to Section 363 of the Bankruptcy Code to authorize the 363 Sale and to approve procedures and bid protections to effect such sale (in form and substance satisfactory to the DIP Administrative Agent, the "<u>Bid Procedures Motion</u>") having been filed by no later than two (2) business days following the Petition Date; (ii) an order approving the Bid Procedures Motion having been entered by no later than eighteen (18) days following the Petition Date; (iii) bids for the 363 Sale being due by no later than thirty-five (35) days following the Petition Date; (iv) if applicable, an auction pursuant to the Bid Procedures Motion having occurred by no later than forty (40) days following the Petition Date; (v) the hearing to confirm the 363 Sale having been concluded and the order confirming the 363 Sale having been entered by no later than forty-five (45) days following the Petition Date; and (vi) the 363 Sale having been consummated by no later than sixty (60) days following the Petition Date. Additionally, proceeds of the 363 Sale (less the Wind-Up Amount, as defined below) shall be transferred to the party designated by the DIP Agent within two (2) business days of the consummation of such sale.

(r) <u>Events of Default</u>: The DIP Agreement sets forth various Events of Default, including without limitation, (i) failure

---

[11] Canadian Prime Rate is defined as follows:

[F]or any day, the rate of interest per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the greatest of (a) the interest rate per annum publicly announced from time to time by the Administrative Agent as its reference rate in effect on such day at its principal office in Toronto for determining interest rates applicable to commercial loans denominated in Canadian Dollars and made by it in Canada (each change in such reference rate being effective from and including the date such change is publicly announced as being effective), (b) the interest rate per annum equal to the sum of (i) the CDOR Rate on such day (or, if such rate is not so reported on the Reuters Screen CDOR Page, the average of the rate quotes for bankers' acceptances denominated in Canadian Dollars with a one month term received by the Administrative Agent at approximately 10:00 a.m., Toronto time, on such day (or, if such day is not a Business Day, on the next preceding Business Day) from the Schedule I Reference Lenders) and (ii) 0.50% per annum and (c) 3% per annum.

to make payments when due, (ii) material breaches of covenants, representations and warranties, (iii) dismissal or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code; (iv) appointment of a chapter 11 trustee or examiner with enlarged powers relating to the operation of the Debtors' business, (v) noncompliance with the Sale Milestones; and (vi) other Events of Default as more specifically set forth in the DIP Agreement.

(s)   Remedies Upon Default:  Upon the occurrence of an Event of Default, the DIP Agent and the DIP Lenders may terminate the DIP Facility and declare the DIP Obligations to be immediately due and payable.  The Loan Documents also include customary remedies including, without limitation, the right to realize on all DIP Collateral upon five (5) business days' prior notice to (i) the Debtors and their counsel; (ii) counsel to any official committee of unsecured creditors appointed in the Cases (the "Creditors' Committee"); and (iii) the U.S. Trustee.

(t)   Adequate Protection:  As adequate protection for the use of collateral securing the ABL Facility and the Notes, the Prepetition Lenders and Holders will, during the pendency of the Cases, (a) receive payments in cash on a current basis of all reasonable fees, costs and expenses of their professionals; and (b) be granted replacement liens and superpriority claims, in each case, of the same relative priority as enjoyed under the Notes and the ABL Facility, to the extent of the post-petition diminution in value of their respective prepetition collateral, subject, in each case, to the Carve-Out.

33.      The terms of the DIP Facility are contained in the DIP Agreement annexed hereto as Exhibit B.  Advances under the DIP Facility will be made pursuant to the Approved Budget.  For avoidance of doubt, at no time during the Availability Period shall the amount outstanding under the DIP Facility exceed $30,000,000 whether on account of the variance permitted pursuant to the Approved Budget, the Carve-Out or otherwise.  Unless terminated sooner pursuant to the provisions of the DIP Agreement, the DIP Facility will terminate upon consummation of the 363 Sale at which time an amount of up to $2,250,000 of the 363 Sale proceeds (the "Wind-Up Amount") will be provided to fund the reasonable and

necessary expenses in connection with the wind-up of the Cases and the Canadian Proceedings. The Wind-Up Amount shall include no more than $500,000 on account of any key employee incentive plan or related severance for the participants in the key employee incentive plan for any employees of the Debtors. In addition, upon consummation of the 363 Sale, the DIP Lenders will pay, as and when approved for payment by the Bankruptcy Court or the Canadian Court, as applicable, the reasonable fees and expenses incurred but not yet paid in the Cases and the Canadian Proceedings by professionals retained by the Debtors or any Creditors' Committee prior to the consummation of a 363 Sale (to the extent subsequently allowed by the Bankruptcy Court and subject to the rights of the DIP Administrative Agent, the DIP Lenders and any other party in interest to object to the allowance of any such fees and expenses); provided, that the DIP Lenders shall only be obligated to pay any such amounts to the extent that the aggregate amount paid to any professional firm retained by either of the Debtors or any Creditors' Committee on account of fees and expenses incurred prior to the consummation of the 363 Sale does not exceed the amount set forth for such firm in the "Total Fees" column in the Schedule of Estimated Professional Fees (the "Fee Schedule") annexed to the Approved Budget and subject to paragraph 17 of the Interim Order.

34.     Local Rule 4001-2 requires that certain provisions contained in the DIP Agreement and/or Interim Order be highlighted, and that the Debtors justify the inclusion of such highlighted provisions. The Debtors believe the following provisions of the DIP Agreement and Interim Order implicate Local Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of these Cases:

(a)     Local Rule 4001-2(a)(i)(B): The Interim Order requires the Debtors to acknowledge (i) the validity, enforceability and perfection of the Prepetition Lenders/Holders' prepetition liens and (ii) the amount of the Prepetition Lenders/Holders' prepetition

claims. While the Debtors have acknowledged and waived the right to challenge the validity, perfection and amount of the Prepetition Lenders/Holders' prepetition liens and claims, the Interim Order complies with Local Rule 4001-2(a)(i)(B) because it provides any Creditors' Committee appointed in the Cases until the later of (x) seventy-five (75) days from the Petition Date or (y) sixty (60) days from its appointment to investigate and/or pursue any claims against the Prepetition Lenders or Holders regarding their respective prepetition liens and claims.

(b)     Local Rule 4001-2(a)(i)(C): The DIP Agreement, subject to entry of the Final Order, requires the Debtors to waive their estates' rights under section 506(c) of the Bankruptcy Code. This provision was a condition to the DIP Agreement required by the DIP Lenders, and the Debtors do not believe that the DIP Lenders will extend the DIP Facility if the Final Order does not include a section 506(c) waiver. Accordingly, the Debtors believe this provision is reasonable under the circumstances and necessary to enable the Debtors to obtain the financing they need to operate postpetition.

(c)     Local Rule 4001-2(a)(i)(D): The DIP Agreement, subject to entry of the Final Order, grants the DIP Lenders an immediate lien on the proceeds of any claims or causes of action under 11 U.S.C. §§ 544, 545, 547, 548 and 549 (collectively, "Avoidance Actions"). This provision was a condition to the DIP Agreement required by the DIP Lenders, and the Debtors do not believe that the DIP Lenders will extend the DIP Facility if the Final Order does not include a lien on the proceeds of Avoidance Actions. Accordingly, the Debtors believe this provision is reasonable under the circumstances and necessary to enable the Debtors to obtain the financing they need to operate postpetition.

(d)     Local Rule 4001-2(a)(i)(E): The DIP Agreement contains provisions that provide for a "roll-up" of the Prepetition Credit Agreement Obligations (as described in greater detail in paragraph 31 above). Under the facts and circumstances of the Cases, approval of the Roll-Up is appropriate because the DIP Lenders would not agree to enter into the DIP Facility without it.

35.     The Debtors believe that each of the foregoing provisions are reasonable under the circumstances and necessary to enable the Debtors to obtain the financing they require to pursue a sale of their assets as a going concern and thereby maximize the value of their estates. The DIP Lenders required each of these provisions as a condition to entering the

DIP Agreement, and the Debtors do not believe that the DIP Lenders will extend the proposed DIP Facility if any of the foregoing provisions are not approved.

## BASIS FOR THE RELIEF REQUESTED

### A.    The Court Should Approve the DIP Facility

36.    Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses specified in Bankruptcy Code section 503(b) or 507(b), (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

37.    Bankruptcy Code section 364(d) further allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

38.    Due to their current financial condition, the Debtors have been unable to procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) and/or (iv) without granting the proposed DIP liens pursuant to section 364(d). The Debtors also have been unable to obtain post-petition financing or other financial

accommodations from any alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

39.     Having determined that financing is available only under Bankruptcy Code sections 364(c) and (d), the Debtors negotiated the DIP Agreement with the DIP Agent extensively and at arms' length. The Debtors believe that, in their business judgment, entering into the DIP Agreement is in their best interests. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds by* 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based on the debtor's business judgment); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (stating, "[c]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah 1981).

40.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, a debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co.*, 789 F.2d at 1088; *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

41.	Given that substantially all of the Debtors' assets are encumbered by the Prepetition Lenders' prepetition liens and security interests, and the Debtors' failure to obtain more favorable financing proposals during their prepetition marketing efforts, the Debtors determined that the proposed DIP Facility is the only reasonable prospect for the financing the Debtors need to preserve their going concern value while they implement a section 363 sale process. Accordingly, the Debtors' decision to enter into the DIP Facility Agreement represents an exercise of their sound business judgment.

42.	The Debtors, DIP Agent, DIP Lenders, Prepetition Lenders and Holders have engaged in good faith and extensive arms-length negotiations in an effort to agree on the terms and conditions of the DIP Agreement, and the Debtors believe they have negotiated the best financing arrangement available under the circumstances. The DIP Lenders are also the Prepetition Lenders/Holders, and they consent to the terms of the DIP Agreement, including the priming liens provided thereunder. The failure to approve the DIP Facility (including the loss of jobs and going-concern value of the Debtors' business) would be catastrophic to the Debtors, their employees, creditors and other parties in interest. Accordingly, the Court should enter the Interim Order and authorize the Debtors to enter into the DIP Agreement.

**B.	The Court Should Authorize the Debtors to Use Cash Collateral**

43.	The Court should also authorize the Debtors to use Cash Collateral pending the Final Hearing, subject to the Approved Budget, and grant the adequate protection provisions set forth in the Interim Order.

44.	Section 362(c)(2) of the Bankruptcy Code provides that the Debtors may not use Cash Collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in

accordance with the provisions of [section 363]." 11 U.S.C. § 363(c)(2). Here, the Prepetition Lenders, the entities with interests in Cash Collateral, have consented.

45.       Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in property to be used, sold or leased by a debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e). In addition, section 364(d) also requires that adequate protection be provided where a secured creditor's liens are being primed to secure the obligations under a debtor in possession financing facility, as is the case here. 11 U.S.C. § 363(e).

46.       The Interim Order contemplates various protections for the Prepetition Lenders and Holders' respective interests in Cash Collateral, including, *inter alia*, current payment of interest and expenses, replacement liens and allowed super-priority claims. The Prepetition Lenders and Holders have agreed that these protections are adequate. *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

47.       Based on the extent of the protections provided to the Prepetition Lenders and Holders for the use of their Cash Collateral, as well as the Prepetition Lenders and Holders' consent to the use of their Cash Collateral subject to the terms of the Approved Budget and Interim Order, the Debtors submit that the Court should authorize the use of Cash Collateral pending the Final Hearing.

## C.       The Automatic Stay Should be Modified on a Limited Basis

48.       The relief requested in the Motion contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to grant the liens, security interests and superpriority claims described above and to perform such acts as may be reasonably required

to assure the perfection and priority of such security interests and liens. The Debtors further request that the automatic stay be lifted and/or modified, to the extent necessary, to permit the DIP Agent and DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default, all rights and remedies under the DIP Agreement, Interim or Final Order, as applicable, other than those rights and remedies against the DIP Collateral, and (ii) upon the occurrence and continuance of an Event of Default, and the giving of five (5) business days' written notice to the Debtors and counsel to any Creditors' Committee, all rights and remedies against the DIP Collateral. In any hearing regarding the DIP Lenders' exercise of their rights or remedies, the only issue that may be raised by the Debtors shall be whether an Event of Default has occurred and has not been cured.

49.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing facilities and, in the Debtors' business judgment, the stay modifications requested herein are reasonable and fair under the circumstances.

**D.    Interim Approval Should be Granted**

50.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Fed. R. Bankr. P. 4001.

51.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and (a) authorize the Debtors to borrow up to the lesser of (i) $17,500,000 and (ii) the sum of (A) $7,000,000, (B) an amount

equal to the aggregate Interim Reimbursed Amounts applied to repay the Prepetition Credit Agreement Obligations, and (C) the amount of the Petition Date Loan, to be applied to repay the Prepetition Credit Agreement Obligations, in each case, to the extent authorized by the Interim Order and CCAA Initial Order,[12] pending entry of the Final Order, in order to (i) maintain and finance the Debtors' ongoing operations, (ii) avoid immediate and irreparable harm to the Debtors' estates, business operations, employees and other parties in interest, and (b) schedule the Final Hearing.

52.     Currently, the Debtors do not have sufficient funds to operate on an ongoing basis, and the Debtors have an urgent and immediate need for cash to continue their operations. The availability of interim loans under the DIP Facility will provide necessary assurance of the Debtors' ability to meet their near-term obligations and will ensure that the Debtors are able to maintain their going concern value as they pursue a sale. Accordingly, interim relief is necessary to preserve and maintain the Debtors' operations for the benefit of the Debtors' estates and creditors.

## NOTICE

53.     No trustee, examiner or Creditors' Committee has been appointed in these Cases. Notice of this Motion has been given to: (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtors' list of twenty (20) largest unsecured creditors; (iv) counsel to the Prepetition Lenders; (v) the trustee for the Holders; (vi) counsel to the DIP Agent for itself and the DIP Lenders; (vii) the trustee under the Indenture; (viii) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (ix) all

---

[12] As stated above, the allocation of the proceeds of the loans advanced pursuant to the DIP Facility between the Debtors and Barzel Canada cannot be determined at this time, as such allocation is dependent on their respective business needs. All borrowings under the DIP Facility by the Debtors will be used solely in respect of the Debtors' operations in the US. All borrowings under the DIP Facility by Barzel Canada will be used solely in respect of Barzel Canada's operations in Canada.

financial institutions at which the Debtors maintain deposit accounts; and (x) all other parties required to receive notice pursuant to Bankruptcy Rule 4001 or requesting to receive notice prior to the date hereof. The Debtors submit that no other or further notice need be provided.

## NO PREVIOUS REQUEST

54. No previous request for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, (a) approving the Debtors' post-petition financing, (b) authorizing the Debtors' use of Cash Collateral, (c) granting adequate protection (d) modifying the automatic stay, (e) scheduling a final hearing and (f) granting such other and further relief as the Court deems appropriate.

Dated: September 15, 2009

<div style="margin-left: 40%;">

**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**

By: _____
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Tel: (302) 652-3131
Fax: (302) 652-3117

-and-

Gerald H. Gline, Esq.
25 Main Street
Hackensack, NJ 07602-0800
Tel: (201) 489-3000
Fax: (201) 489-1536

Proposed Counsel for the Debtors and Debtors in Possession

</div>