# EXHIBIT B

# DIP AGREEMENT



## SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT

dated as of

September 15, 2009

among

## BARZEL INDUSTRIES INC.

## BARZEL FINCO INC.

## BARZEL INDUSTRIES CANADA INC.

the Lenders party hereto

### JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

and

### JPMORGAN CHASE BANK, N.A., TORONTO BRANCH,
as Canadian Agent

---

**J.P. MORGAN SECURITIES INC.**
as Joint Lead Arranger and
Joint Bookrunner

**CIBC WORLD MARKETS CORP.**
as Joint Lead Arranger and
Joint Bookrunner

# TABLE OF CONTENTS

Page

## ARTICLE I

### Definitions

SECTION 1.01. Defined Terms ..................................................................2
SECTION 1.02. Classification of Loans and Borrowings.......................................28
SECTION 1.03. Terms Generally .............................................................28
SECTION 1.04. Accounting Terms; GAAP; Pro Forma Calculations ...................29
SECTION 1.05. Currency Translation ........................................................29
SECTION 1.06. Status of Obligations........................................................30

## ARTICLE II

### The Credits

SECTION 2.01. Revolving Commitments ...................................................30
SECTION 2.02. Loans and Borrowings ......................................................30
SECTION 2.03. Requests for Borrowings ...................................................31
SECTION 2.04. Protective Advances .........................................................32
SECTION 2.05. [Reserved.].....................................................................33
SECTION 2.06. [Reserved.].....................................................................33
SECTION 2.07. [Reserved.].....................................................................33
SECTION 2.08. Funding of Borrowings .....................................................33
SECTION 2.09. [Reserved.].....................................................................34
SECTION 2.10. Termination and Reduction of Revolving Commitments..............34
SECTION 2.11. Repayment of Loans; Evidence of Debt; Operation of Lockbox Accounts ......................................................................35
SECTION 2.12. Prepayment of Loans .......................................................36
SECTION 2.13. Fees .............................................................................38
SECTION 2.14. Interest .........................................................................38
SECTION 2.15. [Reserved.].....................................................................40
SECTION 2.16. Increased Costs ..............................................................40
SECTION 2.17. [Reserved.].....................................................................41
SECTION 2.18. Taxes ...........................................................................41
SECTION 2.19. Payments Generally; Pro Rata Treatment; Sharing of Set-offs .....43
SECTION 2.20. Mitigation Obligations; Replacement of Lenders........................44

## ARTICLE III

### Representations and Warranties

SECTION 3.01. Organization; Powers........................................................45
SECTION 3.02. Authorization; Enforceability ..............................................46

| | | |
|---|---|---|
| SECTION 3.03. | Governmental Approvals; No Conflicts | 46 |
| SECTION 3.04. | Financial Condition; No Material Adverse Change | 46 |
| SECTION 3.05. | Properties | 47 |
| SECTION 3.06. | Litigation and Environmental Matters | 47 |
| SECTION 3.07. | Compliance with Laws and Agreements | 48 |
| SECTION 3.08. | Investment Company Status | 48 |
| SECTION 3.09. | Taxes | 48 |
| SECTION 3.10. | ERISA; Canadian Benefit and Pension Plans | 48 |
| SECTION 3.11. | Disclosure | 49 |
| SECTION 3.12. | Subsidiaries and Joint Ventures | 50 |
| SECTION 3.13. | Insurance | 50 |
| SECTION 3.14. | Reorganization Matters | 50 |
| SECTION 3.15. | Labor Matters | 51 |
| SECTION 3.16. | Accounts | 51 |
| SECTION 3.17. | Collateral Matters | 51 |
| SECTION 3.18. | Federal Reserve Regulations | 53 |
| SECTION 3.19. | [Reserved.] | 53 |
| SECTION 3.20. | Approvals | 53 |
| SECTION 3.21. | The Bankruptcy Court Orders and the Canadian Court Orders | 53 |
| SECTION 3.22. | Prepetition Obligations | 54 |
| SECTION 3.23. | 632422 N.B. Ltd | 54 |
| SECTION 3.24. | Hencorp LLC | 54 |
| SECTION 3.25. | Chriscorp ULC | 54 |
| SECTION 3.26. | Delta Tubes | 54 |

## ARTICLE IV

### Conditions

| | | |
|---|---|---|
| SECTION 4.01. | Effective Date | 54 |
| SECTION 4.02. | Each Credit Event | 59 |

## ARTICLE V

### Affirmative Covenants

| | | |
|---|---|---|
| SECTION 5.01. | Financial Statements and Other Information | 60 |
| SECTION 5.02. | Notices of Material Events | 61 |
| SECTION 5.03. | Information Regarding Collateral | 62 |
| SECTION 5.04. | Existence; Conduct of Business | 62 |
| SECTION 5.05. | Payment of Obligations | 62 |
| SECTION 5.06. | Maintenance of Properties | 63 |
| SECTION 5.07. | Payment of Preferred Claims | 63 |
| SECTION 5.08. | Insurance | 63 |
| SECTION 5.09. | Casualty and Condemnation | 63 |
| SECTION 5.10. | Books and Records; Inspection and Audit Rights | 64 |
| SECTION 5.11. | Compliance with Laws | 64 |

SECTION 5.12.    Use of Proceeds ...................................................................64
SECTION 5.13.    Entry of the Final Order........................................................64
SECTION 5.14.    Notice of Order .....................................................................64
SECTION 5.15.    Further Assurances ...............................................................64
SECTION 5.16.    Chief Restructuring Officer ..................................................65
SECTION 5.17.    Approved Sale ......................................................................65
SECTION 5.18.    Interim Reimbursed Obligations............................................66
SECTION 5.19.    Bankruptcy Filings................................................................66
SECTION 5.20.    Cash Management Systems ....................................................66
SECTION 5.21.    Payment of Obligations ........................................................66
SECTION 5.22.    No Discharge; Survival of Claims.........................................66

## ARTICLE VI

### Negative Covenants

SECTION 6.01.    Indebtedness; Certain Equity Securities .........................................67
SECTION 6.02.    Liens ...........................................................................................68
SECTION 6.03.    Fundamental Changes; Business Activities....................................69
SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions ......70
SECTION 6.05.    Asset Sales ..................................................................................71
SECTION 6.06.    Sale and Leaseback Transactions .................................................71
SECTION 6.07.    Hedging Agreements ...................................................................71
SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness.............71
SECTION 6.09.    Transactions with Affiliates.........................................................72
SECTION 6.10.    Restrictive Agreements................................................................72
SECTION 6.11.    Amendment of Material Documents .............................................73
SECTION 6.12.    Bonus Payments..........................................................................73
SECTION 6.13.    Fiscal Year; Accounting Treatment..............................................73
SECTION 6.14.    Amendment of Approved Budget.................................................73
SECTION 6.15.    Approved Budget.........................................................................73
SECTION 6.16.    Bankruptcy Court Orders; Administrative Priority; Lien Priority;
                     Payment of Claims.......................................................................73
SECTION 6.17.    Canadian Pension Plans...............................................................74
SECTION 6.18.    632422 N.B. Ltd ........................................................................75
SECTION 6.19.    Hencorp LLC ..............................................................................75
SECTION 6.20.    Chriscorp ULC............................................................................75
SECTION 6.21.    Delta Tubes .................................................................................75

## ARTICLE VII

### Events of Default

## ARTICLE VIII

### The Administrative Agent

# ARTICLE IX

## Miscellaneous

SECTION 9.01.    Notices ........................................................................83
SECTION 9.02.    Waivers; Amendments...........................................................84
SECTION 9.03.    Expenses; Indemnity; Damage Waiver ........................................85
SECTION 9.04.    Successors and Assigns ........................................................87
SECTION 9.05.    Survival .........................................................................89
SECTION 9.06.    Counterparts; Integration; Effectiveness ......................................90
SECTION 9.07.    Severability ....................................................................90
SECTION 9.08.    Right of Setoff .................................................................90
SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process .......90
SECTION 9.10.    WAIVER OF JURY TRIAL ...................................................91
SECTION 9.11.    Headings ........................................................................91
SECTION 9.12.    Confidentiality .................................................................92
SECTION 9.13.    Interest Rate Limitation .......................................................92
SECTION 9.14.    [Reserved.]......................................................................93
SECTION 9.15.    USA Patriot Act Notice .......................................................93
SECTION 9.16.    No Fiduciary Relationship....................................................93
SECTION 9.17.    Non-Public Information........................................................93
SECTION 9.18.    Conversion of Currencies .....................................................93

## SCHEDULES:

Schedule 1.01B— Applicable Funding Account

Schedule 2.01— Revolving Commitments; Applicable Lending Offices

Schedule 2.06A— Existing Letters of Credit

Schedule 3.05— Properties and Mortgaged Properties

Schedule 3.06(b)— Environmental Matters

Schedule 3.10— Canadian Pension Plans

Schedule 3.12— Subsidiaries and Joint Ventures

Schedule 3.13— Insurance

Schedule 3.16— Accounts

Schedule 6.01— Existing Indebtedness

Schedule 6.02— Existing Liens

Schedule 6.04— Existing Investments

Schedule 6.10— Existing Restrictions

## EXHIBITS:

Exhibit A — Initial Approved Budget

Exhibit B — Form of Assignment and Assumption

Exhibit C — Form of CCAA Initial Order

Exhibit D — Form of US Bankruptcy Initial Order

Exhibit E — Form of Perfection Certificate

**THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT** (this "<u>Agreement</u>"), dated as of September 15, 2009, among **BARZEL INDUSTRIES INC., BARZEL FINCO INC, BARZEL INDUSTRIES CANADA INC.**; the **LENDERS** party hereto; **JPMORGAN CHASE BANK, N.A.**, as Administrative Agent; and **JPMORGAN CHASE BANK, N.A., TORONTO BRANCH**, as Canadian Agent.

**WHEREAS,** the Borrowers are party to that certain Credit Agreement, dated as of November 15, 2007 (as amended, the "<u>Prepetition Credit Agreement</u>"), among the Borrowers, the several banks, financial institutions and other entities from time to time parties thereto, as lenders thereunder (the "<u>Prepetition Lenders</u>"), and the Administrative Agent, as administrative agent and as Canadian agent (the "<u>Prepetition Agent</u>") for the Prepetition Lenders.

**WHEREAS,** under the Prepetition Credit Agreement, the Prepetition Lenders provided the Borrowers with revolving credit loans and certain letters of credit in aggregate amount outstanding as of September [14], 2009 (the "<u>Filing Date</u>") as set forth on <u>Schedule 1.01A</u>.

**WHEREAS,** Barzel, the US Borrower and certain of its Subsidiaries excluding the Canadian Debtor (the "<u>US Debtors</u>") have commenced voluntary cases (the "<u>Chapter 11 Cases</u>") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), and the US Borrower continues to operate its businesses and manage its properties as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Canadian Borrower (the "<u>Canadian Debtor</u>" and together with the US Debtors, the "<u>Debtors</u>") has filed an Application under the *Companies Creditors Arrangement Act* (the "<u>CCAA</u>") in the Ontario Superior Court of Justice - Commercial List (the "<u>Canadian Court</u>") for relief (the "<u>Canadian Case</u>" and together with the Chapter 11 Cases, the "<u>Cases</u>") and the Canadian Borrower continues to operate its business and manage its properties pursuant to the CCAA and the CCAA Initial Order (as defined below); and

**WHEREAS**, the Borrowers have requested that the Lenders make post-petition loans and advances to the Borrowers consisting of a revolving credit facility in an aggregate principal amount not to exceed US$30,000,000 at any one time outstanding. The Lenders have severally, and not jointly, agreed to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

# ARTICLE I

## Definitions

SECTION 1.01. <u>Defined Terms.</u>  As used in this Agreement, the following terms have the meanings specified below:

"<u>ABR</u>", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"<u>Account</u>" has the meaning assigned to such term in the New York UCC.

"<u>Adequate Protection Claims</u>" means a superpriority administrative expense claim in an amount equal to the aggregate diminution, if any, subsequent to the Filing Date, in the value of the Prepetition Collateral, caused by (i) the reduction in the Prepetition Agent's and Prepetition Lenders' interest, and the Prepetition Indenture Trustee's and Senior Noteholders' interest, in the Prepetition Collateral available to satisfy the Prepetition Credit Agreement Obligations and Senior Notes Obligations as a consequence of the priming authorized under this Agreement; (ii) depreciation, use, sale, loss, decline in market price or otherwise of the Prepetition Collateral; and (iii) the satisfaction of any obligations or expenses of the Loan Parties, other than the Prepetition Obligations, from Cash Collateral or non-cash Prepetition Collateral.

"<u>Administrative Agent</u>" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent for the Lenders hereunder, or, as applicable, such Affiliates thereof as it shall from time to time designate for the purpose of performing its obligations hereunder in such capacity, including with respect to a Loan or Borrowing made to the Canadian Borrower, JPMorgan Chase Bank, N.A., Toronto Branch.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agreed Administrative Expense Priorities</u>" means those administrative expenses with respect to the US Debtors which shall have the following order of priority with respect to the US Collateral:

> *first*, amounts in respect of the Carve-Out,

> *second*, all Obligations then due and payable,

> *third*, all Adequate Protection Claims; and

*fourth*, all other allowed administrative expenses to the extent then due and payable and not otherwise paid.

"Albany Facility" means the real estate premises and building located at One West Albany Drive, Town of Colonie, New York, 12205 and all edifices and fixtures related thereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) 3%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Applicable Funding Account" means, as to each Borrower, the applicable account with the Administrative Agent specified on Schedule 1.01B hereto, or any other account with the Administrative Agent (or one of its Affiliates) that shall be specified in a written notice signed by a Financial Officer of such Borrower and delivered to and approved by the Administrative Agent (such approval not to be unreasonably withheld).

"Applicable Lending Office" means, with respect to any Lender, the office(s) of such Lender (or any Affiliate of such Lender) specified as its "Lending Office(s)" on Schedule 2.01 or, as to any Person that becomes a Lender after the Effective Date, in the Assignment and Assumption executed by such Person, or such other office(s) of such Lender (or an Affiliate of such Lender) as such Lender may hereafter designate from time to time as its "Lending Office(s)" by notice to the Borrowers and the Administrative Agent. A Lender may designate different Lending Offices for Loans to the US Borrower and the Canadian Borrower.

"Applicable Percentage" means, with respect to any Revolving Lender, the percentage of the total Revolving Commitments represented by such Lender's Revolving Commitment. If the Revolving Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Revolving Commitments most recently in effect, giving effect to any assignments.

"Applicable Rate" means, for any day, with respect to any Loan, or with respect to the commitment fees payable hereunder, as the case may be, the applicable rate per annum set forth below under the caption "ABR/Canadian Prime Spread" or "Commitment Fee Rate", as the case may be, per annum:

| ABR/Canadian Prime Spread | Commitment Fee Rate |
|---|---|
| 7.0% | 0.50% |

"Approved Budget" means, the detailed operating budget of the Borrowers and their Subsidiaries (as may be amended solely in accordance with Section 6.14)

NY 72292764v14

setting forth the projected financial operations of the Borrowers and their Subsidiaries for the period from the Effective Date through December 11, 2009, in form and substance satisfactory to the Administrative Agent, including, without limitation, the projected cash receipts and disbursements of the Borrowers, on a weekly basis, the weekly projected use of the Revolving Commitments, available cash, cash flow, trade payables, total expenses and capital expenditures. The initial Approved Budget is set forth on <u>Exhibit A</u>.

"<u>Approved Sale</u>" means a transaction (including, for the avoidance of doubt, the orders from the Bankruptcy Court and the Canadian Court approving such transaction) in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, pursuant to which a sale of all or substantially all of the assets of Barzel and the US Debtors to the Buyer pursuant to Section 363 of the Bankruptcy Code and all of the assets of the Canadian Borrower to the Buyer pursuant to an order of the Canadian Court made in the Canadian Case is consummated.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit B or any other form approved by the Administrative Agent.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy".

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Bankruptcy Court Orders</u>" means the Interim Order and the Final Order.

"<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"<u>Barzel</u>" means Barzel Industries Inc., a Delaware corporation.

"<u>Barzel Parent</u>" means Barzel Holdings Inc., a Delaware corporation.

"<u>Benefit Plan</u>" means any employee benefit, health, welfare, pension, supplemental pension, deferred compensation, stock, share or other similar incentive compensation, retirement, post-retirement benefit and post-employment benefit and long-term incentive plans or arrangements, disability or any other employee benefit plan, program, arrangement, policy or practice, whether written or oral, formal or informal, funded or unfunded, registered or unregistered, insured or self-insured, that, in any of the foregoing cases, are applicable to present or former employees, directors or officers of, or individuals working on contract with, Barzel or any Subsidiary and are currently maintained, administered or participated in by Barzel or any Subsidiary, or in respect of which Barzel or any Subsidiary has any contribution obligation or other liability or contingent liability.

NY 72292764v14

"<u>Bidding Procedures Orders</u>" means orders of the Bankruptcy Court and the Canadian Court approving certain procedures governing the process by which a buyer may acquire all or substantially all of the assets of the Borrowers and their Subsidiaries pursuant to Section 363 of the Bankruptcy Code and pursuant to an order of the Canadian Court, as applicable, which orders shall be reasonably satisfactory in form and substance to the Lenders.

"<u>Board</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" or "<u>Borrowers</u>" means, individually or collectively, the US Borrower and the Canadian Borrower.

"<u>Borrowing</u>" means (a) Loans of the same Type, made, converted or continued on same date or (b) a Protective Advance.

"<u>Borrowing Request</u>" means a request by a Borrower for a Borrowing in accordance with Section 2.03.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; <u>provided</u> that, when used in connection with a Loan for the account of the Canadian Borrower, the term "Business Day" shall also exclude any day on which banks are not open for business in Toronto.

"<u>Buyer</u>" means such entity as may be approved by the Lenders to consummate the Approved Sale.

"<u>Canadian Agent</u>" means JPMorgan Chase Bank, N.A., Toronto Branch, acting by designation as Administrative Agent with respect to Loans or Borrowings made to the Canadian Borrower.

"<u>Canadian Appeal Period</u>" means the period of time beginning on the CCAA Filing Date and ending on the date that is 21 days following the date on which the latest of the notices required by Section 5.14 is served.

"<u>Canadian Benefit Plans</u>" means all material employee benefit plans maintained or contributed to by Barzel or any Subsidiary that are not Canadian Pension Plans, including, without limitation, all profit sharing, savings, post-retirement, supplemental retirement, retiring allowance, severance, pension, deferred compensation, welfare, bonus, incentive compensation, phantom stock, legal services and supplementary unemployment benefit plans or arrangements and all life, health, dental and disability plans and arrangements in which employees or former employees of Barzel or its Subsidiaries employed in Canada participate or are eligible to participate.

"<u>Canadian Borrower</u>" means Barzel Industries Canada Inc., a Canadian corporation.

"Canadian Case" has the meaning assigned to such term in the recitals hereto.

"Canadian Collateral" means all of the property, assets, rights and undertaking of the Canadian Debtor.

"Canadian Collateral Documents" means (a) the Canadian Guarantee and Collateral Agreement among the Canadian Borrower, the other Canadian Loan Parties and the Administrative Agent, in form and substance satisfactory to the Administrative Agent, (b) the Canadian Debenture and (c) in the case of any Canadian Loan Party having assets located in the Province of Quebec, any hypothecs and related bonds, debentures and pledges, in form and substance reasonably satisfactory to the Administrative Agent, granting a Lien on the assets of the Canadian Loan Parties to secure the Obligations.

"Canadian Court" has the meaning assigned to such term in the recitals hereto.

"Canadian Court Orders" means the CCAA Initial Order and CCAA Extension Order.

"Canadian Debenture" means the debenture (Ontario) by the Canadian Borrower in favor of the Canadian Agent.

"Canadian Debtor" has the meaning assigned to such term in the recitals hereto.

"Canadian Dollars" means the lawful money of Canada.

"Canadian Guarantee and Collateral Agreement" means that certain Canadian Guarantee and Collateral Agreement dated as of September 15, 2009 among Barzel Industries Canada Inc., the Subsidiaries of Barzel Industries Canada Inc. identified therein and JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian Agent.

"Canadian Loan Party" means any Loan Party that is not a US Loan Party.

"Canadian MEPP" has the meaning assigned to such term in clause (n) of Article VII.

"Canadian Pension Event" means (a) the occurrence of a Termination Event with respect to a Canadian Pension Plan; (b) the failure by Barzel or any Subsidiary to make a required contribution when due to a Canadian Pension Plan, which results in a deemed trust or lien arising pursuant to the PBA against the assets of Barzel or any Subsidiary; (c) the failure to fund all Canadian Pension Plans as required by applicable law; (d) the failure to make on a timely basis all required contributions (including employee contributions made by authorized payroll deductions or other withholdings) to the appropriate funding agency in accordance with all applicable laws and the terms of each Canadian Pension Plan of each Borrower and each Subsidiary; (e) the violation of any material provision of the terms of any Canadian Pension Plan or the

PBA; or (f) the merger of any Canadian Pension Plan with another pension plan or the transfer of assets and liabilities from or to any Canadian Pension Plan to any other Canadian or non-Canadian pension plan, other than a merger or transfer of assets that has been approved by the appropriate regulators or has occurred in connection with the termination of employment of members of a Canadian Pension Plan in the ordinary course.

"Canadian Pension Plan" means a Benefit Plan that is a "registered pension plan" as defined in the ITA that Barzel or any Subsidiary sponsors or is required to contribute to on behalf of its employees or former employees in Canada, whether or not registered.

"Canadian Prime", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Canadian Prime Rate.

"Canadian Prime Rate" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the greatest of (a) the interest rate per annum publicly announced from time to time by the Administrative Agent as its reference rate in effect on such day at its principal office in Toronto for determining interest rates applicable to commercial loans denominated in Canadian Dollars and made by it in Canada (each change in such reference rate being effective from and including the date such change is publicly announced as being effective), (b) the interest rate per annum equal to the sum of (i) the CDOR Rate on such day (or, if such rate is not so reported on the Reuters Screen CDOR Page, the average of the rate quotes for bankers' acceptances denominated in Canadian Dollars with a one month term received by the Administrative Agent at approximately 10:00 a.m., Toronto time, on such day (or, if such day is not a Business Day, on the next preceding Business Day) from the Schedule I Reference Lenders) and (ii) 0.50% per annum and (c) 3% per annum.

"Canadian Subsidiary" means any Subsidiary that is organized under the laws of Canada or any Province thereof.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" means (a) prior to the Final Order Entry Date, the "Carve-Out" as defined in the Interim Order and (b) on and after the Final Order Entry Date, the "Carve-Out" as defined in the Final Order.

"Cases" has the meaning assigned to such term in the recitals hereto.

"Cash Balance" has the meaning assigned to such term in Section 2.12(c)(v).

"Cash Balance Limit" has the meaning assigned to such term in Section 2.12(c)(v).

"Cash Collateral" has the meaning assigned to such term in the Interim Order.

"Cash Management Bank" shall mean any Person that is a Lender or the Issuing Bank or an Affiliate of a Lender or the Issuing Bank at the time it provides any Cash Management Services or that is a Lender or an Affiliate of a Lender at any time after it has provided any Cash Management Services.

"Cash Management Obligations" shall mean obligations owed by the Loan Parties to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"Cash Management Services" shall mean treasury, depository, overdraft, credit or debit card, including non-card e-payables services, purchase card, electronic funds transfer, automated clearing house fund transfer services and other cash management services.

"CCAA" has the meaning assigned to such term in the recitals hereto.

"CCAA Charge" means the court ordered priority charge granted in the CCAA Initial Order over the Canadian Collateral in an amount not to exceed US$1,000,000 and otherwise on terms acceptable to the Administrative Agent to secure (a) all reasonable fees and disbursements of Davies Ward Phillips & Vineberg LLP, Canadian legal counsel to the Canadian Debtor, and (b) all reasonable fees and disbursements of the Monitor and the Monitor's legal counsel.

"CCAA Extension Date" means the date the CCAA Extension Order shall have been issued and entered by the Canadian Court.

"CCAA Extension Order" means an order of the Canadian Court extending the stay of proceeding granted in the CCAA Initial Order in form and substance satisfactory to the Administrative Agent and the Required Lenders.

"CCAA Filing Date" means the date the CCAA Initial Order shall have been issued and entered by the Canadian Court

"CCAA Initial Order" means collectively, the initial order of the Canadian Court issued in the Canadian Case on the CCAA Filing Date, in the form as set out in Exhibit C providing for *inter alia* the granting of the DIP Lenders' Charge or otherwise in form and substance satisfactory to the Administrative Agent and the Required Lenders, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Administrative Agent and the Required Lenders.

"CCAA Plan" means any plan of compromise or arrangement in the Canadian Case, made pursuant to the CCAA.

"CDOR Rate" means, on any date, an interest rate per annum equal to the stated average discount rate applicable to bankers' acceptances denominated in Canadian Dollars with a term of 30 days (for purposes of the definition of "Canadian Prime Rate") appearing on the Reuters Screen CDOR Page (or on any successor or substitute page of such Screen, or any successor to or substitute for such Screen, providing rate quotations comparable to those currently provided on such page of such Screen, as determined by the Administrative Agent from time to time) at approximately 10:00 a.m., Toronto time, on such date (or, if such date is not a Business Day, on the next preceding Business Day).

"Change in Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Equity Interests representing more than 35% of either the aggregate ordinary voting power or the aggregate equity value represented by the issued and outstanding Equity Interests in Barzel; (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of Barzel by Persons who were neither (i) nominated by the board of directors of Barzel (or the nominating committee of such board) nor (ii) appointed by directors so nominated; (c) the acquisition of direct or indirect Control of Barzel by any Person or group; (d) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person other than Barzel of any Equity Interest in Barzel Parent; (e) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person other than Barzel Parent of any Equity Interest in the US Borrower; (f) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person other than the US Borrower of any Equity Interest in the Canadian Borrower; or (g) the occurrence of a "Change of Control" or similar event, however denominated, as defined in the Senior Notes Documents (so long as any Senior Notes shall be outstanding) or any other instrument or agreement evidencing or governing Material Indebtedness, other than, in each case, as the result of an Approved Sale.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals hereto.

"Chief Restructuring Officer" means Wayne Day as chief restructuring officer in connection with the Cases, or such other chief restructuring officer appointed by the Board of Directors of Barzel as shall be reasonably acceptable to the Administrative Agent.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets and properties of Barzel and the Subsidiaries other than Delta Tubes that are required to be subject to Liens securing any of the Loan Documents Obligations, including all "Collateral" as defined in any Collateral Agreement. For the avoidance of doubt, none of the assets or properties of Delta Tubes is "Collateral" under the Loan Documents.

"Collateral Agreements" means (a) the Guarantee and Collateral Agreement and (b) the Canadian Collateral Documents; provided that, when used in reference to a US Loan Party, the term "Collateral Agreement" shall mean the Guarantee and Collateral Agreement.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a) the Administrative Agent shall have received from Barzel, each Borrower and each other Loan Party counterparts of the Collateral Agreements and other Security Documents (other than the Mortgages), duly executed and delivered on behalf of such Loan Party,

(b) all documents and instruments, including Uniform Commercial Code or other personal property security registry financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by this Agreement and by, the Security Documents, shall have been filed, registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(c) the Administrative Agent shall have received counterparts of a Mortgage with respect to each Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property; and

(d) each Loan Party shall have obtained all consents and approvals required to be obtained by it in connection with the execution and delivery of all Security Documents to which it is a party, the performance of its obligations thereunder and the granting by it of the Liens thereunder.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Subsidiary, if and for so long as the Administrative Agent determines, in its sole discretion, that the cost of creating or perfecting such pledges or security interests in such assets or providing such Guarantees (taking into account any adverse tax consequences to each Borrower and its Affiliates (including the imposition of withholding or other material taxes)) or obtaining title insurance, legal opinions or other deliverables in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom. The Administrative Agent may grant extensions of

time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debtors" has the meaning assigned to such term in the recitals hereto.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would become an Event of Default.

"Delta Tubes" means, collectively, Tubes Delta, Societé en Commandite, a Quebec limited partnership, and Tubes Delta Inc., a Part IA Companies' Act (Quebec).

"Deposit Account Control Agreement" has the meaning assigned to such term in the Guarantee and Collateral Agreement or the Canadian Collateral Documents, as applicable.

"DIP Lenders' Charge" has the meaning assigned to such term in Section 3.17(b).

"Directors Charge" means the charge provided for in the CCAA Initial Order in favor of the Canadian Borrower's directors and officers which charge shall be junior to the CCAA Charge but senior to the DIP Lenders' Charge.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof) or upon the happening of any event or condition:

(a)     matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable at the option of the holder thereof for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interest and cash in lieu of fractional shares of such Equity Interests); or

(c)      is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interest and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date that is six months after the Revolving Maturity Date; provided, however, that an Equity Interest that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after repayment in full of all the Loans and all other Loan Documents Obligations that are accrued and payable and the termination of the Revolving Commitments.

"Document" has the meaning assigned to such term in the New York UCC.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Environmental Laws" means all laws, rules, regulations, codes, guidelines, ordinances, orders, decrees, judgments, injunctions or permits issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources or the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or the presence of any Hazardous Materials in, on or under any property or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the US Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) prior to the effectiveness of the applicable provisions of the Pension Act, the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA) or, on or after the effectiveness of the applicable provisions of the Pension Act, any failure by any Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, in each case whether or not waived; (c) the filing pursuant to, prior to the effectiveness of the applicable provisions of the Pension Act, Section 412(d) of the Code or Section 303(d) of ERISA or, on or after the effectiveness of the applicable provisions of the Pension Act, Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any Plan; (d) on and after the effectiveness of the applicable provisions of the Pension Act, a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by the US Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (f) the receipt by the US Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (g) the incurrence by the US Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (h) the receipt by the US Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the US Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or, on and after the effectiveness of the applicable provisions of the Pension Act, in endangered or critical status, within the meaning of Section 305 of ERISA

"Event of Default" has the meaning assigned to such term in Article VII.

"Exchange Rate" means on any day, for purposes of determining the US Dollar Equivalent of any amount denominated in Canadian Dollars, the rate at which Canadian Dollars may be exchanged into US Dollars at the time of determination on such day as set forth on the Reuters WRLD Page for Canadian Dollars. In the event that such rate does not appear on any Reuters WRLD Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrowers, or, in the absence of such an agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of Canadian Dollars are then being conducted, at or about such time as the Administrative Agent shall elect after determining that such rates shall be the basis for determining the Exchange Rate, on such date for the purchase of US Dollars for delivery two Business Days later; provided that if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative

Agent may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its Applicable Lending Office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction referred to in the preceding clause (a), (c) in the case of any Lender (other than an assignee pursuant to a request by the Borrowers under Section 2.20(b)) any withholding tax that is imposed (except for any such tax imposed after the occurrence and during the continuance of an Event of Default) by the United States of America on amounts payable by a Borrower from a location within such jurisdiction to such Lender's Applicable Lending Office, to the extent such tax is in effect and applicable (assuming the taking by such Borrower of all actions required in order for available exemptions from such tax to be effective) at the time such Lender becomes a party to this Agreement (or designates a new Applicable Lending Office), except, in the case of a Lender, to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or an assignment), to receive additional amounts with respect to such withholding tax pursuant to Section 2.18, and (d) any withholding tax that is attributable to the failure of such Lender to comply with Section 2.18(e).

"Existing Letter of Credit" means each letter of credit listed on Schedule 2.06A, each of which constitute a "Letter of Credit" under and as defined in the Prepetition Credit Agreement.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Filing Date" has the meaning assigned to such term in the recitals.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures so approved by the Bankruptcy Court with respect to the Loan Parties and this Agreement, in form and substance satisfactory to the Lenders, each in their sole discretion, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, and from which

no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied.

"Final Order Entry Date" means the date on which the Final Order shall have been entered on the docket of the Bankruptcy Court.

"Financial Officer" means, with respect to Barzel or a Borrower, the Chief Restructuring Officer, the chief financial officer, principal accounting officer, treasurer or controller of Barzel or such Borrower, respectively. Each reference herein to a Financial Officer of Barzel and the Borrowers shall mean such an officer of any of them who is authorized to deliver the applicable certificate or other document on behalf of all of them and the Administrative Agent and the Lenders shall be entitled to assume that any such officer who delivers such a certificate or other document is so authorized.

"First Day Orders" means all the orders entered by the Bankruptcy Court or the Canadian Court with respect to motions heard by the Bankruptcy Court at the first hearing in the Chapter 11 Cases and by the Canadian Court on the CCAA Filing Date, respectively.

"Foreign Pledge Agreement" means a pledge or charge agreement with respect to each portion of the Collateral that constitutes Equity Interests of a Foreign Subsidiary, in form and substance reasonably satisfactory to the Administrative Agent.

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia.

"GAAP" means generally accepted accounting principles and practices in the United States of America consistently applied.

"Governmental Approvals" means all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and reports to, all Governmental Authorities.

"Governmental Authority" means the government of the United States of America, Canada, any other nation or any political subdivision thereof, whether state, provincial, territorial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of

such Indebtedness or other obligation of the payment thereof (including pursuant to any "synthetic lease" financing), (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; <u>provided</u>, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"<u>Guarantee and Collateral Agreement</u>" means the Guarantee and Collateral Agreement among Barzel, Barzel Parent, the Borrowers, the Subsidiary Parties and the Administrative Agent, in form and substance satisfactory to the Administrative Agent and the Lenders, together with all supplements thereto.

"<u>Guarantor</u>" or "<u>Guarantors</u>" means, with respect to Obligations of the US Borrower, the Barzel Guarantors (as defined in the Guarantee and Collateral Agreement) and the Canadian Borrower, and with respect to Obligations of the Canadian Borrower, the Barzel Guarantors and the US Borrower.

"<u>Hazardous Materials</u>" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature, each as regulated pursuant to any Environmental Law.

"<u>Hedging Agreement</u>" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock, deferred compensation or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Barzel, the Borrowers or the other Subsidiaries shall be a Hedging Agreement.

"<u>Indebtedness</u>" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of

16

such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Intercompany Notes" means the senior secured demand promissory notes evidencing loans by the US Borrower to the Canadian Borrower in an aggregate principal amount of US$125,000,000, made as of November 15, 2007, which shall be subordinate to the Obligations in right of payment and in priority with respect to the Liens in the Collateral to be created as contemplated hereunder and, in the Interim Order and the CCAA Initial Order.

"Interest Payment Date" means, with respect to interest accrued on any Loan, (a) the last day of each calendar month and (b) the day that such Loan is required to be repaid.

"Interim Order" means the order of the Bankruptcy Court with respect to the Loan Parties and this Agreement, in substantially the form of Exhibit D hereto, in form and substance acceptable to the Lenders in their sole discretion, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied.

"Interim Order Entry Date" means the date on which the Interim Order shall have been entered on the docket of the Bankruptcy Court.

"Interim Reimbursed Amounts" has the meaning assigned to such term in Section 5.18.

"Inventory" has the meaning assigned to such term in the New York UCC.

"Issuing Bank" means the issuer of any Existing Letter of Credit.

"ITA" means the Income Tax Act (Canada), as amended, and any successor thereto, and any regulations promulgated thereunder.

"LC Obligations" means, at any time, the aggregate undrawn face amount of all Existing Letters of Credit at such time.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means this Agreement, any promissory notes delivered pursuant to Section 2.11(e), the Collateral Agreements and the other Security Documents.

"Loan Documents Obligations" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Loan Parties" means Barzel, the Borrowers and each Subsidiary Party.

"Loans" means the loans made to the Borrowers pursuant to this Agreement.

"Local Time" means (a) with respect to a Loan or Borrowing denominated in US Dollars (other than any such Loan to or Borrowing of the Canadian Borrower), New York City time, and (b) with respect to a Loan or Borrowing denominated in Canadian Dollars or any Loan or Borrowing denominated in US Dollars of the Canadian Borrower, Toronto time.

"Lockbox Agreement" has the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Long-Term Indebtedness" means any Indebtedness that, in accordance with GAAP, constitutes (or, when incurred, constituted) a long-term liability.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of Barzel, the Borrowers and the other Subsidiaries, taken as a whole, (b) the ability of any Loan Party to perform any of its obligations under any Loan Document, (c) the material rights of or material benefits available to the Lenders under any Loan Document, (d) the legality, validity or enforceability of any Loan Document or the Bankruptcy Court Orders or the Canadian Court Orders and the Bid Procedures Orders, (e) the value of the Collateral or (f) the ability of the Administrative Agent, the Canadian Agent and the Lenders to enforce the Loan Documents, in each case, other than such effects as a result solely from the commencement of the Cases, the continuation of the Cases or the Approved Sale.

NY 72292764v14

"Material Indebtedness" means Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of Barzel, the Borrowers and the Subsidiaries in an aggregate amount exceeding US$1,000,000 (such amount to be determined, with respect to any Indebtedness, without duplication for any Guarantees thereof). For purposes of determining Material Indebtedness, the "amount" of the obligations of Barzel, a Borrower or any other Subsidiary in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that Barzel, such Borrower or such Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"MEPP Liability" has the meaning assigned to such term in clause (n) of Article VII.

"Monitor" means Deloitte & Touche Inc. in its capacity as court appointed monitor in the Canadian Case.

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means a mortgage, deed of trust, debenture, hypothec, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any Mortgaged Property to secure the Obligations. Each Mortgage shall be satisfactory in form and substance to the Administrative Agent.

"Mortgaged Property" means each parcel of real property and the improvements thereto owned by a Loan Party and identified on Schedule 3.05 as a Mortgaged Property.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Insurance/Condemnation Proceeds" means an amount equal to: (i) any cash payments or proceeds received by Barzel or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder, or (b) as a result of the taking of any assets of Barzel or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking; minus (ii) any actual and reasonable costs incurred by Barzel or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Barzel or such Subsidiary in respect thereof including, real estate transfer taxes, broker's commissions and other customary settlements expenses connected thereto.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Norwood" means the real property, and edifices and fixtures related thereto, located at 1050-1080 University Avenue, Norwood, Massachusetts.

"Obligations" means the obligations of the Borrowers and the other Loan Parties under this Agreement, including, without limitation, (a) the due and punctual payment by the Borrowers of (i) the principal of and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans (including Protective Advances), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) all other monetary obligations of the Borrowers and the other Loan Parties under this Agreement or any other Loan Document, including in respect of fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including any monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding), and (iii) Cash Management Obligations, (b) the due and punctual performance of all other obligations of the Borrowers and the other Loan Parties under or pursuant to this Agreement and each other Loan Document, and (c) the due and punctual payment and performance of all of the obligations of each other Loan Party under or pursuant to each of the other Loan Documents.

"Other Taxes" means any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"Participant" has the meaning set forth in Section 9.04(c)(i).

"PBA" means, collectively, the Pension Benefits Act (Ontario), an Act respecting supplemental pension plans (Quebec) and similar acts of each Province in Canada or to the extent applicable the federal jurisdiction, and all regulations thereunder as amended from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pension Act" means the Pension Protection Act of 2006, as amended from time to time.

"Perfection Certificate" means a certificate in the form of Exhibit E or any other form approved by the Administrative Agent.

"Permitted Discretion" means a determination made by the Administrative Agent in the exercise of its reasonable credit judgment and consistent with its policies applicable to asset based lending transactions of this type.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.05, and Liens imposed on a real property for property taxes, where the recourse with respect thereto is limited to the taking

of such real property and such real property is not material to the business of Barzel, the Borrowers and the other Subsidiaries;

(b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.05;

(c) Liens arising by virtue of any statutory, common law or contractual provisions relating to bankers' liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depositary bank;

(d) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations or in respect of health, disability, retirement or other employee benefits obligations, and deposits made in the ordinary course of business securing obligations to insurance carriers under insurance or self-insurance arrangements;

(e) deposits to secure the performance of bids, trade contracts, leases, regulatory or statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(f) judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(g) easements, zoning restrictions, covenants, conditions, restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of either Borrower or any Subsidiary; and

(h) liens permitted pursuant to the US Bankruptcy Orders or Canadian Court Orders;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness other than the Loans.

"Permitted Investments" means:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America or Canada (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America or Canada), in each case maturing within one year from the date of acquisition thereof;

(b)     investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)     investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or Canada, or any State or Province thereof, which has a combined capital and surplus and undivided profits of not less than US$500,000,000;

(d)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)     money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least US$5,000,000,000.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which Barzel, either Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prepetition Agent" has the meaning assigned to such term in the recitals hereto.

"Prepetition Collateral" means all collateral upon which any Borrower or any other Loan Party granted a Lien therein or purported to grant a Lien therein pursuant to, in connection with or under the Prepetition Credit Agreement, including without limitation, (i) collateral in or upon which a Lien or other security interest has been granted in favor or for the benefit of the Prepetition Agent and the Prepetition Lenders in connection with, pursuant to, or under the Prepetition Credit Agreement or any related document, and (ii) any Prepetition Collateral provided under the Prepetition Credit Agreement or any document related thereto that existed as of the Filing Date, and all prepetition, and subject to Section 552 of the Bankruptcy Code, postpetition proceeds, products, offspring, rents and profits.

"Prepetition Credit Agreement Obligations" means all indebtedness, obligations and liabilities of the Borrowers and their Subsidiaries to the Prepetition Agent and the Prepetition Lenders incurred prior to the Filing Date arising from or related to the

Prepetition Credit Agreement, including the LC Obligations, fees, interest, make-whole amounts, premiums, expenses, indemnities and reimbursement obligations due thereunder (including, without limitation, any attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable pursuant to the Prepetition Credit Agreement) and interest thereon accruing both before and after the Filing Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prepetition Indenture Trustee" means The Bank of New York Mellon, as successor to The Bank of New York, as trustee under the Senior Notes Indenture.

"Prepetition Lender" has the meaning assigned to such term in the recitals hereto.

"Prepetition Obligations" means Obligations under the Prepetition Obligations Documents.

"Prepetition Obligations Documents" means the Prepetition Credit Agreement, the Senior Notes Documents and any other agreements or documents evidencing the Prepetition Credit Agreement Obligations and the Senior Notes Documents.

"Prime Rate" means (a) in the case of an ABR Borrowing in US Dollars by the US Borrower, the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A., as its prime rate in effect at its principal office in New York City, and (b) in the case of an ABR Borrowing in US Dollars by the Canadian Borrower, the rate of interest per annum publicly announced from time to time by the Administrative Agent as its reference rate in effect at its principal office in Toronto for loans made in Canada and denominated in US Dollars. Each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Protective Advance" has the meaning assigned to such term in Section 2.04.

"Protective Advance Exposure" means, at any time, the sum of the principal amounts of all outstanding Protective Advances at such time. The Protective Advance Exposure of any Revolving Lender at any time shall be its Applicable Percentage of the total Protective Advance Exposure at such time.

"Register" has the meaning set forth in Section 9.04(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents attorneys, and advisors of such Person and such Person's Affiliates.

NY 72292764v14

"Reports" means reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrowers' assets from information furnished by or on behalf of the Borrowers, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports (except where prepared for internal purposes of the Administrative Agent) shall, upon request by any Lender, be distributed to such Lender by the Administrative Agent.

"Required Lenders" means, at any time, Lenders having Revolving Exposures and unused Revolving Commitments representing more than 50% of the sum of the total Revolving Exposures and unused Revolving Commitments at such time; provided, that "Required Lenders" shall include both JPMorgan Chase Bank, N.A. and CIBC Inc. at all times that both (a) JPMorgan Chase Bank, N.A. and its Affiliates alone would otherwise constitute the Required Lenders and (b) the Revolving Commitment held by CIBC Inc. and its Affiliates is not less than 10% of the aggregate Revolving Commitments.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Barzel, a Borrower or any other Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Barzel, a Borrower or any other Subsidiary.

"Revolving Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Revolving Maturity Date and the date of termination of the Revolving Commitments.

"Revolving Borrowing" means a Borrowing consisting of Revolving Loans.

"Revolving Commitment" means, with respect to each Lender, the commitment of such Lender to make Revolving Loans and Protective Advances hereunder, expressed as an amount representing the maximum aggregate permitted amount of such Lender's Revolving Exposure hereunder, as such commitment may be (a) reduced or increased from time to time pursuant to Section 2.10 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04. The initial amount of each Lender's Revolving Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption pursuant to which such Lender shall have assumed or provided its Revolving Commitment, as applicable. The initial aggregate amount of the Lenders' Revolving Commitments on the Effective Date is US$30,000,000.

"Revolving Exposure" means, with respect to any Lender at any time, the sum of the US Dollar Equivalents of the outstanding principal amount of such Lender's Revolving Loans and Protective Advance Exposure at such time.

"Revolving Lender" means a Lender with a Revolving Commitment or, if the Revolving Commitments have terminated or expired, a Lender with Revolving Exposure.

"Revolving Loan" means a Loan made pursuant to Section 2.01.

"Revolving Maturity Date" means the earliest of (i) in any case, December 11, 2009; (ii) if either the Final Order Entry Date or the CCAA Extension Date has not occurred, the date thirty (30) days after the Filing Date, or (iii) the date of consummation of an Approved Sale.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Sale Milestones" means, (a) in the Chapter 11 Case, (i) prior to the Final Order Entry Date, the milestones in the Interim Order set forth in the paragraph entitled "Sale Milestones" and (ii) on and after the Final Order Entry Date, the milestones in the Final Order set forth in the paragraph entitled "Sale Milestones" and (b) in the Canadian Case, the milestones set forth in the CCAA Initial Order or in such other order of the Canadian Court, as may be applicable.

"Samuel Son & Co Lease" means that certain Lease between American Steel and Aluminum Corporation and Samuel Son & Co., Inc. dated as of February 13, 2009.

"Schedule I Lender" means any Lender named on Schedule I to the Bank Act (Canada).

"Schedule I Reference Lenders" means one or more Schedule I Lenders agreed upon by the Canadian Borrower and the Administrative Agent from time to time.

"Secured Party" means (a) the Lenders, (b) the Administrative Agent, (c) the Canadian Agent, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, (e) the successors and assigns of each of the foregoing and (f) any Person deemed a "DIP Lender" or granted the benefit of any "DIP Lien" under and as defined in any Bankruptcy Court Order.

"Security Documents" means the Collateral Agreements, the Foreign Pledge Agreements, the Mortgages and each other security agreement or other instrument or document executed and delivered pursuant to Section 5.15 to secure any of the Obligations.

"Senior Noteholders" means the holders of the Senior Notes.

"Senior Notes" means the 11.5% Senior Secured Notes due 2015 issued by the US Borrower on November 15, 2007 pursuant to the Senior Notes Indenture.

NY 72292764v14

"Senior Notes Documents" means the Senior Notes Indenture and all other instruments, agreements and other documents evidencing or governing the Senior Notes, providing for any Guarantee or security interest or other right in respect thereof, affecting the terms of the foregoing or entered into in connection therewith and all schedules, exhibits and annexes to each of the foregoing.

"Senior Notes Indenture" means the Indenture dated as of November 15, 2007, among Barzel, Barzel Finco Inc., as the issuer, certain other Subsidiaries party thereto and The Bank of New York Mellon, as successor to The Bank of New York, as the trustee, under which the Senior Notes are issued.

"Senior Notes Obligations" means the "Notes Obligations" as defined in the Senior Notes Indenture.

"Special Purpose Holdco" means a Subsidiary that (a) is not engaged in any business or activity other than the ownership of Equity Interests in any Subsidiary that is not a wholly-owned Subsidiary or any Person that is not a Subsidiary, and activities incidental thereto, (b) does not own any assets other than the Equity Interests referred to in clause (a) above and any contract rights under joint venture or other similar agreements relating thereto and (c) owes no Indebtedness and has no other liabilities (other than liabilities imposed by law, including tax liabilities, and other liabilities incidental to its existence and permitted business and activities).

"Subordinated Indebtedness" of any Person means any Indebtedness of such Person that is subordinated in right of payment to any other Indebtedness of such Person.

"subsidiary" means, with respect to any Person (the "parent") at any date, any other Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other Person (a) of which Equity Interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of Barzel other than 632422 N.B. Ltd., Hencorp LLC, a Delaware limited liability company, and Chriscorp ULC, a Nova Scotia unlimited liability company.

"Subsidiary Party" means each Subsidiary other than any Subsidiary that is not a wholly-owned Subsidiary, where the organizational documents thereof or any related joint venture or similar agreements prohibit such Subsidiary from becoming a party to the Collateral Agreements without the prior consent of the equity holders thereof (other than Barzel and the Subsidiaries).

"Superpriority Claim" means a claim against the US Debtors in any of the Chapter 11 Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Tax Refund Proceeds" means any Cash payments or proceeds received by Barzel or any of its Subsidiaries in respect of refund or any reduction of, or credit against, any of its liabilities for Taxes.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority, including any interest and penalties imposed in connection with any liability for any of the foregoing.

"Termination Event" means (a) the termination or partial termination of a Canadian Pension Plan by Barzel or any Subsidiary, (b) the institution of proceedings by any Governmental Authority to terminate in whole or in part or have a third party appointed to administer a Canadian Pension Plan or (c) any other event or condition which might constitute grounds for the termination of, winding up or partial termination or winding up or the appointment of a third party to administer any Canadian Pension Plan.

"Thirteen Week Forecast" means a 13-week cash flow statement setting forth all receipts and disbursements for the 13-week period ending on December 11, 2009, including a line item specifying the projected amount of cash and outstanding Loans as of the end of each week covered thereby.

"Transaction Costs" means fees and expenses incurred in connection with the Transactions on the Effective Date.

"Transactions" means (a) the filing of the Chapter 11 Cases and the commencement of the Canadian Case, (b) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the borrowing of Loans, the transactions contemplated by the Loan Documents, the use of the proceeds thereof, (c) the execution, delivery and performance of all documentation in connection with any of the foregoing by each Loan Party or Subsidiary party thereto, and (d) the payment of all fees and expenses in connection with the foregoing.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Canadian Prime Rate.

"US Borrower" means Barzel Finco Inc., a Delaware corporation.

"US Collateral" means all of the property, assets, rights and undertaking of the US Debtors.

"US Debtors" has the meaning assigned to such term in the recitals hereto.

"US Dollars" or "US$" refers to lawful money of the United States of America.

"US Dollar Equivalent" means, on any date of determination, (a) with respect to any amount in US Dollars, such amount and (b) with respect to any amount in Canadian Dollars, the equivalent in US Dollars of such amount, determined by the Administrative Agent pursuant to Section 1.05 using the Exchange Rate with respect to such currency at the time in effect under the provisions of such Section.

"US Loan Party" means any Loan Party that is organized under the laws of the United States of America, any State thereof or the District of Columbia.

"US Subsidiary" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia.

"Variance" means, with respect to the Approved Budget, a maximum cumulative variance with respect to projected borrowings in each then-current Approved Budget in the amount of US$1,000,000, aggregate across line items and cumulative for the period of the Approved Budget, provided that in no event shall the Variance be permitted, if after giving effect thereto, the aggregate amount of the Loans outstanding plus the LC Obligations would exceed the aggregate Revolving Commitment at such time.

"wholly-owned", when used in reference to a subsidiary of any Person, means any subsidiary of such Person all the Equity Interests in which (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, controlled or held by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., an "ABR Loan"). Borrowings also may be classified and referred to by Type.

SECTION 1.03. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein),

(b) any definition of or reference to any statute, regulation or other law herein shall be construed (i) as referring to such statute, regulation or other law as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor statutes, regulations or other laws) and (ii) to include all official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04. <u>Accounting Terms; GAAP; Pro Forma Calculations.</u> (a) Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if a Borrower notifies the Administrative Agent that it requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

(b) All pro forma computations required to be made hereunder to give effect to any investment or other transaction shall be calculated after giving pro forma effect thereto (and any other such transaction consummated since the date as of which, or since the first day of the period for which, such pro forma computation is being made and on or prior to the date of such computation) as if such transaction had occurred on such date (in the case of pro forma computations as of a specified date) or on the first day of such period (in the case of pro forma computations for a specified period), and, to the extent applicable, the historical earnings and cash flows associated with the assets acquired or disposed of and any related incurrence or reduction of Indebtedness, but shall not take into account any projected synergies or similar benefits expected to be realized as a result of any such transaction.

SECTION 1.05. <u>Currency Translation.</u> The Administrative Agent shall determine the US Dollar Equivalent of any Borrowing denominated in Canadian Dollars as of the date on which such Borrowing is made and as of the last Business Day of each subsequent calendar quarter, in each case using the Exchange Rate for Canadian Dollars in relation to US Dollars in effect on the last Business Day of the calendar quarter preceding the date of such Borrowing (or, if such Borrowing occurs on the last Business Day of a calendar quarter, on such Business Day) and as of the last Business Day of such subsequent calendar quarter, as the case may be, and each such amount shall be the US

29

Dollar Equivalent of such Borrowing until the next required calculation thereof pursuant to this sentence. The Administrative Agent shall notify the Borrowers and the Lenders of each calculation of the US Dollar Equivalent of each Borrowing.

SECTION 1.06. Status of Obligations.

The Loan Documents Obligations are hereby designated as "senior indebtedness" and as "designated senior indebtedness" under and in respect of any indenture or other agreement or instrument under which Subordinated Indebtedness is outstanding and are further given all such other designations as shall be required under the terms of any such Subordinated Indebtedness in order that the Lenders or the Administrative Agent may have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness.

ARTICLE II

The Credits

SECTION 2.01. Revolving Commitments. (a) Subject to the terms and conditions set forth herein and subject to the Bankruptcy Court Orders, and the Canadian Court Orders, each Lender agrees from time to time during the Revolving Availability Period to (a) make Revolving Loans denominated in US Dollars to the US Borrower and (b) make Revolving Loans denominated in US Dollars or Canadian Dollars to the Canadian Borrower, in each case, in an aggregate principal amount that will not result in (i) such Lender's Revolving Exposure exceeding such Lender's Revolving Commitment or (ii) the sum of the aggregate Revolving Exposures of all Lenders plus the LC Obligations exceeding the lesser of (x) the aggregate Revolving Commitments then in effect and (y) the aggregate Revolving Exposures plus the LC Obligations set forth in the then current Approved Budget for such week, subject to the Variance. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Loans.

(b) Notwithstanding the foregoing, prior to the occurrence of both the Final Order Entry Date and the expiration of the Canadian Appeal Period, the Lenders shall not be obligated to make any Loans to the Borrowers in an aggregate principal amount exceeding the lesser of (1) US$17,500,000 and (2) the sum of (A) US$ 7,000,000, (B) an amount equal to the aggregate Interim Reimbursed Amounts applied to repay the Prepetition Credit Agreement Obligations pursuant to Section 5.18 hereto, and (C) the amount of any Loan deemed requested pursuant to Section 2.03(b) (it being understood that the limitations contained in this Section 2.01(b), for the time periods contained herein, shall not be subject to increase by the Variance), in each case, to the extent authorized by the Interim Order and CCAA Initial Order.

SECTION 2.02. Loans and Borrowings. (a) Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type and currency made by the Lenders ratably in accordance with their respective Revolving Commitments. The failure

of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Revolving Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b) Each Revolving Borrowing denominated in US Dollars shall be comprised entirely of ABR Loans in accordance herewith; and each Revolving Borrowing denominated in Canadian Dollars shall be comprised entirely of Canadian Prime Revolving Loans. Each Protective Advance shall be an ABR Loan. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan and any exercise of such option shall not affect the obligation of the applicable Borrower to repay such Loan in accordance with the terms of this Agreement.

(c) Borrowings of more than one Type may be outstanding at the same time.

SECTION 2.03. Requests for Borrowings. (a) To request a Revolving Borrowing, the applicable Borrower shall notify the Administrative Agent of such request by telephone in the case of an ABR Borrowing or a Canadian Prime Borrowing, not later than 11:00 a.m., Local Time, one Business Day before the date of the proposed Borrowing (or such shorter period as may be agreed by the Administrative Agent and the Lenders); provided that any such notice of an ABR Revolving Borrowing to finance the repayment of a Protective Advance as contemplated by Section 2.04(a) may be given not later than 10:00 a.m., Local Time, on the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the applicable Borrower. Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrower requesting such Borrowing;

(ii)    the currency and aggregate amount of such Borrowing;

(iii)   the date of such Borrowing, which shall be a Business Day;

(iv)    whether such Borrowing is to be an ABR Borrowing or a Canadian Prime Borrowing;

(v)     [Reserved]; and

(vi)    the Applicable Funding Account.

Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

(b) On the Filing Date, the US Borrower shall be deemed to have requested a Loan to be applied pursuant to Section 5.18, in an amount equal to the aggregate amount of funds on deposit in any account of Barzel or any of its Subsidiaries (other than payroll accounts listed on Schedule 3.16) in excess of US$2,000,000.

(c) Prior to the later of the Final Order Entry Date and the expiration of the Canadian Appeal Period and subject to the limitations set forth in Section 2.01(b), the Borrowers shall be deemed to have requested on each Business Day a Loan to be applied pursuant to Section 5.18, in an amount equal to the Cash Collateral available on such day and not previously applied to repay Prepetition Credit Agreement Obligations pursuant to Section 5.18.

(d) On the earlier of the Final Order Entry Date and the expiration of the Canadian Appeal Period, the US Borrower or the Canadian Borrower, as applicable, to the extent approved by the Bankruptcy Court as set forth in the Final Order and the Canadian Court as set forth in the CCAA Initial Order, shall be deemed to have requested a Loan in the then-outstanding principal amount of the Prepetition Credit Agreement Obligations, together with accrued and unpaid interest thereon prior to the Filing Date, plus the aggregate undrawn face amount of the Existing Letters of Credit.

SECTION 2.04. Protective Advances. (a)    Subject to the limitations set forth below, the Administrative Agent is authorized by the Borrowers and the Lenders, from time to time in the Administrative Agent's sole discretion (but the Administrative Agent shall have absolutely no obligation), to make Loans in US Dollars to the Borrowers, on behalf of all Lenders, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Loan Documents Obligations or (iii) to pay any other amount chargeable to or required to be paid by the Borrowers pursuant to the terms of this Agreement, including interest, unused line fees, payments of reimbursable expenses (including costs, fees and expenses as described in Section 9.03) and other sums payable under the Loan Documents (any such Loans being referred to as "Protective Advances"); provided that, no Protective Advance shall be made if after giving effect thereto (A) the aggregate Revolving Exposures of all Lenders plus the LC Obligations would exceed the Revolving Commitments or (B) the aggregate principal amount of the outstanding Protective Advances would exceed US$1,000,000.  Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied.  The Protective Advances shall constitute Loan Documents Obligations hereunder and shall be secured as provided in the Security Documents, the Bankruptcy Court Orders and the Canadian Court Orders.  All Protective Advances shall be ABR Borrowings.  The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders.  Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof.  The Administrative Agent may at any time (i) subject to the limitations set forth in Section 2.01 and to the satisfaction of the conditions set forth in Section 4.02, request, on behalf of any Borrower, the Revolving Lenders to make ABR Revolving Loans to repay

any Protective Advance or (ii) require the Lenders to fund their risk participations in any Protective Advance as provided in paragraph (b) of this Section.

(b) The Administrative Agent may, by notice given not later than 10:00 a.m., New York City time, on any Business Day, require the Revolving Lenders to acquire participations on such Business Day in all or a portion of the Protective Advances outstanding. Such notice shall specify the aggregate amount of Protective Advances in which the Revolving Lenders will participate and each Lender's Applicable Percentage of such Protective Advances. Each Revolving Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to the Administrative Agent such Lender's Applicable Percentage of such Protective Advances. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations in Protective Advances pursuant to this paragraph is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or reduction or termination of the Revolving Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever. Each Revolving Lender shall comply with its obligation under this paragraph by wire transfer of immediately available funds, in the same manner as provided in Section 2.08 with respect to Loans made by such Lender (and Section 2.08 shall apply, _mutatis_ _mutandis_, to the payment obligations of the Revolving Lenders). Any amounts received by the Administrative Agent from a Borrower (or other party on behalf of a Borrower) in respect of a Protective Advance after receipt by the Administrative Agent of the proceeds of a sale of participations therein shall be promptly remitted by the Administrative Agent to the Revolving Lenders that shall have made their payments pursuant to this paragraph as their interests may appear; provided that any such payment so remitted shall be repaid to the Administrative Agent if and to the extent such payment is required to be refunded to a Borrower for any reason. The purchase of participations in a Protective Advance pursuant to this paragraph shall not relieve the applicable Borrower of any default in the payment thereof.

SECTION 2.05. [Reserved.]

SECTION 2.06. [Reserved.]

SECTION 2.07. [Reserved.]

SECTION 2.08. Funding of Borrowings. (a) (i) Each Lender shall make each Loan to be made by it hereunder (other than Loans made in respect of Interim Reimbursed Amounts and other Loans applied to repay any Prepetition Credit Agreement Obligations) on the proposed date thereof by wire transfer of immediately available funds in the applicable currency by 12:00 noon, Local Time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders; provided that Protective Advances shall be made as provided in Section 2.04, and the Administrative Agent will make such Loan proceeds available to the applicable Borrower by promptly crediting the amounts so received, in like funds, to the Applicable Funding Account of such Borrower (provided that (x) the proceeds of ABR Revolving Loans or Canadian Prime Revolving Loans made to finance the repayment of a Protective

Advance as provided in Section 2.04(a) shall be applied by the Administrative Agent for such purpose, (y) the proceeds of any Protective Advance shall be retained by the Administrative Agent and applied for the purposes for which such Protective Advance shall have been made) (ii) Loans deemed requested on the Filing Date pursuant to Section 2.03(b) shall be deemed made hereunder on the Interim Order Entry Date by book entry by the Administrative Agent, and for each such Loan deemed made, the Prepetition Credit Agreement Obligations shall be reduced on a dollar-for-dollar basis; (iii) Loans deemed requested in respect of Interim Reimbursed Amounts pursuant to Section 2.03(c) shall be deemed to be made hereunder on a daily basis by book entry by the Administrative Agent, and for each such Loan deemed made, the Prepetition Credit Agreement Obligations shall be reduced on a dollar-for-dollar basis; and (iv) Loans deemed requested pursuant to Section 2.03(d) shall be deemed made hereunder on the Final Order Entry Date by book entry by the Administrative Agent, and for each such Loan deemed made the Prepetition Credit Agreement Obligations shall be reduced on a dollar-for-dollar basis.

(b) Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the applicable Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and such Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to such Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, (A) in the case of amounts denominated in US Dollars, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, and (B) in the case of amounts denominated in Canadian Dollars, the rate reasonably determined by the Administrative Agent to be the cost to it of funding such amount, or (ii) in the case of the Borrowers, (A) in the case of amounts denominated in US Dollars, the interest rate applicable to ABR Loans, and (B) in the case of amounts denominated in Canadian Dollars, the interest rate applicable to Canadian Prime Revolving Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

SECTION 2.09. [Reserved.]

SECTION 2.10. Termination and Reduction of Revolving Commitments. (a) Unless previously terminated, the Revolving Commitments shall terminate on the Revolving Maturity Date.

(b) The Borrowers may at any time terminate, or from time to time reduce, the Revolving Commitments; provided that (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of US$100,000 and not

less than US$1,000,000 and (ii) the Borrowers shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent repayment or prepayment of the Loans the sum of the aggregate Revolving Exposures plus the LC Obligations would exceed the total Revolving Commitments.

(c) The Borrowers shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrowers pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitments delivered by the Borrowers may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrowers (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination or reduction of the Revolving Commitments shall be permanent. Each reduction of the Revolving Commitments shall be made ratably among the Lenders in accordance with their respective Revolving Commitments.

SECTION 2.11. Repayment of Loans; Evidence of Debt; Operation of Lockbox Accounts. (a) Each Borrower hereby unconditionally promises to pay (i) to the Administrative Agent on the Revolving Maturity Date, or such earlier date as the Loans may otherwise become due and payable hereunder, for the account of each Lender the then unpaid principal amount of each Revolving Loan of such Lender made to such Borrower and (ii) to the Administrative Agent the then unpaid principal amount of each Protective Advance made to such Borrower on the earlier of the Revolving Maturity Date and the date on which payment shall be demanded by the Administrative Agent. Each Borrower will pay the principal amount of each Loan made to or drawn by such Borrower and the accrued interest on such Loan in the currency of such Loan.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c) The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from each Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the applicable Borrower to repay the Loans in accordance with the terms of this Agreement.

(e) Any Lender may request that Revolving Loans made by it to either Borrower be evidenced by a promissory note. In such event, such Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

(f) The Administrative Agent shall instruct the depositary bank party to the applicable Deposit Account Control Agreement and Lockbox Agreement to transfer all funds on deposit in such deposit account or accounts at the close of business on each Business Day (A) prior to the Final Order Entry Date, from, with respect to the US Borrower, Bank of America, Account Number: 004615683083, ABA Number: 026009593; and, with respect to the Canadian Borrower, Bank of America, Bank Number: 241, Transit Number: 56792, Swift Code: BOFACATT, Account Numbers: 47996211 & 47996112, to the designated operating accounts of the Borrowers, and upon such transfer a Loan shall be deemed disbursed pursuant to Section 2.08(a)(iii), and (B) on and after the Final Order Entry Date, from, with respect to the US Borrower, Bank of America, Account Number: 004615683083, ABA Number: 026009593; and, with respect to the Canadian Borrower, Bank of America, Bank Number: 241, Transit Number: 56792, Swift Code: BOFACATT, Account Numbers: 47996211 & 47996112, to the designated operating accounts of the Borrowers, subject to the mandatory prepayment requirements of Section 2.12(c)(v).

SECTION 2.12. Prepayment of Loans. (a) Each Borrower shall have the right at any time and from time to time to prepay any Borrowing of such Borrower in whole or in part, subject to the requirements of this Section.

(b) In the event and on such occasion that the sum of the aggregate Revolving Exposures of all Lenders plus the LC Obligations exceeds the aggregate Revolving Commitments then in effect, the Borrowers shall prepay Borrowings in an aggregate amount sufficient to eliminate such excess.

(c) Disposition and Cash Balance Mandatory Prepayments.

(i) No later than the first Business Day following the date of receipt by Barzel, any Borrower or any of their Subsidiaries (other than assets of Delta Tubes, but not the equity interests in Delta Tubes) of any net cash proceeds from the sale of any asset, the Borrowers shall prepay the Obligations in an aggregate amount equal to 100% of such net cash proceeds.

(ii) No later than the first Business Day following the date of receipt by Barzel, any Borrower or any of their Subsidiaries, or Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the Borrowers shall prepay the Loans in an aggregate amount equal to 100% of such Net

Insurance/Condemnation Proceeds, less the amount of any such proceeds actually paid to the Buyer pursuant to the terms of, and prior to the consummation of, the Approved Sale.

(iii)     On the date of receipt by Barzel, any Borrower or any of their Subsidiaries of any cash proceeds from the issuance of debt by, or a capital contribution to, or the issuance of any capital stock of, Barzel or any of its Subsidiaries, the Borrowers shall prepay the Loans in an aggregate amount equal to 100% of such cash proceeds.

(iv)     No later than the first Business Day following the date of receipt by Barzel, any Borrower or any of their Subsidiaries of any Tax Refund Proceeds, the Borrowers shall prepay the Loans in an aggregate amount equal to 100% of such Tax Refund Proceeds.

(v)     No later than the first Business Day following each date when cash and Permitted Investments (the "Cash Balance") held by Barzel or any of its Subsidiaries exceeds US$5,000,000 (the "Cash Balance Limit") for a period of 2 or more consecutive days, the Borrowers shall prepay the Loans in an amount sufficient to reduce the Cash Balance below the Cash Balance Limit.

Notwithstanding the foregoing, the amount of any mandatory prepayments made by the Canadian Borrower shall not exceed the amount of the Obligations owed by it or a Canadian Loan Party. Each such mandatory prepayment set forth in subsections (i) through (v) above other than from Tax Refund Proceeds and from proceeds of the sale of Norwood, shall permanently reduce the Revolving Commitments in an amount equal to such amounts so prepaid.

(d) Prior to any prepayment of Borrowings the applicable Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (e) of this Section.

(e) The applicable Borrower shall notify the Administrative Agent by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of an ABR Borrowing or a Canadian Prime Revolving Borrowing, not later than 11:00 a.m., Local Time, one Business Day before the date of prepayment or (ii) in the case of prepayment of a Protective Advance, not later than 12:00 noon, New York City time, on the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that, if a notice of optional prepayment is given in connection with a conditional notice of termination of the Revolving Commitments as contemplated by Section 2.10, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.10. Promptly following receipt of any such notice (other than a notice relating solely to Protective Advances), the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case

of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.14.

(f) This Section shall not apply to prepayments made pursuant to Section 2.11(f).

(g) Notwithstanding anything to the contrary contained herein, the proceeds of the Approved Sale received by the Administrative Agent shall be applied first, for the benefit of the Issuing Bank, to cash collateralize LC Obligations in respect of the Existing Letters of Credit in an amount in cash equal to 105% of the LC Obligations in respect of the Existing Letters of Credit and then, as so provided in Section 5.02 of the Guarantee and Collateral Agreement.

SECTION 2.13. <u>Fees.</u> (a) The US Borrower agrees to pay in US Dollars to the Administrative Agent for the account of each Lender a commitment fee, which shall accrue at the Applicable Rate on the average daily unused amount of the Revolving Commitment of such Lender during the period from and including the date hereof to but excluding the date on which such Revolving Commitment terminates. Accrued commitment fees shall be payable in arrears on the last day of each calendar month and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the date hereof. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). For purposes of computing commitment fees with respect to Revolving Commitments, a Revolving Commitment of a Lender shall be deemed to be used to the extent of the outstanding Revolving Loans (and the Protective Advance Exposure of such Lender shall be disregarded for such purpose).

(b) The US Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the US Borrower and the Administrative Agent.

(c) All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution to the Lenders entitled thereto. Fees paid shall not be refundable under any circumstances.

SECTION 2.14. <u>Interest.</u> (a) The Loans comprising each ABR Borrowing and each Protective Advance shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b) The Loans comprising each Canadian Prime Revolving Borrowing shall bear interest at the Canadian Prime Rate plus the Applicable Rate.

(c) [Reserved.]

38

(d) Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by a Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% per annum plus the interest rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2% per annum plus the rate applicable to ABR Revolving Loans made to the US Borrower (in the case of amounts payable in US Dollars) or the rate applicable to Canadian Prime Revolving Loans (in the case of amounts payable in Canadian Dollars), in each case as provided in paragraph (a) or (b) of this Section.

(e) Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and, in the case of Revolving Loans, upon termination of the Revolving Commitments; provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan or Canadian Prime Revolving Loan prior to the end of the Revolving Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment. All interest shall be payable in the currency in which the applicable Loan is denominated.

(f) All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Canadian Prime Rate or the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Canadian Prime Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(g) For the purposes of the *Interest Act* (Canada), in any case in which an interest rate is stated in this Agreement to be calculated on the basis of a year of 360 days or any other period of time that is less than a calendar year, the yearly rate of interest to which the rate determined pursuant to such calculation is equivalent is the rate so determined multiplied by the actual number of days in the calendar year for which the calculation is made and divided by either 360 or such other period of time, as the case may be. In addition, the principles of deemed investment of interest do not apply to any interest calculations under this Agreement and the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

(h) If any provision of this Agreement would obligate the Canadian Borrower to make any payment of interest or other amount payable to the Administrative Agent, any Lender in an amount or calculated at a rate which would be prohibited by law or would result in the receipt by the Administrative Agent or such Lender of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)), then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case

may be, as would not be so prohibited by law or so result in a receipt by the Administrative Agent or such Lender of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: (i) first, by reducing the amount or rates of interest required to be paid under this Section; and (ii) second, by reducing any fees, commissions, premiums and other amounts which would constitute interest for purposes of Section 347 of the *Criminal Code* (Canada). If, notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, the Administrative Agent or any Lender shall have received an amount in excess of the maximum permitted by such clause, then the Canadian Borrower shall be entitled, by notice in writing to the Administrative Agent or such Lender, to obtain reimbursement from it of an amount equal to such excess, and, pending such reimbursement, such amount shall be deemed to be an amount payable by the Administrative Agent or such Lender to the Canadian Borrower. Any amount or rate of interest referred to in this paragraph shall be determined in accordance with generally accepted actuarial practices and principles as an effective annual rate of interest over the term of any Loan on the assumption that any charges, fees or expenses that fall within the meaning of "interest" (as defined in the *Criminal Code* (Canada)) shall, if they relate to a specific period of time, be prorated over that period of time and otherwise be prorated over the period from the Effective Date to the Revolving Maturity Date and, in the event of dispute, a certificate of a Fellow of the Canadian Institute of Actuaries appointed by the Administrative Agent shall be conclusive for the purposes of such determination absent manifest error.

SECTION 2.15. [Reserved.]

SECTION 2.16. Increased Costs. (a) If any Change in Law shall:

(A) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

(B) impose on any Lender any other condition affecting this Agreement made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the applicable Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers

will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as specified in paragraph (a) or (b) of this Section shall be delivered to the applicable Borrower and shall be conclusive absent manifest error. Such Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the applicable Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies such Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.17. [Reserved.]

SECTION 2.18. Taxes. (a)    Any and all payments by or on account of any obligation of a Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if a Loan Party shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) Each Loan Party shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of such Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto (except to the extent such penalties, interest and expenses result solely from the gross negligence or willful misconduct of the Administrative Agent or such Lender, as the case may be), whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority;

provided, however, that the Administrative Agent or such Lender, as the case may be, shall reasonably cooperate with the Borrowers, at the Borrowers' sole cost and expense, in good faith to recover any such Indemnified Taxes or Other Taxes that the Administrative Agent or such Lender, as the case may be, in each case in its sole discretion, and the Borrowers agree were incorrectly or illegally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) Any Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which a Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to such Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by such Borrower as will permit such payments to be made without withholding or at a reduced rate; provided that such Lender has received written notice from such Borrower advising it of the availability of such exemption or reduction and containing all applicable documentation. Each Lender shall promptly notify the Borrowers at any time it determines that it is no longer in a position to provide any such previously delivered documentation.

(f) If the Administrative Agent or any Lender, as the case may be, determines in its sole discretion that it is entitled to receive a refund in respect of Taxes with respect to which it has received additional amounts from a Borrower pursuant to paragraph (a) of this Section or as to which it has been indemnified by a Borrower pursuant to paragraph (c) of this Section, the Administrative Agent or such Lender, as the case may be, shall notify the Borrowers and shall, within 45 days after receipt of a request by the Borrowers, apply for such refund at the Borrowers' sole cost and expense. If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by a Borrower or with respect to which a Borrower has paid additional amounts pursuant to this Section, it shall pay over such refund to such Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that such Borrower, upon the request of the Administrative Agent or such Lender agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such

refund to such Governmental Authority. This Section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to a Borrower or any other Person.

SECTION 2.19. <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs.</u> (a) Barzel and each Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest, fees or otherwise) prior to the time required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 12:00 noon, Local Time), on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made (i) in the case of payments made by Barzel or the US Borrower, to the Administrative Agent, and (ii) in the case of payments made by the Canadian Borrower, to the Canadian Agent, in each case to the applicable account specified by such Agent, as expressly provided herein and except that payments pursuant to Sections 2.16, 2.18 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent and the Canadian Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof (it being understood that all payments received by the Canadian Agent shall be distributed, with respect to any Lender, to the Applicable Lending Office of such Lender designated by such Lender for the receipt of payments from the Canadian Borrower). If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder of principal or interest in respect of any Loan shall, except as otherwise expressly provided herein, be made in the currency of such Loan; all other payments hereunder and under each other Loan Document shall be made in US Dollars.

(b) If at any time insufficient funds from a Borrower are received by and available to the Administrative Agent to pay fully all amounts of principal of the Loans, interest and fees then due hereunder from such Borrower, such funds shall be applied in the manner determined by the Administrative Agent, in its sole discretion, but subject to the provisions of Section 2.11(f).

(c) If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Revolving Loans or Protective Advances resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Revolving Loans and Protective Advances and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Loans and Protective Advances of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders

ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Loans and Protective Advances; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by a Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or Protective Advances to any assignee or participant, other than to the applicable Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply). Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

(d) Unless the Administrative Agent shall have received notice from a Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if such Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e) If any Lender shall fail to make any payment required to be made by it pursuant to Sections 2.08(b), 2.19(d) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

SECTION 2.20. Mitigation Obligations; Replacement of Lenders. (a) If a Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.18, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans or other extensions of credit hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to 2.18, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

44

(b)  If (i) any Loan Party is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.18, (ii) any Lender defaults in its obligation to fund Loans hereunder or (iii) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of Section 9.02 requires the consent of all of the Lenders and with respect to which the Required Lenders shall have granted their consent, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if such other Lender accepts such assignment); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (C) in the case of any such assignment resulting from payments required to be made pursuant to Section 2.18, such assignment will result in a reduction in such compensation or payments, and (D) in the case of any such assignment resulting from the failure to provide a consent, the assignee shall have given such consent.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.  Each party hereto agrees that an assignment required pursuant to this Section 2.20(b) may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

ARTICLE III

Representations and Warranties

Each of Barzel and the Borrowers represents and warrants to the Lenders that:

SECTION 3.01. Organization; Powers.  Each of Barzel, the Borrowers and the other Subsidiaries other than Delta Tubes is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction) in good standing under the laws of the jurisdiction of its organization, subject to the entry and the terms of the Bankruptcy Court Orders and the Canadian Court Orders, has all requisite power and authority and all material Governmental Approvals to carry on its business as now conducted and as proposed to be conducted, and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

NY 72292764v14

SECTION 3.02. <u>Authorization; Enforceability.</u>  The Transactions to be entered into by each Loan Party are within such Loan Party's corporate or other organizational powers and, subject to the entry and terms of the Bankruptcy Court Orders and the Canadian Court Orders, have been duly authorized by all necessary corporate or other organizational action and, if required, stockholder or other equityholder action. This Agreement has been duly executed and delivered by each of Barzel and the Borrowers and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of Barzel, such Borrower or such Loan Party, as the case may be, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, plans of arrangement, moratorium or other laws affecting creditors' rights generally (including without limitation, the terms of the US Bankruptcy Court Orders and the Canadian Court Orders) and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03. <u>Governmental Approvals; No Conflicts.</u>  Subject to the entry and terms of the Bankruptcy Court Orders and the Canadian Court Orders, the Transactions (a) do not require any material consent or approval of, registration or filing with or any other material action by any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) filings necessary to perfect Liens created under the Loan Documents, (b) will not violate in any material respect any applicable law or regulation or order of any Governmental Authority, (c) will not violate the charter, by-laws or other organizational documents of Barzel, any Borrower or any other Subsidiary, (d) other than conflicts, breaches and defaults the enforcement of which will be stayed by virtue of the filing of the Chapter 11 Cases and issuance of the Canadian Court Orders, will not violate or result in a default under any indenture or other material agreement or instrument binding upon Barzel, either Borrower or any other Subsidiary or its assets, or give rise to a right thereunder to require any payment to be made by Barzel, either Borrower or any of the Subsidiaries, and (e) will not result in the creation or imposition of any Lien on any asset of Barzel, either Borrower or any other Subsidiary, except for Liens created under the Loan Documents or the US Bankruptcy Court Orders or Canadian Court Orders.

SECTION 3.04. <u>Financial Condition; No Material Adverse Change.</u>  (a) Barzel and the Borrowers have heretofore furnished to the Lenders the consolidated balance sheets, consolidated statements of operations and comprehensive income, consolidated statement of stockholders' equity and consolidated statements of cash flows of Barzel and its consolidated subsidiaries (i) as of and for the fiscal year ended November 29, 2008, reported on by Raymond Chabot Grant Thornton LLP, independent registered public accountants, (ii) as of and for the fiscal quarter and the portion of the fiscal year ended May 30, 2009 and (iii) as of and for the months ended June 30, 2009 and July 31, 2009, and in the case of (ii) and (iii), certified by a financial officer of Barzel.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of Barzel and its consolidated subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

46

(b) The Approved Budget has been prepared in good faith by Barzel and is based on assumptions believed by Barzel to be reasonable at the time made.

(c) Each update to the Approved Budget, to the extent the Administrative Agent and the Lenders have consented to such update, delivered in accordance with the terms hereunder, shall be, at the time furnished, reasonable and shall have been prepared on a reasonable basis and in good faith by Barzel, based on assumptions believed by Barzel to be reasonable at the time made and upon the best information then reasonably available to Barzel, and Barzel shall not be aware of any facts or information then reasonably available to Barzel and not disclosed with the Lenders that would lead Barzel to believe that such projections, as so updated, are incorrect or misleading in any material respect.

(d) Other than the Cases and the circumstances related thereto, since July 30, 2009, there has been no event that could reasonably be expected to have a Material Adverse Effect.

SECTION 3.05. Properties. (a)    Each of Barzel, the Borrowers and the other Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to its business (including its Mortgaged Properties), except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes.

(b) Each of Barzel, the Borrowers and the other Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by Barzel, the Borrowers and the other Subsidiaries does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c) Schedule 3.05 sets forth the address of each real property that is owned or leased by Barzel, either Borrower or any other Subsidiary as of the Effective Date and identifies each of such real properties that is a Mortgaged Property, if any.

(d) As of the Effective Date, none of Barzel, the Borrowers or the other Subsidiaries has received notice of, or has knowledge of, any pending or contemplated condemnation proceeding affecting any real property listed on Schedule 3.05 or any sale or disposition thereof in lieu of condemnation. As of the Effective Date, neither any real property listed on Schedule 3.05 nor any interest therein is subject to any right of first refusal, option or other contractual right to purchase such real property or interest therein (except for the Albany Facility, Delta Tubes and Norwood, in each case, only on the terms and conditions disclosed to and/or approved by the Lenders).

SECTION 3.06. Litigation and Environmental Matters. (a)    Except for any pre-petition litigation that is stayed by 11 U.S.C. § 362 or the Canadian Court Orders, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Barzel or either Borrower, threatened against or affecting Barzel, either Borrower or any other Subsidiary (i) as to which there

is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents.

(b) Except with respect to matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, or except as disclosed in Schedule 3.06(b), none of Barzel, the Borrowers or the other Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability against Barzel, either Borrower or any other Subsidiary.

SECTION 3.07. Compliance with Laws and Agreements. Except for such violations existing as of or resulting from the commencement of the Cases, each of Barzel, the Borrowers and the other Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property (including ERISA, Canadian pension laws and regulations and margin regulations) and all indentures, agreements and other instruments binding upon it or its property, except where the failure to be in compliance, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.08. Investment Company Status. None of Barzel, the Borrowers or the other Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09. Taxes. Each of Barzel, the Borrowers and the other Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) any Taxes that are being contested in good faith by appropriate proceedings and for which Barzel, such Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves, (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect or (c) to the extent that such payment or any enforcement action is stayed as a result of the Cases.

SECTION 3.10. ERISA; Canadian Benefit and Pension Plans. (a) No ERISA Event or Canadian Pension Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events or Canadian Pension Event for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect. The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent consolidated financial statements reflecting such amounts, exceed by more than US$10,000,000 the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the

48

most recent financial statements reflecting such amounts, exceed by more than US$10,000,000 the fair market value of the assets of all such underfunded Plans.

(b) The Canadian Pension Plans are duly registered in accordance with any applicable law, which requires registration, and no event has occurred which is reasonably likely to cause the loss of such registered status. All material obligations of Barzel, each Borrower and each other Subsidiary (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans and the funding agreements therefor have been performed in a timely fashion. There have been no improper withdrawals or applications of the assets of the Canadian Pension Plans or the Canadian Benefit Plans. There are no outstanding disputes concerning the assets held under the funding agreements for the Canadian Pension Plans or the Canadian Benefit Plans. None of the Canadian Pension Plans provides benefits under a defined benefit provision and the Canadian Loan Parties do not have any obligations under any multiemployer pension plan as defined in the PBA. There has been no partial termination of any Canadian Pension Plan and, except as disclosed in Schedule 3.10, no facts or circumstances have occurred or existed that could reasonably be expected to result in the declaration of a partial termination of any Canadian Pension Plan under the Ontario PBA. No promises of benefit improvements under the Canadian Pension Plans or the Canadian Benefit Plans have been made, except where such improvement could not reasonably be expected to result in a Material Adverse Effect and in any event no such improvements will result in a solvency deficiency or going concern unfunded liability in the affected Canadian Pension Plans. All contributions or premiums required to be made or paid by Barzel, any Borrowers or any other Subsidiary to the Canadian Pension Plans or the Canadian Benefit Plans have been made or paid when due in accordance with the terms of such plans and all applicable law. All employee contributions to the Canadian Pension Plans or the Canadian Benefit Plans by way of authorized payroll deduction or otherwise have been properly withheld or collected by Barzel, the Borrowers and the other Subsidiaries and fully paid into such plans when due. The pension fund under each Canadian Pension Plan is exempt from the payment of any income tax, and there are no Taxes, penalties or interest owing in respect of any such pension fund. All material reports and disclosures relating to the Canadian Pension Plans required by such plans and any applicable law to be filed or distributed have been filed or distributed in a timely manner.

SECTION 3.11. Disclosure. Barzel and the Borrowers have disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which Barzel, either Borrower or any other Subsidiary is subject, and all other matters known to any of them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected

financial information, Barzel and the Borrowers represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 3.12. Subsidiaries and Joint Ventures. Schedule 3.12 sets forth, as of the Effective Date, the name and jurisdiction of organization of, and the percentage of each class of Equity Interests owned by Barzel, any Borrower or any other Subsidiary in, (a) each Subsidiary, accurately identifying each Subsidiary that is a Subsidiary Party as such, and (b) each joint venture in which Barzel, any Borrower or any other Subsidiary owns any Equity Interests.

SECTION 3.13. Insurance. Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of Barzel, the Borrowers and the other Subsidiaries as of the Effective Date. As of the Effective Date, all premiums in respect of such insurance have been paid. Barzel and the Borrowers believe that the insurance maintained by or on behalf of Barzel, the Borrowers and the other Subsidiaries is adequate.

SECTION 3.14. Reorganization Matters. (a) The Chapter 11 Cases and the Canadian Case were commenced on September [14], 2009 and September [15], 2009, respectively, in each case in accordance with applicable law and proper notice thereof and proper notice of the hearings to consider entry of the Interim Order and entry of the CCAA Initial Order has been given or dispensed with pursuant to the terms of the Interim Order and CCAA Initial Order and proper notice of the hearing to consider entry of the Final Order will be given.

(a) Each of the Interim Order (with respect to the period prior to the entry of the Final Order), the Final Order (with respect to the period following the entry of the Final Order) and the CCAA Initial Order is in full force and effect and has not been reversed, stayed, modified, vacated or amended without the written consent of the Administrative Agent and the Required Lenders.

(b) Subject to and after the entry of the Interim Order (with respect to the period prior to entry of the Final Order), the Final Order (with respect to the period following the entry of the Final Order) and the CCAA Initial Order, notwithstanding the provisions of Section 362 of the Bankruptcy Code or the stay of proceedings contained in the CCAA Initial Order, upon the Revolving Maturity Date (whether by acceleration or otherwise), the Administrative Agent and Lenders shall be entitled to immediate payment in full in cash of the Obligations (or, with respect to the Existing Letters of Credit, the provision of cash collateral or back to back letters of credit for the benefit of the Issuing Bank in an amount equal to 105% of the face amount of each Existing Letter of Credit) and to enforce the remedies provided for hereunder and under the other Loan Documents, without further application to or order by the Bankruptcy Court or the Canadian Court, as more fully set forth in and subject to the Interim Order, the Final Order and the CCAA Initial Order, except that with respect to exercising any additional remedies as to which the Bankruptcy Court or Canadian Court has proscribed a notice requirement, prior notice has been given as so required.

SECTION 3.15. <u>Labor Matters.</u> As of the Effective Date, there are no strikes, lockouts or slowdowns against Barzel, either Borrower or any Subsidiary pending or, to the knowledge of Barzel or either Borrower, threatened. The hours worked by and payments made to employees of Barzel, the Borrowers and the other Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, provincial, territorial, local or foreign law dealing with such matters. All material payments due from Barzel, either Borrower or any Subsidiary, or for which any claim may be made against Barzel, either Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Barzel, such Borrower or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Barzel, either Borrower or any Subsidiary is bound.

SECTION 3.16. <u>Accounts.</u> <u>Schedule 3.16</u> sets forth all of the operating, payroll and other deposit accounts of Barzel and its Subsidiaries and identifies the concentration accounts to which all receivables of Barzel and the Subsidiary Parties are directed pursuant to Section 5.20.

SECTION 3.17. <u>Collateral Matters.</u> (a) The provisions of the Bankruptcy Court Orders, the Canadian Court Orders, and the other Loan Documents create legal, valid and enforceable Liens on all the Collateral of Barzel, the Borrowers and Guarantors in favor of the Administrative Agent or the Canadian Agent, as applicable, for the benefit of itself and the Secured Parties, and pursuant to such Loan Documents together with, the Bankruptcy Court Orders and the Canadian Court Orders, such Liens constitute perfected and continuing first priority Liens on the Collateral, securing the Obligations, enforceable against the applicable Loan Party and all third parties, subject to (b) and (c) below, except in the case of Permitted Encumbrances to the extent any such Permitted Encumbrances would have (and are permitted to have) priority over the Liens in favor of the Administrative Agent or the Canadian Agent pursuant to any applicable law.

(b) Subject to the Canadian Court Orders, Barzel and the Borrowers hereby covenant, represent and warrant that, upon entry of the Canadian Court Orders, the Obligations shall at all times be secured by a valid, binding, continuing, enforceable and, subordinate only to the CCAA Charge and the Directors Charge, fully perfected first priority security interest in, and first ranking court-ordered charge on (or applicable equivalents outside of the Province of Ontario to such security and charge), all of the existing and after-acquired real and personal, tangible and intangible, assets of the Canadian Borrower and each of the Canadian Loan Parties, including, without limitation, all cash, cash equivalents, bank accounts, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, tradenames, trademarks, copyrights, industrial designs, intellectual property, general intangibles, intangibles, capital stock, investment property, supporting obligations, letter of credit rights, documents of title, commercial tort claims,

51

causes of action and all substitutions, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds (the "DIP Lenders' Charge").

(c) Subject to the priorities set forth in subsections (a) and (b) above and to the Carve-Out, the CCAA Charges and the Directors Charge, as applicable, as to (i) all existing and after-acquired personal property of Barzel, the Borrowers or any Guarantor, and (ii) all real property now owned or hereafter acquired the title to which is held by Barzel, the Borrowers, or any Guarantor (whether or not such personal or real property secures the Prepetition Indebtedness), or the possession of which is held by Barzel, the Borrowers or any Guarantor pursuant to leasehold interests; each of Barzel, the Borrowers and the Guarantors hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Canadian Agent for the benefit of itself and the Secured Parties to secure its Obligations all of the right, title and interest in all of such owned real and personal property and in all such leasehold interests, together in each case with all of the right, title and interest of Barzel, the Borrowers and such Guarantor in and to all personal property, buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. Barzel, the Borrowers and each other Guarantor acknowledges that, pursuant to the Bankruptcy Court Orders and the Canadian Court Orders, as applicable, the Liens in favor of the Canadian Agent in all of such real and personal property and leasehold instruments shall be perfected without any registration or the recordation of any instruments of mortgage or assignment or other documents.

(d) Each Mortgage, upon execution and delivery by the parties thereto, will create in favor of the Administrative Agent or the Canadian Agent, as applicable, for the benefit of itself and the Secured Parties, a legal, valid and enforceable Lien on all the applicable mortgagor's right, title and interest in and to the Mortgaged Properties subject thereto and the proceeds thereof, and when the Mortgages have been filed in the jurisdictions specified therein or when the Interim Order is entered and CCAA Initial Order is entered, the Mortgages will constitute a fully perfected Lien on all right, title and interest of the mortgagors in the Mortgaged Properties and the proceeds thereof, superior in right to any other Person other than the CCAA Charge and Directors Charge.

(e) Each Security Document (other than the Mortgages), when executed and delivered and when the filings or other actions provided for therein have been taken, including, without limitation, entry of the Interim Order and CCAA Initial Order, will be effective under applicable law to create in favor of the Administrative Agent or the Canadian Agent, as applicable, for the benefit of itself and the Secured Parties, a valid and enforceable security interest in the Collateral subject thereto, and will constitute a fully perfected Lien on and security interest in all right, title and interest of the Loan Parties in the Collateral subject thereto prior and superior in right to any other Person, other than the CCAA Charge and Directors Charge.

(f) On and after the Interim Order Entry Date and prior to the Final Order Entry Date, the Interim Order is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Agents and the Required Lenders, and on and after the Final Order Entry Date, the Final Order is in full force and

effect, and has not been reversed, modified , amended, stayed or vacated absent the written consent of the Agents and the Required Lenders.

(g) On and after the CCAA Filing Date and prior to the Canadian Extension Order Date, the CCAA Initial Order is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Agents and the Required Lenders, and on and after the Canadian Extension Order Date, each of the CCAA Extension Order and the CCAA Initial Order is in full force and effect (as confirmed and extended by the CCAA Extension Order), and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Agents and the Required Lenders.

SECTION 3.18. <u>Federal Reserve Regulations.</u> Neither Barzel nor any of the Subsidiaries is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board), or extending credit for the purpose of purchasing or carrying margin stock. No part of the proceeds of the Loans will be used, whether directly or indirectly, to purchase or carry any margin stock or to refinance Indebtedness originally incurred for such purpose, or for any purpose that entails a violation (including on the part of any Lender) of Regulation U or X of the Board.

SECTION 3.19. [Reserved.]

SECTION 3.20. <u>Approvals</u>. Except for the Bankruptcy Court Orders and the Canadian Court Orders, no authorizations of any Governmental Authority, or any securities exchange, are necessary for the execution, delivery or performance by any Loan Party of the Loan Documents to which such Loan Party is a party, or for the legality, validity or enforceability hereof or thereof.

SECTION 3.21. <u>The Bankruptcy Court Orders and the Canadian Court Orders</u>.

(a) From and after the Interim Order Entry Date, the Interim Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect (except as expressly permitted under this Agreement).

(b) From and after the Final Order Entry Date, the Final Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect (except as expressly permitted under this Agreement).

(c) From and after the CCAA Filing Date, the CCAA Initial Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect (except as expressly permitted under this Agreement).

(d) From and after the CCAA Extension Date, the CCAA Extension Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect (except as expressly permitted under this Agreement)

SECTION 3.22. <u>Prepetition Obligations</u>. Subject to the reservation of rights of the third parties as set forth in the Interim Order, the amount of the Prepetition Obligations is as set forth on <u>Schedule 3.21.</u>

SECTION 3.23. <u>632422 N.B. Ltd.</u> 632422 N.B. Ltd. does not carry on any business or own or control any assets having more than a nominal value.

SECTION 3.24. <u>Hencorp LLC</u>. Hencorp LLC does not carry on any business or own or control any assets having more than a nominal value.

SECTION 3.25. <u>Chriscorp ULC</u>. Chriscorp ULC does not carry on any business or own or control any assets having more than a nominal value.

SECTION 3.26. <u>Delta Tubes</u>. Delta Tube is not a wholly-owned Subsidiary of Barzel, any of the Borrowers or any other Subsidiary. The organizational documents of Delta Tube and any related joint venture or similar agreement prohibit any assignment, pledge or grant of security interest in the Equity Interests of Delta Tube without the consent of the equity holders of Delta Tube.

ARTICLE IV

Conditions

SECTION 4.01. <u>Effective Date</u>. The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a) The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement and the other Loan Documents signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or electronic transmission) that such party has signed a counterpart of this Agreement and the other Loan Documents.

(b) The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Davies Ward Phillips & Vineberg LLP, Canadian counsel for Barzel and the Borrowers in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, and, in the case of such opinion required by this paragraph, covering such other matters relating to the Loan Parties, the Loan Documents or the Transactions as the Administrative Agent shall reasonably request. Each of Barzel and the Borrowers hereby requests such counsel to deliver such opinions.

(c) The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the Transactions and any other legal matters relating to the Loan Parties, the Loan Documents or the Transactions, all in form and substance satisfactory to the Administrative Agent and its counsel.

(d) The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the President, a Vice President or a Financial Officer of Barzel and the Borrowers, confirming compliance with the conditions set forth in paragraphs (e), (i), (j), (k), (l), (m), (n), (r), (v), (w), (x), (z), (aa) and (bb) of this Section and paragraphs (a) and (b) of Section 4.02.

(e) The commencement of the Cases and the consummation of the other Transactions contemplated hereunder and by the other Loan Documents shall have been duly authorized by the Borrowers and each Guarantor.

(f) The Administrative Agent shall have received (i) a completed Canadian Perfection Certificate, dated the Effective Date and signed by a Financial Officer or legal officer of the Canadian Borrower, together with all attachments contemplated thereby, and (ii) the results of a recent lien search in (A) each of the Canadian jurisdictions where assets of the Debtors are located and (B) the jurisdiction of formation of each Debtor, and such Perfection Certificate shall confirm that there are no Liens on any of the assets of the Canadian Debtor or their respective subsidiaries except for Permitted Encumbrances and Liens to secure the Prepetition Obligations together with a description of such Permitted Encumbrances and Liens satisfactory to the Administrative Agent or such Liens are discharged on or prior to the Effective Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(g) The Administrative Agent shall have received evidence that the insurance required by Section 5.08 is in effect, together with endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder to the extent required by such Section.

(h) The Administrative Agent shall have received, with respect to each Mortgaged Property, each of the following, in form and substance reasonably satisfactory to the Administrative Agent, to the extent requested by the Administrative Agent (orally or in writing):

      (i)      a Mortgage on such property;

      (ii)      evidence that a counterpart of the Mortgage (or any necessary amendment to any Mortgage existing immediately prior to the Effective Date to reflect the consummation of the Transactions) has been recorded in the place necessary, in the Administrative Agent's judgment, to create a valid and enforceable Lien in favor of the Administrative Agent or the Canadian Agent, as applicable, for the benefit of itself and the Lenders; and

      (iii)      such other information, documentation, and certifications as may be reasonably required by the Administrative Agent.

(i) The Collateral and Guarantee Requirement shall have been satisfied.

(j) The Administrative Agent shall have received (i) a completed Perfection Certificate dated the Effective Date and signed by an executive officer or Financial

Officer of Barzel and the Borrowers, together with all attachments contemplated thereby, including the results of a search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties in the jurisdictions contemplated by the Perfection Certificate and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are permitted by Section 6.02 or have been, or substantially simultaneously with the initial funding of the Loans on the Effective Date will be, released and (ii) evidence that the lockbox arrangements contemplated by the Collateral Agreements shall have been established.

(k) The Administrative Agent and the Lenders shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including fees, charges and disbursements of legal counsel, bankruptcy counsel and financial advisors) required to be reimbursed or paid by any Loan Party hereunder or under any other Loan Document.

(l) The CCAA Initial Order granting *inter alia* the DIP Lenders' Charge shall have been issued and entered into by the Canadian Court in form and substance satisfactory to the Administrative Agent and the Required Lenders, the Interim Order Entry Date and the CCAA Filing Date shall have occurred and the Administrative Agent shall have received true and complete copies of the Interim Order and the CCAA Initial Order and such orders together with all motions and other documents to be filed and submitted to the Bankruptcy Court and the Canadian Court in connection with the Interim Order and the CCAA Initial Order, respectively, (i) shall have been made upon the application of the US Debtors and the Canadian Debtor, respectively, in form and substance satisfactory to the Administrative Agent, (ii) shall approve the Loan Documents and the extensions of credit in an amount not to exceed the Revolving Commitment and granting the Liens described in, and with priority described in, Section 3.17 and (iii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and the Required Lenders and shall not be subject to a pending appeal or motion for leave to appeal or other proceeding to set aside such order; and if the Interim Order or the CCAA Initial Order is the subject of a pending appeal in any respect, neither the making of any Loans nor the performance by the Borrowers or any of the other Loan Parties of any of their respective obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(m) No trustee, examiner, receiver, interim-receiver or receiver and manager or any other estate representative of the Chapter 11 Cases and the Canadian Case, as applicable, shall have been appointed or designated with respect to the Borrowers, their Subsidiaries or their respective businesses, properties or assets and no motion shall be pending seeking any such relief; no motion shall be pending seeking any other relief in the Bankruptcy Court or the Canadian Court to exercise control over any Collateral and all First Day Orders entered by the Bankruptcy Court or the Canadian Court, as applicable, to the extent entered at the time of the commencement of the Chapter 11

Cases and the Canadian Case, shall be in form and substance satisfactory to the Administrative Agent and the Lenders, in their sole discretion.

(n) Barzel shall have retained the Chief Restructuring Officer, who shall have the authority and responsibilities described further in Section 5.16 hereof.

(o) The Lenders shall have received from Barzel and the Borrowers the Approved Budget, certified as of the Effective Date as true and correct by the Chief Restructuring Officer of Barzel and as complying with the applicable representations and warranties set forth in Article III hereof.

(p) The Administrative Agent shall have received unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Barzel and Barzel Industries for (i) each fiscal quarter ended after November 29, 2008, and (ii) each fiscal month after the most recent fiscal quarter for which financial statements were received pursuant to clause (i) above and ended at least 30 days before the Effective Date, which financial statements shall be prepared in accordance with, or reconciled to, GAAP (subject to normal year-end adjustments and, in the case of clause (ii), to lack of footnotes).

(q) The Administrative Agent shall have received (i) a copy of the Thirteen Week Forecast, in form and substance satisfactory to the Lenders in their sole and absolute discretion, and (ii) copies of all reports of Barzel and its Subsidiaries filed with the Securities and Exchange Commission or prepared by Barzel and/or its Subsidiaries for any other party including any committees in the Cases.

(r) Each document (including any financing statement, fixture filing, mortgage, deed of trust or other document) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create or maintain in favor of the Administrative Agent, for the benefit of the Lenders, a perfected Lien on the Collateral described therein, shall be in proper form for filing, registration or recordation.

(s) The Administrative Agent, for the benefit of the Lenders, shall have a valid and perfected lien on and security interest in the Collateral on the basis and with the priority set forth in Section 3.17 hereof, the Interim Order and the CCAA Initial Order.

(t) The Prepetition Indenture Trustee shall have consented to the entry by the Loan Parties into this Agreement and the other Loan Documents and the granting of liens by the Loan Parties in the Collateral to secure the Obligations on the priority set forth in Section 3.17 hereof, the Interim Order and the CCAA Initial Order.

(u) The Administrative Agent and the Lenders shall be satisfied in all respects with the form and amount of any adequate protection provided to the Prepetition Lenders and the holders of the Senior Notes.

(v) The Lenders shall be satisfied with the Loan Parties' cash management arrangements, and the Administrative Agent shall have received each Deposit Account

Control Agreement and Lockbox Agreement required to be provided pursuant to Section 4.06 of the Guarantee and Collateral Agreement and Section 3.06 of the Canadian Guarantee and Collateral Agreement, all of which shall be effective.

(w) The Borrower shall have paid all fees and expenses then due and payable to the Prepetition Agent and Prepetition Lenders in accordance with the Bankruptcy Court Orders and the Canadian Court Orders.

(x) After giving effect to the Transactions to be consummated on the Effective Date, none of Barzel, the Borrowers and the other Subsidiaries shall have outstanding any shares of preferred stock or any Indebtedness, other than (i) Revolving Loans, (ii) the Prepetition Obligations, (iii) other existing Indebtedness set forth on Schedule 6.01 and (iv) any other Indebtedness permitted under Section 6.01.

(y) Other than the Cases, or as stayed upon the commencement of the Cases, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened against Barzel or any of its Subsidiaries in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon this Agreement, the Interim Order or the CCAA Initial Order, the Collateral or the transactions contemplated hereunder.

(z) The Agents and Lenders shall have received all documentation and other information requested by them for purposes of ensuring compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the United States Patriot Act, the Criminal Code (Canada), the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and the Anti-Terrorism Act (Canada), not fewer than five Business Days prior to the Effective Date.

(aa) After giving effect to the Bankruptcy Court Orders and Canadian Court Orders, all governmental and third-party consents and approvals necessary in connection with the transactions contemplated hereunder shall have been obtained, without the imposition of any conditions that are not acceptable to the Administrative Agent and the Lenders, and shall be in full force and effect; and no law or regulation shall be applicable that restrains, prevents or imposes materially adverse conditions upon this Agreement or the transactions contemplated hereunder.

(bb) No event shall have occurred since July 30, 2009, that could reasonably be expected to have a Material Adverse Effect.

(cc) There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the Borrowers, the Interim Order and the CCAA Initial Order, this Agreement or the exercise by the Administrative Agent or the Lenders of their rights as secured parties with respect to the Collateral.

(dd) The Administrative Agent shall have received, in form and substance reasonably satisfactory to the Administrative Agent, such other agreements, instruments,

approvals, opinions and other documents, as the Administrative Agent may reasonably request.

The Administrative Agent shall notify the Borrowers and the Lenders of the Effective Date, and such notice shall be conclusive and binding. Notwithstanding the foregoing, the obligations of the Lenders to make Loans hereunder shall not become effective unless each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) at or prior to 5:00 p.m., New York City time, on September 18, 2009 (and, in the event such conditions shall not have been so satisfied or waived, the Revolving Commitments shall terminate at such time).

SECTION 4.02. <u>Each Credit Event.</u> The obligation of each Lender to make a Loan on the occasion of any Borrowing, including any Loan advanced on the Effective Date, is subject to receipt of the request therefor in accordance herewith and to the satisfaction of the following conditions:

(a) The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing;

(b) At the time of and immediately after giving effect to such Borrowing no Default or Event of Default shall have occurred and be continuing;

(c) The Administrative Agent shall have received a fully executed Borrowing Notice;

(d) No event shall have occurred that could reasonably be expected to have a Material Adverse Effect;

(e) Each Sale Milestone scheduled to occur on or prior to the proposed date of such Borrowing shall have been achieved and complied with in all respects;

(f) The appointment of the Chief Restructuring Officer shall not have terminated or otherwise ceased to be in effect in accordance with <u>Section 5.16</u>;

(g) The Bankruptcy Court Orders and the CCAA Initial Order shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Required Lenders;

(h) Other than with respect to any Loan advanced prior to the CCAA Extension Date, the CCAA Extension Order shall be in full force and effect and shall not have been stayed, reversed, modified or amended in any respect without the prior written consent of the Required Lenders;

(i) Other than with respect to a Loan advanced on the Effective Date, notice of the CCAA Initial Order shall have been served on each party that has registered a Lien against any of the Debtors and 21 days shall have passed since the date on which the latest of such notices was served, all appeal periods with respect to the CCAA Initial

Order shall have expired with no notice of appeal, or motion to vary, amend, stay, reverse or otherwise affect the CCAA Initial Order having been filed or pending;

(j) The Administrative Agent shall have received a variance analysis which has been reviewed and approved by the Chief Restructuring Officer detailing any discrepancies between the actual results for the week prior to the week of such proposed date of Borrowing and the Approved Budget for such week, in each case, in form and substance satisfactory to the Lenders;

(k) The making of such Loan shall comply with the then-current Approved Budget subject to any applicable Variance;

(l) There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the Borrowers, the Bankruptcy Court Orders and Canadian Court Orders, this Agreement or the exercise by the Secured Parties of their rights as secured parties with respect to the Collateral; and

(m) The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

Each Borrowing shall be deemed to constitute a representation and warranty by Barzel and the Borrowers on the date thereof as to the matters specified in paragraphs (a), (b), (d), (e), (f), (g), (h), (i), (k), (l) and (m) of this Section.

ARTICLE V

Affirmative Covenants

Until the Revolving Commitments have expired or been terminated and the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full, each of Barzel and the Borrowers covenants and agrees with the Lenders that:

SECTION 5.01. Financial Statements and Other Information. Barzel and the Borrowers will furnish to the Administrative Agent and each Lender:

(a) within thirty (30) days of each month-end, monthly consolidated financial statements of Barzel and the Borrowers and their Subsidiaries, including balance sheet, income statement and cash flow statement, in each case, certified by the Barzel's chief financial officer;

(b) on the Wednesday of each week by 5:00 p.m. (NY time), in form and substance satisfactory to the Administrative Agent and Required Lenders, (i) a variance analysis which has been reviewed and approved by the Chief Restructuring Officer detailing (x) any discrepancies between the actual results for the previous week and the Approved Budget in effect for such week and (y) any discrepancies between the cumulative actual results from the Filing Date to such date and the Approved Budget for

such cumulative time period, and (ii) an outline of actions to be taken by Loan Parties to eliminate any adverse discrepancies, if any, and to return to compliance with the Approved Budget;

(c) within two (2) days after the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by or on behalf of the Borrowers or any Loan Party in the Cases, which papers and documents shall also be given or served on Lenders' counsel and the Administrative Agent's counsel;

(d) copies of all reports prepared for any reason by Barzel or the Borrowers for any Person including any committees in the Cases;

(e) promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Barzel, either Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by Barzel to its shareholders generally, as the case may be;

(f) promptly after the request by the Administrative Agent or any Lender, on and after the effectiveness of the applicable provisions of the Pension Act, copies of (i) any documents described in Section 101(i)(1) of ERISA that the US Borrower or any of its ERISA Affiliates may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l)(1) of ERISA that the US Borrower or any of its ERISA Affiliates may request with respect to any Multiemployer Plan; provided that if the US Borrower or any of its ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the US Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(g) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Barzel, either Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Information required to be delivered pursuant to this Section shall be deemed to have been delivered if such information (i) shall have been posted by the Administrative Agent on an IntraLinks or similar site to which the Lenders have been granted access or (ii) shall be available on the website of the Securities and Exchange Commission, provided that Barzel and the Borrowers shall have delivered a notice to the Administrative Agent that such information is so available. Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

SECTION 5.02. Notices of Material Events. Barzel and the Borrowers will furnish to the Administrative Agent prompt written notice of the following:

(a) the occurrence of any Default;

(b) the filing or commencement of any action, suit or proceeding (other than the Cases) by or before any arbitrator or Governmental Authority against or affecting Barzel, either Borrower or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c) the occurrence of any ERISA Event or Canadian Pension Event that, alone or together with any other ERISA Events or Canadian Pension Events that have occurred, could reasonably be expected to result in liability of Barzel, the Borrowers and the other Subsidiaries in an aggregate amount exceeding US$10,000,000; and

(d) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(e) any material development in the Cases not already disclosed to the Lenders.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of Barzel setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03. Information Regarding Collateral. Barzel and the Borrowers will furnish to the Administrative Agent promptly (and, in any event, within 15 days of the occurrence of any such change) written notice of any change (i) in any Loan Party's legal name, as set forth in its documents or organization, (ii) in the location of any Loan Party's chief executive office, the jurisdiction of its domicile (for purposes of the Civil Code of Quebec), the jurisdiction of any office in which it maintains books or records relating to the Collateral owned by it or the jurisdiction of any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility in a new jurisdiction), (iii) in any Loan Party's form of organization or corporate structure (including as a result of any merger or consolidation), (iv) in any Loan Party's Federal Taxpayer Identification Number or identification number, if any, issued to it by the jurisdiction of its organization or (v) in the jurisdiction of any Loan Party's organization.

SECTION 5.04. Existence; Conduct of Business. Each of Barzel and the Borrowers will, and will cause each of the Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.05.

SECTION 5.05. Payment of Obligations. Each of Barzel and the Borrowers will, and will cause each of the Subsidiaries to, pay its obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a)

the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) Barzel, such Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect and (d) the requirement to make such payments is stayed by the Bankruptcy Court.

SECTION 5.06. <u>Maintenance of Properties.</u>  Each of Barzel and the Borrowers will, and will cause each of the Subsidiaries to, keep and maintain all property used in the conduct of its business in good working order and condition, ordinary wear and tear excepted, except (i) where the failure to do so could not reasonably be expected to result in a Material Adverse Effect and (ii) where the enforcement of non-compliance resulting in a default is stayed by the Cases.

SECTION 5.07. <u>Payment of Preferred Claims</u>.  The Borrowers shall, and shall cause its Subsidiaries to, from time to time pay when due or cause to be paid when due all material amounts related to wages, source deductions, workers' compensation obligations, government royalties or pension fund obligations and any other amount which may result in a lien, charge, security interest or similar encumbrance against any or all of the assets of the Borrowers or such Subsidiary arising under statute or regulation, which ranks or may rank in priority to all or any part of the security interest in favor of the Administrative Agent for the benefit of the Secured Parties, in each case subject to the Approved Budget.

SECTION 5.08. <u>Insurance.</u>  Each of Barzel and the Borrowers will, and will cause each of the Subsidiaries to, maintain, with financially sound and reputable insurance companies insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations. Each such policy of insurance maintained by Loan Parties (other than policies of the type in respect of which such actions customarily are not required) shall (a) in the case of each liability insurance policy, name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder, (b) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as the loss payee thereunder and (c) provide for at least 30 days' (or such shorter number of days may be agreed to by the Administrative Agent) prior written notice to the Administrative Agent of any cancellation of such policy.  Barzel and the Borrowers will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

SECTION 5.09. <u>Casualty and Condemnation.</u>  Barzel and the Borrowers (a) will furnish to the Administrative Agent prompt written notice of any casualty or other insured damage to any material portion of any Collateral or the commencement of any action or proceeding for the taking or expropriation of any Collateral or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the proceeds of any such event (whether in the form

of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of the Security Documents.

SECTION 5.10. <u>Books and Records; Inspection and Audit Rights.</u> Each of Barzel and the Borrowers will, and will cause each of the Subsidiaries to, keep proper books of record and account in accordance with GAAP and applicable law. Each of Barzel and the Borrowers will, and will cause each of the Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

SECTION 5.11. <u>Compliance with Laws.</u> Except for such violations existing as of or resulting from the commencement of the Cases, each of Barzel and the Borrowers will, and will cause each of the Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.12. <u>Use of Proceeds.</u> The proceeds of the Loans shall be applied, in each case in accordance with the Approved Budget (as in effect from time to time and subject to the Variance) to: (i) payment of (A) the working capital and other general corporate needs of the Borrowers and the Guarantors in the ordinary course of business; (B) Chapter 11 and Canadian Case expenses, including professional fees and expenses; and (C) adequate protection payments in favor of the Prepetition Lenders and the holders of the Senior Notes, and (ii) repayment of the Prepetition Credit Agreement Obligations. No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

SECTION 5.13. <u>Entry of the Final Order</u>. Barzel and the Borrowers shall undertake reasonable efforts to effect the Final Order being signed and entered by the Bankruptcy Court and the CCAA Extension Order by the Canadian Court on or before the date that is thirty (30) days after the Filing Date, and deliver to the Lenders a true and complete copy of the Final Order and the CCAA Extension Order, and the Final Order and CCAA Extension Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated absent the prior written consent of the Required Lenders.

SECTION 5.14. <u>Notice of Order</u>. Within 6 days after the CCAA Filing Date, the Canadian Borrower shall serve notice of the CCAA Initial Order on each party that has a Lien against the Canadian Debtor.

SECTION 5.15. <u>Further Assurances.</u> (a) Subject to the terms of the Bankruptcy Court Orders and the Canadian Court Orders, each of Barzel and the Borrowers will, and will cause each Subsidiary Party to, execute any and all further

documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), which may be required under any applicable law, or which the Administrative Agent may reasonably request, to cause the Collateral and Guarantee Requirement to be and remain satisfied at all times, all at the expense of the Loan Parties. Barzel and the Borrowers also agree to provide to the Administrative Agent, from time to time upon request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents. Notwithstanding the foregoing, Barzel and the Borrowers shall not be deemed to be in breach of their covenants hereunder with respect to the Collateral and Guarantee Requirement in the event of an inadvertent failure to comply in any immaterial respect with the requirements set forth in the definition of such term, provided that Barzel and the Borrowers shall take, or shall cause the applicable Subsidiary Party to take, prompt corrective action upon discovery or notice thereof.

(b) If any material assets (including any real property or improvements thereto constituting Mortgaged Properties) are acquired by Barzel, any Borrower or any Subsidiary Party after the Effective Date (other than assets constituting Collateral under the Collateral Agreements that become subject to the Lien of the Collateral Agreements upon the acquisition thereof), Barzel and the Borrowers will notify the Administrative Agent thereof and, if requested by the Administrative Agent, will cause such assets to be subjected to a Lien securing the Obligations and will take, and cause the Subsidiary Parties to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the Loan Parties.

SECTION 5.16. Chief Restructuring Officer. Barzel shall continue the retention of the Chief Restructuring Officer on the terms specified in the engagement letter provided to the Administrative Agent prior to the Filing Date, and the Chief Restructuring Officer shall, among other things: (i) report and be responsible directly to the board of directors of Barzel, (ii) have full authority with respect to Barzel, the Borrowers and all other Subsidiaries (including binding signing authority) generally vested in a chief executive officer, (iii) be responsible for all aspects of the Cases and the Approved Sale, (iv) communicate with customers and vendors as required during the pendency of the Cases, (v) assist in the preparation of any financial reports required to be delivered hereunder and (vi) take any other actions as reasonably requested by, or reasonably acceptable to, the board of directors of Barzel. The Chief Restructuring Officer shall be retained until such time as Barzel receives the prior written consent of the Required Lenders to discontinue, amend or alter the terms of such retention and in the event the Chief Restructuring Officer ceases for any reason to act in such capacity, Barzel and the Borrowers shall engage a successor Chief Restructuring Officer reasonably acceptable to the Required Lenders within five (5) Business Days of such cessation.

SECTION 5.17. Approved Sale. Barzel and its Subsidiaries shall comply at all times with any asset purchase agreement related to the Approved Sale and comply at all times with the Sale Milestones, and take all such actions as are reasonably required

or desirable to achieve each Sale Milestone on and when scheduled to be met, and Barzel and its Subsidiaries shall undertake their best efforts to consummate the Approved Sale as expeditiously as possible.

SECTION 5.18. <u>Interim Reimbursed Obligations.</u>  From and including the Filing Date until the later of the Final Order Entry Date, in the case of the US Borrower, and the expiration of the Canadian Appeal Period, in the case of the Canadian Borrower (determined at the end of each Business Day) any and all amounts of Cash Collateral of such Borrower and its Subsidiaries shall be applied to payment of the Prepetition Credit Agreement Obligations until such obligations are repaid in full (the "<u>Interim Reimbursed Amounts</u>").  Such repayments of Prepetition Credit Agreement Obligations shall be effected by book entry by the Prepetition Agent, and a Loan shall be deemed an advance hereunder in an amount equal to such Prepetition Credit Agreement Obligations repaid, which Loan shall be advanced by book entry by the Administrative Agent.

SECTION 5.19. <u>Bankruptcy Filings</u>.  Barzel and the Borrowers shall deliver to the Administrative Agent and the Lenders and their counsel for review and comment prior to filing all material pleadings, motions and other documents (provided that any of the foregoing relating to the Loans hereunder shall be deemed material) to be filed with the Bankruptcy Court or the Canadian Court.

SECTION 5.20. <u>Cash Management Systems</u>.  Barzel and the Borrowers shall maintain their cash management systems substantially in the manner maintained as of the Effective Date and in any case in a manner satisfactory to the Administrative Agent and in accordance with the requirements of this Agreement.  Barzel and the Borrowers shall instruct all account debtors of the Loan Parties, and any other parties remitting a payment constituting Cash Collateral, to remit such payments to the applicable lockbox address with respect to the applicable Lockbox Agreement.

SECTION 5.21. <u>Payment of Obligations</u>.  Subject to the provisions of Article VII, upon the Revolving Maturity Date or upon the acceleration of the Obligations under this Agreement or for any other reason, the Borrowers shall make immediate payment of such Obligations without further application to or order of the Bankruptcy Court or the Canadian Court.

SECTION 5.22. <u>No Discharge; Survival of Claims</u>.  Each of the Borrowers and the Guarantors agrees that (i) its Obligations hereunder shall not be discharged by the entry of an order confirming a Chapter 11 Plan or an order sanctioning a CCAA Plan (and each of Borrowers and the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Orders in the Cases and the DIP Lenders' Charge granted to the Administrative Agent and the Lenders in the Canadian Case pursuant to the CCAA Initial Order and the other Liens granted to the Administrative Agent pursuant to the Orders and the CCAA Initial Order, if any, shall not be affected in any manner by the entry of an order confirming a Chapter 11 Plan or an order sanctioning a CCAA Plan, in each such case

NY 72292764v14

unless the Obligations are indefeasibly paid in full in cash on the Chapter 11 Plan effective date or the CCAA Plan effective date, as the case may be (or, with respect to the Existing Letters of Credit, the provision of cash collateral or back to back letters of credit for the benefit of the Issuing Bank in an amount equal to 105% of the face amount of each Existing Letter of Credit).

ARTICLE VI

Negative Covenants

Until the Revolving Commitments have expired or terminated and the principal of and interest on each Loan and all fees payable hereunder have been paid in full, each of Barzel and the Borrowers covenants and agrees with the Lenders that:

SECTION 6.01. Indebtedness; Certain Equity Securities. (a) Barzel and the Borrowers will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i)     Indebtedness created under the Loan Documents;

(ii)    the Prepetition Obligations;

(iii)   Indebtedness existing on the date hereof and set forth on Schedule 6.01;

(iv)    Indebtedness of any Loan Party to Barzel or any other Loan Party (including the Intercompany Notes); provided that (A) such Indebtedness shall not have been transferred or pledged to any Person, other than pledges thereof pursuant to the Loan Documents, (B) such Indebtedness shall be subordinated to the Obligations, in each case on terms customary for intercompany subordinated Indebtedness, as reasonably determined by the Administrative Agent, and (C) any such Indebtedness shall be evidenced by a promissory note that shall have been pledged pursuant to the Collateral Agreements;

(v)     Indebtedness owed in respect of any overdrafts and related liabilities arising in the ordinary course of business from treasury, depository and cash management services or from any automated clearing-house transfers of funds;

(vi)    Indebtedness (including obligations in respect of letters of credit) owed to providers of workers' compensation, health, disability, retirement or other employee benefits or casualty or liability insurance pursuant to reimbursement or indemnification obligations; and

(vii)   Indebtedness owed in respect of performance bonds, bid bonds, surety bonds, appeal bonds and bank guarantees and letters of credit (other than bank guarantees and letters of credit supporting other Indebtedness), in each case

67

provided in the ordinary course of business, including those securing health, safety and environmental obligations in the ordinary course of business.

(b) Barzel and the Borrowers will not, and will not permit any Subsidiary to, issue any preferred stock or other preferred Equity Interests.

SECTION 6.02. <u>Liens</u>. (a) Barzel and the Borrowers will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i) Liens created under the Loan Documents, the US Bankruptcy Orders or the CCAA Initial Order;

(ii) Liens securing Indebtedness permitted under clause (ii) of Section 6.01(a);

(iii) Permitted Encumbrances;

(iv) any Lien on any property or asset of a Canadian Loan Party securing Indebtedness owed by any Canadian Loan Party to any US Loan Party and permitted under clause (iv) of Section 6.01(a);

(v) any Lien on any property or asset of a Borrower or any other Subsidiary existing on the date hereof and set forth in <u>Schedule 6.02</u>, and any renewals and continuations thereof; <u>provided</u> that (A) such Lien shall not apply to any other property or asset of Barzel, any Borrower or any other Subsidiary and (B) such Lien shall secure only those obligations which it secures on the date hereof;

(vi) in the case of any Subsidiary that is not a wholly-owned Subsidiary, any put, call, right of first refusal and similar arrangements, and customary transfer restrictions, set forth in its organizational documents or any related joint venture or similar agreement;

(vii) existing leases, subleases, licenses and sublicenses of assets, in each case that have been entered into by a Borrower or any other Subsidiary in the ordinary course of business prior to the date hereof, that do not interfere with the ordinary course of business of Barzel, the Borrowers and the other Subsidiaries; and

(viii) Liens imposed by Section 107(1) of CERCLA or any other Environmental Law for costs or damages that (A) are not yet due or are being contested in good faith by appropriate proceeding or (B) are imposed on a real property, where the recourse with respect thereto is limited to the taking of such real property and such real property is not material to the business of Barzel, the Borrowers and the other Subsidiaries; <u>provided</u> that the amount of obligations secured thereby shall not exceed US$3,500,000 in the aggregate.

68

Notwithstanding the foregoing, none of the Liens permitted pursuant to this Section may at any time attach to any Loan Party's (A) Accounts, other than Liens permitted under clause (a) of the definition of the term "Permitted Encumbrances" and clauses (i), (ii) and (iv) above, or (B) Inventory, other than Liens permitted under clauses (a) and (b) of the definition of the term "Permitted Encumbrances" and clauses (i), (ii) and (iv) above.

(b) Barzel will not create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect thereof, except Liens referred to in clauses (i), (ii), (iii), (vi) and (viii) of paragraph (a) of this Section.

(c) No Loan Party will incur, create, assume or permit to exist any administrative expense, unsecured claim, or other Superpriority Claim or Lien that is *pari passu* with or senior to the Superpriority Claims or DIP Lenders' Charge, as applicable, of the Secured Parties against the Loan Parties hereunder, or apply to the Bankruptcy Court or the Canadian Court for authority to do so, except for the Carve-Out, the Directors Charge and the CCAA Charges.

SECTION 6.03. <u>Fundamental Changes; Business Activities.</u> (a) Barzel and the Borrowers will not, and will not permit any Subsidiary to, merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, or liquidate or dissolve (except in accordance with the Bidding Procedures Order).

(b) The Borrowers will not, and will not permit any other Subsidiary to, engage to any material extent in any business other than businesses of the type conducted by the Borrowers and the Subsidiaries on the date hereof and businesses reasonably related thereto.

(c) Barzel will not engage in any business or activity other than the ownership of all the outstanding Equity Interests in Barzel Parent and of Equity Interests in its other Subsidiaries and of the other assets permitted to be owned by Barzel under the next sentence, activities incidental thereto and corporate maintenance activities associated with being a public holding company. Barzel will not own or acquire any assets, other than (i) Equity Interests, cash and Permitted Investments (including any deposit accounts relating thereto) and (ii) other nonoperating assets (including office space leases, office equipment and office equipment leases) that, in the aggregate, are not material to the business of Barzel and the Subsidiaries.

(d) Barzel Parent will not engage in any business or activity other than the ownership of all the outstanding Equity Interests in the US Borrower and of Equity Interests in its other subsidiaries and of the other assets permitted to be owned by Barzel Parent under the next sentence and activities incidental thereto. Barzel Parent will not own or acquire any assets, other than (i) Equity Interests, cash and Permitted Investments (including any deposit accounts relating thereto) and (ii) other nonoperating assets (including office space leases, office equipment and office equipment leases) that, in the aggregate, are not material to the business of Barzel and the Subsidiaries.

NY 72292764v14

(e) Barzel and the Borrowers will not permit (i) any Person other than Barzel to own any issued and outstanding Equity Interests in Barzel Parent, (ii) any Person other than Barzel Parent to own any issued and outstanding Equity Interests in the US Borrower, (iii) any Person other than the US Borrower to own any issued and outstanding Equity Interests in the Canadian Borrower, (iv) any Person other than the US Borrower, or one or more of its subsidiaries that is a US Subsidiary, to own any issued and outstanding Equity Interests in any US Subsidiary (other than Barzel Parent and the US Borrower) and (v) any Person other than the Canadian Borrower, or one or more of its subsidiaries that is a Canadian Subsidiary, to own any issued and outstanding Equity Interests in any Canadian Subsidiary (other than the Canadian Borrower), in each case other than (A) directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law and (B) in the case of clauses (iv) and (v), Equity Interests held by third parties in any Subsidiary that is not a wholly-owned Subsidiary.

(f) For so long as any Subsidiary owns any Equity Interests of the type referred to in clause (a) of the definition of the term "Special Purpose Holdco", Barzel and the Borrowers will not permit such Subsidiary to cease to meet the requirements set forth in clauses (b) and (c) of the definition of such term.

SECTION 6.04. <u>Investments, Loans, Advances, Guarantees and Acquisitions.</u>  Barzel and the Borrowers will not, and will not permit any of the Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interests in or evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) assets of any other Person that, taken as a whole, constitute a division or a line of business, except:

(a) Permitted Investments;

(b) investments, loans, advances and Guarantees existing on the date hereof and set forth on <u>Schedule 6.04</u> (but not any additions thereto (including any capital contributions) made after the date hereof);

(c) loans or advances made in the ordinary course of business which are usual and customarily made by a Borrower or any other Subsidiary to a Borrower or any other Loan Party;

(d) investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(e) accounts receivable arising and trade credit granted in the ordinary course of business; and

(f) investments resulting from pledges and deposits referred to in clause (d) or (e) of the definition of the term "Permitted Encumbrances".

SECTION 6.05. <u>Asset Sales.</u> Barzel and the Borrowers will not, and will not permit any of the Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will they permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to Barzel, a Borrower or any other Subsidiary in compliance with Section 6.04), except:

(a) sales of inventory and Permitted Investments in the ordinary course of business;

(b) the Approved Sale;

(c) sales, transfers and other dispositions to a Borrower or any other Subsidiary; <u>provided</u> that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09; and

(d) the sale of the Albany Facility pursuant to Section 19.01 of the Samuel Son & Co Lease, Norwood, Hartford and Delta Tubes, in each case on the terms and conditions disclosed to and, other than in the case of the Albany Facility, approved by the Lenders in their sole and absolute discretion.

Nothing in this Section shall be construed to prohibit or restrict any investment, loan or advance permitted to be made under Section 6.04.

SECTION 6.06. <u>Sale and Leaseback Transactions.</u> Barzel and the Borrowers will not, and will not permit any of the Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

SECTION 6.07. <u>Hedging Agreements.</u> Barzel and the Borrowers will not, and will not permit any of the Subsidiaries to, enter into any Hedging Agreement, except (a) Hedging Agreements entered into to hedge or mitigate risks to which either Borrower or any other Subsidiary has actual exposure (other than in respect of Equity Interests or Indebtedness of Barzel, either Borrower or any other Subsidiary), in the ordinary course of business for non-speculative purposes and (b) Hedging Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of Barzel, either Borrower or any other Subsidiary, in the ordinary course of business for non-speculative purposes.

SECTION 6.08. <u>Restricted Payments; Certain Payments of Indebtedness.</u>

(a) Barzel and the Borrowers will not, and will not permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

(b) Barzel and the Borrowers will not, and will not permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

> (i)     payments of Indebtedness created under the Loan Documents and repayments of the Prepetition Credit Agreement Obligations;

> (ii)     payments of Indebtedness under the Intercompany Notes or any other Indebtedness owed by any Canadian Loan Party to a US Loan Party; and

> (iii)     payments of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness.

SECTION 6.09. <u>Transactions with Affiliates.</u>  Barzel and the Borrowers will not, and will not permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions in the ordinary course of business that are at prices and on terms and conditions not less favorable to Barzel, such Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Loan Parties not involving any other Affiliate and (c) compensation and indemnification (including advancement of expenses in connection thereto) of, and other employment arrangements (including stock option or other employee benefit, retention, incentive or retirement plans or agreements) with, directors, officers and employees of Barzel, either Borrower or any other Subsidiary on terms and conditions satisfactory to the Required Lenders.

SECTION 6.10. <u>Restrictive Agreements.</u>  Barzel and the Borrowers will not, and will not permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of Barzel, either Borrower or any other Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to Barzel, either Borrower or any other Subsidiary or to Guarantee Indebtedness of a Borrower or any other Subsidiary; <u>provided</u> that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document or any Prepetition Obligations Document, (B) restrictions and conditions existing on the date hereof identified on <u>Schedule 6.10</u> (but shall apply to any amendment or modification expanding the scope of any such

72

restriction or condition), (C) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, <u>provided</u> such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (D) restrictions and conditions imposed by agreements relating to Indebtedness of any Subsidiary in existence at the time such Subsidiary became a Subsidiary and otherwise permitted under clause (iv) of Section 6.01(a) (but shall apply to any amendment or modifications expanding the scope of any such restriction or condition), <u>provided</u> such restrictions and conditions apply only to such Subsidiary, and (E) restrictions and conditions imposed by agreements relating to Indebtedness of any Foreign Subsidiary (other than any Canadian Subsidiary) permitted under Section 6.01(a), <u>provided</u> that such restrictions and conditions apply only to such Foreign Subsidiary, and (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (B) customary provisions in leases, licenses and other contracts restricting the assignment thereof.

SECTION 6.11. <u>Amendment of Material Documents.</u>  Barzel and the Borrowers will not, and will not permit any Subsidiary to, amend, modify or waive any of its rights under (a) any Prepetition Obligations Document or (b) its certificate of incorporation, by-laws or other organizational documents; provided however that Barzel may amend its by-laws to reduce the minimum number of directors.

SECTION 6.12. <u>Bonus Payments.</u>  Neither Barzel nor any Borrower shall, and shall not permit any Subsidiaries to, make, commit to make, or permit to be made any bonus payments to executive officers of Barzel, any Borrower or their Subsidiaries in excess of the amounts set forth in the Approved Budget, except as approved by the Administrative Agent in its sole discretion.

SECTION 6.13. <u>Fiscal Year; Accounting Treatment.</u>  Barzel and the Borrowers will not change its fiscal year end or change its accounting treatment or reporting practices except as required by GAAP.

SECTION 6.14. <u>Amendment of Approved Budget.</u>  The Approved Budget shall not be amended, updated or otherwise revised, except with the prior written consent of the Administrative Agent and the Lenders.

SECTION 6.15. <u>Approved Budget.</u>  Barzel and the Borrowers shall not, and shall ensure that each of their Subsidiaries shall not, request or maintain Loans outstanding at any time in amounts exceeding the amount set forth on the line item titled "Ending Revolver" in the Approved Budget for the then current week, subject to the Variance.

SECTION 6.16. <u>Bankruptcy Court Orders; Administrative Priority; Lien Priority; Payment of Claims.</u>  No Loan Party shall nor shall it permit any of its Subsidiaries to:

73

(a) at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Bankruptcy Court Orders or the Canadian Court Orders, except for modifications and amendments consented to by the Administrative Agent and the Lenders, in their sole discretion;

(b) at any time (or with respect to an administrative expense arising under section 506(c) of the Bankruptcy Code, at any time after the Final Order Entry Date) suffer to exist a priority for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising) of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552, 726 and 1114 of the Bankruptcy Code equal or superior to the priority of the Agent and the Lenders in respect of the Obligations, except for (i) the Carve-Out, having priority of payment over the Obligations to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities", (ii) the CCAA Charge and (iii) the Directors Charge;

(c) at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Collateral Agent (as described in the Bankruptcy Court Orders and Canadian Court Orders) for the benefit of the Secured Parties in respect of the Collateral (other than the Carve-Out, the CCAA Charge and the Directors Charge);

(d) prior to the date on which the Obligations have been indefeasibly paid in full in cash, the Borrower shall not pay any administrative expense claims except (i) the payments then due and payable to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities"; (ii) payments due and payable under the CCAA Charge; (iii) the Obligations then due and payable hereunder; (iv) other administrative expense and professional claims then due and payable in the ordinary course of the business of the Borrower or its Chapter 11 Case; and (v) such other administrative expenses as may be set forth in the Approved Budget, in each case, to the extent and having the order of priority set forth in the definitions of the terms "Agreed Administrative Expense Priorities" and Canadian Court Orders; and

(e) prior to the date on which the Obligations have been indefeasibly paid in full in cash, the Borrowers shall not pay any prepetition unsecured claims except as set forth in the Approved Budget.

SECTION 6.17. Canadian Pension Plans. Neither Barzel nor any Subsidiary shall, directly or indirectly, (a) terminate or cause to terminate, in whole or in part, or initiate the termination of, in whole or in part, any Canadian Pension Plan so as to result in any liability to Barzel or the Subsidiary which could have a Material Adverse Effect; (b) enter into any new Canadian Pension Plan or Canadian Benefit Plan or modify any such existing plans so as to increase its obligations thereunder which could result in any liability to Barzel or any Subsidiary and which could have a Material Adverse Effect; (c) fail to make a required contribution under any Canadian Pension Plan or Canadian Benefit Plan which could result in the imposition of a Lien upon the assets of Barzel or any Subsidiary within 30 days after the date such payment becomes due; (d) make any

improper withdrawals or applications of assets of a Canadian Pension Plan or Canadian Benefit Plan; (e) accept payment of any amount from any Canadian Pension Plan; or merge any Canadian Pension Plan with any other pension plan without the consent of the Lenders.

SECTION 6.18. <u>632422 N.B. Ltd</u>. 632422 N.B. Ltd. shall not at any time carry on any business or own any assets having more than a nominal value.

SECTION 6.19. <u>Hencorp LLC</u>. Hencorp LLC shall not at any time carry on any business or own any assets having more than a nominal value.

SECTION 6.20. <u>Chriscorp ULC</u>. Chriscorp ULC shall not at any time carry on any business or own any assets having more than a nominal value.

SECTION 6.21. <u>Delta Tubes</u>. Delta Tube shall not at any time constitute a wholly-owned Subsidiary of Barzel, any of the Borrowers or any other Subsidiary. Any Equity Interest of Barzel, any of the Borrowers or any other Subsidiary in Delta Tube shall constitute an Excluded Equity Interest (as such term is defined in the Canadian Guarantee and Collateral Agreement).

## ARTICLE VII

### Events of Default

If any of the following events ("<u>Events of Default</u>") shall occur:

(a) either Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b) either Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two (2) Business Days;

(c) any representation, warranty or statement made or deemed made by or on behalf of Barzel, either Borrower or any Subsidiary in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d) Barzel or either Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02, 5.04 (with respect to the existence of Barzel or a Borrower) or 5.12. 5.15, 5.17 or in Article VI;

(e) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 10 days after notice thereof from the Administrative Agent to the Borrowers (which notice will be given at the request of any Lender);

(f) any event or condition shall occur that results in any Material Indebtedness becoming due prior to its scheduled maturity (other than the delivery of a notice of optional redemption or optional prepayment by the issuer thereof) or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf, or, in the case of any Hedging Agreement, the applicable counterparty, to cause such Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or, in the case of any Hedging Agreement, to cause the termination thereof;

(g) the indictment of any Loan Party or any of its managers, officers or directors under any criminal statute, or commencement of criminal or civil proceedings against any such Person or any of its Subsidiaries pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person;

(h) an order with respect to any of the Chapter 11 Cases or the Canadian Cases shall be entered by the Bankruptcy Court or the Canadian Court appointing, or any Loan Party or any Subsidiary shall file an application for an order with respect to (i) any Chapter 11 Case seeking the appointment of, (A) a trustee under Section 1104 of the Bankruptcy Code; or (B) a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (ii) the Canadian Case, seeking the appointment of a receiver, interim receiver, receiver and manager or trustee in bankruptcy;

(i) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case, or with respect to the Canadian Case converting the CCAA Case to a proceeding under the Bankruptcy and Insolvency Act (Canada);or a proceeding under the Winding-up and Restructuring Act (Canada);

(j) an order shall be entered by the Bankruptcy Court or the Canadian Court dismissing any of the Chapter 11 Cases or the Canadian Case or granting any relief which does not contain a provision for termination of the total Revolving Commitments, and payment in full in cash of all Obligations of the Borrowers hereunder and under the other Loan Documents upon entry thereof (or, with respect to the Existing Letters of Credit, providing for cash collateral or back to back letters of credit for the benefit of the Issuing Bank in an amount up to 105% of the face amount of each Existing Letter of Credit);

(k) (i) an order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court, or a motion shall be filed by any Borrower in the Canadian Case, without the express prior written consent of the Administrative Agent and the Required Lenders, (A) to revoke, reverse, stay, modify, supplement or amend any of the Bankruptcy Court Orders or the Canadian Court Orders, (B) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrowers equal or superior to the priority of the Administrative Agent and the Lenders in respect of the Obligations, except for allowed administrative expenses to the extent set forth in clause "first" of the definition of the term "Agreed Administrative Expense Priorities," and the CCAA Charge and the Directors Charge for the Canadian Case or (C) to grant or permit the grant of a Lien on the Collateral (other than Permitted Liens); or (ii) except with respect to the Approved Sale, any sale procedure order, sale order or assignment order is entered by the Bankruptcy Court or the Canadian Court without the express prior written consent of the Administrative Agent and the Required Lenders;

(l) one or more judgments for the payment of money in an aggregate amount in excess of US$1,000,000 (excluding any amount covered by insurance to the extent a claim therefor has been made in writing and liability therefor has not been denied by the insurer) shall be rendered against Barzel, either Borrower, any other Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of Barzel, either Borrower or any other Subsidiary to enforce any such judgment;

(m) an ERISA Event or Canadian Pension Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events and Canadian Pension Events that have occurred and all Withdrawal Liabilities and the MEPP Liabilities referred to in clause (n) below, could reasonably be expected to result in a Material Adverse Effect;

(n) (i) Barzel, either Borrower or any Affiliate thereof as employer under a Multiemployer Plan shall have made a complete or partial withdrawal from such Multiemployer Plan and the plan sponsor of such Multiemployer Plan shall have notified such withdrawing employer that such employer has incurred a Withdrawal Liability that will be assessed against Barzel, either Borrower or any other Subsidiary, or (ii) Barzel, either Borrower or any Affiliate thereof ceases to participate as a participating employer under a Canadian Pension Plan which is a multi-employer pension plan (a "Canadian MEPP") as defined in the PBA or Barzel, either Borrower or any Affiliate thereof is a participating employer in a Canadian MEPP that has an ongoing deficiency and the Canadian MEPP requires such employer to contribute to eliminating such deficiency and, after such cessation of participation, or otherwise in the case of such deficiency, such employer has any further liability to contribute to such Canadian MEPP (a "MEPP Liability") and the aggregate of the Withdrawal Liabilities and the MEPP Liabilities, when taken together with all other ERISA Events and Canadian Pension Events referred to in clause (m) above, could reasonably be expected to result in a Material Adverse Effect;

77

(o) any Lien purported to be created under any Security Document or any of the Bankruptcy Court Orders or the Canadian Court Orders shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral with the priority required hereunder or by the applicable Security Document, any of the Bankruptcy Court Orders or the Canadian Court Orders, except as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents;

(p) any Guarantee purported to be created under any Loan Document shall cease to be, or shall be asserted by any Loan Party not to be, in full force and effect, except upon the consummation of any transaction permitted by this Agreement as a result of which the Subsidiary Party providing such Guarantee ceases to be a Subsidiary or upon the termination of such Loan Document in accordance with its terms;

(q) a Change in Control shall occur;

(r) the determination of Barzel or any of its Subsidiaries, whether by vote of such Person's board of directors or otherwise, to suspend the operation of such Person's business in the ordinary course, liquidate all or substantially all of such Person's assets, or to conduct any sales of all or substantially all of such Person's assets (other than the Approved Sale), or the filing of a motion or other application in the Cases, seeking authority to do any of the foregoing, in each case, without the prior consent of the Administrative Agent and the Lenders;

(s) unless none of the Loan Parties have prior notice of such appointment, the failure of the Loan Parties to oppose the appointment of any official committee in the Cases; provided that if none of the Loan Parties have prior notice of such appointment, it shall be an Event of Default if the Loan Parties do not promptly file and diligently pursue an objection to such appointment or motion for disbandment of such committee, in either case in form and substance satisfactory to the Administrative Agent; further provided that nothing in this subparagraph (s) shall apply with respect to the Bankruptcy Court's appointment of an official committee of unsecured creditors pursuant to § 1102 of the Bankruptcy Code;

(t) any Sale Milestone shall not have been achieved as of the date set forth therefor in the definition of "Sale Milestones"; provided that failure to achieve the Sale Milestones in subsection (b) and (e) of such definition shall not constitute an Event of Default solely because of the Bankruptcy Court's failure to schedule such Sale Milestone, so long as the Bankruptcy Court shall have scheduled such Sale Milestone within three (3) days of such Sale Milestone deadline;

(u) the retention or appointment of the Chief Restructuring Officer shall have been terminated and no replacement Chief Restructuring Officer satisfactory to the Lenders shall have been appointed within five (5) Business Days;

(v) an event resulting in a Material Adverse Effect shall have occurred;

(w) adequate protection payments or any other payments shall have been made or adequate protection shall have been granted, in each case, with respect to prepetition debt other than the Prepetition Credit Agreement Obligations or the Senior Notes Obligations;

(x) the Bankruptcy Court or the Canadian Court shall have granted relief from the automatic stay in its respective Case to permit foreclosure or enforcement on assets of either the Borrowers or their Subsidiaries having a value in excess of US$50,000 in the aggregate for all such assets since the Filing Date;

(y) the Final Order Entry Date shall not have occurred by the date that is thirty (30) days after the Filing Date;

(z) the CCAA Extension Date shall not have occurred by the date that is thirty (30) days after the CCAA Filing Date or the stay of proceedings granted in the Canadian Court Orders shall expire;

(aa) any creditors' committee or any other party in interest with requisite standing shall in any of the Cases (i) successfully challenge the (A) the validity, extent, priority, characterization or perfection of the security interests and Liens of the Prepetition Lenders, Prepetition Agent, Prepetition Indenture Trustee, or Senior Noteholders with respect to the Prepetition Collateral, or (B) the validity, enforceability, allowability, priority, characterization, fully-secured status or amount of the Prepetition Obligations evidenced by the Prepetition Obligations Documents; or (ii) otherwise successfully assert any claim or cause of action, including, without limitation, any derivative action, against the Prepetition Agent, the Prepetition Lenders, Prepetition Indenture Trustee, or Senior Noteholders;

(bb)    (i) from and after the Interim Order Entry Date, the Interim Order has been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect; (i) from and after the Final Order Entry Date, the Final Order has been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect; (iii) from and after the CCAA Filing Date, the CCAA Initial Order has been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect; or (iv) from and after the CCAA Extension Date, the CCAA Extension Order has been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect, in the case of (i) through (iv), except as expressly permitted under this Agreement;

(cc)    the Canadian Borrower shall not have served the Notice of the CCAA Initial Order on each party that has registered a Lien against the Canadian Debtor within 6 days after the CCAA Filing Date; or

(dd)    the Debtors shall fail to comply with the Bankruptcy Court Orders or the Canadian Court Orders in any material respect.

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take any or all of the following actions, at the same or different

times: (i) terminate the Revolving Commitments, and thereupon the Revolving Commitments shall terminate immediately, (ii) declare the Loans to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and (iii) exercise any and all of its other rights and remedies under applicable law (including, without limitation, the Bankruptcy Code and the CCAA), subject in the case of this subsection (iii), to the delivery of the required prior notices pursuant to the terms of (x) the Interim Order or, after the Final Order Entry Date, the Final Order, or (y) the CCAA Initial Order or, after the CCAA Extension Date, the Extension Order.

Barzel and the Borrowers shall waive, and shall cause their Subsidiaries to waive, any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, or any comparable relief in the Canadian Case, to the extent such relief would restrict or impair the rights and remedies of the Administrative Agent and the Lenders set forth in the Bankruptcy Court Orders and the CCAA Initial Order and in the Loan Documents. In the event any party requests a hearing seeking to prevent the Administrative Agent or the Lenders from exercising any of their rights and remedies that arise after an Event of Default, the sole issue that shall be permitted to be raised before the Bankruptcy Court at such hearing shall be whether an Event of Default has occurred and has not been cured.

## ARTICLE VIII

### The Administrative Agent

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Barzel, either Borrower or any other Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated

by the Loan Documents that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Barzel, either Borrower or any other Subsidiary that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by Barzel, a Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for Barzel or a Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders and the Borrowers. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor.

If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by the Administrative Agent or Lenders, as applicable, on the Effective Date.

Without limiting the powers of the Administrative Agent or any other Person acting as an agent, attorney-in-fact or mandatary for the Administrative Agent under this Agreement or under any other Loan Document, each Lender hereby (a) irrevocably constitutes, to the extent necessary, the Administrative Agent as the holder of an irrevocable power of attorney (*fondé de pouvoir* within the meaning of Article 2692 of the *Civil Code of Québec*) for the purposes of holding any Liens, including hypothecs, granted or to be granted by any Loan Party on movable or immovable property pursuant to the laws of the Province of Quebec to secure obligations of a Loan Party under any bond issued by a Loan Party; and (b) appoints and agrees that the Administrative Agent, acting as agent for the Secured Parties, may act as the agent and custodian for and on behalf of the Lenders with respect to any bond that may be issued and pledged from time to time for the benefit of the Secured Parties. The said constitution of the Administrative Agent as *fondé de pouvoir* (holder of an irrevocable power of attorney within the meaning of Article 2692 of the *Civil Code of Québec*) as the

holder of any Lien and as agent and custodian with respect to any such bond shall be deemed to have been ratified and confirmed by any future Secured Party that becomes a party to this Agreement and by any assignee pursuant to Section 9.04 by the execution of the applicable Assignment and Assumption. Notwithstanding the provisions of Section 32 of *An Act respecting the special powers of legal persons (Quebec)*, the Administrative Agent may purchase, acquire and be the holder of any bond issued by any Loan Party. Each Loan Party hereby acknowledges that any such bond shall constitute a title of indebtedness, as such term is used in Article 2692 of the *Civil Code of Québec*. The Administrative Agent in its capacity as *fondé de pouvoir* shall have the rights, powers and immunities stipulated in this Article, all of which shall apply <u>mutatis</u> <u>mutandis</u> to the Administrative Agent acting in such capacity and, without limitation, to the resignation and appointment of a successor to the Administrative Agent acting as *fondé de pouvoir*. Each Lender shall be entitled to the benefits of any charged property covered by any hypothec and shall participate in the proceeds of realization of any such charged property, the whole in accordance with the terms thereof.

ARTICLE IX

<u>Miscellaneous</u>

SECTION 9.01. <u>Notices.</u> (a) Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i) if to Barzel or a Borrower, to it at 320 Norwood Park South, 2nd Floor, Norwood, MA 02062, Attention: Chief Restructuring Officer, G. Wayne Day, it being understood that any notice provided to Barzel shall be deemed to have been provided to each Borrower; with a copy to Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178, Attention of Patricia M. Lee (Fax No. (212) 808-7897) and Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801, Attention of Norman Pernick (Fax 302-574-2100);

(ii) (A) if to the Administrative Agent, to JPMorgan Chase Bank, N.A., 270 Park Avenue, New York, New York 10017, Attention of Douglas Jenks (Fax No. (212) 270- 4557) with a copy to Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, Attention of Andrew DeNatale (Fax No. (212) 806-7231) and Karl J. Wiemer (Fax No. 212-806-7883); or (B) if to the Administrative Agent in respect of any Loan to the account of the Canadian Borrower, to JPMorgan Chase Bank, N.A., Toronto Branch, 200 Bay Street, Royal Bank Plaza, South Tower, 18th Floor, Toronto, Ontario M5J 2J2 Canada, Attention of Loan Administration (Fax Nos. (416) 981-9128 and (416) 981-9138), with a copy to the Administrative Agent as provided in clause (A) and to Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, Attention of

Andrew DeNatale (Fax No. (212) 806-7231) and Karl J. Wiemer (Fax No. 212-806-7883).

(b) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. Any notices and other communications to the Administrative Agent, Barzel or a Borrower hereunder (other than any Borrowing Request or any other notice pursuant to Article II) may be delivered or furnished by electronic communications pursuant to procedures approved by the recipient thereof prior thereto; provided that approval of such procedures may be rescinded by any such Person by notice to each other such Person.

(c) Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

(d) Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Borrower or any other Person to serve upon the Agents and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Administrative Agent and the Lenders pursuant to the Bankruptcy Code.

SECTION 9.02. Waivers; Amendments. (a) No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b) Subject to Section 9.19, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Barzel, the Borrowers and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; provided that no such agreement shall (i)

increase the Revolving Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the maturity of any Loan or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Revolving Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.19(c) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender, (v) change any of the provisions of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (vi) release all or substantially all the Guarantees under the Collateral Agreements, or limit liability in respect of all or substantially all such Guarantees, without the written consent of each Lender, (vii) release all or substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender or (viii) modify, waive, release or subordinate the Superpriority Claim status of the Obligations without the written consent of each Lender; provided further that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent without the prior written consent of the Administrative Agent, as the case may be. Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by Barzel, the Borrowers, the Administrative Agent and the Lenders that will remain parties hereto after giving effect to such amendment if (i) by the terms of such agreement the Revolving Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment, (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made and all other amounts owing to it or accrued for its account under this Agreement, and (iii) after giving effect to such amendment and all contemporaneous repayments of Loans and reductions of Revolving Commitments, the sum of the aggregate Revolving Exposures of all Lenders plus the LC Obligations shall not exceed the total Revolving Commitments. Notwithstanding any other provision of any Loan Document, no consent shall be required to be obtained in connection with any waiver, amendment or other modification of any Loan Document from any Lender that has no Revolving Commitment and whose Revolving Exposure is zero.

SECTION 9.03. Expenses; Indemnity; Damage Waiver. (a) Barzel and the Borrowers agree to pay fees, costs and expenses of the Administrative Agent and the Lenders (including all reasonable fees, out-of-pocket expenses and disbursements of their professionals, including, without limitation, their financial advisor and primary, outside, Delaware and Canadian counsel) in connection with (a) the preparation, execution and delivery of the Loan Documents and the funding of all Loans hereunder, the administration of the Loans, and any amendment or waiver of any provision of the Loan Documents and (b) the enforcement of any of their rights and remedies under the Loan Documents, in each case, to the extent provided in and in accordance with the terms of the Interim Order, Final Order, CCAA Initial Order or the Extension Order.

(b)  Barzel and the Borrowers shall indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, (in addition to local counsel in each relevant jurisdiction, including Canadian local counsel and a financial advisor to such counsel), incurred by or asserted against any Indemnitee arising out of, in connection with or as a result of (i) the arrangement and the syndication of the credit facilities provided for herein, the preparation, execution, delivery and administration of the Loan Documents or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any Mortgaged Property or any other property currently or formerly owned or operated by Barzel, either Borrower or any other Subsidiary, or any Environmental Liability related in any way to Barzel, either Borrowers or any other Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by a Borrower or any Affiliate thereof; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)  To the extent that Barzel or a Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.  For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total Revolving Exposures and unused Revolving Commitments at the time.

(d)  To the extent permitted by applicable law, neither Barzel nor the Borrowers shall assert, and each hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems (including the internet), so long as commercially reasonable and customary efforts generally are made to safeguard access thereto, it being understood that this clause (i) is not intended to exculpate any knowing and intentional breach of any confidentiality agreement, or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection

with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e) All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04. <u>Successors and Assigns.</u> (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) neither Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by a Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Loans) with the prior written consent (such consent not to be unreasonably withheld) of the Administrative Agent.

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Revolving Commitment or Loans the amount of the Revolving Commitment or Loans (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than US$1,000,000 unless the Administrative Agent otherwise consents;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption (which shall specify the Applicable Lending Office for the assignee), together with a processing and recordation fee of US$3,500; and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the

assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about Barzel, the Borrowers and their Related Parties or their securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal, state, provincial, territorial and foreign securities laws.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.16, 2.18 and 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)     The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices in New York, New York, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Commitment of, and principal amount of the Loans, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this Section and any written consent to such assignment required by this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c) (i)   Any Lender may, without the consent of the Borrowers or the Administrative Agent grant participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Revolving Commitment and the Loans); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (D) unless the Canadian Borrower has received a notice of such participation, such participation will not result in payments by the Canadian Borrower in respect of the rights and obligations subject to such participation being subject to withholding taxes under the laws of Canada in an amount that exceeds the Canadian withholding taxes applicable to amounts payable by the Canadian Borrower to the Lender that granted such participation.  Any agreement or instrument pursuant to which a Lender grants such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.  Subject to paragraph (c)(ii) of this Section, each Borrower agrees that each Participant shall be entitled to the benefits of Section 2.16 and 2.18 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.19(c) as though it were a Lender.

(ii)   A Participant shall not be entitled to receive any greater payment under Section 2.18 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.

(d) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

SECTION 9.05.  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf

and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Revolving Commitments have not expired or terminated. The provisions of Sections 2.16, 2.18 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Revolving Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06. <u>Counterparts; Integration; Effectiveness.</u> This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties thereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means, such as portable document format (pdf), shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07. <u>Severability.</u> Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08. <u>Right of Setoff.</u> If an Event of Default shall have occurred and be continuing, subject to the requirements of the Bankruptcy Court Orders and Canadian Court Orders, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of either Borrower against any of and all the obligations then due of such Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff), which such Lender may have.

SECTION 9.09. <u>Governing Law; Jurisdiction; Consent to Service of Process.</u> (a) This Agreement shall be construed in accordance with and governed by the law of the State of New York and with respect to the Canadian Borrower, the laws of

the Province of Ontario, except as governed by the Bankruptcy Code and the CCAA, as applicable and provided that the last paragraph of Article VIII of this Agreement shall be governed by and construed in accordance with the laws of the Province of Quebec.

(b) So long as the Cases are pending, each of Barzel and the Borrowers hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court or the Canadian Court, as applicable, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. If the Cases are no longer pending, nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Barzel, the Borrowers or their properties in the courts of any jurisdiction.

(c) Each of Barzel and the Borrowers hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10. <u>WAIVER OF JURY TRIAL.</u> EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11. <u>Headings.</u> Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this

Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12. <u>Confidentiality.</u> Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Barzel, either Borrower or any Subsidiary and its obligations, (g) with the consent of a Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than Barzel or a Borrower. For the purposes of this Section, "<u>Information</u>" means all information received from Barzel or the Borrowers relating to Barzel or the Borrowers or their business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Barzel or a Borrower; <u>provided</u> that, in the case of information received from Barzel or a Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 9.13. <u>Interest Rate Limitation.</u> Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

NY 72292764v14

SECTION 9.14. [Reserved.]

SECTION 9.15. <u>USA Patriot Act Notice.</u> Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of each of them and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrowers in accordance with the Act.

SECTION 9.16. <u>No Fiduciary Relationship.</u> Barzel and each Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, Barzel, the Borrowers, the Subsidiaries and their Affiliates, on the one hand, and the Administrative Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

SECTION 9.17. <u>Non-Public Information.</u> (a) Each Lender acknowledges that all information furnished to it pursuant to this Agreement by Barzel or a Borrower on its behalf and relating to Barzel, the Borrowers, the Subsidiaries or their businesses may include material non-public information concerning Barzel, the Borrowers and the Subsidiaries or their securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with the procedures and applicable law, including Federal, state, provincial, territorial and foreign securities laws.

(b) All such information, including requests for waivers and amendments, furnished by Barzel, a Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about Barzel, the Borrowers and the Subsidiaries and their securities. Accordingly, each Lender represents to Barzel, the Borrowers and the Administrative Agent that it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal, state, provincial, territorial and foreign securities laws.

SECTION 9.18. <u>Conversion of Currencies.</u> (a) If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b) The obligations of each party hereto in respect of any sum due to any other party hereto or any holder of the obligations owing hereunder (the "Applicable Creditor") shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than the currency in which such sum is stated to be due hereunder (the "Agreement Currency"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrowers agree as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss.  The obligations of each party hereto contained in this Section shall survive the termination of this Agreement and the payment of all other amounts owing hereunder.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BARZEL INDUSTRIES INC.

by

_____
Name: Corrado De Gasperis
Title: Chief Executive Officer


BARZEL FINCO INC.

by

_____
Name: Corrado De Gasperis
Title: President and Treasurer


BARZEL INDUSTRIES CANADA INC.

by

_____
Name: Corrado De Gasperis
Title: President


JPMORGAN CHASE BANK, N.A.,
TORONTO BRANCH, as Canadian Agent

by

_____
Name:
Title:


JPMORGAN CHASE BANK, N.A.,
individually and as Administrative Agent

by

_____
Name:
Title:

CIBC INC.

by

_____
Name:
Title:

For purposes of Section 2.12(g),

BANK OF AMERICA, N.A.

by

_____
Name:
Title:

## EXHIBIT A

## INITIAL APPROVED BUDGET

**(To Be Filed)**

# EXHIBIT B

## FORM OF ASSIGNMENT AND ASSUMPTION

**(To Be Supplied)**

**<u>EXHIBIT C</u>**

**FORM OF CCAA INITIAL ORDER**

**(To Be Supplied)**

## EXHIBIT D

## FORM OF US BANKRUPTCY INITIAL ORDER

## (To Be Supplied)

# EXHIBIT E

## FORM OF PERFECTION CERTIFICATE

# DIP PERFECTION CERTIFICATE

Reference is made to (a) the Senior Secured, Super-Priority Debtor-in-Possession Revolving Credit Agreement, dated as of September [__], 2009, among Barzel Industries Inc., a Delaware corporation ("Barzel"), Barzel Finco Inc., a Delaware corporation (the "US Borrower"), Barzel Industries Canada Inc., a Canadian corporation (the "Canadian Borrower" and together with the US Borrower, the "Borrowers"), the Lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, JPMorgan Chase Bank, N.A., Toronto Branch, as Canadian Agent, and J.P. Morgan Securities Inc. and CIBC World Markets Corp., as Joint Lead Arrangers and Joint Bookrunners (as amended, the "Credit Agreement") and (b) the Guarantee and Collateral Agreement dated as of September [__], 2009 (the "Guarantee and Collateral Agreement") among Barzel, the Borrowers, the subsidiaries of Barzel party thereto and the Administrative Agent. Capitalized terms used but not defined herein have the meanings assigned in the Credit Agreement or the Guarantee and Collateral Agreement, as applicable.

The undersigned, a Financial Officer, of Barzel and each Borrower, hereby certifies to the Administrative Agent and each other Secured Party as follows:

1. <u>Names</u>.

(a) The exact legal name of each Grantor, as such name appears in its respective certificate of organization, is set forth in **Schedule 1(a)**. Each Grantor is (i) the type of entity disclosed next to its name in **Schedule 1(a)** and (ii) a registered organization except to the extent disclosed in **Schedule 1(a)**. Also set forth in **Schedule 1(a)** is the organizational identification number, if any, of each Grantor that is a registered organization, the Federal Taxpayer Identification Number of each Grantor and the jurisdiction of formation of each Grantor.

(b) Set forth in **Schedule 1(b)** hereto is any other legal name each Grantor has had in the past five years, together with the date of the relevant change.

(c) Except as set forth in **Schedule 1(b)** hereto, no Grantor has changed its identity or corporate structure in any way within the past five years. Changes in identity or corporate structure would include mergers, amalgamations, consolidations and acquisitions, as well as any change in the form, nature or jurisdiction of organization. If any such change has occurred, included in **Schedule 1(b)** is the information required by Sections 1 and 2 of this certificate as to each acquiree or constituent party to a merger, amalgamation or consolidation.

(d) Set forth in **Schedule 1(c)** hereto is a list of all other names (including trade names or similar appellations) used by each Grantor or any of its divisions or other business units in connection with the conduct of its business or the ownership of its properties at any time during the past five years.

2. <u>Current Locations</u>.

(a) The chief executive office of each Grantor is located at the address set forth in **Schedule 2(a)** hereto.

(b)  Set forth in **Schedule 2(b)** are all locations where such Grantor maintains any books or records relating to any Accounts Receivable (with each location at which chattel paper, if any, is kept being indicated by an "*"):

(c)  Set forth in **Schedule 2(c)** are the jurisdiction of formation of each Grantor that is a registered organization.

(d)  Set forth in **Schedule 2(d)** are all the locations where such Grantor maintains any Equipment or other Collateral not identified in the Schedules above.

(e)  Set forth in **Schedule 2(e)** are all the places of business of such Grantor not identified in paragraph (a), (b), (c) or (d) above.

(f)  Set forth in **Schedule 2(f)** are the names and addresses of all Persons other than such Grantor that have possession of any of the Collateral of such Grantor.

3.  Unusual Transactions.  All Accounts have been originated by the Grantors and all Inventory has been acquired by the Grantors in the ordinary course of business.

4.  File Search Reports.  Search results have been obtained with respect to each Grantor organized or maintaining an establishment in a jurisdiction in the United States or Canada or having assets located in a jurisdiction in Canada from the appropriate Uniform Commercial Code filing office (or other personal property security registry office) in each jurisdiction identified with respect to such Grantor in Section 2 hereof, and such search reports reflect no liens against any of the Collateral other than those permitted under the Credit Agreement.

5.  Filings.  Financing statements in appropriate form have been prepared for filing in the proper Uniform Commercial Code filing office in each jurisdiction in the United States in which any Grantor is organized and, to the extent any of the collateral is comprised of fixtures, timber to be cut or as extracted collateral from the wellhead or minehead, in the proper local jurisdiction, in each case as set forth with respect to such Grantor in Section 2 hereof.  Personal Property Security Act (Ontario) ("PPSA") filings or other applicable personal property security filings have been prepared for filing in proper personal property security filing offices in the proper local jurisdiction, in each case as set forth with respect to such Grantor in Section 2.

6.  Schedule of Filings.  Attached hereto as **Schedule 6** is a schedule setting forth, with respect to the filings described in Section 5 above, each filing and the filing office in which such filing is to be made.

7.  Stock Ownership and other Equity Interests.  Attached hereto as **Schedule 7** is a true and correct list of all the issued and outstanding Equity Interest of each Borrower and each other Subsidiary and the record and beneficial owners of such Equity Interests. Also set forth on **Schedule 7** is each equity investment of Barzel, either Borrower or any Subsidiary that represents 50% or more of the equity of the entity in which such investment was made.

8.  Debt Instruments.  Attached hereto as **Schedule 8** is a true and correct list of all promissory notes and other evidence of indebtedness held by Barzel, each Borrower and each other Subsidiary that are required to be pledged under the Guarantee and Collateral Agreement,

the Intercompany Note Documents or any other Collateral Agreement, including all intercompany notes between Barzel, each Borrower and each Subsidiary of Barzel and each other such Subsidiary.

9. Advances. Attached hereto as **Schedule 9** is a true and correct list of all advances made by Barzel or either Borrower to any Subsidiary of such Borrower or made by any Subsidiary to Barzel, either Borrower or any other Subsidiary (other than those identified on **Schedule 8**), which advances will be on and after November 15, 2007 evidenced by one or more intercompany notes pledged to the Administrative Agent under the Guarantee and Collateral Agreement, the Intercompany Note Documents or any other Collateral Agreement.

10. Mortgage Filings. Attached hereto as **Schedule 10** is a schedule setting forth, with respect to each Mortgaged Property, (a) the exact name of the Person that owns such property as such name appears in its certificate of incorporation or other organizational document, (b) if different from the name identified pursuant to clause (a), the exact name of the current record owner of such property reflected in the records of the filing office for such property identified pursuant to the following clause (or the registered owner of such property), (c) the filing office in which a Mortgage with respect to such property must be filed or recorded in order for the Administrative Agent to obtain a perfected security interest therein, (d) the legal description of such property and (e) the municipal address of such property.

11. Intellectual Property.

(a) Attached hereto as **Schedule 11(a)** in proper form for filing with the United States Patent and Trademark Office or the Canadian Intellectual Property Office, as applicable, is a schedule setting forth all of each Grantor's Patents and Patent Applications, including the name of the registered owner, type, registration or application number and the expiration date (if already registered) of each Patent and Patent Application owned by any Grantor.

(b) Attached hereto as **Schedule 11(b)** in proper form for filing with the United States Patent and Trademark Office or the Canadian Intellectual Property Office, as applicable, is a schedule setting forth all of each Grantor's Trademarks and Trademark Applications, including the name of the registered owner, the registration or application number and the expiration date (if already registered) of each Trademark and Trademark application owned by any Grantor.

(c) Attached hereto as **Schedule 11(c)** in proper form for filing with the United States Copyright Office or the Canadian Intellectual Property Office, as applicable, is a schedule setting forth all of each Grantor's Copyrights (including the name of the registered owner, title and the registration number) and Copyright Applications (including the name of the registered owner and title) of each Copyright or Copyright Application owned by any Grantor.

12. Commercial Tort Claims. Attached hereto as **Schedule 12** is a true and correct list of commercial tort claims in excess of $1,000,000 held by any Grantor, including a brief description thereof.

13. Deposit Accounts. Attached hereto as **Schedule 13** is a true and correct list of deposit accounts maintained by each Grantor, including the name and address of the depositary institution, the type of account and the account number.

14. <u>Securities Accounts</u>.  Attached hereto as **<u>Schedule 14</u>** is a true and correct list of securities accounts maintained by each Grantor, including the name and address of the intermediary institution, the type of account and the account number.

*[remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the undersigned have duly executed this certificate as of the date first written above.

BARZEL INDUSTRIES INC.

by_____
     Name: G. Wayne Day
     Title: Chief Restructuring Officer


BARZEL FINCO INC.,

by_____
     Name: G. Wayne Day
     Title: Chief Restructuring Officer


BARZEL INDUSTRIES CANADA INC.,

by_____
     Name: G. Wayne Day
     Title: Chief Restructuring Officer


*[Signature page to DIP Perfection Certificate]*