## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Barzel Industries Inc., *et al.*, | : | Case No. 09-_____ (___) |
| | : | |
| Debtors.[1] | : | Joint Administration Requested |

## DECLARATION OF KAREN G. NARWOLD IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Karen G. Narwold, hereby declare, under penalty of perjury, that the following information is true to the best of my knowledge, information and belief.

1.     I am the Vice President, Strategic Counsel and Secretary of Barzel Industries Inc., a Delaware corporation ("BII"). I am familiar with the day-to-day operations, financial condition, books, records and business affairs of BII and each of the above-captioned debtors (collectively with BII, the "Debtors" or "Barzel").

2.     I am authorized to submit this declaration on behalf of each of the Debtors. Except as otherwise noted, the facts set forth herein are based on my personal knowledge, review of relevant documents, and information provided to me by the Debtors' management and other professionals working with me or under my supervision, and reflect my opinions based on my knowledge, experience and information concerning the Debtors and their operations. If called upon to testify, I could and would testify competently to the facts set forth herein.

3.     On September 15, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief pursuant to chapter 11, title 11 of the United States Code (the

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number are: Barzel Industries Inc. (0836), Barzel Holdings Inc. (1107), Barzel Finco Inc. (1010), Barzel Industries U.S. Inc. (6382), American Steel and Aluminum Corporation (2435), Nova Tube and Steel, Inc. (1790), Novamerican Tube Holdings, Inc. (3740) and Nova Tube Indiana, LLC (8275).

"Bankruptcy Code"). The Debtors continue to operate their business and manage their assets as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

4.     On September 15, 2009 (the "Canadian Filing Date"), Barzel Industries Canada Inc. ("Barzel Canada"), one of the Debtors' Canadian affiliates (the "Canadian Debtor"), will file an application with the Ontario Superior Court of Justice – Commercial List (the "Canadian Court") under the Companies Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA") seeking protection from its creditors in Canada (the case commenced under the CCAA by the Canadian Debtor, the "Canadian Proceedings"). The Canadian Debtor will continue to manage its properties and operate its businesses under the supervision of the Canadian Court. Deloitte and Touche Inc. has agreed to act as Monitor in connection with the Canadian Proceedings, if so appointed by the Canadian Court.

5.     The Debtors' and the Canadian Debtor's operations are highly integrated. All finance, public issuer regulatory matters, treasury, cash management and executive functions for the Debtors and Canadian Debtor are provided by BII. In addition, all supply contracts and processing contracts for the benefit of the Debtors and Canadian Debtor are with BII as the named counterparty.

6.     To minimize the potentially adverse effects which the commencement of these chapter 11 cases may have on the Debtors' ability to continue operations while it works to consummate a Transaction (as defined below), and to facilitate an orderly transition into chapter 11, the Debtors have filed certain "first day" motions and applications with the Court (collectively, the "First Day Pleadings").

7.     I am familiar with each of the First Day Pleadings and believe the relief sought therein is required to facilitate an orderly transition into chapter 11 and avoid the immediate and

irreparable harm the Debtors will suffer if they are not authorized to obtain financing, use cash collateral, make certain essential payments and otherwise continue their business operations as requested in the First Day Pleadings.

## BACKGROUND

### I.    Overview of Barzel's Business

8.    Headquartered in Norwood, Massachusetts, Barzel operates an integrated system of fifteen (15) strategically located metal processing, manufacturing and distribution facilities throughout the Northeastern, Mid-Atlantic and Mid-Western United States and the Canadian provinces of Ontario and Québec. From these locations, Barzel employs approximately 600 people in the United States and Canada, who serve over 3,800 customers with speed, quality and reliability.

*The Decalogue™ Methodology*

9.    Barzel operates as one integrated system governed by the Decalogue™ operating methodology.[2] The Decalogue™ methodology is founded on proven management philosophies that require the close statistical monitoring of Barzel's operations and focus on maximizing the speed at which Barzel can generate cash. In the Barzel business model, the ability to generate cash is directly related to the speed at which it can replenish steel. Barzel's ability to replenish steel faster than the industry average is driven by unprecedented supplier agreements that provide for daily raw material deliveries with lead times not exceeding two weeks, as opposed to the normal industry range of five to twelve weeks. Barzel's streamlined replenishment system enhances Barzel's operating performance by reducing excess inventory, mitigating raw material

---

[2] The Decalogue™ trademark is owned by Barzel's former president, Dr. Domenico Lepore. The Debtors use the Decalogue™ trademark pursuant to a license agreement between Barzel and Dr. Lepore dated September 15, 2006.

price risk and accelerating the time from customer order to customer delivery to receipt of payment.

*Business Lines*

10.     Barzel has four primary business lines: (a) tube and pipe production, (b) manufacturing, (c) processing and (d) distribution:

Tube and Pipe Production. Barzel is a leading North American producer of hollow structural section ("HSS") tubes and A53 electric resistance welded ("ERW") pipes. Collectively, the HSS tube and A53 ERW pipe markets represent a $5 billion market in North America. Barzel operates five (5) state-of-the-art tube and pipe facilities—including the only A53 ERW pipe facility on the East Coast of the U.S.—that have total annual capacity of approximately 700,000 tons. In fiscal 2008, HSS tubes accounted for approximately 16% of Barzel's total consolidated revenue.

Manufacturing. Barzel's manufacturing operations are located in Québec, Canada and consist primarily of the production of custom light and heavy fabricated components. Manufacturing services include roll-forming, welding, punching, cutting and assembly. In fiscal 2008, manufacturing generated approximately 5% of Barzel's total consolidated revenue.

Distribution. Barzel is also a leading distributor of steel, aluminum and stainless products, including hot and cold rolled carbon, aluminum, stainless and alloys and coated products in sheet, coil, bar, shapes, tubular and plate forms. Barzel operates five (5) distribution facilities that are strategically located in close

4

proximity to major customers and transportation routes. Distribution services generated approximately 33% of Barzel's total consolidated revenue in 2008.

Processing. Barzel operates the largest independent continuous process-pickling facility in Canada and offers a range of other metal processing services including slitting, cutting-to-length, shearing, leveling and blanking. While the majority of Barzel's processing business involves direct processing, *i.e.* the processing of raw materials purchased directly by Barzel for sale to its customers, Barzel also provides toll-processing services, *i.e.* the processing of raw materials purchased directly by Barzel's customers. In fiscal 2008, processing generated approximately 46% of Barzel's total consolidated revenue, primarily related to processing for the automotive industry.

### *Customers*

11.     Barzel's customer base is well diversified, with no one customer accounting for more than 10% of sales. Barzel's customers include automotive parts manufacturers and stampers, other steel service centers, general fabricators and manufacturers of transportation equipment, material handling equipment, electrical components, appliances, storage tanks, ship building material, construction and heavy equipment and agricultural equipment.

### *Recent Operating Results*

12.     For fiscal year ended November 29, 2008, Barzel generated consolidated revenues of approximately $801 million and had operating losses of approximately $38 million. For the six months ended May 30, 2009, Barzel had consolidated revenues of approximately $73.7 million and operating losses of approximately $63.5 million.

5

13.     As of May 30, 2009, Barzel's consolidated balance sheet listed assets totaling approximately $370.1 million, and liabilities totaling approximately $375.4 million.

## II.     Barzel's History and Corporate Structure

14.     BII (then Symmetry Holdings Inc.) was formed in 2006 as a Delaware development stage company to acquire one or more operating businesses that BII could transform and modernize by implementing the Decalogue™ operating methodology.

15.     In March 2007, BII completed a firm commitment, registered, initial public offering of common stock and warrants, for gross proceeds of $150 million. At that time, BII's common stock and warrants were listed on the American Stock Exchange.

16.     On November 15, 2007, BII acquired Novamerican Steel, Inc. ("NSI") and various NSI subsidiaries (collectively "Novamerican") for $585.2 million. The acquisition of Novamerican (and related transaction costs) were financed by (a) $112 million of the net proceeds from the initial public offering of BII's common stock and warrants, (b) $15 million from a private placement sale of additional common stock and warrants of BII, and (c) debt financing consisting of $315 million of senior secured notes issued by Barzel Finco Inc. ("Barzel Finco") and $67 million of borrowings under an asset based lending facility, each of which is discussed more fully below, and (d) cash held by Novamerican at closing.

17.     On December 31, 2007, the listing of BII's common stock and warrants was moved from the American Stock Exchange to the NASDAQ Capital Market.

18.     On December 6, 2007, Symmetry Holdings Inc. changed its name to Novamerican Steel, Inc. and on February 13, 2009, Novamerican Steel, Inc. changed its name to Barzel Industries Inc. "Barzel" means "iron" and/or "steel" in many languages.

47658/0001-5975002v11

19.     BII is the direct or indirect parent of the other Debtors and Canadian Debtor. On February 17, 2009, the symbols for BII's common stock and warrants were changed and, from February 17, 2009 until August 20, 2009, BII's common stock and warrants were traded publicly on the NASDAQ Capital Market under the symbols "TPUT" and "TPUTW," respectively.[3]

20.     A chart depicting Barzel's corporate structure is attached hereto as **Exhibit A.**

## III.     The Debtors' Prepetition Debt Structure

### *The Notes*

21.     On November 15, 2007, Barzel Finco issued $315 million of 11.5% Senior Secured Notes due 2015 (the "Notes") pursuant to an Indenture dated November 15, 2007 as supplemented, (the "Indenture"), among the Debtors and The Bank of New York Mellon, as successor to the Bank of New York, as Trustee (the "Trustee"). The Notes have a maturity date of November 15, 2015, and they bear interest at an annual rate of 11.5%, payable semi-annually in arrears on each May 15 and November 15.

22.     The proceeds of the Notes were used to fund BII's acquisition of Novamerican.

23.     The Notes are guaranteed by all other Debtors[4], and they are secured by:

a first priority security interest in all of the Debtors' (a) owned real property,

fixtures, equipment, instruments, investment property, intellectual

---

[3] On August 20, 2009, trading in BII's common stock and warrants was suspended due to BII's non-compliance with NASDAQ Rule 5550(b)(1), which requires companies whose securities are listed on the NASDAQ Capital Market to maintain (a) a minimum of $2,500,000 in stockholders' equity, or (b) to have had a minimum of $500,000 of net income for the most recently completed fiscal year (or 2 of the last 3 years), or (c) have a minimum of $35,000,000 of market value of listed securities. On or about September 14, 2009, BII will be delisted from the NASDAQ Capital Markets.

[4] For U.S. corporate income tax reasons, the Canadian Debtor did not guaranty the Notes. Rather, Barzel Finco loaned $125 million of Note proceeds to Barzel Canada (the "Intercompany Loan"). The Intercompany Loan is evidenced by notes issued by Barzel Canada in favor of Barzel Finco dated November 15, 2007 (the "Intercompany Notes") and is secured by substantially all of the assets of the Canadian Debtor. On November 15, 2007, Barzel Finco assigned all of its rights under and related to the Intercompany Notes to a collateral trustee as collateral security for the benefit of the holders of the Notes.

property, contract rights, other general intangibles and other assets that do not constitute second-priority collateral, (b) 100% of the capital stock of each existing and future U.S. subsidiary of Barzel that is directly owned by any of the Debtors, and 66% of the capital stock of each existing and future foreign subsidiary of Barzel that is directly owned by any of the Debtors, (c) 100% of the capital stock of each existing and future subsidiary of Barzel Canada except certain special purpose holding company subsidiaries and any subsidiaries that are not wholly owned where, pursuant to its organizational documents and any related joint venture or similar agreement, the grant of a security interest would be prohibited without the consent of a person other than Barzel or its subsidiaries, (d) intercompany receivables, and (e) proceeds of the foregoing; and

a second priority security interest in all of the Debtors' (a) accounts receivable and related records, chattel paper, deposit accounts, cash, checks and other negotiable instruments, funds and other evidences of payment, (b) inventory, (c) documents, general intangibles, instruments, investment property and letter of credit rights, commercial tort claims and (d) books and records related to, and proceeds of, the foregoing.

24.     Two-thirds of the Notes are held by JPMorgan Chase Bank, N.A. ("JPM"), and one-third of the Notes are held by CIBC World Markets Inc. ("CIBC," and together with JPM, the "Holders").

47658/0001-5975002v11

25.     In or about April 2009, it became clear that Barzel would not be able to pay the $18.1 million interest payment due under the Notes on May 15, 2009. Accordingly, on May 14, 2009, Barzel and the Holders entered a Deferral Agreement (as amended, the "Deferral Agreement") with respect to the Notes.

26.     Pursuant to the Deferral Agreement, the interest payment due on May 15, 2009 was deferred until August 14, 2009. On July 17, 2009, Barzel and the Holders amended the Deferral Agreement and further deferred payment of outstanding interest until October 13, 2009.

27.     Under the Deferral Agreement, Barzel agreed to use its best efforts to consummate either (i) a recapitalization or restructuring of a substantial portion of the equity and/or debt securities and/or other indebtedness of Barzel, (ii) a disposition of all or a majority of the outstanding equity securities of Barzel and/or all or a majority of the assets or operations of Barzel, or (iii) a refinancing of Barzel and/or the placement, raising or issuance of equity, equity-linked or debt securities in connection with Barzel (each or any of the foregoing, a "Transaction"). Barzel also agreed to provide periodic reports and documentation to the Holders regarding Barzel's efforts to consummate a Transaction.

*The ABL Facility*

28.     On November 15, 2007, Barzel obtained additional financing for the Novamerican acquisition and general operations pursuant to the Credit Agreement dated as of November 15, 2007 (as amended, the "Credit Agreement"), by and among BII, Barzel Finco and Barzel Canada as borrowers, JPM, CIBC and other lender parties thereto (collectively, the "Prepetition Lenders"), as lenders, and JPM, CIT Business Credit Canada Inc. and The CIT Group/Business Credit Inc., as agents.

9

29.     Pursuant to the Credit Agreement, the Prepetition Lenders extended to Barzel a five (5) year revolving credit facility of up to $175 million (the "ABL Facility"), availability under which is subject to a borrowing base.

30.     The ABL Facility is guaranteed by each of the non-borrowing Debtors, and Barzel Canada's borrowings under the ABL Facility are also guaranteed by 632422 N.B. Ltd, a non-debtor.

31.     The ABL Facility is secured by:

a first priority security interest in the U.S. Debtors', the Canadian Debtor's and 632422 N.B. Ltd.'s[5] (a) accounts receivable and related records, chattel paper, deposit accounts (other than certain accounts controlled by the Trustee and the cash or other assets deposited in such accounts), cash, checks and other negotiable instruments, funds and other evidences of payment; (b) inventory; (c) to the extent evidencing, governing, security or otherwise related to the items referred to in (a) and (b), documents of title, intangibles, instruments and investment property; (d) books and records related to the foregoing; (e) all collateral security and guarantees given by any person with respect to any of the foregoing; and (f) all proceeds, including insurance proceeds, of any and all of the foregoing; and

a second priority security interest in the U.S. Debtors' (i) owned real property (subject to one exception), fixtures, equipment, instruments, investment property, intellectual property, contract rights, other general intangibles

---

[5] The Canadian Debtor's and 632422 N.B. Ltd.'s assets only secure Barzel Canada's borrowings under the ABL Facility.

and other assets that do not constitute first-priority collateral, (ii) 100% of the capital stock of each existing and future U.S. subsidiary of Barzel Industries Inc. that is directly owned by any of the U.S. Debtors, and 66% of the capital stock of each existing and future foreign subsidiary of Barzel Industries Inc. that is directly owned by any of the U.S. Debtors except non-wholly owned subsidiaries (and certain special purpose subsidiaries) where pursuant to the organizational documents such subsidiary and any related joint venture or similar agreement such pledge is prohibited, (iii) intercompany receivables, including the receivables owed by the Applicant secured by the Applicant's assets as described in (i) above and 100% of the capital stock of each existing and future subsidiary of the Barzel Canada except non-wholly owned subsidiaries (and certain special purpose subsidiaries) where pursuant to the organizational documents such subsidiary and any related joint venture or similar agreement such pledge is prohibited and (iv) proceeds of the foregoing.

32.     As of September 10, 2009, the applicable interest rate in effect for (a) U.S. dollar borrowings under the ABL Facility was 5.4%, and (b) Canadian dollar borrowings was 6.5%.

33.     From early February 2009 to June 2, 2009, but for approximately $883,000 of letter of credit obligations associated with Barzel's workers compensation insurance program, there were no amounts outstanding under the ABL Facility.

34.     On June 1, 2009 and July 17, 2009, the ABL Facility was amended to provide Barzel limited liquidity to enable it to pursue and consummate a Transaction as contemplated under the Deferral Agreement. The ABL Facility was also amended to terminate the

47658/0001-5975002v11

commitments of any Prepetition Lenders other than JPM and CIBC, leaving JPM and CIBC as the sole remaining Prepetition Lenders.

35.     As of the Petition Date, approximately $18.5 million was outstanding under the ABL Facility.

### Trade Debt

36.     In addition to amounts outstanding under the Notes and the ABL Facility, Barzel estimates that is has approximately $5.6 million in trade debt.

## IV.     Events Leading to Chapter 11

37.     Barzel has suffered increasing operating losses during 2008 and 2009. Barzel's losses are due, in large part, to the current global economic recession and credit crisis, and the resulting dramatic downturn in the automotive, transportation, manufacturing and construction industries in the United States and Canada—which account for many of Barzel's customers. Barzel's losses have been exacerbated by an unprecedented increase in customer inventories through mid-2008 due to a run-up in steel prices through that time, which, upon the onset of the recession, led to an inventory overhang that depressed demand over and above that caused by the recession. In addition, Barzel's losses have been exacerbated by the unprecedented reduction, subsequent to mid-2008, in the overall price of steel, which was exacerbated by a decrease in consumer confidence resulting from the global financial crisis and recessionary environment.

38.     The reduced demand and lowered prices for Barzel's goods and services resulted in a significant decrease in revenue. Barzel's declining operating performance reduced liquidity and limited Barzel's ability to borrow under the ABL Facility or obtain new financing to fund their operations.

47658/0001-5975002v11

39. To offset these factors, Barzel has taken numerous steps over the past eighteen (18) months to reduce expenses and improve operations. Among other things, Barzel closed or sold six (6) redundant distribution and processing facilities, reduced their workforce by approximately 350 people, lowered annual operating expenses by approximately $33 million and reduced inventory levels by approximately $110 million.

40. Despite these efforts, Barzel was not able to make the interest payment due under the Notes on May 15, 2009.

41. As a result, in May 2009, Barzel initiated a process with a view towards completing a Transaction as described above.

42. On May 2, 2009, Barzel engaged Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan") to assist it in identifying potential purchasers/investors and pursuing a Transaction. Upon its engagement, Houlihan prepared written materials, including a confidential information memorandum, to market Barzel's business. During ensuing weeks, Houlihan identified and contacted over 220 potential strategic and financial buyers/investors. Concurrently, management contacted a significant number of additional potential strategic and financial buyers/investors known to it. Of those parties, 72 executed confidentiality agreements, received the information memorandum and gained access to an electronic data room to conduct due diligence. Thereafter, more than 13 potential buyers and investors received management presentations or conducted facility tours.

43. After this initial round of marketing and due diligence, Barzel received 12 offers to pursue a Transaction involving substantially all of the Debtors' assets, including nine offers from financial buyers/investors and three offers from strategic buyers/investors. After the

deadline for submitting first-round offers expired, Barzel also received proposals from two additional strategic buyers/investors.

44. After reviewing these offers, BII's Board of Directors directed Houlihan and management to initiate an in-depth diligence process and conduct a final round of bidding. Eight offers were submitted during the final round of bidding, consisting of offers from five financial and three strategic buyers/investors.

45. Between the initial marketing period and first and final rounds of bidding, interested parties have had more than three and a half (3½) months to conduct extensive due diligence of Barzel.

46. After carefully reviewing the final round offers, BII's Board of Directors directed management and Houlihan to negotiate with and assist four (4) bidders to expeditiously secure a fully financed bid and definitively documented Transaction that maximized the value reasonably obtainable under the circumstances and to continue to work with other bidders who might reasonably be expected to submit a bid in a sale process under section 363 of the Bankruptcy Code.

47. After allowing a reasonable time for securing bids that satisfied such criteria and reviewing the status of bids then available for acceptance, BII's Board of Directors selected Chriscott USA Inc. and 4513614 Canada (the "Buyers") to serve as a stalking horse purchaser of substantially all of the Debtors' assets. On September 14, 2009, Barzel and the Buyers executed an asset purchase agreement (the "APA") pursuant to which the Buyers agreed to purchase substantially all of Barzel's assets for $65 million, subject to certain adjustments and the assumption of certain limited liabilities.

14

48.     The Prepetition Lenders have agreed to extend limited debtor in possession financing to Barzel to support Barzel's operations during the sale process, including the satisfaction of chapter 11 administrative claims incurred through closing. Although such debtor in possession financing will terminate by no later than December 11, 2009, the Prepetition Lenders have agreed that a portion of the proceeds from the sale to the Buyers (or any alternative purchaser) in an amount to be negotiated between the Prepetition Lenders and the Debtors (but which shall not be less than $2.25 million, plus payment of reasonable incurred but unpaid professional fees and expenses for the Debtors and any creditors' committee up to an amount specified in the budget to the debtor in possession financing facility) will be provided to fund reasonable and necessary expenses in connection with the wind-up of these chapter 11 cases. The proposed debtor in possession financing will be paid in full and terminated following the closing of the sale to the Buyers (or any alternative purchaser).

49.     Given Barzel's severe liquidity constraints, I understand that BII's Board of Directors believes that the pursuit of an expedited sale process involving substantially all of Barzel's assets is the best option for maximizing the value of the Debtors' estates and is in the best interest of the Debtors' creditors and other parties in interest.

## SUMMARY OF FIRST DAY PLEADINGS[6]

50.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Pleadings they believe are necessary to minimize the potentially adverse effects the commencement of these chapter 11 cases may have on Barzel's business and to facilitate an orderly transition into chapter 11. A description of the relief requested and facts supporting each of the First Day Pleadings is set forth below.

---

[6] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

47658/0001-5975002v11

# ADMINISTRATIVE MOTIONS

## I. Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases

51.     These chapter 11 cases involve eight (8) affiliated Debtors. Many, if not most, of the motions, applications and other pleadings that will be filed in these cases will relate to relief sought by all of the Debtors. The Debtors, therefore, seek joint administration of their chapter 11 cases for procedural purposes only. I am advised by counsel that jointly administering these chapter 11 cases will: (a) ease the administrative burden on the Court and parties in interest, (b) protect creditors of different estates and (c) simplify the United States Trustee's supervision of the administrative aspects of these chapter 11 cases.

52.     For these reasons, the Debtors believe, and I agree, that joint administration of the Debtors' chapter 11 cases is in the best interest of the Debtors, their estates and creditors and will reduce the administrative burden on the Court and all parties in interest, and therefore, should be granted.

## II. Debtors' Motion for Declaratory Order Enforcing Section 362 of the Bankruptcy Code

53.     By this Motion, the Debtors seek entry of a declaratory order enforcing section 362 of the Bankruptcy Code. Such an order is necessary to apprise parties affected by section 362 of the existence and the effect of that provision and, in particular, the protections that the provision provides the Debtors. The Debtors have developed valuable relationships with national and local businesses in both the Untied States and Canada. The Debtors also maintain valuable business relationships with a number of potential creditors located outside of the United States. The Debtors believe that many of these creditors do not deal with chapter 11 debtors in possession on a regular basis and it is highly likely that they will be unfamiliar with both the

scope of the debtor in possession's authority and the operation of the automatic stay. Accordingly, the Debtors request this Court's assistance in clarifying the Debtors' rights and authority under chapter 11.

54. For these reasons, I believe that entry of a declaratory order enforcing section 362 of the Bankruptcy Code is in the best interest of the Debtors' estates, their creditors and all parties in interest.

## III. Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol

55. By this Motion, the Debtors seek the entry of an order approving a protocol for the coordination of these chapter 11 proceedings and the Canadian Proceedings on matters of concern to both this Court and the Canadian Court. Specifically, the cross-border protocol will ensure that (a) the U.S. and Canadian Proceedings are coordinated to avoid inconsistent, conflicting or duplicative rulings, (b) all parties in interest receive sufficient notice of key issues and events in both Insolvency Proceedings, (c) the substantive rights of all parties in interest are protected, and (d) the jurisdictional integrity of this Court and the Canadian Court are preserved.

56. Barzel's operations are highly integrated, and substantially all finance, regulatory, treasury, cash management and executive functions of the Canadian Debtor are provided by BII. In light of the transnational nature of Barzel's business, the U.S. and Canadian Proceedings must be managed in a coordinated fashion. The proposed court-to-court protocol is designed to facilitate such coordination, thereby maximizing the efficiency of the U.S. and Canadian Proceedings, reducing the costs associated therewith and avoiding any duplication of efforts and the possibility of conflicting rulings by this Court and the Canadian Court.

47658/0001-5975002v11

# RETENTION OF CLAIMS, NOTICING AND BALLOTING AGENT

**IV.** **Motion of the Debtors for Entry of an Order Authorizing the Retention and Employment of Logan & Company, Inc. as Claims, Noticing, and Balloting Agent**

57.     By this Motion, the Debtors request that the Court enter an order, pursuant to Bankruptcy Rule 2002(f), Local Rule 2002-1(f), and 28 U.S.C. § 156(c), appointing Logan & Company, Inc. ("Logan") as the official claims, noticing and balloting agent in these cases to assume responsibility for distributing notices and proofs of claim; maintaining, processing and docketing of proofs of claim filed in these chapter 11 cases; and providing other services typically rendered by claims agents in chapter 11 cases as more fully described in the Motion.

58.     The Debtors estimate that there are more than 200 potential creditors and other parties in interest who require notice of various matters in these chapter 11 cases. Given this estimate, it would be highly burdensome for the Court and the Clerk's Office to perform the services Logan will perform. To relieve the Clerk's Office of these burdens, the Debtors propose to appoint Logan as their notice and claims agent in these chapter 11 cases.

59.     I am advised that Logan is a leading, well-known chapter 11 administrator with expertise in noticing, claims processing, claims reconciliation, balloting and distribution in cases such as these. Based on such advice, I believe Logan is well qualified to provide the Debtors with experienced noticing, claims and balloting services in connection with these cases.

47658/0001-5975002v11

## MOTIONS RELATED TO BUSINESS OPERATIONS

**V.** **Debtors' Motion for an Order (i) Authorizing: (a) Payment of Prepetition Employee Wages, Salaries, Commissions and Other Compensation; (b) Payment of Prepetition Compensation Owed to Independent Contractors and Temporary Workers; (c) Reimbursement of Prepetition Employee Business Expenses; (d) Payments for Which Prepetition Payroll and Tax Deductions Were Made; (e) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (f) Payment of Workers' Compensation Obligations; and (g) Payment to Third Parties of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (ii) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtors' Payroll Accounts to Make the Foregoing Payments**

60.     By this Motion the Debtors seek entry of an order authorizing but not directing the Debtors to pay Employee Related Claims and continue their employment practices postpetition.

61.     The Debtors currently employ approximately 67 active salaried employees and 119 hourly employees (with 33 on layoff and 6 on leave) (collectively, the "Employees"). In addition, the Debtors normally utilize the services of two independent contractors (the "Independent Contractors") and two temporary, full-time equivalent hourly workers (the "Temporary Workers" and collectively with the Employees and Independent Contractors, the "Debtors' Workforce" or the "Workforce"). Approximately 48 Employees are represented by multiple unions or associations (the "Union Employees") and are covered under one of four collective bargaining or association agreements (each such agreement a "CBA").[7]

62.     The Debtors' Workforce is the estates' most valuable asset because of the skills, knowledge and understanding of the Debtors' business that each member of the Workforce provides. Without the continued services of the Employees, it will not be possible for the

---

[7] For purposes of this Motion, the Employees other than the Union Employees shall be collectively referred to as the "Non-Union Employees."

47658/0001-5975002v11

Debtors to operate the business in the ordinary course pending the consummation of a sale of substantially all of their assets.

63. The Debtors seek the relief set forth in this Motion to: (a) minimize the personal hardship that the Debtors' Workforce will suffer if the prepetition Employee Related Claims are not paid when due or as expected; (b) maintain the morale of the Workforce during this critical time; and (c) provide competency and consistency to the Debtors' operations during the sale process. The Debtors believe, and I agree, without this consistency the Debtors' operations will be negatively impacted and the value of their assets will decline.

### *Wages, Salaries and Other Compensation*

64. The Debtors' average gross monthly compensation for their Employees, including wages, salaries, and other compensation is approximately $1.2 million ("Wages"). The majority of payroll payments are made via direct deposit through electronic transfer of funds directly to the Employees, while the remaining payroll payments are made by check. The Debtors' Employees are paid on Thursdays, on either a weekly or bi-weekly schedule. Hourly Employees at American Steel and Aluminum Corporation ("ASA") and Nova Tube and Steel, Inc. ("NTS") and hourly and salaried employees at Nova Tube Indiana, LLC ("NTI") are paid each Thursday, one week in arrears. Salaried Employees at ASA and NTS are paid bi-weekly on Thursdays for the past and current week through to the following day. Because many of the Debtors' Employees are paid in arrears, as of the Petition Date, some of the Debtors' Employees will not have been paid all of the prepetition Wages they have earned.

65. As of the Petition Date, the aggregate amount of accrued Wages earned prior to the Petition Date that remain unpaid to the Debtors' Employees is approximately $175,000 (the

47658/0001-5975002v11

"Unpaid Wages").[8]  By this Motion, the Debtors request the authority to pay all such Unpaid Wages to their Employees in the ordinary course of business, including, without limitation, to the Union Employees in the ordinary course of business and in accordance with the terms and conditions of their respective CBA.  The Debtors have made careful inquiries and have taken diligent steps to ensure that no Employees are owed more than $10,950 for Unpaid Wages as of the Petition Date.  Accordingly, if this Motion is granted, no Employee will be paid more than $10,950 for such Unpaid Wages.

66.     As noted above, the Debtors currently employ two Independent Contractors, a risk management and insurance consulting and a payroll benefits coordinator.  As of the Petition Date, the Debtors estimate that they owe approximately $11,500 for the unpaid and accrued services of the Independent Contractors.  Accordingly, the Debtors believe that no Independent Contractor is owed more than $10,950.00 and request authority to pay any prepetition amounts owing for the services of their Independent Contractors up to the $10,950 limit provided for in Bankruptcy Code Section 507(a)(4).

67.     The Debtors generally pay the temporary agencies for the services of Temporary Workers and the agencies pay the Temporary Workers one week in arrears.  The Debtors spend approximately $23,000 per month for the services of the Temporary Workers.  As of the Petition Date, the Debtors estimate that a total prepetition obligation of $11,500 for both Temporary Workers remains outstanding.  By this Motion, the Debtors request authority to pay the prepetition amounts owing for the services of the Temporary Workers up to the $10,950 limit for each as provided in Section 507(a)(4) of the Bankruptcy Code.

---

[8]  Approximately $32,000 of this amount includes the Withheld Amounts.

### *Reimbursement of Prepetition Employee Business Expenses*

68.     The Debtors spent an average of $52,000 per month over the last three months on Reimbursable Expenses incurred through the use of Employee personal funds.  Because Employees do not always submit expense reports with perfect regularity, it is difficult to determine with precision the aggregate amount of outstanding Reimbursable Expenses. However, the Debtors estimate that as of the Petition Date, approximately $38,000 in Reimbursable Expenses have been incurred but remain unpaid.

69.     The Reimbursable Expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed.  The vast majority of the Debtors' Workforce relies exclusively on the full compensation or reimbursement of their expenses in order to continue to pay daily living expenses.  If the Debtors are not permitted to honor these claims, its Employees will suffer financial difficulty and low morale at a time when their focus and support are critical to proceed with the chapter 11 process.  Accordingly, the Debtors request authority to reimburse the Employees for Reimbursable Expenses that were incurred prepetition.

### *Prepetition Withholdings and Deductions*

70.     The Debtors are required by law to withhold from an employee's wages amounts related to, among other things, federal, state and local income taxes, state and federal unemployment taxes (collectively, the "Withheld Amounts") for remittance and forwarding to the appropriate federal, state, or local taxing authorities.  As of the Petition Date, the Debtors estimate that accrued and outstanding prepetition Withheld Amounts total approximately $32,000.

71.     The Debtors must then make payments based on a percentage of gross payroll for social security and Medicare taxes as well as federal and state unemployment insurance (the

"Employer Payroll Taxes," and together with the Withheld Amounts, the "Payroll Taxes"). As of the Petition Date, the Debtors estimate that accrued and outstanding prepetition Employer Payroll Taxes total approximately $20,125. The Debtors seek authority to honor and process the prepetition Payroll Taxes to the appropriate taxing authorities.

72. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) union dues and union fund contributions, (b) garnishments, child support, and similar deductions, and (c) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of pension payments, health care benefits, insurance premiums, 401(k) plan contributions, legally ordered deductions and other miscellaneous deductions) (collectively, the "Deductions") and forward those amounts to various third party recipients. On average, the Debtors have historically taken approximately $107,000 in Deductions from the Employees' paychecks per month. As of the Petition Date, approximately $25,000 had been previously deducted from Employees' earnings but not yet forwarded to the appropriate third party recipients. Accordingly, the Debtors seek authority to forward these prepetition Deductions to the applicable third party recipients.

### Prepetition Employee Benefits

73. The Debtors provide their Employees, directly or indirectly, and in the ordinary course of business, with a number of employee benefits, including, but not limited to (a) a broad range of medical and health care programs, (b) vacation, holiday and leave benefits, (c) savings and pension plans, and (d) certain other specific employee benefits, including short term and long term disability insurance, life insurance, accidental death and dismemberment insurance,

47658/0001-5975002v11

and severance (the "Employee Insurance Benefits & Severance"), which are described in greater detail below (collectively the "Specified Employee Benefits").

### Insured Health Care Programs

74.     The Debtors offer health, prescription drug, and dental coverage to eligible full-time employees.  The Insured Health Programs are funded through contributions by the Debtors and participating Employees.  The Debtors contribute a majority of the costs for the Insured Health Programs, and the percentage contributed by the Employee varies depending on whether the Employee's family members or partners and any dependents are covered.[9]  Employee contributions are deducted from each Employee's paycheck.

75.     On average, the Debtors pay approximately $225,000 per month for the Insured Health Programs.[10]  Although, the monthly premiums for the Insured Health Programs are generally paid at the beginning of the month, as of the Petition Date, approximately $98,382.90 remains outstanding for Insured Health Programs for August and September 2009.

76.     By this Motion, the Debtors seek authority to (a) continue to provide the Insured Health Programs for their Employees in the ordinary course of business, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees, and (c) pay all such amounts owed under the Insured Health Programs to the extent that they remain unpaid on the Petition Date.

### Vacation, Holiday, and Leave Benefits

77.     The Debtors provide vacation time to their Employees as a paid time off benefit (the "Vacation Time").  Each Employee's vacation benefits depends on the Employee's location, job title and length of service.  Pursuant to the Debtors' policies, Vacation Time may not be

---

[9] Employee contribution for Union Employees is governed by the applicable CBA.

[10] Employee contributions are $53,676.53 per month.

carried over from year to year and the Employees are not cashed-out for unused Vacation Time. Employees are generally paid for Vacation Time at their regular hourly or salaried rates.

78. The Debtors estimate that the Employees have approximately $420,000 of unused Vacation Time as of the Petition Date.

79. Eligible Employees also receive between 10 and 11 paid holidays (the "Holiday Pay"), depending on the Employees' location. Non-Union Employees scheduled to work on a holiday receive time and a half pay for actual hours worked.

80. In addition to the primary leave policies discussed above, the Debtors offer additional leave policies to their Employees (the "Additional Leave Payments" and together with the Holiday Pay, the "Leave Pay").[11] The Additional Leave Payments vary between Union and Non-Union Employees. Generally Employees are provided with Additional Leave Payments for sick days, jury duty and bereavement.[12]

81. Additional Leave Payments and Holiday Pay are paid as part of the payroll process by the continuation of pay during the affected Employee's leave. Since these payments are managed through the payroll system, the prepetition obligations for Additional Leave Payments have been accounted for in the Unpaid Wages amounts set forth above.

### Savings and Employee Pension Plans

82. Prior to the Petition Date, and in the ordinary course of business, the Debtors maintained savings plans for the benefit of their Employees known as the American Steel and Aluminum Corporation Employees' Deferred Compensation Plan (the "401(k) Plan") and the Nova Tube Indiana, LLC 401(k) Profit Sharing Plan & Trust (the "Nova Tube 401(k) Plan"

---

[11] Leave Pay and Vacation Time for Union Employees is governed by the applicable CBA. Generally, Union Employees also receive 10 or 11 paid holidays but are paid double time or time and a half on company holidays.

[12] Additional Leave Payments for Union Employees are governed by the applicable CBA.

47658/0001-5975002v11

together with the 401(k) Plan, the "<u>Employee Savings Plans</u>").[13]  The Debtors make weekly deductions from the Employee's pay which are paid to the Employee Savings Plans.  On or shortly after the last payroll of each month, both the Employee deductions and the Debtors' matching contributions are forwarded to ING and Lincoln Income, which administer the 401(k) Plans and Nova Tube 401(k) Plans respectively.

83.     ASA and NTS Employees are eligible for the 401(k) Plans after one year of service.  Enrollment in the 401(k) Plan occurs twice a year in January and July.  The Debtors match 50% of the Employee's contribution (up to 4% of the Employee's salary) in the first year of participation, 52% of the Employee's contribution (up to 4% of the Employee's salary) in the second year of participation, 54% of the Employee's contribution (up to 4% of the Employee's salary) in the third year of participation and up to 100% of the Employee's contribution (up to 4% of the Employee's salary) after 25 years of service.  Employees are immediately vested in the employer contribution.  The monthly costs for the 401(k) Plan is approximately $58,208.78 consisting of a $44,865.82 employee contribution and a $13,342.96 employer match.

84.     NTI Employees may enroll in the Nova Tube 401(k) on the first day of the quarter following their date of hire.  The Debtors match 33% of the Employee's contribution (up to 6% of salary).  NTI Employees are 30% vested after one year of service, 60% vested after two years of service, and 100% vested after three years of service.  The monthly costs for the Nova Tube 401(k) Plan is approximately $4,109.30 consisting of a $3,253.42 employee contribution and $855.88 employer match.

---

[13] The Debtors' matching payments are subject to the applicable contribution caps.

47658/0001-5975002v11

85.     As of the Petition Date, the Debtors owed approximately $17,500[14] (for September 2009) to third parties in connection with the Employees Savings Plans. By this Motion, the Debtors seek authority to pay all prepetition amounts owed under the Employee Savings Plans and to continue to perform their obligations under the Employee Savings Plans in the ordinary course of business.

### Employee Insurance Benefits & Severance

86.     As provided in greater detail below, the Debtors provide their full time Employees with Employee Insurance Benefits & Severance. The Debtors currently pay on average approximately $10,150 per month with respect to Short Term Disability, Long Term Disability, Life Insurance, and AD&D. As of the Petition, the Debtors owe approximately $5,000 in prepetition Employee Insurance Benefits & Severance.

### Workers' Compensation Program

87.     Under the laws of the various states in which they operate, the Debtors are required to maintain workers' compensation policies and programs (the "Workers' Compensation Programs") to provide their Employees compensation for injuries arising from or related to their employment with the Debtors. The Debtors have Workers' Compensation Programs in the six states in which they operate.[15]

88.     The Debtors' current Workers' Compensation Programs cover claims incurring from March 1, 2009 to the present and are administered by AIG (the "AIG Policy"). The AIG Policy provides coverage up to $1,000,000 for each Employee and does not require the payment of a deductible. The Debtors pay AIG approximately $558,451 per year to maintain the AIG

---

[14] This total does not include employer matching contributions, which are calculated and taken out at the end of each month.

[15] The Debtors operate in Maine, New York, Pennsylvania, Massachusetts, Virginia, and Indiana.

Policy. As of the Petition Date, there are no outstanding amounts owed on the AIG Policy because it has been paid in full for the 2009 policy year. Additionally, as of the Petition Date, 17 claims have been made on the AIG Policy eight of which are still open.

89. Prior to March 1, 2009, the Debtors maintained Workers' Compensation Policies administrated by other insurers (the "Former Workers' Compensation Policies"). The coverage for these Former Workers' Compensation Policies began in 2003 and continued through February 28, 2009. Several of the Former Workers' Compensation Policies required a $150,000 deductible. Thus, any workers compensation claims subject to the Former Workers' Compensation Policies are self-funded by the Debtors.

90. As of the Petition Date, there are approximately 15 workers compensation claims pending against the Debtors that are subject to the Former Workers' Compensation Policies. As of the Petition Date, the Debtors had reserved $615,324 in potential liability and costs for the resolution of the workers compensation claims (the "Workers' Compensation Reserve").

91. Because the Workers' Compensation Programs are mandated by state law the Debtors request authority to pay any prepetition amounts due or that may become due with respect to the Workers' Compensation Programs. The Debtors further seek authority to maintain and continue their prepetition practices with respect to the Workers' Compensation Programs, including allowing employees holding valid workers' compensation claims to proceed with their Claims under the applicable Workers' Compensation Programs, and to maintain the Workers' Compensation Reserve for existing workers' compensation claims.

92. The Debtors also request authority to pay all costs incident to the Employee Related Claims, including other processing costs or administration costs ("Prepetition Processing Costs"). The Debtors estimate that the aggregate amount of Prepetition Processing Costs

accrued but unpaid as of the Petition Date constitutes a *de minimis* amount. Payment of the Prepetition Processing Costs is justified because the failure to pay any such amounts might disrupt the services of third party providers with respect to the Employee Related Clause.

93.     The Debtors request authority to pay all costs incident to, among other items, the Employee Wages and Benefits, Unpaid Wages, Reimbursable Expenses, and the Payroll Taxes and Deductions, including other processing costs or administration costs ("Prepetition Processing Costs"). The Debtors estimate that the aggregate amount of Prepetition Processing Costs accrued but unpaid as of the Petition Date constitutes a *de minimis* amount. Payment of the Prepetition Processing Costs is justified because the failure to pay any such amounts might disrupt services of third party providers with respect to the Employee Wages and Benefits, Unpaid Wages, and the Payroll Taxes and Deductions.

## VI.     Motion of the Debtors for an Order Authorizing the Payment of Prepetition Claims of Shippers, Warehousemen, Brokers and Other Lien Claimants

94.     By this motion (the "Shippers Motion") the Debtors seek entry of an order authorizing them, in their discretion, to pay certain prepetition claims of shippers, vendors, warehousemen, brokers and other lien claimants in the ordinary course of business. Without authority to make these payments, it is probable that several, if not all, of the shippers will cease doing business with the Debtors, thereby affecting the Debtors' manufacturing processes and delivery of goods. At this critical time in the Debtors' chapter 11 cases, it is important that the delivery of raw materials and finished product remain uninterrupted. Without this required consistency, I believe the Debtors are likely to lose customers which will severely hamper the Debtors' reorganization prospects and significantly decrease the value of the Debtors' estates.

95.     An integral component of the Debtors' day-to-day operations is the efficient flow of raw materials and finished goods to and from their facilities. The Debtors' supply and

47658/0001-5975002v11

delivery system depends upon the use of reputable common carriers, full and less-than-truckload carriers, freight brokers and parcel carriers (collectively, the "Shippers"), as well as a network of third-party warehousemen who store goods in transit on behalf of the Debtors (the "Warehousemen").

96.     To ensure that their delivery network runs smoothly, the Debtors use several third parties for its shipments, including the Shippers and Warehousemen. The Debtors engage Shippers to transport, store and deliver raw materials and goods to the Debtors, as well as finished products to the Debtors' customers. The Debtors also contract with Warehousemen to store raw materials and finished goods which are in inventory.

97.     In the ordinary course of business, Shippers and Warehousemen regularly have possession of raw materials, supplies, and finished goods produced by the Debtors and intended for delivery to their customers. The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices for goods that were delivered to the Debtors and Debtors' customers prior to the Petition Date.

98.     I am informed that under most state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods. Additionally, I am also informed that pursuant to section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection in the form of a possessory lien. As a result, certain Shippers and Warehousemen may refuse to deliver or release goods in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors (collectively, the "Shipping and Warehousing Claims") have been satisfied and their liens redeemed.

47658/0001-5975002v11

99.     Additionally, a significant portion of the Debtors' business relies on the timely importation of goods and products between the United States and Canada. Accordingly, in the ordinary course of their businesses, customs brokers (the "Brokers") provide the services that enable the Debtors to comply with the complex customs laws and regulations of the United States and Canada (the "Customs Services"). The Customs Services are a vital link in the Debtors' integrated distribution system because the Shippers and Brokers complete paperwork necessary for customs clearance, prepare tariff import summaries, facilitate exportation of the Debtors' products, obtain tariff numbers and perform numerous other essential services for the Debtors.

100.    The Debtors pay the Brokers fees for their Customs Services (collectively, the "Customs Fees") and reimburse the Brokers for any funds advanced on behalf of the Debtors (a) to pay fees to the United States Customs Service (the "Customs Service") relating to work in process or finished goods delivered to or from locations outside the United States (collectively, the "Customs Duties"); and (b) for charges of certain shippers and miscellaneous storage and handling expenses (collectively, the "Advances"). As of the Petition Date, certain of the Brokers had outstanding claims for the payment of Customs Fees, Customs Duties and Advances (collectively, the "Customs Claims").

101.    In addition to the Shippers, Warehousemen and Brokers, the Debtors also routinely transact business with a number of other third parties (collectively, the "Lien Claimants"). I am informed that under applicable state law, these Lien Claimants have the potential to assert liens against the Debtors and their property if the Debtors fail to pay for goods or services rendered prior to the Petition Date ("Statutory Liens"). The Lien Claimants provide equipment, raw materials and perform various services for the Debtors, including (i)

manufacturing tooling and other capital and non-capital equipment and parts necessary for the Debtors' operations and (ii) rendering essential services related to the Debtors' manufacturing facilities, such as machine repair and maintenance.

102.    Although the Debtors have generally made timely payments to the Lien Claimants, as of the Petition Date, some of the Lien Claimants may not have been paid in full for certain prepetition goods, equipment and services, which I understand, may result in such Lien Claimants asserting, and perfecting, Statutory Liens against the Debtors' relevant locations or the Debtors' goods or equipment.  Additionally, certain Lien Claimants may refuse to perform their ongoing obligations to the Debtors, including manufacturing, installation, and servicing obligations, unless their claims are paid in full.

103.    As discussed in the Shippers Motion the Debtors strongly believe, and I agree, that (a) continuation of their positive relationships with the Shippers, Warehouseman, Brokers and Lien Claimants is imperative to their continued business operations and reorganization efforts, (b) the payment of the Shipping and Warehousing Claims, Customs Claims and Lien Claimant Claims is essential to preserve and enhance the value of the Debtors' estates.  Put simply, the Debtors believe, and I agree that maintaining the production and timely delivery of the Debtors' products is necessary in order for their businesses to survive in the preliminary stages of these cases.

**VII.    Motion of the Debtors for Entry of an Interim and Final Order (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (ii) Deeming Utility Providers Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment**

104.    By this Motion, the Debtors seek an Interim Order and Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code:  (i) prohibiting Utility Providers from altering, refusing, or discontinuing service to the Debtors on account of prepetition invoices, including

32

demanding security deposits or accelerated payment terms, (ii) providing that Utility Providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtors' establishment of a segregated account containing an amount equal to 50% of the Debtors' estimated average monthly cost of utility service, and (iii) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to the Utility Providers.

105.    In connection with the operation of their business and management of their properties, the Debtors incur utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telephone service, waste disposal and other similar services.  On a monthly basis, the Debtors spend approximately $175,000 for various Utility Services.  These Utility Services are provided by more than 30 Utility Providers in the United States, with whom the Debtors may have multiple accounts.

106.    The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of operating their business postpetition.  However, to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to deposit an initial sum equal to 50% of the Debtors' estimated average monthly cost of Utility Services (the "Adequate Assurance Deposit") into an interest-bearing, newly-created, segregated account (the "Adequate Assurance Account") within 20 days of the Petition Date, pending further order of the Court.  Because the Debtors' monthly spending on Utility Services is approximately $175,000, the Adequate Assurance Deposit will be approximately $87,500.

107.    The Debtors believe that the availability of the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of

business, constitutes sufficient adequate assurance of future payment to the Utility Companies. Nonetheless, if any Utility Company believes additional assurance is required, they may request such assurance pursuant to the procedures set forth in the Motion.

108.    Uninterrupted Utility Services are critical to the Debtors' ongoing operations and the success of the Debtors' efforts to sell their business as a going concern. A disruption in Utility Services would be costly and distracting to the Debtors, as they would be forced at the outset of these cases to focus on finding replacement Utility Providers as opposed to the operation of their business and sale efforts. Accordingly, the Debtors believe the relief requested in this Motion is necessary to maximize the value of the Debtors' assets and is in the best interest of the Debtors' estates and creditors.

## VIII.   Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes

109.    By this Motion, the Debtors seek authority to pay, in their discretion, certain prepetition taxes and/or related obligations. In the ordinary course of business, the Debtors incur various taxes and related obligations (collectively, the "Taxes") that are payable directly to various state and local taxing authorities (collectively, the "Taxing Authorities") as such payments become due. As the Debtors have facilities and operations located throughout the United States, they are subject to the payment of Taxes to numerous Taxing Authorities located throughout the country.

110.    Although the Debtors believe they are current on all of the prepetition Taxes that have become due as of the Petition Date, because such Taxes are paid on a periodic basis (and in arrears), there is lag between the time the Debtors incur an obligation to pay Taxes and the date such Taxes become due. Various Taxing Authorities may therefore have claims against the Debtors for prepetition Taxes that have accrued but remain unpaid as of the Petition Date, and

for certain other prepetition taxes that will come due during the pendency of these cases. The Debtors estimate that, during the pendency of their chapter 11 cases, the amount of prepetition Taxes to be paid to various Taxing Authorities will not exceed $375,000 (the "Tax Estimate").[16] In an abundance of caution, the Debtors have also requested authority to pay additional amounts, if necessary, up to 25% beyond the Tax Estimate. Following is brief summary of the Debtors' Taxes:

### Real Property Taxes

111.    The Debtors own real property in various states located throughout the Northeastern, Mid-Atlantic and Mid-Western United States that are subject to state and local property taxes (the "Real Property Taxes"). Real Property Taxes normally accrue on an annualized basis. Depending on where the property is located, Real Property Taxes are paid annually, semi-annually or quarterly. For the fiscal year 2009, the Debtors' liability for Real Property Taxes totals approximately $650,000. Real Property Taxes almost always create a lien or security interest in the taxed property. As of the Petition Date, certain Real Estate Taxes have accrued, but are not yet due and owing to the relevant Taxing Authorities. Accordingly, the Debtors seek authority to pay any amounts that may become due during the pendency of these cases.

### Personal Property Taxes

112.    In certain jurisdictions where the Debtors' operations are located, certain Taxing Authorities impose and collect a tax on business owned personal property (collectively, the "Personal Property Taxes"). Personal property generally includes furniture, fixtures, office and

---

[16] The Debtors may also be subject to certain audit investigations (the "Audits") during the pendency of their chapter 11 cases that may result in the assessment of additional prepetition Taxes (the "Audit Amounts"). The Debtors' estimated Audit Amounts are included in the Tax Estimate.

industrial equipment, machinery, tools, supplies, inventory and any other property not classified as real property. Personal Property Taxes are paid on an annual, semi-annual or quarterly basis. For the fiscal year 2009, the Debtors' liability on account of Personal Property Taxes totals approximately $140,000. The Debtors believe that, as of the Petition Date, no Personal Property Taxes are owed to the relevant Taxing Authorities, but seek authority to pay any amounts that may become due during the pendency of these cases.

### Franchise Taxes

113. Certain Taxing Authorities impose and collect franchise taxes and *de minimis* filing fees (collectively, the "Franchise Taxes") on the Debtors for the right to exist as a domestic corporation, for the privilege of doing business in the state as a foreign corporation, or for the actual conduct or carrying on of business in the state. Franchise Taxes are generally measured by net income, gross receipts, capital stock, or some other measure of value. Certain states may impose personal liability on the directors, officers, and employees of a corporation if that corporation fails to pay Franchise Taxes. Furthermore, the Debtors' failure to pay Franchise Taxes could cause some states to challenge the Debtors' right to operate within their jurisdiction. Addressing any subsequent actions taken by those states would be costly, place an administrative burden on management, and divert management's attention from these chapter 11 proceedings. For the fiscal year 2009, the Debtors' estimated liability for Franchise Taxes is approximately $365,000. The Debtors believe that, as of the Petition Date, no Franchise Taxes are owed to the relevant Taxing Authorities, but seek authority to pay any amounts that may become due during the pendency of these cases.

### Sales and Use Taxes

114.     As discussed above, the Debtors are a leading distributor of steel, aluminum and stainless products.  In the normal course of business, the Debtors are required to collect sales taxes (the "Sales Taxes") from purchasers of their products on a per sale basis and periodically remit such Sales Taxes to the applicable Taxing Authorities.  Sales Taxes are remitted to the relevant Taxing Authorities on the basis of Sale Taxes actually collected from customers during the prior period.  The Sales Taxes are paid on an annual, quarterly or monthly basis.

115.     The Debtors are responsible for paying nominal use taxes (the "Use Taxes," and together with the Sales Taxes, the "Use and Sales Taxes") when purchasing equipment and other tangible personal property from suppliers.  Use Taxes typically arise when the Debtors make purchases from a supplier for use in a state in which the supplier has no business operations.  Without a nexus to such state, the supplier is not required to collect or remit sales taxes.  Nonetheless, the purchasers (and in the present case, the Debtors) are required to make a self assessment and pay the Use Taxes to the states in which the tangible personal property is used.  The Debtors generally remit the Use Taxes to certain Taxing Authorities on a quarterly basis in arrears.

116.     For the fiscal year 2009, the Debtors' total liability on account of Use and Sales Taxes is estimated to be approximately $60,000.  The Debtors believe that, as of the Petition Date, no Sales and Use Taxes are owed to the relevant Taxing Authorities, but seek authority to pay any amounts that may become due during the pendency of these cases.

### Canadian Taxes

117.     In the ordinary course of business, Nova Tube and Steel, Inc. ("NTS") pays federal commodity taxes (the "Commodity Taxes") to the Canadian government in connection

with its import and export of goods to Canada. These Commodity Taxes are paid in arrears on a monthly basis on or before the last business Friday of the following month. As of the Petition Date, Commodity Taxes for August 2009 have accrued, but are not payable until the end of September 2009. NTS is unable, at this time, to project the amount of Commodity Taxes due for August 2009. For the month of July 2009, NTS received a tax credit of $700. That amount, however, is not indicative of the amount that will be credited or due for the August 2009 as the monthly amount of Commodity Taxes varies depending on current import and export of goods. The Debtors will initially attempt to utilize tax credits available for the payment of Commodity Taxes that will come due during the pendency of these cases. If no tax credit is available, however, the Debtors seek authority to pay any amounts that may become due during the pendency of these cases.

118.    As stated above, in connection with the normal operation of their businesses, the Debtors incur and collect the Taxes and pay to the Taxing Authorities on a periodic basis (monthly, quarterly, or annually, depending on the particular tax) with funds drawn by means of electronic fund transfers or by check. Accordingly, to the extent any check or electronic transfer has not cleared the Banks as of the Petition Date, the Debtors request the Court to authorize and direct the Banks, when requested by the Debtors in their sole discretion, to process and honor such check or electronic transfers. To the extent that any of the Taxing Authorities have otherwise not received payment for the prepetition Taxes owed, the Debtors seek authorization to issue checks, or to provide for another means of payment to the extent necessary to pay all outstanding Taxes.

119.    I believe that the payment of Taxes is necessary to ensure the Debtors' ability to operate seamlessly in chapter 11. If the Taxes are not paid, the Debtors may be subject to

various enforcement actions, including the filing of liens against the Debtors' assets, audits by taxing authorities, the imposition of personal liability on the Debtors' officers and directors and other measures that would disrupt the Debtors' operations and impair the Debtors' ability to achieve their chapter 11 goals.

120.     Accordingly, I believe that the authority to pay prepetition tax obligations is necessary and in the best interest of the Debtors' estates and creditors.

## IX.     Motion of the Debtors for an Order (i) Authorizing Continued Use of Existing Cash Management System, (ii) Authorizing Continued Use of Existing Bank Accounts and Business Forms, (iii) Authorizing the Continuation of Certain Intercompany Transactions, (iv) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, and (v) Granting Administrative Expense Status to Postpetition Intercompany Transactions

121.     By this Motion, the Debtors seek entry of an order (i) authorizing the Debtors' continued use of their existing cash management system, (ii) authorizing the Debtors to continue using their existing bank accounts and business forms, (iii) authorizing the Debtors to continue intercompany transactions, by and among the Debtors and by and among the Debtors and certain of their non-debtor affiliates, on a postpetition basis, (iv) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis with respect to the Debtors' deposit and investment practices, and (v) granting administrative expense status to postpetition intercompany transactions between and among the Debtors and between and among the Debtors and certain of their non-debtor affiliates. In connection with this relief, the Debtors seek a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that generally require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor in possession accounts, and obtain new business forms and stationery reflecting the Debtors' status as debtors in possession.

47658/0001-5975002v11

*Description of the Centralized Cash Management System*

122.     In the ordinary course of business, the Debtors each use a centralized cash management system to collect funds from their operations and to pay operating and administrative expenses (the "Centralized Cash Management System"). The Centralized Cash Management System is similar to the centralized cash management systems used by other companies to collect, transfer, and disburse funds in a cost-effective and efficient manner.

123.     Each Centralized Cash Management System is carefully managed through oversight procedures and controls implemented by the Debtors' treasury department. Through their control over the Centralized Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of various bank accounts required to effect the collection, disbursement, and movement of cash.

124.     NTS, NTI, ASA and Finco are the four U.S. Debtors that engage in cash transactions. Each of these entities maintains its own bank accounts. Cash is managed centrally through the tracking of cash receipts and controlling disbursements through defined, internal procedures and practices. Each of these Debtors has accounts with Bank of America except for Finco and NTI. Payroll and other disbursements for NTS, NTI and ASA are made separately from their respective operating accounts with the exception of NTS payroll. NTS payroll is managed and disbursed by ASA. NTS is charged by ASA for the cost of its payroll via intercompany transaction.

125.     Finco's account is not maintained with Bank of America and is outside the Centralized Cash Management System. Finco's Master Operating Account is maintained with J. P. Morgan Chase & Co. Finco's only source of cash receipts is from bank borrowings. When

47658/0001-5975002v11

Finco borrows, it loans the money to other U.S. Debtors, as Finco, along with the Canadian Debtor are the only authorized borrowers under the credit agreement. Finco's expenses relate to bank fees and interest expenses.

### *Continued Use of the Centralized Cash Management System*

126.    It is critical that the Debtors remain able to manage cash and centrally coordinate transfers of funds in order to efficiently and effectively operate their business operations. Consequently, the Debtors seek authority to continue using the Centralized Cash Management System on a postpetition basis. I believe that any disruption in the current cash management procedures would impair the Debtors' ability to preserve and enhance their respective going concern value and to successfully complete a sale during these chapter 11 cases.

127.    The Centralized Cash Management System provides significant benefits to the Debtors, including the ability to: (a) closely track, and thus control, all corporate funds through the provision of near-continuous status reports on the location and amount of all such funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. I believe any disruption in the Centralized Cash Management System would likely cause delays in the collection and disbursement of funds, thus impeding the Debtors' ability to carry out their normal business operations to the detriment of the Debtors' employees, customers and suppliers.

128.    The Centralized Cash Management System allows the Debtors to centrally manage all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as their creditors and this Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable. The Debtors will

41

continue to maintain detailed records reflecting all postpetition transfers of funds. Any changes to the Debtors' bank accounts or their treasury systems, that report on account activity and generate wire transfers, would be disruptive to the Debtors' business operations and could undermine the effectiveness of such systems.

129. In my opinion, it is both essential and in the best interests of the Debtors' respective estates and creditors that the Centralized Cash Management System be maintained. Furthermore, the Debtors' efforts to consummate a sale of its business operations will be facilitated by preserving the "business as usual" atmosphere and avoiding the distractions that would be associated with disruptions in the Centralized Cash Management System. Accordingly, the Debtors respectfully request that the Court authorize their continued use of the Centralized Cash Management System.

130. In addition, the Debtors also request that no bank participating in the Cash Management System (the "Cash Management Banks") that honors a prepetition check or other item drawn on any account that is the subject of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition. I believe that such protections are necessary in order to induce the Cash Management Banks to continue providing cash management services to the Debtors without additional credit exposure.

### *Continued Use of Existing Bank Accounts and Business Forms*

131. I have been advised that the U.S. Trustee for Region 3, who administers bankruptcy cases filed in the District of Delaware, has issued certain chapter 11 operating

guidelines pursuant to 28 U.S.C. § 586. These guidelines require that chapter 11 debtors, among other things: (a) close all existing bank accounts upon filing of their petitions and open new "debtor in possession" accounts in certain financial institutions designated as authorized depositories by the U.S. Trustee; (b) establish one debtor in possession account for all estate monies required for the payment of taxes; and (c) maintain a separate debtor in possession account for cash collateral.

132.    By the motion, the Debtors seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new postpetition bank accounts be opened. If enforced in these cases, I believe such requirements would cause enormous disruption in the Debtors' businesses and would likely impair the Debtors' efforts to successfully reorganize. As described in detail above, the Bank Accounts comprise an established Centralized Cash Management System that the Debtors need to maintain in order to ensure smooth collections and disbursements in the ordinary course of their businesses. Therefore, to avoid delays in paying debts incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, I believe the Debtors should be permitted to continue to maintain the existing bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of their business operations. Otherwise, transferring the bank accounts will be disruptive, time consuming, and expensive.

133.    The Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those that are specifically authorized by this Court. To prevent any inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will immediately advise the Cash Management Banks not to honor prepetition checks. The Debtors will work closely with the

Cash Management Banks to ensure that appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

134.     I am also advised that, pursuant to Local Rule 2015-2(a), the Debtors may, with Court approval, continue to use their existing check stock and business forms without imprinting "DIP" or "Debtor in Possession" thereon until such forms are depleted. By the motion, the Debtors request that they be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices) and checks without reference to the Debtors' status as debtors in possession. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding these chapter 11 cases. If the Debtors were required to change their correspondence, business forms and checks, they may be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers and vendors are familiar. Such a change in operations could potentially create a sense of disruption and confusion within the Debtors' organization and could result in confusion for the Debtors' customers and vendors. Moreover, it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationery, business forms and checks.

### *Interim Waiver of the Requirements of 11 U.S.C. § 345(B)*

135.     Prior to the Petition Date, the Debtors did not maintain any investments, cash or otherwise, except as described in the Motion with regard to the Cash Management System. As of September 11, 2009, the Debtors held approximately $1.7 million in those Bank Accounts. The Debtors do not invest any other funds. The Debtors request that the Court waive the requirements of section 345(b) on an interim basis and permit them to continue investing funds in the U.S. Bank account in accordance with their prepetition practices.

47658/0001-5975002v11

136.    All of the Debtors' Bank Accounts that the Debtors seek to continue to use are federally insured, but the balances may exceed the federally insured limit of $250,000. Given that the Bank Accounts are business accounts and considering the relative stability of the Debtors' Bank Accounts, the Debtors believe such funds are not at risk. Accordingly, the Debtors require the Court grant an interim 60 day waiver of the requirements of section 345(b) of the Bankruptcy Code.

### Request for Authority to Continue Certain Intercompany Transactions and for Administrative Expense Status for All Postpetition Intercompany Transactions

137.    In the normal course of their business operations, the Debtors and certain of their non-debtor affiliates engage in various intercompany transactions. As a result, on any given date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payments made in the ordinary course between and among the Debtors and between and among the Debtors and certain of their non-debtor affiliates (the "Intercompany Transactions"). These Intercompany Transactions include, but are not limited to: Intercompany Sales Transactions and Intercompany Loans and Trade Obligations.

138.    The Debtors maintain records of all Intercompany Transactions and can ascertain, trace and account for all Intercompany Transactions between and among the Debtors and between and among the Debtors and their non-debtor affiliates. To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor or a non-debtor affiliate arising after the Petition Date as a result of an Intercompany Transaction be accorded administrative priority expense status. If all Intercompany Claims are accorded administrative priority expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary course transactions. I

45

believe that granting the relief requested herein is appropriate and in the best interests of their estates and creditors.

**X.** **Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Approving Postpetition Financing and Repayment of Certain Prepetition Obligations, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, and (vi) Scheduling a Final Hearing**

139.    The Debtors do not have sufficient sources of working capital, including cash collateral, to operate their business while they implement a section 363 sale process. Indeed, the Debtors' ability to obtain sufficient working capital to operate through an auction and closing is critical to preserving the Debtors' ongoing concern value and maximizing the value of the Debtors' assets for the benefit of the Debtors estates and creditors.

140.    Consequently, the Debtors seek entry of an interim and final order authorizing the Debtors to obtain secured postpetition financing (the "DIP Financing") from JPM and CIBC (the "DIP Lenders") on a superpriority basis (the "DIP Facility"). Subject to the approval of this Court, and corresponding approval by the Canadian Court, the Debtors propose to enter into the DIP Facility and to use Cash Collateral, as such term is defined in section 363(a) of the Bankruptcy Code. The DIP Facility includes a roll-up of the Debtors' prepetition debt incurred under the ABL Facility. Assuming that the roll-up is approved, the DIP Facility will provide the Debtors with additional liquidity to fund operations during the chapter 11 cases, in an amount not to exceed $30,000,000 at any one time outstanding. The loans advanced under the DIP Facility will be divided between the Debtors and the Canadian Debtor. Of this amount, approximately $18,439,000 of the prepetition debt incurred under the ABL Facility is being rolled up. Prior to the occurrence of both (a) the date on which the Final Order (as defined in the DIP Facility) is entered, and (b) the date on which the Canadian Court shall have entered the CCAA Final Order

46

(as defined in the DIP Facility), the aggregate commitments available to the Debtors and the Canadian Debtor under the DIP Facility shall be limited to no more than $17,500,000, of which no more than $7,000,000 will be available for the Debtors' and the Canadian Debtor's working capital needs, payment of expenses of the Company in these bankruptcy cases and the Canadian Proceedings (including professional fees and expenses) and repayment of the outstanding and unpaid obligations under the ABL Facility.

141.    The DIP Facility will mature on the earliest of (i) December 11, 2009, (ii) the date of consummation of any sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, and (iii) thirty (30) days after the Petition Date if this Court or the Canadian Court fails to approve the DIP Facility on a final basis.

142.    U.S. dollar advances under the DIP Facility will bear interest at the Alternate Base Rate[17] plus the Applicable Rate.[18] Canadian dollar borrowings will bear interest at the Canadian Prime Rate[19] plus the Applicable Rate.

---

[17] Alternate Base Rate is defined as:

> [F]or any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) 3%. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

[18] Applicable Rate is defined as:

> [F]or any day, with respect to any Loan, or with respect to the commitment fees payable hereunder, as the case may be, the applicable rate per annum set forth below under the caption "ABR/Canadian Prime Spread" or "Commitment Fee Rate", as the case may be, per annum:

| ABR/Canadian Prime Spread | Commitment Fee Rate |
|---|---|
| 7.0% | 0.50% |

[19] Canadian Prime Rate is defined as:

47658/0001-5975002v11

143.     The Debtors' ability to obtain advances under the DIP Facility is subject to,
among other things, compliance with certain milestones for a sale of substantially all of the
Debtors' and Canadian Debtor's assets pursuant to section 363 of the Bankruptcy Code including
(i) a motion to approve the sale (including bid and auction procedures) being filed by no later
than two business days after the Petition Date, (ii) an order approving the bid procedure motion
having been entered no later than 18 days after the Petition Date, (iii) bids for the 363 sale being
due by no later than 35 days after the Petition Date, (iv) if applicable, an auction occurring by no
later than 40 days following the Petition Date, (v) the hearing to confirm the 363 sale having
been concluded and the order confirming the 363 sale having been entered no later than 45 days
after the Petition Date, and (vi) the 363 sale having been consummated by no later than 60 days
following the Petition Date.

144.     The Debtors do not have sufficient sources of working capital, including cash
collateral, to operate their business while they implement a sale process without the DIP
Financing offered by the DIP Lenders.  Due to their financial condition, the Debtors were not
able to procure sufficient financing from an alternative lender on more favorable terms than
those that govern the DIP Facility.

145.     The Debtors ability to continue operating is critical to preserving the Debtors'
going concern value and ensuring that the value of the Debtors' assets is maximized for the

---

[F]or any day, the rate of interest per annum (rounded upwards, if necessary, to the next 1/100 of 1%)
equal to the greatest of (a) the interest rate per annum publicly announced from time to time by the
Administrative Agent as its reference rate in effect on such day at its principal office in Toronto for
determining interest rates applicable to commercial loans denominated in Canadian Dollars and made
by it in Canada (each change in such reference rate being effective from and including the date such
change is publicly announced as being effective), (b) the interest rate per annum equal to the sum of (i)
the CDOR Rate on such day (or, if such rate is not so reported on the Reuters Screen CDOR Page, the
average of the rate quotes for bankers' acceptances denominated in Canadian Dollars with a one month
term received by the Administrative Agent at approximately 10:00 a.m., Toronto time, on such day (or,
if such day is not a Business Day, on the next preceding Business Day) from the Schedule I Reference
Lenders) and (ii) 0.50% per annum and (c) 3% per annum.

benefit of the Debtors' estates and creditors. The Debtors, their employees and estates will suffer irreparable harm if the DIP Facility is not approved and if the Debtors do not obtain the working capital they need to consummate a sale of their business as a going concern.

[SIGNATURE ON NEXT PAGE]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14th day of September 2009.

_Karen G. Narwold_

Karen G. Narwold

**EXHIBIT A**

**ORGANIZATIONAL CHART**

**BARZEL INDUSTRIES INC.**
(formerly SYMMETRY / NOVAMERICAN)

## Organizational Structure

