## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Barzel Industries Inc., et al., | Case No. 09-13204 (CSS) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MOTION FOR (I) ORDER (A) APPROVING SALE PROCEDURES AND BUYER PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE; (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE; AND (C) APPROVING NOTICE OF RESPECTIVE DATE, TIME AND PLACE FOR AUCTION AND FOR HEARING ON APPROVAL OF THE SALE AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) ORDER AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; AND (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Barzel Industries, Inc. ("BII") and its U.S. affiliated debtors and debtors in possession in the above-captioned bankruptcy cases (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this motion (the "Motion") pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), for (I) an order (A) approving the Debtors' proposed sale procedures and buyer protections (the "Sale Procedures") to be employed in connection with the proposed sale of substantially all of the

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number are: Barzel Industries Inc. (0836), Barzel Holdings Inc. (1107), Barzel Finco Inc. (1010), Barzel Industries U.S. Inc. (6382), American Steel and Aluminum Corporation (2435), Nova Tube and Steel, Inc. (1790), Novamerican Tube Holdings, Inc. (3740) and Nova Tube Indiana, LLC (8275).

Debtors' assets (the "Assets") to Chriscott USA Inc. and 4513614 Canada Inc. (collectively, the "Buyer"), pursuant to the Asset Purchase Agreement, dated as of September 14, 2009, by and among the Debtors, one (1) of the Debtors' Canadian affiliates (collectively, the "Sellers") and the Buyer (the "APA,"[2] a copy of which is attached hereto as Exhibit A"); (B) scheduling an auction (the "Auction") and a hearing to consider approval of the sale of the Assets (the "Sale Hearing"); and (C) approving notice substantially in the form attached hereto as Exhibit B of the respective date, time and place for the Auction and the Sale Hearing (the "Auction and Sale Hearing Notice") for approval of the sale of the Assets and the assumption and assignment of certain executory contracts and unexpired leases as set forth in the APA (the "Assigned Contracts" and "Assigned Leases"), a proposed copy of which is attached hereto as Exhibit C (the "Procedures Order"); and (II) an order authorizing (A) the sale of the Assets to the Buyer, or to the bidder with the highest and best bid (the "Successful Bidder") at the Auction, free and clear of Encumbrances (as defined in the APA) (other than with respect to Assumed Liabilities); and (B) the Debtors' assumption and assignment of the Assigned Contracts and Assigned Leases pursuant to and as described in the APA, a proposed copy of which is attached hereto as Exhibit D (the "Sale Approval Order"). In support of the Motion, the Debtors respectfully represent as follows:

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the APA.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O).  Venue of this proceeding and this Motion is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief sought herein are sections 105(a), 363(b), (f), (k), (l) and (m), 365(a) and (b) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006, and 9007.

## INTRODUCTION

3.     The Debtors, in the exercise of their considered business judgment, have determined that the best way to maximize value for the benefit of their estates and creditors is to sell the Assets and assume and assign the Assigned Contracts and the Assigned Leases.  Toward this end, the Debtors, together with their Canadian affiliate, have executed the APA with the Buyer to provide for the sale of the Assets and for the Debtors' assumption and assignment to the Buyer of the Assigned Contracts and the Assigned Leases.  The transactions contemplated by the APA are designed to preserve the jobs of a substantial portion of the Debtors' employees and to avoid the further deterioration in asset values through a prompt sale of the Assets.  The Debtors seek to expose the Assets to competitive bidding through an Auction pursuant to the Sale Procedures.  If there is no higher and better offer at the Auction, the Debtors will support a sale to the Buyer.

4.      Pursuant to this Motion, and in coordination with the simultaneous CCAA proceedings pending for the Debtors' Canadian affiliate, the Debtors request that the Court enter the proposed Procedures Order, which approves the Sale Procedures, certain bidding protections for the Buyer, the Auction and Sale Hearing Notice and schedules the Sale Hearing. Upon conclusion of the Auction and selection of the highest and best bid, the Debtors request that the Court enter the proposed Sale Approval Order, which authorizes the sale to the Buyer, or alternatively, to the Successful Bidder at the Auction, free and clear of Encumbrances (other than with respect to Assumed Liabilities) and the assumption and assignment of the Assigned Contracts and Assigned Leases.

5.      The Debtors also seek approval pursuant to section 365 of the Bankruptcy Code to assume and assign the Assigned Contracts and the Assigned Leases to the Buyer (or Successful Bidder).

## FACTUAL BACKGROUND

6.      On September 15, 2009 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate their businesses and manage their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. [3]

7.      On September 15, 2009, Barzel Industries Canada Inc. ("Barzel Canada" and, together with the Debtors, "Barzel"), one (1) of the Debtors' Canadian affiliates (the "Canadian Entity"), filed an application with the Ontario Superior Court of Justice (the

---

[3]     A detailed description of Barzel's business operations and the events leading up to the filing of the Debtors' bankruptcy cases is set forth in the Declaration of Karen G. Narwold, Vice President and Strategic Counsel of BII, the direct or indirect parent of the other Debtors (the "Narwold Declaration") (Docket No. 14), filed on the Petition Date and incorporated herein by reference.

"Canadian Court") under the Companies Creditors Arrangement Act, R.S.C. 1985, c. C-36 (the "CCAA") or other insolvency laws (the cases commenced under the CCAA by the Canadian Entities, the "Canadian Proceeding"), seeking protection from its creditors in Canada. The Canadian Entity will continue to manage its properties and operate its business under the supervision of the Canadian Court. Deloitte & Touche, Inc. has agreed to act as Monitor in connection with the Canadian Proceeding, if so appointed by the Canadian Court.

## A.    The Proposed DIP Facility

8.     On the Petition Date, the Debtors filed a motion (the "DIP Motion") seeking approval of a debtor-in-possession financing facility (the "DIP Facility") from JPM and CIBC Inc.  Subject to Court approval, the DIP Facility provides up to a $30,000,000 revolving credit facility to be secured by superpriority liens in the Assets and such of Debtors' other property that is not part of the Assets proposed to be sold under the APA.  As more fully discussed in the DIP Motion, the proceeds of the DIP Facility will be used, among other things, to (a) provide postpetition working capital to Barzel, and (b) upon final Court approval, pay off the outstanding amounts due under the ABL Facility.

9.     The DIP Facility includes various conditions to the Debtors' ability to borrow, including the Debtors' compliance with certain "sale milestones" that establish a timeline for the sale of the Assets.  In particular, under the DIP Facility, the Debtors agreed to file motions for expedited Court approval of the APA and procedures governing the sale of the Debtors' assets by no later than September 17, 2009.

## B.    Prepetition Marketing Efforts and the APA

10.     On May 2, 2009, Barzel engaged Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan") to assist it in identifying potential purchasers/investors and pursuing a

Transaction. Upon its engagement, Houlihan prepared written materials, including a confidential information memorandum, to market Barzel's business. During the ensuing weeks, Houlihan identified and contacted over two hundred twenty (220) potential financial and strategic buyers/investors. Concurrently, management contacted a significant number of additional potential strategic and financial buyers/investors known to it. Of those parties, seventy-two (72) executed confidentiality agreements, received the information memorandum and gained access to an electronic data room to conduct due diligence. Thereafter, more than thirteen (13) potential buyers and investors received management presentations or conducted facility tours.

11.     After this initial round of marketing and due diligence, Barzel received twelve (12) offers to pursue a Transaction involving substantially all of Barzel's assets, including nine (9) offers from financial buyers/investors and three (3) offers from strategic buyers/investors. After the deadline for submitting first-round offers expired, the Debtors also received proposals from two (2) additional strategic buyers/investors.

12.     After reviewing these offers, BII's Board of Directors (the "Board") directed Houlihan and management to initiate an in-depth diligence process and conduct a final round of bidding. Houlihan received eight (8) offers during the final round of bidding, consisting of offers from five (5) financial buyers/investors and three (3) strategic buyers/investors.

13.     Between the initial marketing period and first and final rounds of bidding, interested parties have had more than three and a half (3½) months to conduct extensive due diligence of Barzel.

14.     After carefully reviewing the final round offers, BII's Board directed Houlihan and management to negotiate with and assist four (4) bidders to expeditiously secure a

fully financed bid and definitely documented Transaction that maximized the value reasonable obtainable under the circumstances and to continue to work with other bidders who might reasonably be expected to submit a bid in a sale process under section 363 of the Bankruptcy Code.

15. After allowing a reasonable time for securing bids that satisfied such criteria and reviewing the status of bids then available for acceptance, BII's Board selected the Buyer to serve as a stalking horse purchaser of the Assets. In furtherance of the Debtors' desire to preserve the value of the Assets and thereby facilitate the formulation and ultimate confirmation of a liquidating chapter 11 plan to be financed primarily from an amount up to $2,225,000 from the proceeds of the sale of the Assets, the Sellers and the Buyer entered into the APA. The Sellers and the Buyer have engaged in good faith, arms-length negotiations for the purchase of the Assets.

16. The Assets to be sold to the Purchaser, as provided in the APA, include, *inter alia:* (A) substantially all of Barzel's Assets; and (B) the assignment of the Assigned Contracts and Assigned Leases; but (C) excluding the Excluded Assets, as defined in the APA.

## RELIEF REQUESTED

17.     By this Motion, the Debtors respectfully request, pursuant to sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, the entry of (I) an order: (A) approving the Sale Procedures and certain bid protections to be employed in connection with the sale of the Assets pursuant to sections 363 and 365 of the Bankruptcy Code; (B) scheduling the Auction and the Sale Hearing; and (C) approving the Auction and Sale Hearing Notice; and, upon conclusion of the Auction and selection of the highest and best bid at the Auction, entry of (II) an order authorizing: (A) the sale of the Assets free and clear of Encumbrances (other than with respect to Assumed Liabilities); and (B) the assumption and assignment of the Assigned Contracts and Assigned Leases.

## LOCAL RULE 6004-1 REQUIREMENTS

18.     In accordance with Local Rule 6004-1, the Debtors respectfully represent the following:

a.  <u>Sale to Insider</u>:  Barzel acquired all of the outstanding stock of Barzel Industries Canada Inc., formerly Novamerican Steel Canada Inc. and formerly Novamerican Steel Inc., on November 15, 2007, pursuant to an arrangement agreement dated June 21, 2007.  The controlling shareholder of the Buyer was the majority owner of Novamerican Steel Inc.

b.  <u>Agreements with Management</u>:  None.

c.  <u>Releases</u>:  Pursuant to Section 5.8 of the APA, effective as of the Closing, the Sellers release, discharge, acquit and covenant not to bring any action against the Buyers or any of their Affiliates for any Claims, right or other causes of action, other than any claims incurred pursuant to the APA.

d.  <u>Private Sale/No Competitive Bidding</u>:  As noted above, the Debtors seek to expose the Assets to competitive bidding through an Auction pursuant to the Sale Procedures.  If there is no higher and better offer at the Auction, the Debtors will support a sale to the Buyer.

e.  <u>Closing and Other Deadlines</u>:  As set forth in Section 2.10 of the APA, the Closing Date shall be three (3) business days following the satisfaction of the

conditions set forth in Section 7 of the APA or such other date as the parties may agree. Section 9.1 of the APA sets forth various circumstances under which the APA may be terminated prior to Closing.

f. <u>Good Faith Deposit</u>: The Buyer will deposit $6.5 million within two (2) days after entry of the Sale Procedures Order as a good faith deposit. If the Debtors terminate the APA due to the Buyer's breach, the Buyer shall forfeit 3% of the Purchase Price from the deposit.

g. <u>Interim Arrangements with Proposed Buyer</u>: None.

h. <u>Use of Proceeds</u>: Pursuant to Paragraph 10 of the proposed Sale Order, payment of the proceeds from the sale of the Purchased Assets by the Buyer to the Debtors, net of an amount of up to $2,250,000 to fund the reasonable and necessary expenses in connection with the wind-down of the Debtors' Chapter 11 cases, shall be transferred to the party designated by the DIP lenders or the Debtors' prepetition lenders, as applicable, two (2) business days after the Closing.

i. <u>Tax Exemption</u>: None.

j. <u>Record Retention</u>: Pursuant to Section 2.1(i) of the APA, all of Sellers' Business Records are being sold. Sellers will have access to those records pursuant to Section 8.9 of the APA.

k. <u>Sale of Avoidance Actions</u>: None.

l. <u>Requested Findings as to Successor Liability</u>: The Debtors are seeking a finding in Paragraph 30 of the proposed Sale Order that Buyer is not a successor.

m. <u>Sale Free and Clear of Unexpired Leases</u>: The Debtors are seeking to sell the Assets free and clear of any possessory leasehold interest, license, or other right.

n. <u>Credit Bid</u>: None.

o. <u>Relief from Bankruptcy Rule 6004(h)</u>: The Debtors are seeking a waiver of the ten (10) day stay required pursuant to Bankruptcy Rule 6004(h) to permit the Sale to close immediately after the issuance of the Sale Order.

p. <u>Consumer Privacy Ombudsman</u>: No consumer privacy ombudsman pursuant to Section 332 of the Bankruptcy Code is necessary.

## THE PROPOSED SALE OF THE ASSETS

A. **The Asset Sale**

19. After further discussions and negotiations, and in consultation with JPM and CIBC, BII's Board concluded that the proposed terms of the APA represented the highest

and best offer received for the Assets. Accordingly, the Board authorized and directed the Sellers to enter the APA with the Buyer.

20. The Debtors therefore propose to sell the Assets (a) to the Buyer pursuant to the APA, or (b) to the Successful Bidder at the Auction, as determined by the Debtors in accordance with the terms of the Procedures Order and the Sale Procedures and with the consent of JPM and CIBC, and as ultimately approved by the Court. The Debtors shall provide a copy of this Motion, including the APA (as such APA may be modified from time to time prior to the Auction), to: (i) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 2nd Floor, 844 King Street, Wilmington, Delaware 19801, Attention Mark S. Kenney, Esq.; (ii) counsel to JPM and CIBC, the Debtors' prepetition and postpetition secured lenders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038-4982, Attention: Andrew P. DeNatale, Esq. and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attention: Mark D. Collins, Esq.; (iii) the Indenture Trustee, Bank of New York Mellon, 101 Barclay Street, Floor 8W, New York, NY 10286, Attn: Gary Bush; (iv) counsel to the Buyer, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York, 10166-0193, Attention: Steven Buffone, Esq. and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, P.O. Box 2087, Wilmington, DE 19899 Attention: Richard S. Cobb, Esq.; (v) the top thirty (30) creditors of the Debtors or their known counsel; (vi) the Office of the United States Attorney for the District of Delaware; (vii) the Securities and Exchange Commission; (viii) those parties who have requested service of all motions and pleadings pursuant to Bankruptcy Rule 2002; (ix) all creditors who have asserted liens, encumbrances and claims against, or interests in, the Assets; (x) each party to an Assigned Contract or Assigned Lease under the APA; and (xi) each party that previously expressed an interest in purchasing the

Assets. However, prior to the Auction, the Debtors reserve the right to amend or otherwise change the terms of the APA in such a manner as the Debtors deem to be in the best interests of the Debtors' estates and as shall be agreed to, in writing, by the Debtors and the Buyer.

21.     As further described in the APA, the Assets to be sold to the Buyer consist of Barzel's right, title, and interest, in substantially all of the Assets of Barzel.[4]

22.     The Debtors shall receive $65 million for the Assets, subject to a pre-closing working capital adjustment (the "Purchase Price"). Within two (2) business days of the entry of the Procedures Order, the Buyer is obligated to fund $6.5 million of the Purchase Price (the "Buyer's Deposit") to be held in escrow subject to the terms of a mutually agreeable Deposit Escrow Agreement. Upon certain events of default by the Buyer, the Deposit shall serve as the source of liquidated damages, in the amount of 3.0% of the Purchase Price, for the Debtors, subject to the terms of the APA.

23.     The APA also provides for the payment of a termination fee equal to 3.0% of the cash portion of the Purchase Price (the "Breakup Fee") as liquidated damages in the event of the sale of the Assets to a Successful Bidder other than the Buyer and reasonable, documented expense reimbursements, up to $750,000 (the "Expense Reimbursement") in the event of the termination of the sale of the Assets to a Successful Bidder other than the Buyer, as the result of certain breaches by the Sellers, or as the result of the failure to close the sale by December 31, 2009, if such failure did not result from the failure of Buyer to perform and comply with the terms of the APA. The APA also provides for termination of the APA by the Buyer under certain limited circumstances, including, but not limited to, failure of the Court to enter the

---

[4]     In the event of any discrepancy between the summary description of the APA in this Motion and the APA, the terms of the APA shall control.

Procedures Order within 30 days of the Petition Date and failure of the Court to enter the Sale Approval Order within 75 days of the Petition Date.

24.    Under the APA, the closing shall take place within three (3) business days following satisfaction or waiver of the closing conditions thereby, including entry of the Sale Approval Order.  Proceeds of the Sale of the Assets, net of an amount up to $2,250,000 to fund the reasonable and necessary expenses in connection with the wind down of the Debtors' Chapter 11 cases, shall be transferred to the party designated by JPM within two (2) business days of the closing of the Sale.

**B.    Sale Procedures**

25.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction.  The Debtors believe that good cause exists to expose the Assets to sale at auction and to approve the procedures proposed herein.  An auction conducted substantially in accordance with the Sale Procedures will enable the Debtors to obtain the highest and best offers for the Assets, thereby maximizing the value for the estates.

26.    The Debtors will permit existing interested parties and any new prospective purchasers to perform reasonable due diligence with respect to the Assets and will assist them with such efforts, including providing such potential purchasers with reasonable access to the Debtors' books, records, facilities, customers and executives.  This process will culminate in an Auction prior to the Sale Hearing, at which time a sale of the Assets to either the Purchaser or the Successful Bidder shall be approved.

27.    While all interested bidders should read the Procedures Order (attached hereto as Exhibit C) in its entirety, set forth below is a summary of such procedures, which summary is qualified in its entirety by the Sale Procedures:

A.  **Participation Requirements.**  To participate in the Bidding Process (as defined below), each person or entity must deliver (unless previously delivered) to the Sellers, on or before the Bid Deadline (as defined below), an executed confidentiality agreement in form and substance satisfactory to the Sellers (the "Confidentiality Agreement") and evidence satisfactory to the Sellers, with the consent of the DIP lenders, of such person's or entity's financial capacity.  Each person or entity that delivers the Confidentiality Agreement satisfactory to the Sellers on or before the Bid Deadline is hereinafter referred to as a "Potential Bidder."

After a Potential Bidder delivers the Confidentiality Agreement and evidence satisfactory to the Sellers, with the consent of the DIP lenders, of financial capacity, the Sellers shall deliver or make available (unless previously delivered or made available) to each Potential Bidder satisfying the criteria enumerated in the preceding paragraph certain designated information and financial data with respect to the Assets.

B.  **Determination by Debtors.**  The Sellers, in consultation with the DIP lenders, shall (a) coordinate the efforts of Potential Bidders in conducting their respective due diligence, (b) evaluate bids from Potential Bidders, (c) negotiate any bid made to acquire the Purchased Assets and (d) make such other determinations as are provided in these Sale Procedures (collectively, the "Bidding Process").  None of the Sellers nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

C.  **Due Diligence.**  The Sellers shall afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Sellers, in their business judgment, determine to be reasonable and appropriate.  The Sellers may designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders.  No additional due diligence will be required to be made available to Potential Bidders after the Bid Deadline (as defined below).

D.  **Bid Deadline.**  A Potential Bidder that desires to make a bid shall deliver copies of its bid by facsimile and/or email to (a) counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attention:  Norman L. Pernick, Esq., (b) special counsel to the Debtors, Kelley Drye & Warren LLP LLP, Attention: Benjamin Feder, Esq., 101 Park Avenue, New York, New York 10178, and (c) counsel to the DIP lenders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attention: Andrew DeNatale, Esq. and Richards Layton and Finger, P.A., 920 North King Street, Wilmington, Delaware 19801-1494, Attention: Mark Collins, Esq.; by 5:00 p.m. (Eastern Time) on [_____], 2009 (the "Bid Deadline").

E. **Bid Requirements.** All bids must be accompanied by a letter:

(a) offering to acquire the Assets, accompanied by an agreement attached to the letter, marked to show any proposed amendments and modifications to the APA and its schedules and exhibits (the "Marked Agreement");

(b) agreeing that the Potential Bidder's offer is binding and irrevocable until 48 hours after the earlier of (i) the closing of the sale of the Assets, (ii) the withdrawal of the Assets for sale by the Seller, or (iii) thirty (30) days after the Sale Hearing;

(c) offering to pay a purchase price greater than the aggregate consideration offered by the Buyer pursuant to the APA by at least $500,000 plus the amount of the Breakup Fee and the Expense Reimbursement (the "Initial Bid Increment");

(d) enclosing a copy of a board resolution or similar document demonstrating authority to make a non-revocable bid, to execute the purchase agreement and to close a sale of the Assets; and

(e) disclosing the identity of each entity that will be bidding for the Assets or otherwise participating with such Bid, and the complete terms of any such participation.

Bids must be accompanied by (a) a certified check or wire transfer in an amount equal to 10% of the cash component portion of the bid payable to the order of the Debtors (a "Good Faith Deposit") and (b) written evidence of available cash or a commitment for financing if selected as the Successful Bidder (provided, however, that the closing of the Sale shall not be contingent in any way on the Successful Bidder's financing), and such other evidence of ability to consummate the transaction as the Sellers may reasonably request.

The Sellers, in consultation with the DIP lenders and the Canadian Monitor, will review each bid received from a Potential Bidder to ensure that it meets the requirements set forth above. A bid received from a Potential Bidder that meets the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder." The Sellers, with the consent of the DIP lenders, will determine whether each bid meets the requirements of a Qualified Bid. The APA is a Qualified Bid and the Buyer is a Qualified Bidder, for all purposes and requirements pursuant to the Sale Procedures, notwithstanding the requirements that Potential Bidders must satisfy to be a Qualified Bidder.

A Qualified Bid will be valued by the Sellers, in consultation with the DIP lenders, based upon any and all factors that the Sellers, in consultation with the DIP lenders, may deem pertinent, including, among others, (a) the amount of the Qualified Bid, (b) the risks and timing associated with consummating a transaction with the Potential Bidder, (c) any Excluded Assets or executory

contracts and leases, and (d) any other factors that the Sellers may deem relevant to the Sale.

The Sellers, in their business judgment, and with the consent of the DIP lenders, reserve the right to reject any bid if such bid:

(a) is on terms that are more burdensome or conditional than the terms of the APA;

(b) requires any indemnification of such Potential Bidder;

(c) is not received by the Bid Deadline;

(d) includes non-cash consideration; or

(e) is subject to any due diligence, financing condition or other contingencies (including representations, warranties, covenants, and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the Assets other than as may be included in the APA.

Any bid rejected pursuant to this paragraph shall not be deemed to be a Qualified Bid.

F. **Auction Participation.** Unless otherwise ordered by the Bankruptcy Court for cause shown, only the authorized representatives, professionals or agents of the Buyer, each Qualified Bidder, shall be eligible to participate at the Auction and, in addition to the Sellers, only a statutory committee (if appointed) and the DIP lenders and the Canadian Monitor. At least one business day prior to the Auction, each Qualified Bidder must inform the Sellers whether it intends to participate in the Auction. The Sellers will promptly thereafter inform in writing each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all other Qualified Bidders that may participate in the Auction and will provide copies of all other Qualified Bids to the Buyer and such Qualified Bidders. If the Sellers do not receive any Qualified Bids other than the APA, they will not hold an Auction, the APA will be the Successful Bid (as defined below) and the Buyer will be named the Successful Bidder.

G. **Auction.** If at least one Qualified Bid other than the APA is received by the Bid Deadline, the Sellers will conduct an Auction. The Auction shall take place on [_____], 2009 at 10:00 a.m. (Eastern Time) at the offices of special corporate counsel for the Debtors, Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178, or such other place as the Sellers shall designate and notify to all Qualified Bidders who have submitted Qualified Bids.

At the Auction, the bidding will start at the aggregate consideration for the Assets and terms proposed in the Qualified Bid that the Sellers, with the consent of the

DIP lenders, select as the highest and best offer prior to the Auction and will continue in increments of at least $500,000 in cash. The Sellers, upon consultation with the DIP lenders and the Canadian Monitor, may announce at the Auction additional procedural rules for conducting the Auction so long as the rules are not inconsistent with these Sale Procedures.

Immediately prior to the conclusion of the Auction, the Sellers will, in consultation with the DIP lenders and the Canadian Monitor: (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; (b) with the consent of the DIP lenders, identify the highest and best bid for the Assets of the Sellers at the Auction (the "Successful Bid"); and (c) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the maker of the Successful Bid (the "Successful Bidder"), and the amount and other material terms of the Successful Bid.

All bidders at the Auction will be deemed to have consented to the core jurisdiction of the Bankruptcy Court with respect to the Debtors and their assets and the Canadian Court with respect to the Canadian Entity and its assets and waived any right to jury trial in connection with any disputes relating to the Auction, the sale of the Assets and the construction and enforcement of the APA.

H. **Acceptance of Qualified Bids**. The Sellers, with the consent of the DIP lenders, may (a) determine, in their reasonable business judgment which Qualified Bid is the Successful Bid and the next best bid (the "Next Best Bid"); and (b) reject at any time before entry of the Sale Approval Order any bid, other than the APA, that, in the Sellers' reasonable judgment, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Sale Procedures or the terms and conditions of the Sale or (iii) contrary to the best interests of the Sellers and their estates.

The Sellers, after consultation with the DIP lenders and the Canadian Monitor, shall present to the Bankruptcy Court for approval the Successful Bid. If the Successful Bidder does not close the Sale within twenty-four (24) days of entry of the Sale Approval Order and the Canadian Approval and Vesting Order, then the Sellers shall be authorized, but not required, and only with the consent of the DIP lenders, to close with the party that submitted the Next Best Bid (the "Next Best Bidder"), without a further court order.

I. **No Fees for Potential Bidders or Qualified Bidders.** Except for the Buyer with respect to the Breakup Fee, Potential Bidders or Qualified Bidders shall not be allowed any breakup, termination or similar fee. Moreover, all Potential Bidders and Qualified Bidders, by participating in the Bidding Process, waive any right to seek a claim for substantial contribution.

J.    **Return of Good Faith Deposit.**  The Good Faith Deposits of all Potential Bidders shall be held in escrow by the Sellers, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court. The Good Faith Deposits of all Potential Bidders shall be retained by the Debtors, notwithstanding Bankruptcy Court approval of a sale, until 48 hours after the approval by the Bankruptcy Court of a Sale to a Bidder other than the Potential Bidder.  At the closing of the Sale contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit.  Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

28.    The Debtors believe that the foregoing Sale Procedures provide an appropriate framework for the sale of the Assets in a uniform fashion and will enable the Debtors to review, analyze and compare all offers received to determine which offer is in the best interests of the Debtors' estates and creditors.  Moreover, given the Debtors' extensive prepetition efforts to market the Assets, the Debtors believe that the proposed deadlines and milestones for noticing, marketing and selling the Assets offer potential bidders ample opportunity to prepare and submit Qualified Bids for the Assets.  Therefore, the Debtors respectfully request that the Court approve the Sale Procedures.

## C.    The Auction and Sale Hearing Notice and Notice of Motion

29.    Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the proposed sale of the Assets, including disclosure of the time and place of the Auction, the terms and conditions of the sale, and the deadline for filing any objections thereto.  The Auction and Sale Hearing Notice (a copy of which is attached hereto as <u>Exhibit B</u>) contains information required under Rule 2002(a) and (c), and also includes details about the Sale Procedures and the procedures for the submission of competing Bids.  This information will enable interested parties to participate in the Auction and the Sale Hearing if they so choose. The Debtors accordingly request that the Court approve the form and content of the Auction and Sale Hearing Notice.

30.     The Debtors propose to serve the Auction and Sale Hearing Notice within three (3) days of entry of the Procedures Order, by first-class mail, postage prepaid, to (i) the Office of the United States Trustee; (ii) counsel to JPM and CIBC; (iii) the Indenture Trustee; (iv) counsel to the Buyer; (v) counsel to the Official Committee of Unsecured Creditors, to the extent such committee has been formed; (vi) the top thirty (30) creditors of the Debtors or their known counsel; (vii) the Office of the United States Attorney for the District of Delaware; (viii) the Securities and Exchange Commission; (ix) those parties who have requested service of all motions and pleadings pursuant to Bankruptcy Rule 2002; (x) all creditors who have asserted liens, encumbrances and claims against, or interests in, the Assets; (xi) each party to an executory contract or unexpired lease with the Debtors that is designated for assumption and assignment to the Buyer under the APA; and (xii) each party that previously expressed an interest in purchasing the Assets.  The Debtors shall also cause notice substantially in the form of the Auction and Sale Hearing Notice to be published in the national edition of *The Wall Street Journal, The New York Times, or USA Today* within seven (7) days of the entry of the Procedures Order.

31.     The Debtors submit that (a) the notice to be provided through the Auction and Sale Hearing Notice and this Motion; and (b) the method of service and publication proposed herein constitutes good and adequate notice of the sale of the Assets and the proceedings to be had with respect thereto (including, but not limited to, the Auction and Sale Hearing).  Therefore, the Debtors respectfully request that the Court approve the foregoing notice procedures.

## D. The Bidding Protections

32.     While the Debtors have determined in their reasonable business judgment that an Auction of the Assets at this time will result in the highest and best price for the Assets, such an Auction would be of little value absent the Buyer setting the minimum Purchase Price for the Assets under the APA.

33.     The Debtors hereby request that the Court approve certain bid protections to the Buyer that are customary in similar circumstances (collectively, the "Bidding Protections"), including (a) the Breakup Fee in the amount of 3.0% of the Purchase Price and the Expense Reimbursement; (b) the termination provisions set forth in Article 9 of the APA; (c) the Initial Bid Increment; (d) bidding increments for the Assets after the Initial Bid Increment, in the amount of at least $500,000; and (e) in calculating the highest and best bid for the Assets, the Debtors shall consider its obligation to pay the Breakup Fee and the Expense Reimbursement to the Buyer. The Debtors submit that cause exists to approve the Bidding Protections because they are fair and reasonable under these circumstances.

## E. Assumption and Assignment of the Assigned Contracts and Assigned Leases

34.     The APA contemplates that the Debtors will assume and assign the Assigned Contracts and the Assigned Leases to the Buyer. In accordance with the proposed Procedures Order and the APA, within five (5) days of entry of the Procedures Order, or such other date as determined by the Court, the Debtors will serve a Cure Notice in the form attached hereto as Exhibit E on each counterparty to an Assigned Contract and Assigned Lease and their known counsel (the "Cure Cost Notice"). The Cure Cost Notice shall identify the amount, if any, that the Debtors believe they owe to such Assigned Contract or Assigned Lease counterparty to cure defaults under each respective executory contract or unexpired lease (each, a

"Cure Amount"). If no amount is listed, the Debtors believe that no amount to cure defaults under each respective executory contract or unexpired lease is owing to the Assigned Contract or Assigned Lease counterparty.

35. The Debtors propose that, unless an Assigned Contract or Assigned Lease counterparty files an objection to the Cure Amount contained in the Cure Cost Notice (a "Cure Cost Objection") by a date to be fixed by the Court (or in the event the Buyer is not the Successful Bidder, at or prior to the Sale Hearing), and serves the objection upon counsel to the Debtors, Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attention: Norman L. Pernick, Esq. and Kelley Drye & Warren LLP, 400 Atlantic Street, Stamford, Connecticut 06901, Attention: M. Ridgeway Barker, Esq., counsel to the Buyer, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, Attention: David M. Feldman, Esq. and Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, P.O. Box 2087, Wilmington, Delaware 19899, Attention: Richard S. Cobb, Esq., and counsel to the DIP lenders, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attention: Andrew DeNatale, Esq. and Richards Layton and Finger, P.A., 920 North King Street, Wilmington, Delaware 19801-1494, Attention: Mark Collins, Esq., such counterparty shall (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts arising prior to the Closing Date with respect to such Assigned Contract or Assigned Lease and the Debtors, Buyer and/or Successful Bidder shall be entitled to rely solely upon the Cure Amount set forth in the Cure Cost Notice; (ii) be deemed to have consented to the Debtors' assumption and assignment of such Assigned Contract or Assigned Lease; and (iii) be forever barred and estopped from asserting or claiming against the Debtors, Buyer and/or Successful Bidder or any other assignee of the relevant Assigned Contract

that any additional amounts are due or defaults exist under such Assigned Contract or Assigned Lease as of the Closing Date.

36.    In the event a Cure Cost Objection is timely filed, the Cure Cost Objection must set forth (i) the basis for the objection, (ii) with specificity, the amount the party asserts as the appropriate Cure Amount, and (iii) appropriate documentation in support of the Cure Amount asserted in the Cure Cost Objection.  If the Debtors and any objecting counterparty cannot consensually resolve such party's Cure Cost Objection, the Buyer, Successful Bidder or any other assignee will segregate any disputed Cure Amounts pending the resolution of any such disputes by the Court or mutual agreement of the parties.  Hearings on Cure Cost Objections may be held (a) at the Sale Hearing, or (b) on such other date as the Court may designate.

37.    The Buyer will provide all non-Debtor parties to Assigned Contracts and Assigned Leases information regarding Buyer's adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code within one (1) week prior to the deadline established for objecting to the approval of the sale.  The provision of such information shall not bar, estop or otherwise enjoin any non-Debtor party to an Assigned Contract or Assigned Lease from objecting at the Sale Hearing to the sufficiency of the adequate assurance of future performance.

## GROUNDS FOR APPROVAL OF THE MOTION

### A.    The Proposed Sale of the Assets

38.    Compelling business justifications exist for the proposed sale of the Assets pursuant to the APA.  The Debtors do not have sufficient liquidity or access to financing to fund their operations beyond the proposed time frame for selling the Assets as set forth above. Accordingly, the Debtors have determined that it is in the best interests of their creditors and estates to sell the Assets to the Buyer according to the Sale Procedures and other terms and

conditions set forth in the APA. Among other things, the APA provides what the Debtors believe is the best possible opportunity to (a) preserve the going-concern value of the Assets, (b) preserve jobs for a large percentage of the Debtors' employees, and (c) obtain the highest value for the Assets for the benefit of the Debtors' estates and creditors.

39.     Notwithstanding the Debtors' belief that the terms of the APA are fair and reasonable, the Assets will still be exposed to higher and better offers. The sale of the Assets pursuant to section 363 of the Bankruptcy Code will enable the Assets to be transferred expeditiously, which is necessary to maximize and preserve the going-concern value of the Assets.

40.     Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

41.     Following the decision in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986), courts have used the "sound business purpose" standard for approving sales pursuant to section 363. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

42.     The "sound business purpose" test requires a debtor to establish: "(1) a sound business purpose exists; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith." In re Decora Indus., Inc., No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing Del. & Hudson Ry. Co., 124 B.R. at 176).

43.     As discussed above, based upon an analysis of its ongoing and future business prospects, the Debtors have concluded that, in light of the distressed nature of the Debtors' business, and the Debtors' inability to raise additional capital, the sale of the Assets represents the best manner in which to maximize the value to creditors of the Debtors' estates and therefore satisfies the "sound business purpose" test for the sale of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code. Preservation of enterprise vale for the benefit of all constituencies is a compelling circumstance, and maximization of asset value for the benefit of all creditors is a sound business purpose, warranting authorization of the proposed sale of the Assets.

44.     The Debtors are confident that their efforts have yielded a fair and reasonable price for the Assets under the circumstances. The Purchase Price under the APA— $65 million in cash plus certain Assumed Liabilities—represents the highest and best value achieved during the Debtors' extensive prepetition marketing of the Assets. As further assurance of such value, the APA will be tested through a public Auction consistent with the requirements of the Bankruptcy Code. Upon conclusion of the Auction, the Debtors, the Court, and all parties in interest can be assured that the Assets will be sold for fair market value. Consequently, fairness and reasonableness of the consideration to be received from the Buyer ultimately will be

demonstrated by adequate "market exposure" and an Auction process – the best means for establishing whether a fair and reasonable price is being paid.

45.     In addition to a fair and reasonable value offered by Buyer, the APA is the product of vigorous arms'-length, good faith negotiations between the parties in which the Debtors bargained for the maximum possible purchase price for the Assets. The negotiations involved substantial time and energy by the parties and their professionals, and the APA reflects a give-and-take and compromises by both sides. Under the circumstances, the Debtors believe that the Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

**B.     Buyer Protections Under the APA**

46.     As set forth above, the Debtors also seek approval of certain Bidding Protections. In particular, the Debtors seek approval of the Breakup Fee and the Expense Reimbursement. The Debtors believe that payment of a Breakup Fee and/or the Expense Reimbursement and the establishment of the Bidding Protections are both reasonable and necessary to induce the Buyer to enter into the transactions encompassed by the APA and to obtain the highest and best price possible for the Assets.

47.     The payment of a breakup fee is normal and customary in transactions of this nature. Such fees have frequently been approved in connection with asset sales in other chapter 11 cases. Moreover, without the agreement to this fee, the Debtors believe that they would not have obtained as favorable terms from the Buyer for the Assets. Court approval of the Breakup Fee is, therefore, in the best interests of the Debtors, their estates and their creditors.

48.     Payment of a breakup fee as part of a section 363 sale process is a generally accepted practice. Breakup fees encourage an initial purchaser to invest the time, effort and money necessary to consummate the purchase of a debtor's assets, despite the possibility that such purchaser may not ultimately acquire the property. As such, it is an important tool used to encourage bidding.

49.     The determination of whether the Breakup Fee and Expense Reimbursement should be allowed is based on whether the fees and expenses are necessary to preserve the value of the estate. Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l Energy, Inc., 181 F.3d 527, 534 (3d Cir. 1999). The considerations that underlie a debtor's business judgment to pay a breakup fee are relevant to the Court's determination of the request. Id. Indeed, many courts have evaluated breakup fees under the business judgment rule. See e.g., Cottle v. Storer Communication, Inc., 849 F.2d 570 (11th Cir. 1988); Gey Associates Gen. P'ship, Case Nos. 02 Civ 0710, and 01-B-2798, 2002 U.S. Dist. LEXIS 20759, at *5 (S.D.N.Y. Oct. 29, 2002); In re RSL COM Primecall, Inc., &RSL COM USA, Inc., Case Nos. 01-11457 and 01-11469 (jointly administered), 2002 Bankr. LEXIS 367, at *30-31 (Bankr. S.D.N.Y. Apr. 11, 2002).

50.     It is well-established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arms'-length negotiations." In re Integrated Resources, Inc., 147 B.R. 650, 658 (S.D.N.Y. 1992); In re APP Plus, Inc., 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998). In this case, the proposed Breakup Fee is the product of good faith, arms'-length negotiations between the Debtors.

51.     Moreover, the amount of the Breakup Fee (*i.e.* 3.0% of the Purchase Price) is of the same order of magnitude as breakup fees approved in other cases. See e.g., In re Eddie Bauer Holdings, Case No. 09-12099 (MFW) (Bankr. D. Del. July 23, 2009) (approving breakup fee of approximately 2.5%); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr. D. Del. April 12, 2007) (approving breakup fee of approximately 2%); In re Tweeter Home Entertainment Group, Inc., Case No. 07-10787 (PJW) (Bankr. D. Del. June 26, 2007) (authorizing debtors to pay breakup fee of up to 3%); In re Women First Healthcare, Inc., 332 B.R. 115, 118 (Bankr. D. Del. 2005) (noting approval of break-up fee of 2.8%); In re Decora Industries, Inc., Case No. 00-4459, 2002 WL 32332749 (D. Del. May 20, 2002) (affirming approval of 3% break-up fee); In re Fruit of the Loom, Inc., Case No. 99-4497 (PJW) (Bankr. D. Del. Dec. 11, 2001) (approving break-up fee of 3%); In re Hechinger Investment Co., Case No. 99-02261 (PJW) (Bankr. D. Del. Oct. 1, 1999) (upholding 3% breakup fee).

52.     In general, breakup fees encourage an interested party (here, the Buyer) to expend money, time and effort to negotiate with a debtor, notwithstanding that the transaction is subject to the risks presented by a pending chapter 11 case and uncertainty as to the approval of the transaction by the Bankruptcy Court. Breakup fees are intended to compensate the initial bidder for serving as a "stalking horse" and, thereby, encouraging the participation of other bidders for the assets to be sold. If a Qualified Bid for the Assets is received, it will primarily result from the Buyer's willingness to serve as a "stalking horse" for the Debtors' assets.

53.     The APA is subject to higher and better offers.  If higher and better offers emerge and a transaction is consummated with another Successful Bidder, the amount of such Bid will compensate the estate for the amount of the Breakup Fee and the Expense Reimbursement.  Thus, there will be no loss or prejudice to the estate or the Debtors' creditors if the Bidding Protections are approved.

## C.     The Assets Should be Sold Free and Clear of Liens under 11 U.S.C. § 363(f)

54.     The Debtors also submit that the sale of the Assets should be free and clear of any and all Encumbrances that may be asserted by any third party (other than with respect to Assumed Liabilities).  Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Since section 363(f) is written in the disjunctive, any of the five conditions, including the "consent" of the lienholders, provides authority to sell free and clear of liens.  See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988); In re Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009); In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); In re Eddie Bauer Holdings, Case No. 09-12099 (MFW) (Bankr. D. Del. July 23, 2009); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. April 30, 2007); In re Copelands' Enters. Inc., Case No. 06-10853 (MFW) (Bankr. D. Del. Nov. 29, 2006); In re Three A's Holdings, LLC, Case No. 06-10886 (BLS) (Bankr. D. Del. Nov. 17, 2006).

55.     The Debtors submit that each lien that is not an Assumed Liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such lien will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto.  The Debtors accordingly request that the Assets be transferred to the Buyer, or to the Successful Bidder at Auction, free and clear of Encumbrances (other than with respect to Assumed Liabilities) with such liens to attach to the proceeds of the sale as set forth herein.  JPM and CIBC have consented to the sale free and clear of their blanket liens on substantially all of the Debtors' assets.

56.     The Debtors will send to any purported lienholders both the Auction and Sale Hearing Notice and notice of this Motion (with the Motion and exhibits attached).  The Debtors believe that such lienholders do not object to the proposed sale.  Accordingly, the Debtors request that unless any party asserting an Encumbrances in any of the Assets (other than with respect to Assumed Liabilities and Permitted Encumbrances except as otherwise provided in the Sale Approval Order) timely objects to this Motion, all such parties shall be deemed to have consented to any sale approved at the Sale Hearing.

**D.      Assumption and Assignment of Certain Assigned Contracts and Assigned Leases**

57.     As required by the APA, and in order to enhance the value to the Debtors of the Assets (by curtailing further administrative liability to the estates and eliminating substantial rejection claims) the Debtors request authority, under section 365 of the Bankruptcy Code, to assume and assign the Assigned Contracts and Assigned Leases to the Buyer or, alternatively, to the Successful Bidder at the Auction.  The Debtors further request that the order approving the sale of the Assets provide that the Assigned Contracts and Assigned Leases will be transferred to, and remain in full force and effect for the benefit of, the Buyer (or the Successful

Bidder at Auction) notwithstanding any provisions in the Assigned Contracts and Assigned Leases, including those described in sections 365(b)(2), (f)(1) and (f)(3) of the Bankruptcy Code, that prohibit such assignments.

58.    The Debtors may, subject to Court approval, assume and assign executory contracts and unexpired leases under section 365 of the Bankruptcy Code. 11 U.S.C. § 365(a). Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. See, e.g., L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 298 (3d Cir. 2000); Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 39-40 (3d Cir. 1989); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); In re Network Access Solutions, 330 B.R. 67, 75 (Bankr. D. Del. 2005); Computer Sales Int'l v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003); In re ANC Rental Corp., 278 B.R. 714, 723 (Bankr. D. Del. 2002). Further, such relief has been recently granted by this Court and other courts in this jurisdiction. See, e.g., In re Pacific Energy Resources Ltd., et al., Case No. 09-10785 (KJC) (Bankr. D. Del. Aug. 18, 2009); In re Flying J Inc., et al., Case No. 08-1334 (MFW) (Bankr. D. Del. July 27, 2009); In re Eddie Bauer Holdings, Case No. 09-12099 (MFW) (Bankr. D. Del. July 23, 2009); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. July 10, 2007); In re Copelands' Enters. Inc., Case No. 06-10853 (MFW) (Bankr. D. Del. Nov. 29, 2006); In re Three A's Holdings, LLC, Case No. 06-10886 (BLS) (Bankr. D. Del. Nov. 17, 2006). The

assumption and assignment of the Assigned Contracts and the Assigned Leases set forth in the APA is a necessary part of the deal that the Debtors have struck with Buyer.

59.     Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain, nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default and (iii) adequate assurance of future performance under the lease is provided.  11 U.S.C. § 365(b)(1)(A)-(C).

60.     Pursuant to the terms of the proposed Procedures Order, the Debtors will send the Cure Cost Notice to all counterparties to the Assigned Contracts and Assigned Leases, notifying such counterparties of the potential assumption by the Debtors and assignment to Buyer (or to Successful Bidder at Auction) of the Assigned Contracts and the Assigned Leases. The Cure Cost Notice will also set forth the Cure Amount owing for each such Assigned Contract and Assigned Lease, according to the Debtors' books and records.

61.     Counterparties to the Assigned Contracts and Assigned Leases will be given time (as will be set forth in the Procedures Order) to file an objection to the proposed Cure Amount set forth in the Cure Cost Notice.  To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the Debtors, the Buyer and the applicable Assigned Contract or Assigned Lease counterparty.  The payment of the Cure Amounts specified in the Cure Cost Notice (or a different amount either agreed to by the Debtors or resolved by the Court as a result of a timely-filed objection by an Assigned Contract or

Assigned Lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine, prior to the Sale Hearing, that a particular lease or contract is not truly executory, and does not need to be cured to transfer the Assets to Buyer.

62.     Section 365(f)(2)(B) of the Bankruptcy Code states that a debtor may assign its unexpired leases and/or executory contracts if, *inter alia*, the assignee provides "adequate assurance of future performance. " 11 U.S.C. § 365(f)(2)(B). If necessary, Buyer, or the Successful Bidder at the Auction, will be required to submit, among other things, written evidence of their ability to provide adequate assurance of future performance under the applicable contracts. Contract parties will also be able to challenge the Successful Bidder's ability to provide adequate assurance at the Sale Hearing.

63.     Any assumption and assignment of an Assigned Contract or Assigned Lease will be subject to all of the provisions of such Assigned Contract or Assigned Lease, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code. The Sale Procedures are designed to ensure that any Successful Bidder is financially able and prepared to undertake all of the relevant obligations under the Assigned Contracts and Assigned Leases, and the Debtors will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code with respect to the potential assumption and assignment of the Assigned Contracts and Assigned Leases. Consequently, assumption and assignment of the Assigned Contracts and the Assigned Leases is appropriate under the circumstances.

**E.    The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances**

64.    The Debtors will serve the Auction and Sale Hearing Notice and the Assumption Notice in accordance with the Procedures Order.

65.    The Debtors will have served this Motion (with all exhibits), and the Notice of Motion, at least twenty (20) days prior to the Sale Hearing on the Office of the United States Trustee, counsel to the Debtors' prepetition and postpetition secured lenders, counsel to the Buyer, the Debtors' top thirty (30) creditors, the Office of the United States Attorney for the District of Delaware, the Securities and Exchange Commission, the parties who have requested special notice in these cases pursuant to Bankruptcy Rule 2002, all parties holding an alleged security interest in the Debtors' Assets, each party to an Assigned Contract or Assigned Lease, all entities who have expressed an interest in acquiring the Assets, and counsel to the Official Committee of Unsecured Creditors, if one has been appointed (or as soon thereafter as one is appointed).  The notice of the proposed sale given by the Debtors sufficiently describes the terms and conditions of the proposed sale.

66.    Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements:

(a)    <u>Section 363 Notice</u> – Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing."  Under section 102(1) of the Bankruptcy Code, the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances."  11 U.S.C. § 102(1)(A).  As set forth above, creditors have been provided notice

of the salient details regarding this Motion and the Sale Hearing. Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

(b) <u>Bankruptcy Rule 2002</u> – Bankruptcy Rule 2002 requires twenty (20) days notice of the proposed sale of property other than in the ordinary course of business. In addition, Bankruptcy Rule 2002 provides that notice of a sale shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002. As set forth above, the notice of this Motion that has been and will be provided by the Debtors satisfies each of these requirements.

(c) <u>Bankruptcy Rules 6004 and 6006</u> – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002. As set forth above, the Debtors have complied with Bankruptcy Rule 2002. Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the counterparty to such contract or lease, as well as on other parties in interest as this Court may direct. The Auction and Sale Hearing Notice, the Cure Cost Notice and this Motion have been or will be served on counterparties to the Assigned Contracts and Assigned Leases, thereby satisfying this requirement.

(d) <u>Procedural Due Process</u> – The notice of this Motion that is being provided, including notice being provided by publication as set forth above, is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. <u>See Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this Motion.

67.     The Debtors submit that the notice they have provided and intend to provide both of the proposed sale and of this Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

## F.     The Stay of the Sale Order Should be Waived

68.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), an order authorizing the sale of property or the assignment of an unexpired lease is stayed for ten (10) days after the entry of an order unless the Court orders otherwise.

69.     The Debtors request that this Court order that such stay is not applicable with respect to the sale of the Assets and assignment of the Assigned Contracts and Assigned Leases.  To require the Debtors to effectively be liable under the Assigned Contracts and Assigned Leases for an extra ten (10) days and to delay the closing and the resulting pay down of the Debtors' secured obligations will burden the estates and require unnecessary expenditures of the Debtors' limited resources.  The Debtors note that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) and 6006(d) have previously been granted by courts in this district.  See, e.g., In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009); In re Hancock Fabrics, Inc., Case No. 07-10353 (BLS) (Bankr. D. Del. April 30, 2007); In re Copelands' Enters., Inc., Case No. 06-10853 (MFW) (Bankr. D. Del. Nov. 29, 2006); In re Three A's Holdings, LLC, Case No. 06-10886 (BLS) (Bankr. D. Del., Nov. 17, 2006).

## NO PRIOR REQUEST

70.     No prior request for the relief sought herein has been requested from this Court or any other court.

## NOTICE

71.     Notice of this Motion has been provided in accordance with the notice procedures set forth above.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Motion and grant the Debtors such other and further relief as this Court deems just and proper.

Dated: September 16, 2009
      Wilmington, Delaware

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.


By: */s/ Norman L. Pernick*
Norman L. Pernick  (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Tel:  (302) 652-3131
Fax:  (302) 652-3117

   -and-

Gerald H. Gline, Esq.
Kenneth L. Baum, Esq.
25 Main Street
Hackensack, NJ 07602-0800
Tel:  (201) 489-3000
Fax:  (201) 489-1536

Proposed Counsel for the Debtors
and Debtors in Possession