# EXHIBIT "A"
# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT

BY AND AMONG

BARZEL INDUSTRIES INC.,

THE OTHER ENTITIES IDENTIFIED HEREIN
AS THE SELLING SUBSIDIARIES

AND

CHRISCOTT USA INC. AND 4513614 CANADA INC.

AS BUYERS

DATED AS OF SEPTEMBER 14, 2009

**TABLE OF CONTENTS**

ARTICLE 1      DEFINITIONS; INTERPRETATION.................................................. 2

    Section 1.1.    Definitions......................................................................... 2
    Section 1.2.    Interpretation.................................................................. 15
    Section 1.3.    Exhibits .......................................................................... 17

ARTICLE 2      PURCHASE AND SALE OF PURCHASED ASSETS............................ 17

    Section 2.1.    Transfer of Purchased Assets ......................................... 17
    Section 2.2.    Excluded Assets ............................................................. 18
    Section 2.3.    Assumed Liabilities ....................................................... 19
    Section 2.4.    Excluded Liabilities ....................................................... 20
    Section 2.5.    Designation of Assigned Contracts and Assigned Leases; Cure Costs.............................................................. 20
    Section 2.6.    Purchase Price ................................................................ 22
    Section 2.7.    Deposit ........................................................................... 22
    Section 2.8.    Inventory Count; Purchase Price Adjustments ................. 22
    Section 2.9.    Payment Mechanics ....................................................... 23
    Section 2.10.   The Closing .................................................................... 23
    Section 2.11.   Actions at the Closing and Closing Deliveries ................. 23
    Section 2.12.   Recording of Documents ................................................ 25
    Section 2.13.   Permits and Undertakings .............................................. 25
    Section 2.14.   Assignment of Purchased Assets .................................... 26
    Section 2.15.   Allocation of Purchase Price........................................... 26

ARTICLE 3      REPRESENTATIONS AND WARRANTIES REGARDING THE BUYER ............................................................................... 27

    Section 3.1.    Organization................................................................... 27
    Section 3.2.    Authorization, Execution and Enforceability ................... 27
    Section 3.3.    No Breach ....................................................................... 27
    Section 3.4.    Consents......................................................................... 28
    Section 3.5.    Financing........................................................................ 28
    Section 3.6.    Brokers; Finders ............................................................. 28
    Section 3.7.    Adequate Assurances Regarding Assigned Contracts ...... 28
    Section 3.8.    Canadian Tax Registration.............................................. 28

ARTICLE 4      REPRESENTATIONS AND WARRANTIES REGARDING THE SELLERS.............................................................................. 29

    Section 4.1.    Organization................................................................... 29
    Section 4.2.    Authorization, Execution and Enforceability ................... 29
    Section 4.3.    No Breach ....................................................................... 29
    Section 4.4.    Consents......................................................................... 30
    Section 4.5.    Financial Statements ...................................................... 30
    Section 4.6.    Tax Matters .................................................................... 30
    Section 4.7.    Real Property ................................................................. 31

**TABLE OF CONTENTS**

*(continued)*

Section 4.8.    Title to Purchased Assets ................................................................. 31
Section 4.9.    Contracts ...................................................................................... 31
Section 4.10.   Assigned Contracts and Assigned Leases ................................... 32
Section 4.11.   Permits .......................................................................................... 32
Section 4.12.   Intellectual Property Matters ....................................................... 32
Section 4.13.   Sufficiency of Purchased Assets ................................................. 33
Section 4.14.   Human Resources; Benefit Plans ................................................ 33
Section 4.15.   Compliance with Laws ................................................................ 34
Section 4.16.   Environmental and Health and Safety Matters ........................... 34
Section 4.17.   Insurance ...................................................................................... 35
Section 4.18.   Brokers; Finders .......................................................................... 35
Section 4.19.   Litigation; Proceedings ............................................................... 35
Section 4.20.   Operation of Business ................................................................. 35

ARTICLE 5      PRE-CLOSING COVENANTS ................................................ 36

Section 5.1.    Conduct by the Buyers ................................................................ 36
Section 5.2.    Conduct by the Sellers ................................................................ 36
Section 5.3.    Governmental Filings ................................................................... 38
Section 5.4.    Further Assurances ...................................................................... 39
Section 5.5.    Termination on Closing ............................................................... 39
Section 5.6.    Failure to Obtain Consents .......................................................... 39
Section 5.7.    Lenders' Acknowledgement ........................................................ 40
Section 5.8.    Release .......................................................................................... 40
Section 5.9     Adjusted Net Working Capital Numbers ..................................... 40
Section 5.10.   Insurance Claims ......................................................................... 40

ARTICLE 6      BANKRUPTCY PROCEDURES .......................................... 40

Section 6.1.    Bankruptcy Actions ..................................................................... 40
Section 6.2.    Court Approval ............................................................................ 41
Section 6.3.    Further Solicitation ...................................................................... 42

ARTICLE 7      CONDITIONS TO CLOSING ................................................. 42

Section 7.1.    Conditions of the Buyer to Closing ............................................. 42
Section 7.2.    Conditions of the Sellers to Closing ........................................... 44

ARTICLE 8      ADDITIONAL AGREEMENT ................................................ 45

Section 8.1.    Taxes and Other Costs ................................................................. 45
Section 8.2.    Payments Received ...................................................................... 46
Section 8.3.    Assigned Contracts and Assigned Leases; Adequate Assurance
                and Performance ........................................................................... 46
Section 8.4.    Employee Matters ........................................................................ 47

Section 8.5.     Workers Compensation ................................................. 48
Section 8.6.     Responsibilities under the WARN Act ............................. 48
Section 8.7.     COBRA ....................................................................... 48
Section 8.8.     Preservation of Records ................................................ 49
Section 8.9.     Access by the Sellers .................................................... 49
Section 8.10.    No Other Representations or Warranties .......................... 49
Section 8.11.    Purchased Assets "AS IS," "WHERE IS"; Buyers'
                          Acknowledgement ........................................................ 50
Section 8.12.    Guaranty of Sale Price for Delta Tube ............................ 50

ARTICLE 9        TERMINATION ................................................................ 51

Section 9.1.     Termination .................................................................. 51
Section 9.2.     Effect of Termination .................................................... 52

ARTICLE 10       MISCELLANEOUS PROVISIONS .................................... 54

Section 10.1.    Confidentiality ............................................................. 54
Section 10.2.    Survival ....................................................................... 55
Section 10.3.    Notice .......................................................................... 55
Section 10.4.    Certain Expenses; Certain Financing ............................... 57
Section 10.5.    Governing Law; Forum; Jury Trial .................................. 57
Section 10.6.    Binding Effect; Assignment; Third Party Beneficiaries ..... 57
Section 10.7.    Entire Agreement; Confidentiality Agreement .................. 58
Section 10.8.    Amendments ................................................................ 58
Section 10.9.    Waivers ....................................................................... 58
Section 10.10.   Remedies Limited ......................................................... 58
Section 10.11.   Headings; Counterparts; Interpretation; Schedules .......... 58
Section 10.12.   Severability ................................................................. 60

# LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Knowledge of Sellers |
| Schedule 2.1(b) | Owned Real Property |
| Schedule 2.1(c) | Assigned Leases |
| Schedule 2.1(d) | Tangible Assets |
| Schedule 2.1(e) | Inventory of the Sellers |
| Schedule 2.1(f) | Assigned Contracts |
| Schedule 2.1(m) | Telephone, Facsimile and Domain Names |
| Schedule 2.1(o) | Specified Bank Accounts |
| Schedule 2.1(p) | Other Assets |
| Schedule 2.2(m) | Other Excluded Assets |
| Schedule 2.11(b)(iv) | Undertakings |
| Schedule 2.15 | Purchase Price Allocation |
| Schedule 4.1 | Jurisdictions |
| Schedule 4.4 | Consents |
| Schedule 4.5 | Financial Statements |
| Schedule 4.6 | Tax Matters |
| Schedule 4.7 | Real Property |
| Schedule 4.9 | Contracts |
| Schedule 4.10 | Assigned Contracts and Assigned Leases |
| Schedule 4.11(a) | Material Permits |
| Schedule 4.11(b) | Excluded Permits |
| Schedule 4.11(c) | Other Permit Matters |
| Schedule 4.12(a) | Intellectual Property |
| Schedule 4.12(b) | Intellectual Property Infringement |
| Schedule 4.12(c) | Licenses |
| Schedule 4.13 | Sufficiency of Purchased Assets |
| Schedule 4.14(a) | Collective Bargaining Agreements/Trade Unions |
| Schedule 4.14(b) | Employee Information |
| Schedule 4.14(c) | Domestic Benefit Plans |
| Schedule 4.15 | Compliance with Laws |
| Schedule 4.16 | Environmental and Health and Safety Matters |
| Schedule 4.17 | Insurance |
| Schedule 4.18 | Brokers; Finders |
| Schedule 4.19 | Litigation; Proceedings |
| Schedule 8.4(i) | Employees of the Sellers |
| Schedule 8.4(ii) | Transferred Employees |
| | |
| Exhibit A | Form of US Bid Procedures Order |
| Exhibit B | Form of Canadian Bid Procedures Order |
| Exhibit C | Form of Sale Order |
| Exhibit D | Form of Approval and Vesting Order |

**ASSET PURCHASE AGREEMENT**, dated as of September 14, 2009 (the "Effective Date") by and among Chriscott USA Inc., a Delaware corporation and 4513614 Canada Inc., a corporation formed under the laws of Canada (collectively, the "Buyers"), Barzel Industries Inc., a Delaware corporation (the "Company") and the Company's Subsidiaries identified on the signature pages to this Agreement (the "Selling Subsidiaries" and together with the Company, the "Sellers").

## WITNESSETH:

WHEREAS, Sellers are engaged in the business of manufacturing, processing and distributing steel tube, pipe and other metal products (such business, as conducted by the Sellers, the "Business");

WHEREAS, prior to the date hereof, Sellers have engaged in an extensive marketing process in connection with the proposed sale of the Business, culminating in the identification of the Buyers as purchasers and the execution of this Agreement;

WHEREAS, Sellers desire to sell to Buyers all of the Purchased Assets (as hereinafter defined), and Buyers desire to purchase from Sellers all of the Purchased Assets and assume all of the Assumed Liabilities (as hereinafter defined), upon the terms and conditions hereinafter set forth (the "Transaction");

WHEREAS, the Parties have determined that it is in the best interest of the Sellers to consummate the transactions set forth in the Agreement pursuant to Sections 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36 (the "CCAA");

WHEREAS, (i) the Sellers (excluding Canco (as hereinafter defined)) intend to file voluntary petitions for relief commencing cases (the "Bankruptcy Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and (ii) Canco intends to bring an application for protection under the CCAA (the "CCAA Case") before the Ontario Superior Court of Justice – Commercial List (the "Canadian Court"); and

WHEREAS, (i) the Sellers (excluding Canco) intend to continue to operate the Business and to manage their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code; and (ii) Canco intends to continue to operate and manage its properties while subject to proceedings pursuant to the CCAA;

NOW, THEREFORE, in consideration of the premises, representations and warranties and the mutual covenants and agreements set forth herein and other good, valuable and sufficient consideration, the receipt of which is hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

# ARTICLE 1

## DEFINITIONS; INTERPRETATION

**Section 1.1.** **Definitions**.  As used herein, the following terms shall have the following meanings:

"Accounting Referee" shall have the meaning given to such term in Section 2.15.

"Accounts Receivable," as of any date, shall mean those accounts receivable, net of the related allowance for doubtful accounts, of the Business, recorded or required to be recorded as such on consolidated financial statements of the Business as of such date prepared on a basis consistent with the Audited Financial Statements.

"Accrued Vacation Amount" shall have the meaning given to such term in Section 8.4(b).

"Acquisition Proposal" shall have the meaning given to such term in Section 6.3.

"Adjusted Inventory" as of any date, shall mean Inventory, net of the related allowance for Defective Inventory, recorded or required to be recorded as such on consolidated financial statements of the Business as of such date prepared on a basis consistent with the Audited Financial Statements.

"Adjusted Net Working Capital," as of any date, shall mean an amount equal to (a) the sum of (i) Accounts Receivable, (ii) Prepaid Expenses, and (iii) Adjusted Inventory, minus (b) solely in case of the determination of Adjusted Net Working Capital as of the Determination Date, Adjusted Trade Payables, in each case of clauses (a) and (b), as of such date and determined on a basis consistent with the Audited Financial Statements.

"Adjusted Trade Payables" shall mean, in respect of the Determination Date, the outstanding trade payables of the Sellers as of the Determination Date that accrued after the Petition Date.

"Affiliate" shall mean, with respect to any Person, any other Person which controls, is controlled by or is under common control with, directly or indirectly, such Person, and, if such Person is a natural person, includes any member of such Person's immediate family, or, if such Person is an entity, includes any trustee, member, general partner, manager, director or executive officer of, or any Person performing similar functions for, such Person (in all cases, Delta Tube and Company, Limited and Delta Tubes Inc. shall be deemed Affiliates of Sellers).

"Affiliate Contract" shall have the meaning given to such term in Section 2.5(c).

"Agreement" shall mean this Asset Purchase Agreement, including the Schedules and Exhibits hereto, in each case as amended or supplemented from time to time.

"Alternative Transaction" shall mean the acquisition, transfer, purchase or other disposition of the Business or the Purchased Assets (or any material portion thereof) to a Person other than the Buyers, including (i) the acquisition, transfer, purchase or other disposition of the Equity Interests of the Sellers; (ii) any business combination involving or otherwise relating to the Business; or (iii) the acquisition, transfer, purchase or other disposition of any material portion of the Purchased Assets.

"Approval and Vesting Order" shall have the meaning given to such term in Section 6.1.

"Assigned Contracts" shall have the meaning given to such term in Section 2.1(f).

"Assigned Leases" shall have the meaning given to such term in Section 2.1(c).

"Assumed Liabilities" shall have the meaning given to such term in Section 2.3.

"Auction" shall mean the auction, if any, conducted by Sellers pursuant to the Bid Procedures Orders.

"Audited Financial Statements" shall mean (i) the audited consolidated financial statements for the Company at November 29, 2008 and for the year ended November 29, 2008, (ii) the audited consolidated financial statements for the Company at November 24, 2007 and for the period from November 15, 2007 through November 24, 2007 and (iii) the audited consolidated financial statements for the entity acquired by the Company on November 15, 2007 at November 14, 2007 and for the period from November 26, 2006 through November 14, 2007.

"Avoidance Actions" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code.

"Bankruptcy Cases" shall have the meaning given to such term in the recitals.

"Bankruptcy Code" shall have the meaning given to such term in the recitals.

"Bankruptcy Court" shall have the meaning given to such term in the recitals.

"Barzel Finco" shall mean Barzel Finco Inc., a Delaware corporation.

"Base Amount" shall have the meaning given to such term in Section 2.8(b).

"Base Purchase Price" shall have the meaning given to such term in Section 2.6(a).

"Benefit Plan" shall mean a bonus, incentive, compensation, deferred compensation, equity-based compensation, severance, termination, change of control, pension, savings, profit sharing, retirement, health, dental, disability, hospital or life insurance, loan, vacation, tuition reimbursement, relocation, accidental death and dismemberment or other employee benefit plan, policy, program, arrangement or agreement (whether provided on a funded or unfunded basis, or through insurance or otherwise) under which any employee or

former employee of the Sellers has any current or future rights to benefits, other than (i) a collective bargaining agreement or other Contract with a labor union or association, (ii) a Contract relating to the appointment of a sales agent or representative or a distributor, (iii) a Contract relating to the indemnification of a director, officer or employee, (iv) a Contract relating to the employment of any employee or the engagement of any consultant, (iv) any Organizational Document or (v) any plan sponsored by a Governmental Authority.

"BIA" shall have the meaning given to such term in Section 9.1(d).

"Bid Procedures" means the procedures approved by the Bid Procedures Orders.

"Bid Procedures Orders" shall have the meaning given to such term in Section 6.1.

"Business" shall have the meaning given to such term in the recitals.

"Business Day" shall mean any day of the year other than (a) any Saturday or Sunday or (b) any other day on which the banks located in the State of New York or the provinces of Ontario or Quebec are required or authorized by Law to be closed for business.

"Buyers" shall have the meaning given to such term in the introductory paragraph.

"Buyers Plans" shall have the meaning given to such term in Section 8.4(b).

"Buyers Termination Fee" shall mean an amount equal to 3.0% of the Base Purchase Price.

"Buyers' Cure Costs" shall have the meaning given to such term in Section 2.5(c).

"Buyers' 401(k) Plan" shall have the meaning given to such term in Section 8.4(c).

"Canadian Approval Motion" shall mean a motion filed with the Canadian Court seeking approval of the transactions contemplated by this Agreement in respect of Canco and the entry of the Approval and Vesting Order.

"Canadian Bid Procedure Motion" shall mean a motion filed with the Canadian Court seeking entry of an Order substantially in the form of Exhibit B attached hereto.

"Canadian Court" shall have the meaning given to such term in the recitals.

"Canadian Proceedings" shall mean any proceedings under the CCAA commenced by Canco in the Canadian Court.

"Canco" shall mean Barzel Industries Canada Inc., a Canadian corporation.

"CCAA" shall have the meaning given to such term in the recitals.

"CCAA Case" shall have the meaning given to such term in the recitals.

"Claim" shall have the meaning given to such term in section 101(5) of the Bankruptcy Code.

"Closing" shall have the meaning given to such term in Section 2.10.

"Closing Date" shall have the meaning given to such term in Section 2.10.

"Closing Documents" shall mean the certificates, instruments and documents required to be delivered pursuant to Section 2.11 (other than the Related Agreements).

"COBRA" shall mean Part 6 of Title I of ERISA and Code Section 4980B and the regulations promulgated under any of them or any state benefit continuation Laws.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Commissioner" shall mean the Commissioner of Competition appointed under the Competition Act or a person authorized by her.

"Company" shall have the meaning given to such term in the introductory paragraph.

"Competition Act" shall mean the Competition Act (Canada), as amended from time to time and the regulations promulgated thereunder.

"Confidential Information" shall have the meaning given to such term in Section 10.1(b).

"Confidentiality Agreement" shall mean the Confidentiality Agreement, dated as of May 8, 2009, between Houlihan Lokey, as agent for the Company, and The Chriscott Group.

"Consent" shall mean any approval, authorization, exemption, waiver, permission or consent of any kind of any Person, whether related to any Contract or otherwise, other than a Permit.

"Contract" shall mean any written or oral contract, agreement, note, bond, mortgage, indenture, deed of trust, lease, sublease, license, sublicense, purchase or sale order, quotation or other commitment, obligation or instrument of any kind that is legally binding or enforceable under applicable Law.

"Copyrights" shall mean all US, Canadian and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Cure Cost Cap" shall mean Cure Costs up to the amount of $30,000.

"Cure Costs" shall mean amounts that must be paid, if any, in connection with the assumption and assignment of the Assigned Contracts and the Assigned Leases, including (i) pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code; and (ii) costs to obtain consent in assigning the Assigned Contracts and the Assigned Leases to the Buyers or to cure any defaults thereunder subject to the CCAA Case.

"Defective Inventory" shall mean Inventory that is slow moving, materially defective, obsolete, unsaleable, unmerchantable or damaged, determined on a basis consistent with the treatment of Inventory in the Sellers' most recent Audited Financial Statements.

"Deposit" shall have the meaning given to such term in Section 2.7.

"Deposit Amount" shall mean an amount equal to the sum of (i) the Deposit; and (ii) any amounts of interest or other earnings accrued thereon from (and including) the date on which Buyers deposit the Deposit with the Deposit Escrow Agent pursuant to Section 2.7 through (and including) the Closing Date.

"Deposit Escrow Agent" shall have the meaning given to such term in Section 2.7.

"Deposit Escrow Agreement" shall have the meaning given to such term in Section 2.7.

"Deposit Release Instructions" shall have the meaning given to such term in Section 2.11(b)(vi).

"Designated Contract or Lease" shall have the meaning given to such term in Section 2.5(c).

"Designation Deadline" shall mean two days following entry of the Bid Procedures Order by the Bankruptcy Court.

"Determination Date" shall mean the Closing Date.

"Determined Cure Costs" shall have the meaning given to such term in Section 2.5(c).

"DIP Budget" shall mean the budget attached to the interim debtor-in-possession order entered by the Bankruptcy Court, as may be amended from time to time.

"DIP Facility" shall have the meaning given to such term in Section 5.2(e)(i).

"Disputed Contract" shall have the meaning given to such term in Section 2.5(d).

"Domestic Benefit Plan" shall mean a Benefit Plan (i) maintained or required to be maintained by the Sellers, (ii) to which any Seller makes or is required to make contributions or (iii) with respect to which the Sellers have any Liability, in each case other than a Foreign Benefit Plan.

"Effective Date" shall have the meaning given to such term in the introductory paragraph.

"Effective Time" shall have the meaning given to such term in <u>Section 2.10</u>.

"Employees" shall mean all employees of the Sellers, in each case, as of the Effective Date.

"Encumbrance" means any Interest, charge, lien, Claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, right of way, easement, servitude, restrictive covenant, encroachment, encumbrance, Third Party Interest or other restriction or limitation of any kind.

"Environmental Claim" shall mean any Claim or Proceeding arising from (a) any Environmental Law, (b) any Environmental Condition, (c) any Hazardous Substance or any Release or Remediation thereof or (d) any pollution of or failure to protect the environment (including failure to protect human health and safety, other than in respect of occupational health and safety) from Hazardous Substances Contamination.

"Environmental Condition" shall mean any condition (including any Hazardous Substances Contamination) with respect to the environment (including failure to protect human health and safety, other than in respect of occupational health and safety) as a result of which any Seller (a) has incurred or could incur any Liability or Loss, (b) has or could become subject to any Claim or Proceeding or (c) has or could become subject to any obligation to Remediate such condition, including any condition resulting from the business or activities of the Sellers or the business or activities of any other Person on any of the Owned Real Property or Leased Real Property.

"Environmental Law" shall mean any Law relating to pollution or protection of the indoor or outdoor environment (including protection of human health and safety, other than in respect of occupational health and safety), or any Hazardous Substance or any Release or Remediation thereof, including (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1984, (b) the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, (c) the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, (d) the Toxic Substances Control Act of 1976, (e) the Emergency Planning and Community Right-To-Know Act of 1986, (f) the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, (g) the National Environmental Policy Act of 1970, (h) the Endangered Species Act of 1973, (i) the Safe Drinking Water Act of 1974, (j) the Atomic Energy Act of 1954, (k) the *Politique de protection des sols et de réhabilitation des terrains contaminés* published in 1998 by the Ministry of Sustainable Development, Environment and Parks, as amended to this date, (l) civil and common law responsibility for acts or omissions with respect to the environment, (m) any applicable similar Canadian or foreign Law and all regulations promulgated pursuant to the foregoing and (n) all Permits issued pursuant to such Laws.

"Environmental Liabilities" shall mean all Liabilities arising from any Environmental Claim or Environmental Condition.

"Equity Interests" of a Person shall mean capital stock, capital stock equivalents (including stock options, restricted stock units, stock appreciation rights, any securities convertible into or exchangeable or exercisable for any such capital stock, and phantom stock), partnership interests, membership interests, participations, shares and other equity interests of any class or kind (however designated) of such Person.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974.

"Excluded Assets" shall have the meaning given to such term in Section 2.2.

"Excluded Contracts" shall have the meaning given to such term in Section 2.2(b).

"Excluded Liabilities" shall have the meaning given to such term in Section 2.4.

"Expense Reimbursement" shall mean an amount equal to the documented, reasonable out-of-pocket costs and expenses reasonably incurred by or on behalf of or borne by the Buyers in connection with (i) their negotiation, execution, delivery and performance of this Agreement, the Closing Documents and the Related Agreements and the process leading up thereto, (ii) their appearance or participation in the Bankruptcy Cases and the CCAA Case, and (iii) their participation in the process contemplated by the Bid Procedures Orders, including all reasonable and documented fees and expenses of counsel, accountants and financial and other advisers, up to an aggregate amount of $750,000.

"Final Adjusted Net Working Capital" shall mean the Adjusted Net Working Capital as of the Determination Date determined as described in Section 2.8 (or as otherwise agreed in writing at any time by the Parties).

"Final Order" shall mean an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended, and as to which any and all appeal periods with respect to such order, judgment or decree have expired.

"Foreign Benefit Plan" shall mean any Benefit Plan (a) maintained or required to be maintained by any Seller, (b) to which any Seller makes or is required to make contributions or (c) with respect to which any Seller has any Liability, in each case that is maintained outside of the United States.

"GAAP" shall mean the generally accepted accounting principles in the United States.

"Governmental Authority" shall mean any government (including any US, Canadian or foreign, federal, state, provincial, city, municipal or county government), any political subdivision thereof and any governmental, administrative, ministerial, regulatory, central bank, self-regulatory, quasi-governmental, taxing, executive or legislative department,

commission, body, agency, authority or instrumentality of any thereof, including any Judicial Authority.

"GST" shall have the meaning given to such term in Section 8.1(d).

"Hazardous Substance" shall mean any material, chemical or substance as to which any Liability, standard of conduct or regulatory requirement of any kind is imposed under any Law or regulatory policy statement or guidance of any kind relating to pollution or the protection of the environment or natural resources (including protection of human health and safety, other than in respect of occupational health and safety), including any Hazardous Waste or any flammable, corrosive, toxic, reactive, explosive or radioactive material (including any source, byproduct or special nuclear material), radon, asbestos, formaldehyde, urea formaldehyde, polychlorinated biphenyl, petroleum, petroleum constituent, petroleum product, polycyclic aromatic hydrocarbons, lead, methane or medical waste.

"Hazardous Substances Contamination" shall mean the presence in the indoor or outdoor environment or natural resources of a Hazardous Substance caused by a Release in concentrations or amounts that require Remediation under any Environmental Law.

"Hazardous Waste" shall mean any substance defined as a "hazardous waste" pursuant to the United States Resource Conservation and Recovery Act or any other similar state, provincial, local, Canadian or foreign Law.

"Health and Safety Condition" shall mean any condition with respect to occupational health and safety as a result of which any Person (a) has incurred or could incur any Liability or loss, (b) has or could become subject to any Claim or Proceeding or (c) has or could become subject to any obligation to abate such condition, in each case, under any Health and Safety Law.

"Health and Safety Law" shall mean any Law, other than any Environmental Law, relating to protection of workplace or occupational health and safety or any Remediation of any threat thereto, including the United States Occupational Safety and Health Act of 1970.

"Houlihan Lokey" shall mean Houlihan Lokey Howard & Zukin Capital, Inc.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Intellectual Property" shall mean all intellectual property, whether protected, created or arising under the laws of the United States or any other jurisdiction, including all Copyrights, Patents, Trademarks, Trade Secrets and any similar, corresponding or equivalent rights to any of the foregoing, owned, used or licensed by Seller and used or held for use in the Business.

"Intercompany Note" means the note issued by Canco to Barzel Finco in the principal amount of $125,000,000.

"Interest" shall have the meaning as such term is used in Section 363(f) of the Bankruptcy Code.

"Inventory" shall mean all inventories (including finished goods, work-in-process, raw and packaging materials, stores, manufacturing supplies and spare parts).

"Inventory Count" shall have the meaning given to such term in Section 2.8(a).

"Inventory Report" shall have the meaning given to such term in Section 2.8(a).

"IRS" shall mean the Internal Revenue Service of the United States.

"Judicial Authority" shall mean any court, arbitrator, special master, receiver, tribunal or similar body of any kind entitled to exercise judicial authority.

"Knowledge" means, with respect to any matter in question, in the case of Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(a) with respect to such matter.

"Law" shall mean any treaty, code, statute, law (including common law), rule, regulation, or ordinance of any kind of any Governmental Authority.

"Leased Real Property" shall have the meaning given to such term in Section 4.7.

"Leases" shall have the meaning given to such term in Section 4.7.

"Liability" shall mean any liability, duty, responsibility, obligation, assessment, cost, expense, expenditure, charge, fee, penalty, fine, contribution, premium or obligation of any kind, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Material Adverse Effect" shall mean any change, event or occurrence that individually or in the aggregate (taking into account all other such changes, event or occurrences) has had, or would be reasonably likely to have (x) a material adverse change in or material adverse effect on the Purchased Assets or the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case taken as a whole, or (y) a material adverse change in or to the ability of Sellers to consummate the transactions contemplated by this Agreement, but excluding, in either case (a) any change or effect to the extent that it results from or arises out of the Bankruptcy Cases or commencement of proceedings in the Canadian Court; (b) effects resulting from changes in general economic, regulatory, political or industry conditions or from acts of terror or war, (c) effects resulting from changes in (or proposals to change) any Laws after the date hereof; (d) effects resulting from the identity of, or acts attributable to, or omissions by the Buyers or any of their Affiliates, (e) effects resulting from changes in commodity or energy prices, in interest or currency exchange rates or in capital market conditions, (f) effects resulting from circumstances that affect the industries in which the Sellers operate generally, (g) effects resulting from changes in GAAP after the date hereof, or (h) effects resulting from the execution and delivery of this Agreement, the announcement or closing of the transactions

contemplated by this Agreement or any action contemplated by this Agreement or taken at the request of Buyers, provided, however, that in each case of clauses (b), (c), (e), (f) and (g), such effects are not disproportionately adverse to the Business as compared to other companies in comparable businesses to the Sellers, taken as a whole (other than the Excluded Assets and the Excluded Liabilities).

"Multiemployer Plan" shall have the meaning given to such term in Section 4.14(d).

"Multiple Employer Plan" shall have the meaning given to such term in Section 4.14(d).

"Next Best Bidder" shall have the meaning given to such term in the Bid Procedures.

"Order" shall mean any judgment, writ, decree, directive, decision, injunction, ruling, award or order (including any consent decree or cease and desist order) of any kind of any Governmental Authority or Judicial Authority.

"Ordinary Course" shall mean the ordinary course of business, operations and activities conducted by the Sellers, taken as a whole, taking into account the commencement of the Bankruptcy Cases and CCAA Case.

"Organizational Documents" of a Person at any time shall mean (a) all certificates, articles or agreements of any kind filed with any Governmental Authority or Judicial Authority to form or organize such Person and (b) all agreements, documents or instruments creating, organizing or governing the internal affairs of such Person, including trust agreements, bylaws, codes of regulations, memoranda of incorporation or association, partnership agreements, limited liability company agreements, charters and operating agreements, in each case, as in effect at such time.

"Owned Real Property" shall have the meaning given to such term in Section 4.7.

"Parties" shall mean the Sellers and the Buyers.

"Patents" means US, Canadian and foreign patent and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosure related thereto.

"Permits" shall mean any franchise, license, approval, authorization, registration, certificate of need, waiver, certification or permit of any kind of any Governmental Authority that are necessary for Sellers to own, lease and operate their properties and assets or to carry on the Business.

"Permitted Encumbrances" shall mean (i) easements, leases, reservations, or other rights of others in, or minor defects and irregularities in title that do not materially impair the use of the encumbered property or assets for the purposes for which they are held; (ii) mechanics', materialmen's, carriers', workers', repairers' and similar statutory liens arising in the Ordinary

Course which liens have not had and are not reasonably likely to have a material impact on the Purchased Assets; (iii) any Encumbrance or privilege vested in any lessor, licensor or permittor for rent or other obligations solely related to the period after Closing in respect of any Assigned Contract or Assigned Lease; (iv) licenses of or other grants of rights to use Intellectual Property entered into prior to the Petition Date in the ordinary course of business consistent with past practice of the Sellers (and from and after the Petition Date, in the Ordinary Course) that do not materially impair the use of the encumbered property or assets for the purposes for which they are held; (v) Encumbrances, title exceptions or other imperfections of title caused by or resulting from acts of any Buyer or any of Buyers' Affiliates, employees, officers, directors, agents, contractors, invitees or licensees of the Buyers; and (vi) liens for Taxes not yet due and payable.

"Person" shall mean an individual, a partnership, a sole proprietorship, a company, a firm, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a union, a group acting in concert, a Judicial Authority, a Governmental Authority or any other entity or association of any kind.

"Petition Date" shall mean the date of the commencement of the Bankruptcy Cases.

"Prepaid Expenses," as of any date, shall mean prepaid expenses of the Business recorded or required to be recorded as such on the consolidated financial statements of the Business as of such date prepared on a basis consistent with the Audited Financial Statements.

"Preservation Period" shall have the meaning given to such term in Section 8.8(a).

"Proceedings" shall mean any action, suit, arbitration, mediation, litigation, hearing, investigation, inquiry or other proceeding of any kind involving any Governmental Authority, any Judicial Authority or any other Person.

"Purchase Price" shall have the meaning given to such term in Section 2.6(a).

"Purchased Assets" shall have the meaning given to such term in Section 2.1.

"Purchased Insurance Proceeds" shall have the meaning given to such term in Section 2.1(n).

"QST" shall have the meaning given to such term in Section 8.1(d).

"Related Agreements" shall mean any agreement executed pursuant to this Agreement and designated as such by the Parties in writing.

"Release" shall mean any "release" or "threat of release" within the meaning of any Environmental Law, but shall not include any such "release" or "threat of release" of a routine nature permitted by Environmental Laws.

"Remediation" shall mean abatement, removal, remedial action, corrective action or other response action of any kind to mitigate, reduce or contain any Hazardous Substance or Environmental Condition or to reduce risk from any Health and Safety Condition.

"Representatives" of a Person shall mean controlling persons, partners, directors, officers, managers, trustees, employees, agents, representatives, consultants, affiliates, advisors, counsel or nominees of such Person.

"Required Consents" shall have the meaning given to such term in Section 5.6.

"Sale Hearing" shall mean the joint hearing scheduled by the Bankruptcy Court and Canadian Court to approve the transactions contemplated by this Agreement.

"Sale Motion" shall mean a motion filed with the Bankruptcy Court seeking entry of the Bid Procedures Order with respect to the Bankruptcy Cases, approval of the transactions contemplated by this Agreement in respect of the US Sellers and entry of the Sale Order.

"Sale Order" shall have the meaning given to such term in Section 6.1.

"Sellers" shall have the meaning given to such term in the introductory paragraph.

"Sellers Bring Down Certificate" shall have the meaning given to such term in Section 7.1(i).

"Sellers Business Records" shall mean all books, records, papers and files of any kind (including those in electronic form) of the Sellers which are held by or for the Sellers or any of their respective Representatives, but excluding the stock record books and the minute books of each of the Sellers.

"Sellers Termination Fee" shall mean an amount equal to 3.0% of the Base Purchase Price.

"Sellers' 401(k) Plans" shall have the meaning given to such term in Section 8.4(c).

"Selling Subsidiaries" shall have the meaning given to such term in the introductory paragraph.

"Specifically Assumed Employee Liabilities" shall mean Liabilities assumed by Buyers in respect of the Accrued Vacation Amounts.

"Specified Bank Accounts" shall mean the bank accounts identified on Schedule 2.1(o).

"St. Hubert Lease" shall mean the Lease in respect of Leased Real Property at 5675 La Savane, St. Hubert, Quebec, Canada.

"Subsidiary" means, with respect to any specified Person, any other Person of which such specified Person is, at the time, directly or indirectly, (a) owns at least 50% of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally, (b) holds at least 50% of the partnership, limited liability company, joint venture or similar interests or (c) is a general partner, managing member or joint venturer.

"Successful Bidder" shall have the meaning given to such term in the Bid Procedures.

"Tangible Assets" shall have the meaning given to such term in Section 2.1(d).

"Tax" shall mean any US federal, foreign, state, provincial, city, municipal or county income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including tax under Code Section 59A), capital, capital stock, land transfer, stamp, excise, conveyance, documentary, franchise, profits, withholding, social security, unemployment, disability, payroll, health insurance, government pension plan premium or contribution, real property, personal property, sales, use, transfer, registration, value added, withholding, alternative or add-on minimum, import (including custom duty), export, estimated or other tax or assessment of any kind, whether computed on a separate, consolidated, unitary, combined or other basis, including any interest or penalty thereon or addition thereto.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement relating to any Tax, including any information return or report with respect to backup withholding and other payments to Third Parties.

"Taxes and Other Charges" shall have the meaning given to such term in Section 8.1(a).

"Termination Date" shall have the meaning given to such term in Section 9.1(i).

"Third Party" shall mean any Person other than a Party or any of its Affiliates.

"Title IV Plan" shall have the meaning given to such term in Section 4.14(d).

"Trade Payables," as of any date, shall mean any outstanding trade payables of the Sellers as of such date.

"Trade Secrets" means information, in whatever form and whether or not embodied in a tangible medium, including customer lists, concepts, ideas, methods, processes, know-how, methodologies, designs, plans, schematics, bills of materials, drawings, formulae, technical data, specifications, research and development information, technology and product roadmaps, models, data bases, marketing materials and other proprietary or confidential information, in each case to the extent any of the foregoing derives economic value from not being generally known to other Persons who can obtain economic value from its disclosure or use, excluding any Copyrights, Patents or Trademarks that cover or protect any of the foregoing.

"Trademarks" shall mean US, Canadian and foreign trademarks, service marks, logos, slogans, trade dress and trade names, internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction" shall have the meaning given to such term in the recitals.

"Transactional Costs" shall mean all filing fees, title opinions, title insurance, recording fees, surveys, notarial fees, software license fees and all other similar fees and costs arising out of this Agreement, the transfer, assignment, conveyance or delivery of the Purchased Assets or the consummation of the transactions contemplated hereby.

"Transactional Taxes" shall mean all sales, use, goods and services, transfer, conveyance, bulk transfer, excise, stamp, documentary, retail sales, land transfer and other taxes and all other governmental duties, charges, fees, imposts and assessments, and all interest and penalties thereon and additions thereto, imposed at any time by any taxing authority with respect to this Agreement, the transfer, assignment, conveyance or delivery of the Purchased Assets or the consummation of the transactions contemplated hereby.

"Transferred Employees" shall have the meaning given to such term in Section 8.4(a).

"Transition Services Agreement" shall mean a transition services agreement in form reasonably satisfactory to the Parties.

"Unaudited Financial Statements" shall mean the unaudited consolidated financial statements of the Company at May 30, 2009 and for the six-month period ended May 30, 2009.

"United States" or "US" shall mean the United States of America.

"US Sellers" shall mean the Sellers, excluding Canco.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988 and each similar law.

**Section 1.2.    Interpretation**. Unless otherwise expressly stated in this Agreement:

(a)    the words "hereof", "hereby" and "hereunder," and correlative words, refer to this Agreement as a whole and not any particular provision;

(b)    the words "includes" and "including", and correlative words, are deemed to be followed by the phrase "without limitation";

(c)    the word "written," the phrase "in writing" and correlative words and phrases include electronic and facsimile transmissions;

(d)     the words "asset" and "property" are synonymous and include owned, leased and licensed real, personal and intangible property of every kind, including all Claims, contractual rights, tort claims, cash, securities and information;

(e)     the masculine, feminine or neuter form of a word includes the other forms of such word and the singular and plural forms of a word shall have correlative meanings;

(f)     words and phrases defined herein shall have the same meanings in each Closing Document and each Related Agreement, unless expressly stated otherwise in such Closing Document or Related Agreement;

(g)     the words "will" and "shall" are synonymous;

(h)     references to a Person shall include the successors and permitted assigns thereof;

(i)     references to any Consent, Contract, Law, Order, Permit or Tax Return mean such Consent, Contract, Law, Order, Permit or Tax Return as amended, modified or supplemented and, in the case of any Law, also means any successor Law and, in the case of any Contract or Tax Return, includes any and all exhibits, annexes, schedules and documents attached thereto or incorporated therein or constituting a part thereof;

(j)     references to a "board of directors" of a Person mean the board of directors or correlative governing body or authority of such Person and include any committee thereof, references to an "officer" or "director" of a Person mean an officer, director, executive, manager or trustee of such Person or an individual performing correlative functions for such Person, the words "stockholder" and "shareholder" are synonymous and references to the "stockholders" or "shareholders" of a Person mean the stockholders, shareholders or other owners of Equity Interests (including partners and members) of such Person;

(k)     references to an Article, Section, Schedule or Exhibit mean an Article or Section of, or a Schedule or Exhibit to, this Agreement;

(l)     references to "amendments" of a Contract or other document, and correlative terms, include amendments, modifications, supplements, waivers, releases, discharges and other changes thereto as agreed by the parties thereto;

(m)     references to "environment" include ambient air and waters (including subsurface waters) and the ground (including underground) and all sewer systems;

(n)     capitalized terms that are correlative to terms defined in Section 1.1 shall have correlative meanings;

(o)     the word "or" is not exclusive; and

(p)     references to "$" and "dollars" shall mean United States currency.

**Section 1.3.    Exhibits**.  Each of the Exhibits may be changed after the date hereof by mutual agreement of the Sellers and the Buyers and references herein to such Exhibits shall mean such Exhibits as so changed.

# ARTICLE 2

## PURCHASE AND SALE OF THE PURCHASED ASSETS

**Section 2.1.    Transfer of Purchased Assets**.  Upon the terms and subject to the conditions contained herein, at the Closing, the Sellers shall sell, convey, transfer, assign and deliver to Buyers (or, at the request of Buyers, to their designated Affiliate or Affiliates), and Buyers shall (or shall cause their designated Affiliate or Affiliates to) purchase and accept from the Sellers, free and clear of all Encumbrances (other than any Permitted Encumbrances of which the Sale Order or the Approval and Vesting Order do not provide for the Purchased Assets to be sold free and clear) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code and the Approval and Vesting Order, when granted, as applicable, all right, title and interest of Sellers in and to the assets, of every kind and description, used or relating to the Business, other than Excluded Assets (collectively, the "Purchased Assets"), as such Purchased Assets shall exist on the Closing Date, including all of the following assets and properties of the Sellers:

(a)    [Reserved];

(b)    the Owned Real Property listed or described on Schedule 2.1(b);

(c)    the Leases listed or described on Schedule 2.1(c) (as such Schedule 2.1(c) may be amended or be deemed amended pursuant to Section 2.5) (collectively, the "Assigned Leases");

(d)    all of the Sellers' leasehold improvements, furnishings, furniture, office equipment, vehicles, tools, machinery, equipment, structures and movable fixtures and other tangible personal property, including construction in progress, listed in Schedule 2.1(d) (the "Tangible Assets");

(e)    all Inventory of the Sellers, including those items and categories of items listed in Schedule 2.1(e);

(f)    the Contracts listed or described on Schedule 2.1(f) (as such Schedule may be amended or be deemed amended pursuant to Section 2.5) (collectively, the "Assigned Contracts");

(g)    all Intellectual Property (other than Intellectual Property that is an Excluded Asset) together with any Claims against Third Parties for infringement, misappropriation or other violations thereof, whether for any past, present or future infringement, misappropriation or other violation;

(h)    all (i) customer and vendor lists of the Sellers, and (ii) files and documents (including credit information) which relate to customers and vendors of the Sellers;

(i)      all Sellers Business Records;

(j)      all Accounts Receivable and Prepaid Expenses of the Sellers;

(k)      all Permits, to the extent assignable, used in connection with the Business;

(l)      all goodwill associated with the Business or the Purchased Assets;

(m)      to the extent reasonably practicable, telephone and facsimile numbers and internet domain names used in connection with the Business, other than as set forth on Schedule 2.1(m);

(n)      all rights to proceeds of any casualty insurance policy related to loss, destruction or damage to any Purchased Asset relating to events arising after the Effective Date and before the Effective Time, except for proceeds of insurance policies that fund benefits under the Benefit Plans and proceeds of any liability insurance policy (the "Purchased Insurance Proceeds");

(o)      the bank accounts identified on Schedule 2.1(o) (the "Specified Bank Accounts"), provided, however, that the Buyers acknowledge that the transfer of such Specified Bank Accounts to the Buyers will require the consent of the banks holding such Specified Bank Account. The Sellers will, in good faith, use commercially reasonable efforts to facilitate the transfer of such Specified Bank Accounts to the Buyers and the Buyers shall cooperate by providing information to the banks as is reasonably requested, The failure to obtain any such bank consent shall not be a breach of this Agreement or a condition to Closing; and

(p)      the other assets listed in Schedule 2.1(p).

**Section 2.2.** **Excluded Assets**. Notwithstanding anything contained herein to the contrary, only those assets that are Purchased Assets shall be sold, conveyed, transferred, assigned or delivered to the Buyers or their designated Affiliates under this Agreement. Without limiting the generality of the foregoing, the Purchased Assets shall not include any of the following (collectively, and together with all other assets that are not Purchased Assets, the "Excluded Assets"):

(a)      the Purchase Price delivered to Sellers pursuant to this Agreement;

(b)      any Contract that is not an Assigned Contract or any Lease that is not an Assigned Lease (collectively, the "Excluded Contracts");

(c)      all cash on hand, cash on deposit, checks received but not yet deposited or cleared, wire transfers transmitted but not yet received, cash equivalents, certificates of deposit, and marketable securities, including accrued interest thereon, held by or on behalf of the Sellers other than any Purchased Insurance Proceeds;

(d)      all rights or Claims of the Sellers to the refund of any income or franchise Taxes (whether any such refund is received prior to, on or after the Closing Date) or any other Taxes paid relating to any period prior to the Closing;

(e)      except as set forth in <u>Section 2.1(n)</u>, all insurance policies and rights to proceeds thereof;

(f)      all rights to the names and marks "BARZEL" and "DECALOGUE" together with all variations thereof;

(g)      all Equity Interests, including all Equity Interests of Canco in Delta Tube and Company, Limited and Delta Tubes Inc.;

(h)      all Owned Real Property not listed or described on <u>Schedule 2.1(b)</u>;

(i)      the Intercompany Note and any other receivable payable by any Seller or any Affiliate of a Seller to another Seller;

(j)      all bank accounts of the Sellers other than Specified Bank Accounts;

(k)      Avoidance Actions;

(l)      any rights, Claims or causes of action of Sellers under this Agreement; and

(m)      the assets listed on <u>Schedule 2.2(m)</u>.

In no event shall the Buyers or any of their Affiliates purchase or be deemed to have purchased any assets other than the Purchased Assets.

**Section 2.3.**    **Assumed Liabilities**. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyers shall (or shall cause one or more of their Affiliates to) assume and agree to become responsible for, and perform, discharge and pay when due, only the following Liabilities of the Sellers (collectively, the "<u>Assumed Liabilities</u>"):

(a)      all Liabilities under the Assigned Contracts arising, and in respect of any period, after the Closing Date;

(b)      all Liabilities under Assigned Leases relating to events or circumstances first arising and accruing after the Closing Date;

(c)      Buyers' Cure Costs;

(d)      all Liabilities for Transactional Costs and Transactional Taxes payable in connection with the transactions contemplated by this Agreement as set forth in <u>Section 8.1(b)</u>;

(e)      all Liabilities arising from ownership of the Purchased Assets from and after the Effective Time;

(f)      all Liabilities arising from the employment of the Transferred Employees from and after the Effective Time;

(g)      Specifically Assumed Employee Liabilities;

(h)     all Adjusted Trade Payables, solely to the extent included in the calculation of the Final Adjusted Net Working Capital and excluding any Canadian Taxes thereon that are recoverable by the Sellers; and

(i)     all Liabilities under COBRA for all Employees assumed pursuant to Section 8.7.

**Section 2.4.     Excluded Liabilities**.  Notwithstanding anything contained herein to the contrary, neither the Buyers nor any of their Affiliates shall assume or be deemed to have assumed any Liabilities of the Sellers other than the Assumed Liabilities and the Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, other than Assumed Liabilities (the "Excluded Liabilities").  Without limiting the generality of the foregoing, the Excluded Liabilities shall include:

(a)     all Liabilities related to any Excluded Asset;

(b)     all Liabilities with respect to the Intercompany Note or any other payable by any Seller to any of its Affiliates;

(c)     all Liabilities with respect to any Benefit Plan (other than liabilities and obligations under COBRA and Specifically Assumed Employee Liabilities);

(d)     any Tax imposed on the Business or the Purchased Assets that is attributable to any pre-Closing tax period (other than any Transactional Taxes); and

(e)     any Liabilities with respect to any current Employees or former employees of any Seller who is not a Transferred Employee (regardless of when such Liability arises) and any Liabilities with respect to any Transferred Employees that arise prior to the Closing Date, in each case other than Liabilities under COBRA assumed pursuant to Section 8.7 and other than any Specifically Assumed Employee Liabilities (including in such Excluded Liabilities, for the avoidance of doubt, any accrued but unsatisfied wages, salary, benefits, severance, termination and pay in lieu of notice obligations of any employees that arise prior to the Closing Date and that are not Specifically Assumed Employee Liabilities).

**Section 2.5.     Designation of Assigned Contracts and Assigned Leases; Cure Costs.**

(a)     Prior to the Designation Deadline, the Buyers shall designate by notice to Sellers (such notice to be signed and dated by Buyers) each of the Contracts and Leases, if any, that Buyers elect to have assumed and assigned to them as an Assigned Contract or Assigned Lease and, to the extent that any Contract or Lease listed on Schedule 2.1(c) or Schedule 2.1(f) is not so designated, such Schedules shall be amended accordingly; provided, however, that at any time, and from time to time, prior to the Closing Date, the Buyers may, by written notice to the Sellers, cause any Contract or Lease which has not been assumed by the Sellers at the time such notice is received to cease to be an Assigned Contract, Assigned Lease or Designated Contract or Lease (as defined below) and Schedule 2.1(c) or Schedule 2.1(f), as applicable, shall be amended; and, provided further, that notwithstanding the terms of this Section 2.5(a), Buyers

shall not be entitled to designate to have assumed and assigned any Contract or Lease relating to the properties listed on Schedule 2.2(m).

(b)     Except as set forth in Section 2.5(d) below, Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract and Assigned Lease, including all administrative responsibilities associated therewith, in the Bankruptcy Cases, the CCAA Case and otherwise, and shall use commercially reasonable efforts to establish the proper Cure Costs, if any, for each Assigned Contract and Assigned Lease prior to the Closing Date.

(c)     At the Closing, (i) Sellers shall pay all Determined Cure Costs up to the Cure Cost Cap; and (ii) Buyers shall pay all Determined Cure Costs in excess of the Cure Cost Cap (the "Buyers' Cure Costs"). "Determined Cure Costs" means the Cure Costs of a Designated Contract or Lease for which the Cure Cost thereof has been finally established prior to the Closing Date (whether by Order of the Bankruptcy Court or agreement among the Buyer, Sellers and the applicable counterparty thereto). "Designated Contract or Lease" means (i) each Contract listed or described on Schedule 2.1(f), as amended pursuant to Section 2.5(a) or Section 2.5(d); and (ii) each Lease listed or described on Schedule 2.1(c), as amended pursuant to Section 2.5(a) or Section 2.5(d); provided, however, that Designated Contracts or Leases shall not include any Contract or Lease between (A) any Seller, on the one hand, and (B) any Buyer or any of Buyers' Affiliates, on the other hand (each, an "Affiliate Contract"), and Sellers shall not be required to pay any Cure Costs associated with any Affiliate Contract; and, provided further, however, that (i) in the case of the St. Hubert Lease, the St. Hubert Lease shall be deemed a Designated Contract or Lease, but Buyer shall be responsible for the satisfaction of fifty percent (50%) of the Determined Cure Cost relating to the St. Hubert Lease for the month of September and Sellers shall be responsible for the satisfaction of fifty percent (50%) of the Determined Cure Cost of the St. Hubert Lease for the month of September; and (ii) no provision to the contrary in this Agreement shall relieve the Sellers from paying any post-petition administrative expenses for any amounts owed for any Assigned Leases owing on or after October 1, 2009, to the extent required pursuant to the Bankruptcy Code or the CCAA.

(d)     With respect to each Assigned Contract and Assigned Lease for which the Cure Cost is not determined prior to the Closing Date (each, a "Disputed Contract"), the Buyers shall, prior to the Closing, by written notice to the Sellers, elect to (i) require the Sellers, at the Buyers' expense, and in consultation with the Buyers, to use commercially reasonable efforts to cause such Cure Costs for any Disputed Contract to be determined after the Closing Date (whether by Order of the Bankruptcy Court or agreement among the Buyers, Sellers and the applicable counterparty thereto), or (ii) require such Disputed Contract to be removed from the list of Assigned Contracts or Assigned Leases, in which case Schedule 2.1(c) or Schedule 2.1(f), as applicable, shall be amended accordingly, provided, however, that at any time after the Closing, Buyers may instruct Sellers to remove any unresolved Disputed Contract from the list of Assigned Contracts or Assigned Leases. If the Buyers elect the option described in clause (i) above, upon determination of the Cure Cost for any such Disputed Contract, the Sellers shall pay the Cure Cost for such Disputed Contract, to the extent that Cure Costs, in the aggregate, do not exceed the Cure Cost Cap and any Cure Costs, in the aggregate, above the Cure Cost Cap shall constitute Buyers' Cure Cost and shall be an Assumed Liability for which Buyers are solely responsible and for which none of Sellers shall have any liability whatsoever. In the event that an amendment required to be effectuated pursuant to this Section 2.5 has not been promptly

executed and delivered, Schedule 2.1(c) or Schedule 2.1(f), as applicable, shall be deemed amended in accordance with this Agreement.

(e) After the Designation Deadline, Sellers may reject any Contract or Lease which is not a Designated Contract or Lease or any Contract or Lease removed or deemed to have been removed from Schedule 2.1(c) or Schedule 2.1(f) pursuant to Section 2.5(d) above.

**Section 2.6. Purchase Price**. In consideration for the sale, assignment, transfer, conveyance and delivery by the Sellers of the Purchased Assets to Buyers in accordance with and upon the terms and conditions set forth herein, at the Closing, Buyers shall, or cause one or more of their Affiliates to:

(a) pay to the Sellers the amount of $65 million (the "Base Purchase Price") as adjusted pursuant to Section 2.8(b) (the "Purchase Price"), which Purchase Price shall be payable as set forth in Section 2.9; and

(b) assume and agree to duly perform and discharge, when due, all of the Assumed Liabilities in accordance with Section 2.3.

**Section 2.7. Deposit.** Not later than the second (2nd) Business Day after the date on which the Bid Procedures Order is entered by the Bankruptcy Court, upon execution and delivery by all parties thereto of the Deposit Escrow Agreement, Buyers shall deposit $6,500,000 (the "Deposit") by wire transfer of immediately available funds to an escrow agent as may be mutually agreed upon by Sellers and Buyer (the "Deposit Escrow Agent"). The Deposit Escrow Agent shall hold the Deposit in a segregated, interest-bearing account pursuant to an escrow agreement in form and substance mutually agreeable to the Parties (the "Deposit Escrow Agreement"). Funds held pursuant to the Deposit Escrow Agreement shall be free and clear of all Encumbrances, except for Encumbrances pursuant to the Deposit Escrow Agreement and this Agreement. All interest or other earnings on amounts held pursuant to the Deposit Escrow Agreement shall automatically become a part of the Deposit as such interest or earnings accrue.

**Section 2.8. Inventory Count; Purchase Price Adjustments**.

(a) Not earlier than ten (10) Business Days and no later than two (2) Business Days prior to the Closing Date, the Parties shall use commercially reasonable efforts to conduct a joint inventory count of the Inventory (the "Inventory Count"), which Inventory Count shall include physical identification of Inventory and identification of Defective Inventory. At the end of the Inventory Count at each location, the Parties shall jointly and in good faith prepare a report of such Inventory Count reasonably acceptable to the Parties (the "Inventory Report").

(b) By 9 a.m. New York time on the Closing Date, the Sellers shall prepare and deliver to Buyers a statement setting forth the Final Adjusted Net Working Capital, together with reasonably detailed supporting information and calculations. The Final Adjusted Net Working Capital shall be based on the books and records of the Sellers, be prepared in good faith and on the basis consistent with the Audited Financial Statements (including the methodology used for provisions) and shall accurately reflect the results of each Inventory Count (including the Inventory Reports). If the Final Adjusted Net Working Capital is less than $35,116,717 (the "Base Amount"), the Base Purchase Price will be decreased by the amount of such shortfall. If

the Final Adjusted Net Working Capital exceeds the Base Amount, the Base Purchase Price will be increased by the amount of such excess.

**Section 2.9.    Payment Mechanics**.  At the Closing, in satisfaction of their obligations pursuant to Section 2.6(a), Buyers shall:

(a)    pay to the Sellers the amount equal to the difference between (i) the Purchase Price minus (ii) the Deposit Amount, by wire transfer of immediately available funds to the accounts of the Sellers or as otherwise instructed by the Sellers, in each case as provided in a written notice by the Sellers prior to the Closing Date; and

(b)    deliver to the Sellers and the Deposit Escrow Agent the Deposit Release Instructions as set forth in Section 2.11(b)(v).

**Section 2.10.    The Closing**.  Upon the terms and subject to the conditions hereof, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Kelley Drye & Warren LLP, located at 101 Park Avenue, New York, New York  10178, or such other place as Buyers and the Sellers may mutually agree, no later than three (3) Business Days following the date on which the conditions set forth in Article 7 have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or such other date as the Sellers and Buyers may mutually agree (the "Closing Date").  The Closing shall be deemed to have been consummated and become effective for all purposes as of 12:01 a.m. New York time on the Closing Date (the "Effective Time").

**Section 2.11.    Actions at the Closing and Closing Deliveries**.

(a)    Closing Obligations and Deliveries of the Sellers.  At the Closing, the Sellers shall deliver or cause to be delivered to the Buyers:

(i)    one executed and acknowledged limited warranty deed, in a form reasonably acceptable to the Parties, with respect to each parcel of Owned Real Property;

(ii)    one executed assignment and assumption agreement, in a form reasonably acceptable to the Parties, with respect to any rights appurtenant to the Owned Real Property which cannot be transferred by deed;

(iii)    (A) one executed and acknowledged instrument of assignment of Assigned Leases (other than any Assigned Lease that is an Affiliate Contract), in form reasonably acceptable to the Parties, with respect to each Assigned Lease; and (B) one executed and acknowledged instrument of assignment of Assigned Leases that are Affiliate Contracts, in form reasonably acceptable to the Parties;

(iv)    one executed assignment and assumption agreement, in a form reasonably acceptable to the Parties, with respect to the Assigned Contracts;

(v)    executed bills of sale, assignments of vehicular certificates of title and other instruments of transfer or assignment and other appropriate instruments of transfer, in form reasonably acceptable to the Parties, with respect to all Tangible Assets, all Inventory and any other Purchased Assets not transferred or assigned by any other document or instrument described in this Section 2.11(a);

(vi)    instruments of assignment of Intellectual Property that is owned by Sellers and included in the Purchased Assets, if any, in form for recordation with the appropriate Governmental Authorities and otherwise in form reasonably acceptable to the Parties;

(vii)    one executed document of assignment or transfer with respect to any Permits, to the extent assignable;

(viii)    one certified copy of the resolutions of the boards of directors of each of the Sellers evidencing the authorizations described in Section 4.2;

(ix)    a certified copy of the Sale Order;

(x)    a certified copy of the Approval and Vesting Order, which shall have become a Final Order, unless such requirement is waived by the Buyers as set forth in Section 7.1(h);

(xi)    certificates executed by each Seller (other than Canco), in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person;

(xii)    all Sellers Bring-Down Certificates;

(xiii)    a counterpart signature page to each Related Agreement, duly executed by Sellers, as applicable;

(xiv)    any Purchased Insurance Proceeds received prior to Closing; and

(xv)    such other certificates, instruments and documents, in form and substance reasonably satisfactory to Buyers, as Buyers may reasonably request.

(b)    Closing Obligations and Deliveries of Buyers.  At the Closing, Buyers shall deliver, or cause to be delivered, to the Sellers:

(i)    payment of the Purchase Price as set forth in Section 2.9;

(ii)    one executed copy of each assignment and assumption agreement and each other instrument of assignment or transfer delivered hereunder, in each case in form reasonably satisfactory to the Parties, which shall, by the terms thereof, provide for execution by Buyers;

(iii)    a counterpart signature page to each Related Agreement, duly executed by Buyers, as applicable;

(iv)     replacement letters of credit and performance bonds and other undertakings listed on Schedule 2.11(b)(iv), solely to the extent such letters of credit and performance bonds secure Assumed Obligations in respect of Assigned Contracts or Assigned Leases or Permits that have been assigned pursuant to this Agreement;

(v)     the certificate referred to in Section 7.2(j);

(vi)     the written instructions in form reasonably acceptable to the Parties instructing the Deposit Escrow Agent to release the Deposit to the Sellers (the "Deposit Release Instructions"); and

(vii)     such other certificates, instruments and documents in form and substance reasonably acceptable to the Sellers, as the Sellers may reasonably request.

Section 2.12.     **Recording of Documents**.  Buyers shall be responsible, at their sole cost and expense, for the filing or recording of such deeds, assignments, instruments or documents delivered by the Sellers hereunder, however effected, and for the preparation, recording and filing of such additional assignments, instruments or documents as may be necessary or appropriate to perfect the right, title or interest of Buyers to or in the Purchased Assets; provided that the Sellers shall reasonably cooperate with Buyers in accordance with Section 5.4.

Section 2.13.     **Permits and Undertakings**.

(a)     Notwithstanding anything in this Agreement to the contrary, Sellers' obligation to convey to Buyers all rights of Sellers under the Permits consists of (i) providing, if required by Law, notices of intent to transfer the Permit to Buyers in accordance with any Governmental Authority regulations governing such Permit transfer, (ii) providing information as required by any Governmental Authority regulations governing such Permit transfer; and (iii) delivering the instruments of transfer described in Section 2.11(a)(vii) in respect of assignable Permits (including Permits with respect to which the requisite Consents have been obtained).  In no event shall Sellers be required to deliver any additional documents that (i) require Sellers to make any additional representations, warranties or covenants, express or implied, not contained in this Agreement, or (ii) otherwise expands the liabilities or obligations of Sellers related to the transactions contemplated hereby.

(b)     Upon the reasonable request of Buyers in writing, from the Effective Date until the Closing Date, the Sellers shall use commercially reasonable efforts to obtain any Third Party Consents necessary to the assignment or transfer of any Permits used or held by any Seller which are so assignable or transferable, provided that Buyers shall bear all costs related thereto. Buyers shall, at their sole cost and expense, promptly cooperate with the Sellers and provide to Sellers copies of and access to all books, records, files, work and other papers, premises, personnel, data and other documents and information that Buyers may have in their possession, as the Sellers may reasonably request for the purpose of obtaining such Consents.

**Section 2.14. Assignment of Purchased Assets**.

(a)     To the maximum extent permitted by the Bankruptcy Code or the CCAA, as applicable, the Assigned Contracts and Assigned Leases shall be assumed by Sellers and assigned to Buyers pursuant to Section 365 of the Bankruptcy Code or the CCAA as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if any attempted assignment without the Consent of a Third Party, which Consent has not been obtained prior to the Closing would be legally invalid (after giving effect to the Sale Order, the Bankruptcy Code and the Approval and Vesting Order). If with respect to any Purchased Asset such Consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code or the CCAA other than as a result of the failure to pay Cure Costs, then such Purchased Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price.

(b)     Prior to the Closing, Sellers shall use commercially reasonable efforts to obtain all Consents described in Section 2.14(a); provided, however, that Sellers shall not be obligated to pay any consideration therefor to any Third Party in excess of the Cure Cost Cap (in the aggregate with all Cure Costs being paid by the Sellers) or materially to change or disrupt any operations or other activities. Buyers shall, at their cost and expense, promptly provide cooperation to the Sellers and provide Sellers with copies of and access to all books, records files, work and other papers, premises, personnel, data and other documents and information that Buyers may have in their possession, that the Sellers may reasonably request for the purpose of obtaining such Consents. No provision of Section 2.13 or Section 2.14 shall require Buyers to provide competitive sensitive information or privileged information.

**Section 2.15. Allocation of Purchase Price.**  The Sellers and Buyers shall allocate the sum of the Purchase Price (and any adjustments thereto pursuant to Section 2.8(b)) plus the amount of the Assumed Liabilities among the Purchased Assets in accordance with Schedule 2.15, which shall be prepared by the Buyers and delivered to Sellers within fifteen (15) days after the Effective Date. If, within fifteen (15) days after delivery of such allocation, the Sellers notify the Buyers in writing that the Sellers object to the allocation, the Sellers and the Buyers shall use their respective good faith efforts to resolve such dispute within ten (10) days, If the Sellers and the Buyers are unable to resolve such dispute within such ten (10) days, then promptly after the Closing, the Sellers and the Buyers shall jointly retain a nationally recognized accounting firm mutually acceptable to the Sellers and Buyers (the "Accounting Referee"), to resolve the disputed items.  Upon resolution of the disputed items, the allocation shall be adjusted to reflect such resolution. The costs, fees and expenses of the Accounting Referee shall be borne equally by the Sellers and the Buyers.  The Sellers and Buyers shall report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with the allocation set forth on Schedule 2.15 and shall not take a position (whether in audits, Tax Returns, or otherwise) that is inconsistent with the foregoing, except as otherwise required by Law.

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES REGARDING THE BUYERS

The Buyers hereby represent and warrant to the Sellers as of the date hereof as follows:

**Section 3.1.     Organization**.  Each Buyer is a corporation, partnership, limited liability company or other entity that is duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation (to the extent such concept is recognized in such jurisdiction).  Each Buyer has the corporate power and authority necessary to (a) execute, deliver and perform its obligations under this Agreement, the Closing Documents and the Related Agreements, (b) consummate the transactions contemplated hereby and thereby to be consummated by it, and (c) conduct its business as currently conducted by it.  Each Buyer is duly qualified or licensed and in good standing as a foreign corporation authorized to do business under the Laws of each jurisdiction in which the ownership, leasing or use of assets by it or the conduct of business by it requires such licensing or qualification, except where the failure to be so licensed or qualified and in good standing would not have a material adverse effect on such Buyer, the execution, delivery or performance of this Agreement, or any of the Closing Documents or the Related Agreements by such Buyer or the consummation of the transactions contemplated hereby and thereby to be consummated by it.  The Buyers are "Canadian-controlled entities" within the meaning of the Investment Canada Act.  No Buyer is in violation of any provision of its Organizational Documents.

**Section 3.2.     Authorization, Execution and Enforceability**.  The execution and delivery of this Agreement, the Closing Documents and the Related Agreements, in each case to which each Buyer is a party, by each Buyer, the performance by each Buyer of its obligations hereunder and thereunder and the consummation by each Buyer of the transactions contemplated hereby and thereby to be consummated by it have been duly authorized by all necessary corporate action on the part of each Buyer.  This Agreement constitutes and, as of the Closing each of such Closing Documents and such Related Agreements will constitute, a legal, valid and binding obligation of each Buyer, enforceable against each Buyer in accordance with its respective terms, except insofar as enforceability may be limited by bankruptcy, insolvency, moratorium or other Laws which may affect creditors' rights and remedies generally and by principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law).  This Agreement has been, and, as of the Closing each such Closing Document and such Related Agreement will have been, duly executed and delivered by each Buyer.

**Section 3.3.     No Breach**.  The execution and delivery of this Agreement, the Closing Documents and the Related Agreements, by each Buyer, the performance by each Buyer of its obligations hereunder and thereunder, and the consummation by each Buyer of the transactions contemplated hereby and thereby to be consummated by it does not and will not (a) conflict with, result in any violation of or constitute a default under the Organizational Documents of each Buyer or its Subsidiaries, or (b) result in a violation of or conflict with any Law or any Order applicable to each Buyer or its Subsidiaries, in the case of clause (b) above, which violation or conflict would have a material adverse effect on the execution, delivery or performance of this Agreement, any of the Closing Documents or the Related Agreements, by

each Buyer, or the consummation by each Buyer of the transactions contemplated hereby and thereby to be consummated by it.

Section 3.4.    Consents.  Except as otherwise contemplated by Section 5.3, no Consent is required to be obtained from, no notice is required to be given to and no filing is required to be made with any Person (including any Governmental Authority) by the Buyers in order (a) for this Agreement, each of the Closing Documents and the Related Agreements, in each case to which Buyers are a party, to constitute a legal, valid and binding obligation of the Buyers or (b) to authorize or permit the execution, delivery or performance of this Agreement, any of such Closing Documents or such Related Agreements, by the Buyers or the consummation of the transactions contemplated hereby or thereby to be consummated by them.

Section 3.5.    Financing.  The Buyers have sufficient funds available on hand to enable Buyers (a) to pay the Purchase Price and all fees and expenses related to the transactions contemplated hereby, to the extent that this Agreement or any of the Related Agreements requires them to pay such fees and expenses, and (b) to pay and discharge all of their other liabilities and obligations when due.  The funds available as described in clause (a) of the preceding sentence are not committed or reserved for any other purpose and are not necessary, and are not planned or expected to be used, for any purpose described in clause (b) of the preceding sentence.  The use of the funds described in clause (a) of the preceding sentence for the purpose described in such clause (a) is not subject to any condition or contingency.

Section 3.6.    Brokers; Finders.  No finder, broker or similar intermediary acting on behalf of the Buyers or any of their Affiliates is entitled to a commission, fee or other compensation in connection with the negotiation, execution or delivery of this Agreement or any of the Related Agreements or the consummation of any of the transactions contemplated hereby or thereby for which Sellers are or will become liable, and Buyers shall hold harmless and indemnify Sellers from any Claims with respect to any such fees or commissions.

Section 3.7.    Adequate Assurances Regarding Assigned Contracts.  Buyers are and, as of the Closing Date and thereafter, will be capable of satisfying the conditions contained in Sections 365(b) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

Section 3.8.    Canadian Tax Registration.  4513614 Canada Inc. is duly registered for the purposes of the Tax imposed under Part IX of the *Excise Tax Act* (Canada) and under an *Act respecting Quebec Sales Tax* under registration numbers 851486456 RT0001 and 1215634937 TQ0001, respectively.  Such registrations have not been cancelled and are not in the process of being cancelled.

# ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLERS

The Sellers represent and warrant to the Buyers, as of the date hereof, as follows, except in all cases as disclosed in the respective referenced schedules attached hereto or in such other schedules attached hereto with respect to which applicability of such disclosure is reasonably apparent on its face:

**Section 4.1.** **Organization**. Each Seller is a corporation, partnership, limited liability company or other entity that is duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation (to the extent such concept is recognized in such jurisdiction). Each Seller has the corporate, partnership, limited liability company or other organizational power and authority necessary to conduct the Business as currently conducted by it. Subject to requisite Bankruptcy Court approval and Canadian Court approval, the Company and each Selling Subsidiary has the corporate, partnership, limited liability company or other organizational power and authority necessary to (a) execute, deliver and perform its obligations under this Agreement and, to the extent that it is a party thereto, the Closing Documents and the Related Agreements and (b) consummate the transactions contemplated hereby and thereby to be consummated by it. The Company and each Seller Subsidiary is duly qualified or licensed and in good standing as a foreign corporation authorized to do business under the Laws of each jurisdiction in which the current ownership, leasing or use of assets by it or the current conduct of business by it requires such licensing or qualification, except where the failure to be so licensed or qualified and in good standing would not, individually or in the aggregate, have a Material Adverse Effect. Schedule 4.1 sets forth each jurisdiction under the Laws of which the Company and each Selling Subsidiary is formed and so licensed or qualified.

**Section 4.2.** **Authorization, Execution and Enforceability**. Subject to requisite Bankruptcy Court approval and Canadian Court approval, the execution and delivery of this Agreement, the Closing Documents and the Related Agreements by each applicable Seller, the performance by each Seller of its obligations hereunder and thereunder and the consummation by the Sellers of the transactions contemplated hereby and thereby to be consummated by it have been duly authorized by all necessary corporate, partnership, limited liability company or other organizational action on the part of the Sellers. Subject to requisite Bankruptcy Court approval and Canadian Court approval, this Agreement constitutes, and, as of the Closing each of the Closing Documents and the Related Agreements will constitute, a legal, valid and binding obligation of each Seller, enforceable against such Seller in accordance with its respective terms, except insofar as enforceability may be limited by general principles of equity. This Agreement has been, and, as of the Closing each Closing Document and Related Agreement will have been, duly executed and delivered by each Seller party thereto.

**Section 4.3.** **No Breach**. Subject to the Consents set forth on Schedule 4.4 having been obtained, and Sellers having received the requisite Bankruptcy Court approval and Canadian Court approval, the execution and delivery of, and performance by the Sellers under, this Agreement, the Closing Documents and the Related Agreements and the consummation of the transactions contemplated hereby and thereby to be consummated do not and will not (a) conflict with, result in any violation of or constitute a default under the Organizational

Documents of any Seller, or (b) result in a violation of or conflict with any Law or any Order applicable to any Seller or any Purchased Asset, except in the case of clause (b) above, for violation or conflict that would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 4.4.  Consents**.  Other than requisite Bankruptcy Court and Canadian Court approvals and any approval required pursuant to Section 5.3, except as set forth in Schedule 4.4, no Consent is required to be obtained from any Governmental Authority in connection with the execution and delivery of this Agreement, each of the Closing Documents and the Related Agreements by the Sellers or the performance by Sellers of their obligations hereunder or thereunder, the failure of which to obtain would reasonably be expected to result in a Material Adverse Effect.

**Section 4.5.  Financial Statements**.  Set forth on Schedule 4.5 are true and complete copies of the Unaudited Financial Statements, including a balance sheet and statements of operations and cash flows for the six-month period ended May 30, 2009.  The Unaudited Financial Statements (i) are correct and complete in all material respects and have been derived from the books and records of the Sellers, (ii) were prepared in accordance with GAAP consistently applied with the Audited Financial Statements (except as may be indicated in such statements or in the notes thereto), and (iii) fairly present in all material respects the consolidated financial position of the Sellers as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended, subject to year-end audit adjustments and the absence of footnotes in the case of such Unaudited Financial Statements.

**Section 4.6.  Tax Matters**.  Except as set forth on Schedule 4.6:

(a)     All material Tax Returns required to be filed by or with respect to the Sellers have been timely filed (taking into account all extensions of due dates) and are correct and complete in all material respects.

(b)     All material Taxes required to be paid by the Sellers have been paid.

(c)     No material audit or examination of any such Tax Return of Sellers is currently pending or, to the Knowledge of Sellers, threatened by any Tax authority.  No Seller has received written notice that it is subject to Tax in any jurisdiction where it does not file Tax Returns.

(d)     There are no material Encumbrances on the Purchased Assets that arose in connection with a failure (or alleged failure) of the Sellers to pay any Taxes.

(e)     None of the Purchased Assets sold by Canco will constitute a "United States real property interest" within the meaning of Section 897(c) of the Code for US federal income tax purposes.

(f)     Canco is not a non-resident of Canada as defined in the *Income Tax Act* (Canada).

(g)     None of the Sellers that is a non-resident of Canada, as defined in the *Income Tax* (Canada) is selling any Purchased Asset that is "taxable Canadian property" (as defined in the *Income Tax Act* (Canada)).

(h)     Canco is duly registered for the purposes of the Tax imposed under Part IX of the *Excise Tax Act* (Canada) and under an *Act respecting the Québec Sales Tax* under the following numbers:

> GST registration number: 886411560 RT0001
> QST registration number: 1021280565 TQ0001.

**Section 4.7.     Real Property**.  Schedule 4.7 sets forth a true and complete list of (a) all of the material real property owned by Sellers (together with all written easements, licenses and appurtenances benefiting such material owned real property, collectively, the "Owned Real Property") (including the name of the record title holder thereof); (b) all unexpired leases, subleases, licenses or other occupancy agreements (collectively, the "Leases") under which the Sellers have the right or option to use or occupy real property (the "Leased Real Property"), (c) all of the material written Contracts (including those relating to leases from or to Third Parties and easements granted by or to Third Parties) pertaining to the Owned Real Property or the Leased Real Property to which any Seller is a party, (d) to the Knowledge of the Sellers, all of the easements, rights of way and other rights and Interests (other than those set forth in such Contracts) pertaining to the Owned Real Property or the Leased Real Property, (e) any leases, subleases, licenses or other occupancy agreements to which any of the Owned Real Property or Leased Real Property is subject; and (f) to the Knowledge of the Sellers, all of the Proceedings currently pending by or against, and all of the Orders issued to, the Sellers which pertain to the Owned Real Property, Leased Real Property or Leases which would, individually or in the aggregate, have a Material Adverse Effect.

**Section 4.8.     Title to Purchased Assets**.  The Sellers have good and valid title to the Purchased Assets (or, in the case of property leased or licensed by any Sellers, a valid leasehold or license).  Immediately prior to Closing, Sellers will have, and, upon delivery to Buyers on the Closing Date, and subject to the terms of the Sale Order and the Approval and Vesting Order, Sellers will transfer to Buyers, good and valid title to, or, in the case of property leased or licensed by any Sellers, a valid leasehold or licenses interest in, all of the Purchased Assets, free and clear of all Encumbrances, except for Assumed Liabilities and Permitted Encumbrances of which the Sale Order or the Approval and Vesting Order do not provide for the Purchased Assets to be sold free and clear.

**Section 4.9.     Contracts**.  Except for those Contracts set forth on Schedules 4.7, 4.12(a) and 4.14 and except for those confidentiality agreements, corresponding in all material respects to the Confidentiality Agreement, and those Contracts with Representatives in each case that relate to the process leading up to the negotiation, execution and delivery of this Agreement, Schedule 4.9 sets forth all written Contracts to which any Seller is a party and:

(a)     which involve future expenditures or receipts in excess of $500,000 with respect to the purchase, sale or lease of goods or personal or real property;

(b)     which involve future expenditures or receipts with respect to the purchase or sale of services (including utilities) in excess of $500,000; or

(c)     which involve the handling, treatment, storage, transportation, recycling, reclamation or disposal of Hazardous Waste in the future.

**Section 4.10.  Assigned Contracts and Assigned Leases**.  Except as set forth herein or in any Schedule with respect to the Contracts listed therein, to the Knowledge of the Sellers, each of the Assigned Contracts and Assigned Leases is in full force and effect in all material respects and is a valid and binding obligation of each Seller party thereto and, to the Knowledge of Sellers, the other parties thereto, in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 4.10, and (z) as would not, individually or in the aggregate, have a Material Adverse Effect.  Upon entry of the Sale Order, the Approval and Vesting Order and payment of the Cure Costs, (i) no Seller will be in default or breach of its obligations under any Assigned Contract or Assigned Lease, (ii) no condition exists which, with the passage of time, the giving of notice, or both, would constitute a default or breach by any Seller under any of the Assigned Contracts or Assigned Leases, which default or breach would reasonably be expected to have a Material Adverse Effect, and (iii) to the Knowledge of Sellers, none of the other parties to any of the Assigned Contracts or Assigned Leases is in default or breach thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect.  The Sellers have provided to Buyers true and complete copies of all Assigned Contracts and Assigned Leases.

**Section 4.11.  Permits**.  Schedule 4.11(a) sets forth all of the material Permits (including environmental, health and safety Permits) and all pending applications therefore which have been issued to, or are held or used by, the Sellers, which are or, upon issuance, would reasonably be expected to be material to the conduct of Business.  To the Knowledge of Sellers, except as set forth on Schedule 4.11(b), Schedule 4.11(a) sets forth all material permits necessary to conduct the Business as currently conducted.  As of the date of this Agreement, except as would not reasonably be expected to have a Material Adverse Effect or as otherwise set forth on Schedule 4.11(c), each such Permit is valid and in full force and effect, and is not subject to any pending or, to the Knowledge of Sellers, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any material respect.

**Section 4.12.  Intellectual Property Matters**

(a)     Schedule 4.12(a) sets forth a true and complete list of all US, Canadian and other foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights; and (iv) licenses and non-assertion rights granted to or by the Sellers pursuant to written Contracts pertaining to Patents, Trademarks, Copyrights, inventions, trade secrets, know-how and process technology (including manufacturing and engineering information) or technical information, in each case which are owned or licensed by a Seller as of the Effective Date and which are material to the conduct of the Business.

(b)     Except as set forth in Schedule 4.12(b), to the Knowledge of Sellers, (i) the conduct of the Business by Sellers as currently conducted does not infringe, misappropriate or otherwise violate any Person's intellectual property rights in any material way, and no such Claims are pending or threatened in writing against Sellers; and (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property owned by Sellers, and no such Claims are pending or threatened in writing against any Person by Sellers.

(c)     The Purchased Assets and any right provided to Buyers pursuant to the transactions contemplated by this Agreement include all Patents, Trademarks and Copyrights used in the conduct of the Business as it is presently conducted by Sellers other than the Excluded Assets described in Section 2.2(f).

(d)     The Sellers have taken reasonable steps to protect the Intellectual Property and to maintain the confidentiality (subject to disclosure under legally binding non-disclosure agreements) of all information that constitutes a material Trade Secret or that was intended to be protected as a Trade Secret of any Seller that is used in connection with the Business.

(e)     Except as set forth on Schedule 4.12(e), no licenses of Intellectual Property have been granted by or to the Sellers except for licenses of commercially available "off-the-shelf" software granted to the Sellers.

**Section 4.13.  Sufficiency of Purchased Assets**.  Except as otherwise provided in Schedule 4.13, the Purchased Assets, together with the Excluded Assets listed in clauses (c) through (m) of Section 2.2 and Contracts and Leases listed in Schedules 4.7, 4.9, 4.12(a) and 4.14 that are not Assigned Contracts or Assigned Leases, will, as of the Closing Date, constitute all of the material assets and rights necessary to conduct the Business substantially as presently conducted by Sellers.

**Section 4.14.  Human Resources; Benefit Plans**.

(a)     Except as set forth in Schedule 4.14(a), none of the Sellers is a party to any collective bargaining agreement or any other Contract with a labor union or association.  To the Knowledge of Sellers, there are no current or threatened attempts to organize or establish any trade union or employee association with respect the Sellers except for such existing trade unions or employee associations set forth on Schedule 4.14(a).  Except as set forth in Schedule 4.14(a), there are no strikes, slowdowns, picketing, work stoppages, labor troubles or other similar events in which any of the Employees are participating or, to the Knowledge of Sellers, are threatening to participate and which, individually or in the aggregate, have had, are having or would reasonably be expected to have a Material Adverse Effect.

(b)     Schedule 4.14(b) sets forth a true and complete list of each director, officer, Employee, independent contractor and consultant of the Sellers as of the Effective Date, specifying each Employee's employee number, if any, position, salary, wage rate, commissions and consulting fees, bonus arrangements, benefits, length of service, facility from which they work and information as to whether any such employee is laid-off or on leave of absence.

(c)     Schedule 4.14(c) lists each material Domestic Benefit Plan and each material Foreign Benefit Plan.

(d)     No Domestic Benefit Plan is (i) a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA (a "Multiemployer Plan"), (ii) a single employer plan subject to Title IV of ERISA (a "Title IV Plan") or (iii) an employee benefit plan that is maintained by more than one employer within the meaning of Section 413(c) of the Code (a "Multiple Employer Plan").

Section 4.15. **Compliance with Laws**.  Except as set forth in Schedule 4.15, and except as would not, individually or in the aggregate, have a Material Adverse Effect, to the Knowledge of Sellers, Sellers are not in violation of any Law or any Order applicable to the operation of the Business.

Section 4.16. **Environmental and Health and Safety Matters**.  Except as set forth in Schedules 4.16, or as would not, individually or in the aggregate, have a Material Adverse Effect:

(a)     the current operations of the Business comply with Environmental Law and Health and Safety Law and Sellers have not received written notice from any Person or Governmental Authority alleging that the activities of the Business are in violation of any Environmental Law or Health and Safety Law, or asserting any Environmental Claims, nor do Sellers have any unresolved citations alleging any violations of Environmental Law or Health and Safety Law;

(b)     to the Knowledge of Sellers, the Sellers have not caused or permitted, and there has not been, any Release of any Hazardous Substances that requires reporting under applicable Environmental Law at, on, in or under any of the Owned Real Property or any Leased Real Property, and none of such properties has been used by the Sellers or, to the Knowledge of Sellers, any other Person, as a landfill or storage, treatment or disposal site for any type of Hazardous Substance or non-hazardous solid wastes;

(c)     to the Knowledge of Sellers, Sellers are not subject to any outstanding written notice, consent decree or Order from, or agreement with, any Governmental Authority or other Person in respect of which Sellers (i) are required to incur any material Environmental Liabilities with respect to any of the Owned Real Property or Leased Real Property, or (ii) requires the Sellers to conduct an investigation or subjects the Sellers to any investigation by any Governmental Authority as to whether any material Remediation is needed to respond to a Release of Hazardous Substances at the Owned Real Property or any Leased Real Property;

(d)     to the Knowledge of Sellers, and other than that which would not reasonably be expected to give rise to a material Environmental Liability, the Sellers have filed all notices, reports and information required to be filed by them under any Environmental Laws in connection with the conduct of the Business;

(e)     to the Knowledge of Sellers, no Proceedings by any Governmental Authority or other Person are pending or, threatened with respect to any Environmental Condition or Health and Safety Condition, in each case, relating to the Owned Real Property, the Leased Real Property, the Employees or the conduct of the Business; and

(f) to the Knowledge of Sellers, Sellers are not subject to (i) any Order with respect to, or (ii) any investigation by any Governmental Authority with respect to any failure to comply with any Health and Safety Law or Environmental Laws relating to the Business.

Except with respect to the environmental permits referenced in Section 4.11 above, this Section 4.16 contains the sole and exclusive representations and warranties by the Sellers with respect to environmental matters and health and safety matters. Except as expressly set forth in this Section 4.16, it is expressly agreed between the Buyers and the Sellers that the Sellers makes no representations or warranties of any kind with respect to the presence or absence of Hazardous Substances at, on, near or originating from any Owned Real Property, each of which is being sold and conveyed to, and purchased and accepted by, Buyers, in its present, strict "as is, where is" condition as of the Closing Date and with all faults. Except as otherwise provided herein, Buyers agree to release and waive any claims of any type, whether arising in contract or tort, arising from Environmental Liabilities relating to or arising from the operation of the Business prior to the Closing or the presence of Hazardous Substances at, on, near or originating from the Owned Real Property.

**Section 4.17. Insurance.** Schedule 4.17 sets forth each material insurance policy (including a policy providing property, casualty, liability and workers' compensation coverage and bond and surety arrangements) held by the Sellers.

**Section 4.18. Brokers; Finders.** Except as set forth on Schedule 4.18 and except for the engagement of Houlihan Lokey, no finder, broker or similar intermediary acting on behalf of the Sellers is entitled to a commission, fee or other compensation in connection with the negotiation, execution or delivery of this Agreement or any of the Related Agreements or the consummation of any of the transactions contemplated hereby or thereby.

**Section 4.19. Litigation; Proceedings.** Except as set forth in any Schedule with respect to the matters covered thereby, Schedule 4.19 sets forth (i) all Proceedings currently pending by or against or, to the Knowledge of the Sellers, threatened against the Sellers with respect to the Business and; (ii) all Orders currently outstanding issued in respect of the Sellers with respect to the Business, other than Proceedings and Orders with respect to Proceedings (including product liability, product warranty and worker's compensation Proceedings) in which the maximum amount claimed or in controversy does not exceed $100,000 or in which the maximum amount claimed or in controversy in all Proceedings involving substantially similar issues outstanding at any time after July 31, 2009 does not exceed $100,000.

**Section 4.20. Operation of the Business.** As of the Effective Date, except as set forth in Schedule 4.20, since the date of the last Audited Financial Statement, there has been no material damage to, or material loss, affecting any material portion of the Purchased Assets or any material Purchased Asset (regardless of whether such damage or loss is covered by insurance).

## ARTICLE 5

## PRE-CLOSING COVENANTS

**Section 5.1.    Conduct by the Buyers**.

(a)    The Buyers shall, and shall cause their Affiliates to, refrain from taking any action which would cause any representation or warranty contained in Article 3 to be untrue or incorrect in any material respect as of the Closing.

(b)    Subject to the express provisions of this Agreement, Buyers shall use commercially reasonable efforts (i) to perform and satisfy all conditions to each of Buyers' obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by Buyers under this Agreement, and (ii) to cause the Closing to occur as promptly as reasonably practicable and Buyers shall not, and shall not permit any of their Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby.

**Section 5.2.    Conduct by the Sellers**.  Sellers covenant and agree that, except (x) as expressly contemplated by this Agreement, (y) with the prior written consent of Buyers (which consent shall not be unreasonably withheld or delayed) and (z) as otherwise required by Law, after the Effective Date and prior to the Closing Date:

(a)    Sellers shall carry on the Business in the Ordinary Course, taking into account Sellers' status as debtors in possession and subject to the requirements of the DIP Budget;

(b)    Sellers shall provide to the Buyers, their current and prospective lenders, underwriters, placement agents and Representatives, reasonable access during normal business hours to the Sellers Business Records upon reasonable request with due regard to minimizing interference with the conduct of the Business; provided, however, that no such access shall be provided (i) with respect to technical, financial or operating Sellers Business Records (including price and cost data on any basis other than an aggregate basis) which, in the reasonable opinion of the Sellers, contain information the disclosure of which to competitors of the Business might be detrimental to the Sellers and which is not subject to a confidentiality agreement, (ii) to the extent that such access would (A) violate the terms of any Contract to which the Sellers is a party, or otherwise any Law or any Order or (B) result in the loss of any attorney-client or other privilege or (iii) with respect to Sellers Business Records covered by U.S. export control Laws, to any Person who is not a citizen of the United States unless such Person has obtained all licenses required under such Laws;

(c)    Sellers shall use commercially reasonable efforts to refrain from taking any action that would cause any representation or warranty contained in Article 4 to be untrue or incorrect as of the Closing to the extent it would have a Material Adverse Effect;

(d)     Subject to Bankruptcy Court and Canadian Court approval of the transactions contemplated by this Agreement, the terms of the Bid Procedures Orders and the express provisions of this Agreement, the Sellers shall use commercially reasonable efforts (i) to perform and satisfy all conditions to the Sellers' obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by the Sellers under this Agreement; and (ii) to cause the Closing to occur as promptly as reasonably practicable, and the Sellers shall not, and shall not permit any of their Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby;

(e)     Sellers shall not:

(i)     other than the sale of Inventory in the Ordinary Course and other than the incurrence of Encumbrances pursuant to the Sellers' debtor-in-possession financing (the "DIP Facility") (none of which Encumbrances shall burden or otherwise affect any of the Purchased Assets as of the Closing after giving effect to the Sale Order and the Approval and Vesting Order), sell, lease, transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or voluntarily suffer to be imposed any Encumbrance (other than Permitted Encumbrances identified in clauses (ii), (iv) (v) or (vi) of the definition of Permitted Encumbrances) on, any of the Purchased Assets (except for cash other than the Purchased Insurance Proceeds);

(ii)     amend their Organizational Documents

(iii)     fail to maintain the Purchased Assets in their present condition, reasonable wear and tear excepted;

(iv)     amend any of the Assigned Contracts and Assigned Leases or any other Contract or Lease included in the Purchased Assets other than non-material amendments made in the Ordinary Course;

(v)     make any change in any accounting principles, policies or practices, except as required by GAAP;

(vi)     file a plan of reorganization or agreement of complete or partial liquidation, dissolution or restructuring that prevents the consummation of the transactions contemplated by this Agreement;

(vii)     reject any Designated Contract or Lease; or

(viii)     enter into any Contract obligating any Seller to take any of the actions described in the preceding clauses of this Section 5.2(e).

(f)     Nothing contained in this Agreement shall restrict the Sellers from:

(i)     entering into any debtor-in-possession financing agreement or amending or modifying the same;

(ii)     preparing Tax Returns on a basis consistent with past practice, filing such Tax Returns on a timely basis and paying Taxes due as shown thereon on a timely basis;

(iii)     determining whether and the extent to which targets for bonuses and equity incentives of employees of the Sellers for 2009 have been achieved;

(iv)     making any payments under any employee incentive plan that is approved by the Bankruptcy Court and provided for in the DIP Budget;

(v)     making any payment or taking any action required under any Contract (including any employee benefit or welfare plan) then in effect or under any applicable Law, Order or Permit;

(vi)     changing any accounting principle, practice or policy, recording any charge or taking any other action, in each case required to be taken by any Seller in accordance with GAAP; or

(vii)     entering into a Contract obligating any Seller to take any of the actions described in the preceding clauses of this Section 5.2(f).

(g)     Notwithstanding anything contained herein to the contrary, except as otherwise agreed in writing by the Sellers and the Buyers, the only capital expenditures which the Sellers shall make or be required to make are capital expenditures which they are obligated to make under Contracts with Third Parties or which have become necessary, as determined in good faith by the Sellers, in order to maintain the Business as currently conducted by the Sellers.

(h)     Notwithstanding anything to the contrary, Sellers may transfer all or a portion of any Excluded Asset or repay all or a portion of any Excluded Liability; provided, however, that Sellers shall not transfer any Contract or Lease prior to the Designation Deadline.

(i)     Nothing in this Agreement shall be interpreted to give the Buyers, directly or indirectly, rights to control, influence or direct the operations of the Sellers prior to Closing.

**Section 5.3.  Governmental Filings**.

(a)     As soon as reasonably practicable following entry of the Bid Procedures Orders, each Party shall use commercially reasonable efforts make any and all premerger filings or other notifications, if any, required by any Governmental Authority under the HSR Act or the Competition Act and diligently and promptly respond to all inquiries from such Governmental Authorities in connection with such filings, including providing supplemental information that may be reasonably requested by such Governmental Authorities, and taking any reasonable step to secure the expiration of applicable waiting periods or obtain any required approvals in connection with the transactions contemplated by this Agreement, as well as resolve all objections asserted under (i) the HSR Act and (ii) the Competition Act; provided, however, that notwithstanding any provision to the contrary in this Section 5.3, neither the Buyers nor any of their Affiliates shall be required to dispose of, hold separate or otherwise restrict their enjoyment of any of their respective properties or waive or relinquish any rights.  The Buyers shall be

responsible for 50% of all fees payable in connection with such filings, and the Sellers shall be responsible for the other 50% of such fees.

(b)     In connection with each Party's obligations under Section 5.3(a), each of the Parties shall and shall cause its Affiliates (i) to cooperate and collaborate with the other Parties and their respective Affiliates in preparing and filing any submission to be made to any Governmental Authority and in responding to any comments, requests for information or inquires therefrom, (ii) to keep each other reasonably apprised of the status of the filings or other notifications made pursuant to Section 5.3(a), including the status of any communication with, or any comments, requests or inquiries from any Governmental Authority, (iii) to permit the other Party or its counsel to review in advance any proposed filing, application, submission or written communication with or to any Governmental Authority and to provide copies of all written submissions to and communications with or from any Governmental Authority to the other Parties or their respective counsel; and (iv) to permit the other Parties and their respective Representatives to participate in discussions, and attend meetings, with any Governmental Authority; provided, however, in each case any Party providing any information or documentation pursuant to this Section 5.3(b) may limit access to competitively sensitive information solely to outside counsel of the receiving Party subject to an obligation of confidentiality and shall in all cases be subject to Section 10.1(b).

Section 5.4.     **Further Assurances**. Subject to Section 5.6, each of the Parties shall, and shall cause its Affiliates to, at the request of any other Party, cooperate with such other Party by furnishing additional information, executing and delivering additional documents and instruments and undertaking such additional actions as may be reasonably required by such other Party or its counsel to consummate the transactions contemplated by this Agreement.

Section 5.5.     **Termination on Closing**. The obligations of the Parties under this Article 5 (other than Section 5.4 and Section 5.10, which shall survive until the closing of the Bankruptcy Cases and the CCAA Case and, if the Closing occurs, Section 5.8, which shall survive indefinitely) shall terminate upon consummation of the Closing.

Section 5.6.     **Failure to Obtain Consents.** Buyers acknowledge that, after giving effect to the Sale Order, the Bankruptcy Code and the Approval and Vesting Order, certain Consents to the transactions contemplated by this Agreement may be required from the parties to Assigned Contracts and Assigned Leases to which the Sellers are party (the "Required Consents") and that such Required Consents have not been obtained and may not be obtained. Buyers agree that, subject to compliance with Section 2.14(b) and Section 6.2, the Sellers shall not have any Liability whatsoever to Buyers (and Buyers shall not be entitled to assert any claims) arising out of or relating to the failure to obtain any Required Consents that may have been, or may be, required in connection with the transactions contemplated by this Agreement, or because of the default, acceleration or termination of or loss of right under any such contract, lease, license or other agreement as a result of such failure. Buyers further agree that no representation, warranty or covenant of Sellers contained herein shall be breached or deemed breached and no condition of Buyers shall be deemed not to be satisfied as a result of the failure to obtain any Required Consents, as a result of any default, acceleration or termination or loss of right resulting from such failure, or as a result of any lawsuit, action, claim, proceeding or investigation commenced or threatened by or on behalf of any Person arising out of or relating to

the failure to obtain any Required Consents or any default, acceleration or termination or loss of right resulting from such failure, except for any breach of Section 2.14(b) or Section 6.2.

Section 5.7. **Lenders' Acknowledgement.** On the Effective Date, contemporaneously with the execution and delivery of this Agreement, the Sellers shall deliver to the Buyers a duly executed acknowledgement from all existing secured lenders to the Sellers and all lenders under the DIP Facility, pursuant to which such lenders agree (i) to carve-out, for the benefit of the Buyers, sufficient funds from the collateral that secures Sellers' obligations to such lenders to permit the Sellers to pay to the Buyers the Sellers Termination Fee and Expense Reimbursement as and when such payments are due in accordance with Section 9.2; and (ii) to the sale of the Purchased Assets to the Buyers free and clear of any Encumbrances securing obligations to such lenders if the Buyers are the Successful Bidder following the process set forth in the Bid Procedures Orders.

Section 5.8. **Release.** Effective as of the Closing, the Sellers hereby release, discharge, acquit and covenant not to bring any action against the Buyers or any of their Affiliates for any Claims, right or other causes of action, other than any claims incurred pursuant to this Agreement.

Section 5.9. **Adjusted Net Working Capital Numbers.** During the period commencing on the Effective Date and ending on the Closing Date, and in all events on the date that is three (3) Business Days prior to the expected Closing Date, the Sellers shall deliver to the Buyers on a weekly basis a summary listing the amount of the following: (i) Accounts Receivable, (ii) Prepaid Expenses, (iii) Adjusted Inventory, (iv) cash in the Specified Bank Accounts, and (v) Trade Payables, in each case as of the date of such delivery.

Section 5.10. **Insurance Claims.** After the Closing, at the request of the Buyers, acting reasonably, and at Buyers' sole expense, the Sellers shall reasonably cooperate with the Buyers in collecting any Purchased Insurance Proceeds, including the Sellers filing any claims with respect to such Purchased Insurance Proceeds.

## ARTICLE 6

## BANKRUPTCY PROCEDURES

Section 6.1. **Bankruptcy Actions.** Subject to the requirements of Section 6.2, US Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of an Order substantially in the form of Exhibit A attached hereto and Canco shall use commercially reasonable efforts to obtain entry by the Canadian Court of an Order substantially in the form of Exhibit B attached hereto (collectively, the "Bid Procedures Orders") and to cause the Bid Procedures Orders to become Final Orders. Upon completion of the Auction and subject to an Alternative Transaction not being approved in accordance with the Bid Procedures, US Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court of an Order substantially in the form of Exhibit C attached hereto (the "Sale Order") and to cause the Sale Order to become a Final Order, and Canco shall use commercially reasonable efforts to have the Canadian Court issue an Order substantially in the form of Exhibit D attached hereto

(the "Approval and Vesting Order") and to cause the Approval and Vesting Order to become a Final Order.

### Section 6.2. Court Approval.

(a)     Within three (3) Business Days of the Effective Date, the US Sellers shall commence the Bankruptcy Cases in the Bankruptcy Court and Canco shall commence the CCAA Case in the Canadian Court.

(b)     Subject to the Buyers not being in breach of their obligations under this Agreement, within two (2) Business Days of the Petition Date, the US Sellers shall file the Sale Motion with the Bankruptcy Court and Canco shall file the Canadian Bid Procedure Motion with the Canadian Court. The Sellers shall use commercially reasonable efforts to cause the Sale Motion and the Canadian Bid Procedure Motion to be heard within eighteen (18) days of the Petition Date for the purpose of approving the Bid Procedures Orders. The US Sellers shall use commercially reasonable efforts to cause the Sale Motion to be heard for purposes of approval of the transactions contemplated by this Agreement, in accordance with all notice requirements under applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, at the earliest possible date and in conjunction with the Canadian Approval Motion. The Sellers shall use commercially reasonable efforts to serve (i) any party reasonably requested by Buyers, and (ii) all parties known to Seller to be entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and the Bankruptcy Rules and the CCAA, including all applicable Tax authorities in each jurisdiction where the Purchased Assets are subject to Tax (a) at least twenty (20) days prior to the Sale Hearing for parties required to be provided notice in the Bankruptcy Cases, and (b) at least four (4) days prior to the Sale Hearing for parties required to be provided notice in the CCAA Case.

(c)     The Sellers shall use commercially reasonable efforts to obtain entry by the Bankruptcy Court and the Canadian Court of (i) the Bid Procedures Orders within eighteen (18) days after the Petition Date, and (ii) the Sale Order and the Approval and Vesting Order within forty-five (45) days after the Petition Date.

(d)     In the event an appeal is taken, or a stay pending appeal is requested, from the Bid Procedures Orders, the Sale Order or the Approval and Vesting Order, Sellers shall immediately notify Buyers of such appeal or stay request and shall provide to Buyers promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyers with written notice of any motion or application filed in connection with any appeal from either of such orders.

(e)     Sellers shall use commercially reasonable efforts to (i) cause the Bid Procedures Orders, the Sale Order and the Approval and Vesting Order to become Final Orders; and (ii) consult with the Buyers upon Buyers' reasonable request concerning the Bid Procedures Orders, the Sale Order and the Approval and Vesting Order and provide Buyers with copies of requested applications, pleadings, notices, proposed orders and other documents to be filed by the Sellers relating to such orders prior to submission to the Bankruptcy Court.

**Section 6.3. Further Solicitation.** Buyers and Sellers acknowledge that the officers and directors of the Sellers have fiduciary duties under applicable Law to realize the highest and best offer for the Purchased Assets and the Business. Without limitation of the foregoing, the Sellers shall not, and shall not authorize or permit any of its Representatives to, directly or indirectly: (i) solicit, initiate, facilitate or encourage the submission of any proposal for an Alternative Transaction (an "Acquisition Proposal"), (ii) engage or participate in discussions or negotiations with, furnish material non-public information relating to the Sellers to, or provide access to the material non-public Sellers Business Records to any Third Party that has submitted, or has informed the Sellers that it is seeking to submit, an Acquisition Proposal, provided, however, that any Third Party that has received a copy of the Barzel Industries Confidential Information Memorandum dated 2009, from Houlihan Lokey prior to the Petition Date shall continue to have access to, and Sellers shall be permitted to continue to provide access to, any information that was previously available to such Third Party until entry of the Sale Order, or (iii) enter into a Contract with any Third Party that has submitted, or has informed any Seller that it is seeking to submit an Acquisition Proposal, (a) with respect to an Acquisition Proposal or (b) requiring any Seller to abandon, terminate or fail to consummate the transactions contemplated hereby; provided, however, that, notwithstanding the foregoing, until the entry of the Sale Order, the Sellers retain the right to solicit participation in the Auction from interested parties and to engage in actions otherwise described in clauses (i) through (iii) above; and provided further that such right shall be exercised in strict compliance with the Bid Procedures Orders. For the avoidance of doubt, if there is any conflict between the provisions of this Section 6.3 and the Bid Procedures Orders, the terms of the Bid Procedures Orders shall govern.

## ARTICLE 7

## CONDITIONS TO CLOSING

**Section 7.1. Conditions of the Buyers to Closing.** The obligations of the Buyers to consummate the transactions contemplated hereby are, unless waived by the Buyers, subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a) except for such changes as are permitted or required pursuant to the terms hereof, either (i) the representations and warranties of Sellers set forth in Article 4 shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made at and as of the Closing (except for representations and warranties that are made as of a particular date specified therein, which representations and warranties shall be true and correct in all material respects as of such date), or (ii) if there is any breach of, or inaccuracy in, the representations and warranties of Sellers set forth in Article 4 (without giving effect to any qualification as to materiality or Material Adverse Effect of similar expressions) as of the Closing Date, then such breach or inaccuracy (or the fact or circumstance to which such breach or inaccuracy relates) shall not have, and would not be reasonably expected to have, a Material Adverse Effect;

(b)    (i) no Law shall be in effect, and (ii) no Governmental Authority shall have enacted, issued, promulgated or entered an Order which is in effect, in each case that has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Closing Documents;

(c)    the applicable statutory waiting period under the HSR Act, including all extensions thereof, shall have been terminated or shall have expired;

(d)    if a prenotification is required under Part IX of the Competition Act, either (i) the Commissioner shall have issued an advance ruling certificate under Section 102 of the Competition Act in respect of the Transaction, or (ii) the applicable waiting period under Part IX of the Competition Act shall have expired or been waived by the Commissioner or the Commissioner shall have waived the obligation to notify under Part IX of the Competition Act pursuant to Section 113(c) of the Competition Act, and the Commissioner or a Person authorized by the Commissioner shall have issued a letter stating that the Commissioner does not, at that time, intend to challenge the transaction under Section 92 of the Competition Act;

(e)    Sellers shall have performed and complied in all material respects with all covenants and agreements set forth in this Agreement required to be performed or complied with by the Sellers prior to or concurrently with the Closing;

(f)    the Buyers shall have received the Closing Documents required to be delivered to them by the Sellers at or before the Closing pursuant to this Agreement duly executed by all necessary Persons (other than the Buyers and their respective Affiliates);

(g)    the Bankruptcy Court shall have entered the Sale Order, which order shall not have been stayed, modified or amended in any way;

(h)    (i) the Canadian Court shall have issued the Approval and Vesting Order, which order shall have become a Final Order, and (ii) the Approval and Vesting Order shall not have been stayed, appealed, granted leave to appeal, modified or amended in any way, provided, however, that after entry of the Approval and Vesting Order, the Buyers, in their sole discretion, shall have the right, but not the obligation, to waive the requirement that the Approval and Vesting Order become a Final Order;

(i)    the Bankruptcy Court shall have authorized, other than with respect to Cure Costs, the assumption and assignment of each Assigned Contract or Assigned Lease, as applicable, to the extent assignable, except as would not have a Material Adverse Effect;

(j)    each Seller shall have delivered to the Buyers a certificate signed by a senior executive officer of such Seller to the effect that each of the conditions specified in clauses (a), (e) and (l) of this Section 7.1 has been satisfied in all respects (each, a "Sellers Bring-Down Certificate");

(k)    The Sellers shall request in the Approval and Vesting Order statements that the Bulk Sales Act (Ontario) and any similar legislation in other relevant provinces do not apply to the sale of the Purchased Assets and that Canco and Buyers are discharged from any

obligation under Section 6 of the *Retail Sales Tax Act* (Ontario) and from similar obligations under similar legislation in other relevant provinces; and

(l)     no Material Adverse Effect shall have occurred between the Effective Date and the Closing Date.

**Section 7.2.     Conditions of the Sellers to Closing**. The obligations of the Sellers to consummate the transactions contemplated hereby are, unless waived by Sellers, subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)     payment of the Purchase Price as set forth in <u>Section 2.9</u>;

(b)     the representations and warranties of the Buyers set forth in Article 3 shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) on and as of the Closing Date with the same effect as though such representations and warranties had been made at and as of the Closing (except for representations and warranties that are made as of a particular date specified therein, which representations and warranties shall be true and correct in all material respects as of such date);

(c)     (i) no Law shall be in effect, and (ii) no Governmental Authority shall have enacted, issued, promulgated or entered an Order which is in effect, in each case that has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Closing Documents;

(d)     the applicable statutory waiting period under the HSR Act, including all extensions thereof, shall have been terminated or shall have expired;

(e)     if a prenotification is required under Part IX of the Competition Act, either (i) the Commissioner shall have issued an advance ruling certificate under Section 102 of the Competition Act in respect of the Transaction, or (ii) the applicable waiting period under Part IX of the Competition Act shall have expired or been waived by the Commissioner or the Commissioner shall have waived the obligation to notify under Part IX of the Competition Act, and the Commissioner or a Person authorized by the Commissioner shall have issued a letter stating that the Commissioner does not, at that time, intend to challenge the transaction under Section 92 of the Competition Act;

(f)     Buyers shall have performed and complied in all material respects with all covenants and agreements set forth in this Agreement required to be performed or complied with by the Buyers prior to or concurrently with the Closing;

(g)     the Sellers shall have received the Closing Documents required to be delivered to them by the Buyers at or before the Closing pursuant to this Agreement duly executed by all necessary Persons (other than the Sellers);

(h)     the Bankruptcy Court shall have entered the Sale Order, which order shall not have been stayed, modified or amended in any way material to the Sellers;

(i) the Canadian Court shall have issued the Approval and Vesting Order, which order shall not have been stayed, modified or amended in any way material to the Sellers; and

(j) the Buyers shall have delivered to the Sellers a certificate signed by a senior executive officer of the respective Buyer to the effect that each of the conditions specified in the clauses (b) and (f) of this <u>Section 7.2</u> has been satisfied in all respects.

**ARTICLE 8**

**ADDITIONAL AGREEMENT**

**Section 8.1.    Taxes and Other Costs**.

(a) Upon, from and after the Closing, Buyers shall assume and become solely liable and responsible for all Taxes and the other fees and charges which are attributable to the conduct of the Business or the ownership, leasing, possession or use of the Purchased Assets (including rents, general and special assessments, street surfacing and other municipal charges, fuel, water, sewer, electrical and other utility charges and documentation, license and registration fees), in each case together with all interest and penalties thereon, regardless of when they arose or arise or whether the facts on which they are based occurred prior or subsequent to the Closing, and regardless of where or against whom they are asserted or determined or whether they are asserted or determined prior or subsequent to the Closing, but in each case excluding those which are included in the Excluded Liabilities (collectively, "<u>Taxes and Other Charges</u>").  After the Closing, Buyers shall make or cause to be made all necessary filings with respect to Taxes and Other Charges.  Concurrently with the Closing, Buyers shall reimburse the Sellers for all deposits, prepayments or advances which the Sellers may have made with respect to Taxes and Other Charges, other than any such deposits, prepayments or advances that are either included in the calculation of Adjusted Net Working Capital or are Excluded Assets.

(b) Buyers shall assume and become solely liable and responsible for all Transactional Costs and Transactional Taxes.  After the Closing, Buyers shall make or cause to be made all necessary filings with respect to all Transactional Costs and Transactional Taxes.  Promptly after the Closing, Buyers shall reimburse the Sellers for all deposits, prepayments or advances which the Sellers may have made with respect to Transactional Costs and Transactional Taxes, other than any such deposits, prepayments or advances that are either included in the calculation of Adjusted Net Working Capital or are Excluded Assets.

(c) Buyers shall promptly pay and discharge, or cause to be paid and discharged, all of the Taxes and Other Charges and the Transactional Costs and Transactional Taxes, other than any Taxes that constitute an Excluded Liability.  If the Sellers shall be required to pay any thereof, Buyers shall promptly reimburse the Sellers therefor.  Buyers agree to pay to Canco on Closing the applicable sales taxes under the *Retail Sales Tax Act* (Ontario) in respect of the purchase of the Purchased Assets (and provide any applicable purchaser's exemption certificate) and Canco will remit such amounts to the Ontario Ministry within 20 days of Closing.

(d)     With respect to the sale of the Purchased Assets by Canco, at Buyers' sole expense, Canco and the Buyer of the Purchased Assets from Canco shall jointly execute an election under Section 167(1) of Part IX of the *Excise Tax Act* (Canada) and under Section 75 of an *Act respecting the Quebec Sales Tax* in the forms prescribed for such purposes such that the sale of the Purchased Assets by Canco will take place without payment of any goods and services tax ("GST") or Quebec sales tax ("QST").  Buyers shall file the election forms referred to above with the proper tax authority, together with Buyers' applicable GST/QST return for its GST/QST reporting period during which the transaction of purchase and sale contemplated herein occurs.

(e)     Canco and the Buyers agree, at Buyers' sole expense, to file an election with respect to the Accounts Receivable sold by Canco under Section 22 of the *Income Tax Act* (Canada), Section 184 of the *Taxation Act* (Quebec) and the corresponding sections of any other provincial statute and any regulations under such statutes in a manner consistent with the Purchase Price allocation hereunder.

**Section 8.2.     Payments Received.**  Sellers, on the one hand, and Buyers, on the other hand, each agree that, after the Closing, each will hold in trust and will promptly transfer and deliver to the other, from time to time as and when received by such Party, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other and will account to the other for all such receipts.

**Section 8.3.     Assigned Contracts and Assigned Leases: Adequate Assurance and Performance.**

(a)     With respect to each Assigned Contract and each Assigned Lease, Buyers shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyers of each such Assigned Contract or Assigned Lease.  Buyers and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts or the Assigned Leases, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyers' employees and representatives available to testify before the Bankruptcy Court.

(b)     Without limiting the provisions of Section 8.3(a), Buyers acknowledge that Sellers have no duty to maintain any letters of credit to secure performance or payment under any Assigned Contract or Assigned Lease after the Closing and Buyers agree to reasonably cooperate with Sellers in Sellers' efforts to secure the release of any such letters of credit posted by Sellers, such cooperation to include, if necessary, the provision by Buyers of a letter of credit to secure Buyers' payment and/or performance under any Assigned Contract or Assigned Lease after Closing, which letters of credit are set forth on Schedule 2.11(b)(iv).

**Section 8.4.  Employee Matters**.

(a)     Schedule 8.4(i) sets forth a list of all Employees of the Sellers.  Upon the Closing, Buyers shall (or cause one or more of their Affiliates to) offer employment to or, in Canada, shall continue the employment of, all unionized Employees of Sellers (except to the extent the transfer of employment is automatic under applicable Law) and such other Employees set forth on Schedule 8.4(ii) (all employees transferred to Buyers by operation of Law and all other Employees set forth on Schedule 8.4(ii), including all unionized Employees, who accept the Buyers' offer of employment, collectively, the "Transferred Employees").  No later than September 25, 2009, Buyers shall provide Sellers with an updated Schedule 8.4(ii) provided, however, that no unionized Employee shall be removed from such updated Schedule 8.4(ii).

(b)     Other than in the Province of Québec, where Buyers shall continue the employment of Transferred Employees, Buyers shall offer employment to the Transferred Employees on such terms as determined by the Buyers in their reasonable discretion, subject to the terms of any collective bargaining agreement assumed pursuant to Section 8.4(d) and requirements of applicable Law.  Buyers will cause any employee benefit plans of Buyers (or any Affiliate thereof sponsoring or maintaining such plans) in which the Transferred Employees are entitled to participate from and after the Closing (the "Buyers Plans") to take into account, for purposes of eligibility and vesting thereunder (but not for purposes of benefit accrual), service by the Transferred Employees with Sellers prior to the Closing as if such service were with Buyers, to the same extent such service was credited under a comparable Benefit Plan prior to the Closing (except to the extent it would result in duplication of benefits).  In addition, with respect to each Buyers Plan that is a "welfare benefit plan" (as defined in Section 3(1) of ERISA or a Canadian health and welfare plan), Buyers shall, or shall cause an Affiliate of Buyers sponsoring or maintaining such Buyers Plan, to (i) cause there to be waived any pre-existing conditions, exclusions, insurability requirements or other eligibility limitations , and (ii) to the extent possible under the terms of the provider agreements governing the Buyers Plans, give effect, in determining any deductible, co-insurance and maximum out of pocket limitation, to claims incurred and amounts paid by, and amounts reimbursed to, the Transferred Employees and their dependents under a comparable Benefit Plan in any plan year ongoing as of the Closing Date.  Upon Closing, Buyers shall, and shall cause their Subsidiaries to, credit each Transferred Employee, and assume and become solely liable and responsible for, all current year, vested or carried-forward vacation accrued by each Transferred Employee under any vacation plan maintained by Sellers but not taken as of the Closing Date (the "Accrued Vacation Amount").

(c)     Prior to the Closing, Buyers shall have established a defined contribution plan that (i) meets the requirements of Section 401 of the Code, and (ii) includes qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (the "Buyers' 401(k) Plan").  Effective as of the Closing, all Transferred Employees who were eligible to participate in the Benefit Plans that are intended to be qualified retirement plans that include a cash or deferred arrangement under Section 401(k) of the Code (the "Sellers' 401(k) Plans") immediately prior to the Closing shall be eligible to participate in the Buyers' 401(k) Plan.  Subject to the Sellers' 401(k) Plans administrators' provision of evidence reasonably satisfactory to the Buyers' 401(k) Plan administrator that the Sellers' 401(k) Plans are tax-qualified, each Transferred Employee who has an account under one of the Sellers' 401(k) Plans shall be

entitled to directly rollover any distribution of his or her account under such Sellers' 401(k) Plan, including any plan loans, to the Buyers' 401(k) Plan immediately following the Closing.

(d)     Buyers will assume all collective bargaining agreements in the United States and Canada with respect to any Transferred Employee and be responsible for all Liabilities arising after the Closing Date under such collective bargaining agreements.

(e)     From the date hereof until the Closing, without Buyers' prior written consent (not to be unreasonably withheld), the Sellers shall not change the wages, salaries or positions of the Employees or any of the Benefit Plans or compensation policies or practices applicable to any of the Employees, other than in the Ordinary Course.

**Section 8.5.     Workers' Compensation**. Prior to the Closing, Buyers shall obtain or establish a workers' compensation insurance program covering the Transferred Employees in the United States, on terms satisfying all applicable Laws. Sellers shall be solely responsible for workers' compensation claims of Transferred Employees related to injuries incurred before the Closing.

**Section 8.6.     Responsibilities under the WARN Act**. At least three (3) days before the Closing Date, Sellers shall provide a list setting forth the name and location of any and all Employees and former employees of Sellers who have experienced an employment loss or layoff (as defined by the WARN Act) within ninety (90) days prior to the Closing Date. For a period of ninety (90) days after the Closing Date, Buyers shall not engage in any conduct which would result in an employment loss or layoff for a sufficient number of employees of Buyers at any location which, if aggregated with any such conduct prior to the Closing, would trigger the WARN Act. Buyers shall be responsible for providing any notice to Employees which may be required by WARN or any similar applicable Law for any "employment loss" (as defined in WARN) which occurs after the Closing and for any Liability which may accrue to Employees, any Governmental Authority or any other Person under WARN or any similar applicable Law as a result of providing improper or untimely notice under WARN or such Law after the Closing to the extent the requirements of WARN or any similar applicable Law are triggered by any actions of the Buyers.

**Section 8.7.     COBRA**. Prior to the Closing, Sellers shall be solely responsible and liable for all Liabilities with respect to their Employees with respect to qualifying events occurring before the Closing Date and their "qualified beneficiaries" (within the meaning of COBRA), in respect of health insurance under COBRA. From and after the Closing Date, Buyers shall assume and be solely responsible and liable for all Liabilities with respect to all Employees under COBRA, whether or not such Employee is a Transferred Employee, and all former employees of the Sellers and their "qualified beneficiaries" in respect thereof who are eligible under COBRA.

**Section 8.8.  Preservation of Records.**

(a)     After the Closing, the Buyers shall, and shall cause their Subsidiaries to, (a) preserve all Sellers Business Records which are transferred to the Buyers and relate to the Sellers or the business or affairs of the Sellers as of or prior to the Closing Date for (i) a period of six years after the Closing Date and (ii) for such longer period as may be required (A) by any Contract, Law, Permit or Order (the "<u>Preservation Period</u>") or (B) in connection with any then pending or threatened Claim or Proceeding.

(b)     At any time and from time to time after the Closing, during the Preservation Period or, in respect of any Claim pending at the end of the Preservation Period for two weeks after the end of the Preservation Period, upon reasonable request by the Sellers, the Buyers shall, and shall cause their Affiliates to, (i) provide reasonable access during normal business hours to such Sellers Business Records by then current or former directors or executive officers of the Sellers (and Representatives of such directors and officers) for purposes of investigation, prosecution or defense of any Claim or Proceeding (other than any Claim or Proceeding against Buyers or their Affiliates), and (ii) make their Representatives (other than any advisor or agent)reasonably available to them for such purposes, in each case at no charge to them.

**Section 8.9.  Access by the Sellers.**  At any time and from time to time after the Closing, during the Preservation Period, upon reasonable request by the Sellers, Buyers shall, and shall cause any of their Affiliates (a) to provide reasonable access, during normal business hours, to the Sellers, the Selling Subsidiaries and their respective Representatives to the Sellers Business Records relating to the Business as conducted by Sellers (including, for this purpose, the Selling Subsidiaries), the Purchased Assets as owned, leased, possessed or used by them, the Employees as employed by them or the Assumed Liabilities, in each case prior to the Closing Date and (b) to make their Representatives (other than their advisors or agents) available to the Sellers and their respective Representatives at no charge to the Sellers or such Representatives. Buyers shall also provide the services set forth in the Transition Services Agreement.

**Section 8.10.  No Other Representations or Warranties.**

(a)     Buyers acknowledge that, except for the representations and warranties contained in <u>Article 4</u> or the Sellers Bring-Down Certificates, neither Sellers nor any other Person on behalf of Sellers makes any express or implied representation or warranty with respect to Sellers (including representations and warranties as to the condition of the Purchased Assets or the Business) or with respect to any information provided by or on behalf of Sellers to Buyers. Neither Sellers nor any other Person will have or be subject to any liability or indemnification obligation to Buyers or any other Person resulting from the distribution to Buyers, or use by Buyers, of any such information, including any information, documents, projections, forecasts or other material made available to Buyers in any "data rooms," "data sites," confidential information memoranda or management presentations in expectation of or in connection with the transactions contemplated by this Agreement or any other Closing Document.

(b)     In connection with the investigation by Buyers, Buyers have received or may receive from Sellers certain projections, forward-looking statements and other forecasts and certain business plan information. Buyers acknowledge that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyers are familiar with such uncertainties, that Buyers are taking full responsibility for making their own evaluation of the adequacy and accuracy of any estimates, projections and other forecasts and plan so furnished by Sellers and that Buyers shall have no claim against anyone with respect thereto.

**Section 8.11.  Purchased Assets "AS IS," "WHERE IS"; Buyers' Acknowledgement.**  Buyers agree, warrant and represent that (a) Buyers are purchasing the Purchased Assets on an "AS IS," "WHERE IS" and "WITH ALL FAULTS" basis based solely on Buyers' own investigation of the Purchased Assets and the express representation and warranties of Sellers set forth in Article 4 or the Sellers Bring-Down Certificates, and (b) neither Sellers nor any real estate broker or any other Representative of Sellers has made any warranties, representation or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets or the Business, or the physical condition of the Purchased Assets other than the representations and warranties of Sellers set forth in Article 4 or the Sellers Bring-Down Certificates. The Buyers further acknowledge that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Sellers and Buyers after good-faith, arms-length negotiations in light of Buyers' agreement to purchase the Purchased Assets "AS IS," "WHERE IS" and "WITH ALL FAULTS" subject only to the express representations and warranties of Sellers set forth in Article 4 or the Sellers Bring-Down Certificates. Buyers agree, warrant and represent that, except as set forth in this Agreement (including the representations and warranties of the Sellers set forth in Article 4 or the Sellers Bring-Down Certificates), Buyers have relied, and shall rely, solely upon Buyers' own investigation of all such matters, and that Buyers assume all risks with respect thereto. Except as set forth in this Agreement (including the express representations and warranties of Sellers set forth in Article 4), Sellers make no express warranty, no warranty of merchantability, no warranty of fitness for a particular purpose, and no implied or statutory warranty whatsoever with respect to any real or personal property or any fixtures or the Purchased Assets.

**Section 8.12.  Guaranty of Sale Price For Delta Tube.**  Subject to (i) the approval of the Bankruptcy Court and the Canadian Court, to the extent applicable, and (ii) reasonably acceptable terms and conditions to be set forth in a definitive purchase agreement, the Buyers hereby intend to purchase (or designate a Third Party to purchase) from Canco, and Canco intends to sell, transfer and assign to the Buyers, Canco's sixty percent (60%) interest in Delta Tube and Company Limited and Delta Tubes Inc., and the purchase price for such sale shall be $3 million, payable in immediately available funds. Notwithstanding any other provision of this Agreement to the contrary, (i) this Section 8.12 shall survive the Closing, (ii) the satisfaction of this Section 8.12 shall not be a condition to Closing, and (iii) the Buyers' failure to comply with this Section 8.12 shall not give rise to a right of termination by the Sellers.

# ARTICLE 9

## TERMINATION

**Section 9.1. Termination.** Notwithstanding anything contained herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of the Sellers and the Buyers;

(b)     by Sellers, in the event of any breach by Buyers of any of Buyers' agreements, covenants, representations or warranties contained in this Agreement (provided such breach would result in the failure of a condition set forth in <u>Section 7.2</u> to be satisfied) or (if such breach is material) in the Bid Procedures Orders or Sale Order, and the failure of Buyers to cure such breach within ten (10) days after written notice thereof shall have been given to the Buyers;

(c)     by Buyers, in the event of any breach by Sellers of any of Sellers' agreements, covenants, representations or warranties contained in this Agreement (provided such breach would result in the failure of a condition set forth in <u>Section 7.1</u> to be satisfied) or (if such breach is material) in the Bid Procedures Orders or Sale Order, and the failure of Sellers to cure such breach within ten (10) days after written notice thereof shall have been given to the Sellers;

(d)     by either Party, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, a trustee or examiner with expanded powers is appointed, the Canadian Proceedings are converted into bankruptcy proceedings under the *Bankruptcy and Insolvency Act* (Canada) (the "<u>BIA</u>"), a trustee in bankruptcy is appointed over the applicable Sellers pursuant to the BIA or a receiver, interim receiver or receiver and manager or any similar official is appointed in respect of the Sellers;

(e)     by Buyers, if the Bid Procedures Orders have not been entered by the Bankruptcy Court and the Canadian Court within 30 days of the Petition Date;

(f)     by Buyers, if the Sale Order and the Approval and Vesting Order have not been entered by the Bankruptcy Court and the Canadian Court within 75 days of the Petition Date;

(g)     by Buyers, if Buyers are neither the Successful Bidder at the Auction nor designated as the Next Best Bidder at the Auction; <u>provided</u>, <u>however</u>, that if the Buyers are designated as the Next Best Bidder then Buyers shall only be entitled to terminate this Agreement pursuant to this <u>Section 9.1(g)</u> upon the earlier of (i) twenty-five (25) days of the entry of the orders of the Bankruptcy Court and the Canadian Court approving such Alternative Transaction (provided that Sellers have not informed Buyers in writing during such twenty-five (25) days that the Sellers intend to close the transactions contemplated by this Agreement with Buyers), (ii) forty-five (45) days from the Auction (provided that Sellers have not informed Buyers in writing during the twenty-five (25) days referred to in the preceding clause (i) that the Sellers intend to close the transactions contemplated by this Agreement with Buyers), and (iii) the closing of the Alternative Transaction with the Successful Bidder. If Sellers inform Buyers in writing during the twenty-five (25) day period set forth in clauses (i) or (ii) above that the

Sellers intend to the close the transactions contemplated by this Agreement with the Buyers, then the Buyers shall not be entitled to terminate this Agreement pursuant to this Section 9.1(g);

(h)  by Sellers, if Buyers are not the Successful Bidder at the Auction or designated as the Next Best Bidder at the Auction;

(i)  by Buyers, upon Sellers' consummation of an Alternative Transaction;

(j)  at any time after December 31, 2009 (the "Termination Date") and prior to the Effective Time, by the Buyers if (i) the Closing shall not have been consummated on or before the Termination Date and (ii) the failure to consummate the Closing on or before the Termination Date did not result from the failure by any Buyer to perform or comply with any covenant or agreement contained in this Agreement required to be performed or complied with prior to the Closing by any Buyer; or

(k)  at any time after the Termination Date and prior to the Effective Time, by the Sellers, if (i) the Closing shall not have been consummated on or before the Termination Date and (ii) the failure to consummate the Closing on or before the Termination Date did not result from the failure by any Seller to perform or comply with any covenant or agreement contained in this Agreement required to be performed or complied with prior to the Closing by any Seller.

### Section 9.2.  Effect of Termination.

(a)  In the event of a termination of this Agreement by Buyers or Sellers pursuant to Article 9.1, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party, except as expressly set forth in this Section 9.2. The provisions of this Section 9.2 (and to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 10) shall expressly survive termination of this Agreement.

(b)  In the event of a termination of this Agreement pursuant to Section 9.1(b), Buyers shall be entitled to disbursement of the Deposit (plus, for the avoidance of doubt, all interest and other earnings accrued or earned thereon), less the Buyers Termination Fee, and Sellers shall be entitled to disbursement, from the Deposit, of the Buyers Termination Fee, no later than two (2) Business Days after the effective date of such termination. The Parties expressly agree and acknowledge that it would be extremely difficult or impracticable to ascertain the actual damages that would be incurred by the Sellers in the event of a termination of this Agreement pursuant to Section 9.1(b) and that the Buyers Termination Fee represents the Parties' reasonable estimate of the damages that would be incurred by the Sellers in the event of a termination of this Agreement pursuant to Section 9.1(b). Sellers' right to receive the Buyers Termination Fee pursuant to this Section 9.2(b) shall be the sole and exclusive remedy available to the Sellers against the Buyers with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated pursuant to this Section 9.2(b), and Buyers shall have no further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby. If Sellers shall be entitled to receive and do receive the Buyers Termination Fee in accordance herewith, then Sellers agree that the Buyers

Termination Fee shall be (i) full liquidated damages for any and all failures to act, defaults or breaches hereunder by Buyers, including any material or willful breach by Buyers, and (ii) shall constitute a full release and discharge of all Claims by Sellers for damages for such failure to act, defaults or breaches, and that the Sellers shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against Buyers with respect thereto

        (c)    In the event of a termination of this Agreement pursuant to <u>Section 9.1(g)</u>, <u>Section 9.1(h)</u> or <u>Section 9.1(i)</u>, Buyers shall be entitled to (A) disbursement of the Deposit (plus, for the avoidance of doubt, all interest and other earnings accrued or earned thereon) no later than two (2) Business Days following the effective date of such termination; (B) payment by the Sellers of the Expense Reimbursement at the earlier of (i) within five (5) Business Days of the Sellers consummation of an Alternative Transaction, and (ii) in the event of a termination pursuant to <u>Section 9.1(g)(i)</u>, <u>Section 9.1(g)(ii)</u> or <u>Section 9.1(h)</u>, within forty-five (45) days of the Auction, and (C) the Sellers Termination Fee within five (5) Business Days of the Sellers' consummation of an Alternative Transaction. Notwithstanding anything herein to the contrary, to the extent that Buyers have received payment of the Expense Reimbursement and the Parties subsequently close the transactions contemplated by this Agreement, the Purchase Price shall be increased by the amount of such Expense Reimbursement. In the event of a termination of this Agreement pursuant to <u>Section 9.1(c)</u>, <u>Section 9.1(j)</u> or <u>Section 9.1(k)</u>, Sellers shall pay to Buyers the Expense Reimbursement (but not the Sellers Termination Fee) within five (5) Business Days following such termination; <u>provided</u>, <u>however</u>, that in the event that Sellers consummate an Alternative Transaction subsequent to such a termination pursuant to <u>Section 9.1(c)</u>, <u>Section 9.1(j)</u> or <u>Section 9.1(k)</u>, the Sellers shall pay to the Buyers the amount of the Sellers Termination Fee and Expense Reimbursement previously approved by orders of the Bankruptcy Court and the Canadian Court less any Expense Reimbursement previously paid by the Sellers to the Buyers pursuant to this <u>Section 9.2(c)</u>, within five (5) Business Days of the Sellers' consummation of an Alternative Transaction. Notwithstanding anything in this <u>Section 9.2(c)</u> to the contrary, Buyers shall not be entitled to the Sellers Termination Fee or the Expense Reimbursement if Buyers shall terminate this Agreement because of or as a result of the occurrence of a Material Adverse Effect. Notwithstanding anything to the contrary contained herein, Buyers acknowledge that the Sellers Termination Fee and the Expense Reimbursement must be approved by the Bankruptcy Court and that the Sellers Termination Fee and the Expense Reimbursement shall be payable pursuant to this <u>Section 9.2(c)</u> only upon such approval, <u>provided</u>, <u>however</u>, that nothing in this Agreement shall prejudice Buyers' right to seek allowance of an administrative expense for a termination fee or expense reimbursement under Section 503 of the Bankruptcy Code or under the CCAA. The Parties expressly agree and acknowledge that it would be extremely difficult or impracticable to ascertain the actual damages that would be incurred by the Buyer in the event of a termination of this Agreement pursuant to <u>Section 9.1(c)</u>, <u>Section 9.1(g)</u>, <u>Section 9.1(h)</u>, <u>Section 9.1(i)</u>, <u>Section 9.1(j)</u> or <u>Section 9.1(k)</u> and that the Sellers Termination Fee or the Expense Reimbursement represents the Parties' reasonable estimate of the damages that would be incurred by the Buyers in the event of a termination of this Agreement pursuant to <u>Section 9.1(c)</u>, <u>Section 9.1(g)</u>, <u>Section 9.1(h)</u>, <u>Section 9.1(i)</u>, <u>Section 9.1(j)</u> or <u>Section 9.1(k)</u>. Buyers' right to receive the Sellers Termination Fee or the Expense Reimbursement pursuant to this <u>Section 9.2(c)</u> shall be the sole and exclusive remedy available to the Buyers against the Sellers with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated as set forth in this <u>Section 9.2(c)</u>, and Sellers shall have no further liability or obligation relating to or arising

out of this Agreement or the transactions contemplated hereby.  If Buyers shall be entitled to receive and do receive the Sellers Termination Fee and/or the Expense Reimbursement in accordance herewith, then Buyers agree that the Sellers Termination Fee and/or the Expense Reimbursement shall be (i) full liquidated damages for any and all failures to act, defaults or breaches hereunder by Sellers, including any material or willful breach by Sellers, and (ii) shall constitute a full release and discharge of all claims by Buyers for damages for such failure to act, defaults or breaches, and that the Buyers shall not have any further cause of action for damages, specific performance or any other legal or equitable relief against Sellers with respect thereto.  Upon termination of this Agreement as set forth in this Section 9.2(c), any amounts payable by Sellers to the Buyers shall be accorded the priority of a superpriority administrative expense claim under the Bankruptcy Code.

(d)      If Buyers are entitled to the payment of the Expense Reimbursement, no later than five (5) days after an event triggering the payment of the Expense Reimbursement pursuant to Section 9.2(c), Buyers shall submit to the Sellers evidence to substantiate the amount of the Expense Reimbursement.

(e)      In the event this Agreement is terminated pursuant to Section 9.1 other than as set forth in Section 9.2(b) or Section 9.2(c) above, Buyers shall be entitled to disbursement of the Deposit (plus, for the avoidance of doubt, all interest and other earnings accrued or earned thereon) no later than two (2) Business Days following the effective date of such termination.

## ARTICLE 10

## MISCELLANEOUS PROVISIONS

### Section 10.1.  Confidentiality.

(a)      The Parties agree that the Confidentiality Agreement shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; provided, however, that (i) disclosure of matters that become a matter of public record as a result of the Bankruptcy Cases and any filings related thereto shall not constitute a breach of the Confidentiality Agreement, (ii) disclosures permitted under this Agreement shall not constitute a breach of the Confidentiality Agreement; and (iii) no action of the Parties required by the express terms of this Agreement shall be deemed to violate the Confidentiality Agreement.  The Confidentiality Agreement shall terminate as of the Closing Date.

(b)      For a period of the shorter of (i) two (2) years following the Closing Date or (ii) the date of the closing of the Bankruptcy Cases, the Sellers shall not, and the Sellers shall cause their Affiliates and their respective Representatives not to, use for its or their own benefit or divulge or convey to any Third Party any Confidential Information; provided, however, that the Sellers or their Affiliates may furnish such portion (and only such portion) of the Confidential Information as the Sellers or such Affiliates reasonably determines it is legally obligated to disclose if:  (A) it receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena, civil investigative demand or order issued by a Governmental Authority; (B) to the extent not inconsistent with such request, it notifies the

Buyers of the existence, terms and circumstances surrounding such request and consults with the Buyers on the advisability of taking steps available under applicable Law to resist or narrow such request; (C) it exercises its commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the disclosed Confidential Information; and (D) disclosure of such Confidential Information is required to prevent any Seller or such Affiliate from being held in contempt or becoming subject to any other penalty under applicable Law. For purposes of this Agreement, "Confidential Information" consists of all information and data relating to the Business that is a Purchased Asset or is related to any Transferred Employee (including Intellectual Property, customer and supplier lists, pricing information, marketing plans, market studies, client development plans, business acquisition plans and all other information or data that is a Purchased Asset or relates to a Transferred Employee), the Purchased Assets, the Transferred Employees or the transactions contemplated hereby, except for data or information that is or becomes available to the public other than as a result of a breach of this Section 10.2(b). Notwithstanding any provision to the contrary in this Agreement, any Person (other than the Sellers and their advisors) that is permitted to have access to Sellers Business Records or Representatives of the Buyers after the Closing pursuant to Section 8.8 or Section 8.9 shall have such access solely after such Person has executed a confidentiality agreement substantially in substance of this Section 10.1; provided, however, that such confidentiality agreement shall be in effect in respect of any information provided thereunder for a period of two years after the date such information is provided.

Section 10.2. Survival. None of the representations or warranties contained in Article 3 or Article 4 or in any Closing Document shall survive the Closing and shall thereupon terminate, including any actions for damages in respect of any breach. This Section 10.2 shall not limit any covenant or agreement of any Party which by its terms contemplates performance after the Closing, but only to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing.

Section 10.3. Notice. All notices and demands required or permitted to be given pursuant to this Agreement shall be given in writing in the English language, shall be transmitted by personal delivery, by a nationally recognized courier service, by registered or certified mail, return receipt requested, postage prepaid, or by facsimile or email and shall be addressed as follows:

When the Buyers are the intended recipient:

6001 Irwin Street
Lasalle, QC H8N 1A1
Attention: D. Bryan Jones
Facsimile Number: 514-764-2615
E-mail: bjones@chriscott.ca

With a copy to:

Stikeman Elliot LLP
1155 Rene-Levesque Blvd. W.
40th Floor
Montreal, QC H3B 3V2
Attention: Michael L. Richards
Facsimile Number:  514-397-3610
E-mail:mrichards@stikeman.com

With a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193
Attention: Steven Buffone
Facsimile Number: 212-351-5278
E-mail: sbuffone@gibsondunn.com

When the Sellers are the intended recipient:

Barzel Industries Inc.
320 Norwood Park South – 2nd Floor
Norwood, MA 02062
Attention:  Strategic Counsel
Facsimile Number:  781-278-9830
E-mail: narwold@barzel.com

With a copy to:

Kelley Drye & Warren LLP
400 Atlantic Street
Stamford, Connecticut  06901
Attention:  M. Ridgway Barker
Facsimile Number:  203-327-2669
Email: mbarker@kelleydrye.com

A Party may designate a new address to which notices required or permitted to be given pursuant to this Agreement shall thereafter be transmitted by giving written notice to that effect to the other Parties.  Each notice transmitted in the manner described in this <u>Section 10.3</u> shall be deemed to have been given, received and become effective for all purposes at the time it shall have been (a) delivered to the addressee as indicated by the affidavit of the messenger (if transmitted by personal delivery), the receipt of the courier service (if transmitted by courier service), the return receipt (if transmitted by mail) or the answer back or call back (if transmitted by facsimile) or (b) presented for delivery to the addressee as so indicated during normal business hours, if such delivery shall have been refused for any reason.

**Section 10.4.  Certain Expenses; Certain Financing**.  Except as otherwise expressly provided herein, each Party agrees to pay or cause its Affiliates to pay all expenses, fees and costs (including legal, accounting and consulting expenses and, in the case of the Buyers, expenses, fees and costs of current or prospective lenders) incurred by them or their Affiliates in connection with the transactions contemplated hereby.  The obligation of the Sellers to pay their expenses, fees and costs shall survive the Closing.

**Section 10.5.  Governing Law; Forum; Jury Trial**.  Except to the extent the mandatory provisions of the Bankruptcy Code apply, the validity, interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of New York.  Without limitation of any Party's right to appeal any Order of the Bankruptcy Court or the Canadian Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby (other than in respect of Canco for which the Canadian Court will have jurisdiction), and (ii) any and all Claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court (except with respect to Canco for which Claim may be brought in the Canadian Court), and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court (for all Sellers but Canco) and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or Proceeding; provided, however, that, if the Bankruptcy Cases are closed or dismissed, the Parties consent and submit to the non-exclusive personal jurisdiction of any court in the State of New York in respect of any such Proceeding.  Each Party consents to service of process upon it with respect to any such Proceeding by registered mail, return receipt requested, and by any other means permitted by applicable Law.  Each Party (other than Canco) waives any objection that it may now or hereafter have to the laying of venue of any such Proceeding in any court in the State of New York and any Claim that it may now or hereafter have that any such Proceeding in any court in the State of New York has been brought in an inconvenient forum.  Each Party waives trial by jury in any such Proceeding.

**Section 10.6.  Binding Effect; Assignment; Third Party Beneficiaries**.  This Agreement shall be binding upon the Parties and their respective successors and assigns and shall inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party shall assign any of its rights or delegate any of its duties under this Agreement (by operation of Law or otherwise) without the prior written consent of the Sellers (in case of the Buyers) or of the Buyers (in case of the Sellers); provided, however, that the Buyers shall be entitled, upon prior written notice to Sellers, to assign all or a portion of their rights, interest and obligation under this Agreement to one or more Affiliates that agree in writing to be bound by the terms hereof, such writing to be in form and substance acceptable to Sellers.  Any assignment of rights, interest or obligations or delegation of duties under this Agreement by a Party without the prior written consent of the other Parties, if such consent is required hereby, shall be void.  No such assignment or delegation shall relieve the assignor or delegator of its obligations hereunder.  No Person shall be, or be deemed to be, a third party beneficiary of this Agreement.

**Section 10.7.  Entire Agreement; Confidentiality Agreement**.  This Agreement, together with the Schedules, the Exhibits and the Related Agreements, constitutes the entire agreement among the Parties with respect to the subject matter hereof and cancels and supersedes all of the previous or contemporaneous agreements, representations, warranties and understandings (whether oral or written) by, between or among the Parties with respect to the subject matter hereof (other than the Confidentiality Agreement).  To the extent that there is a conflict or inconsistency between the Confidentiality Agreement and this Agreement with respect to matters occurring on or after the date hereof, this Agreement shall govern.

**Section 10.8.  Amendments**.  Except as set forth in Section 2.5, no addition to, and no cancellation, renewal, extension, modification or amendment of, this Agreement shall be binding upon a Party unless such addition, cancellation, renewal, extension, modification or amendment is set forth in a written instrument which states that it adds to, cancels, renews, extends, modifies or amends this Agreement and which is executed and delivered on behalf of each Party by an officer of, or attorney-in-fact for, such Party.

**Section 10.9.  Waivers**.  No waiver of any provision of this Agreement shall be binding upon a Party, unless such waiver is expressly set forth in a written instrument which is executed and delivered on behalf of the Sellers by an officer of, or attorney-in-fact for, the Sellers (in the case of a waiver by the Sellers) or the Buyers by an officer of, or attorney-in-fact for, the Buyers (in the case of the Buyers).  Such waiver shall be effective only to the extent specifically set forth in such written instrument.  Neither the exercise (from time to time and at any time) by a Party of, nor the delay or failure (at any time or for any period of time) to exercise, any right, power or remedy shall constitute a waiver of the right to exercise, or impair, limit or restrict the exercise of, such right, power or remedy or any other right, power or remedy at any time and from time to time thereafter.  No waiver of any right, power or remedy of a Party shall be deemed to be a waiver of any other right, power or remedy of such Party or shall, except to the extent so waived, impair, limit or restrict the exercise of such right, power or remedy.

**Section 10.10. Remedies Limited**.  The sole and exclusive rights, powers and remedies of any Party, other than such specific performance, injunctive relief or other equitable remedies as may be available to such Party, for a breach of or default under any provision (other than the provisions of Section 8.4 and this Article 10) of this Agreement shall be termination and the right to receive payments and damages as provided in Article 8.  None of the Parties shall, for any reason or under any legal theory, be liable for any special, indirect, incidental or consequential damages arising out of any breach of or default under this Agreement, even if informed of the possibility of such damages in advance.

**Section 10.11. Headings; Counterparts; Interpretation; Schedules**.

(a)      The headings set forth herein have been inserted for convenience of reference only, shall not be considered a part of this Agreement and shall not limit, modify or affect in any way the meaning or interpretation of this Agreement.

(b)      This Agreement may be signed in any number of counterparts, each of which (when executed and delivered) shall constitute an original instrument, but all of which together shall constitute one and the same instrument.  This Agreement shall become effective

and be deemed to have been executed and delivered by all of the Parties at such time as counterparts shall have been executed and delivered by each of the Parties, regardless of whether each of the Parties has executed the same counterpart. It shall not be necessary when making proof of this Agreement to account for any counterparts other than a sufficient number of counterparts which, when taken together, contain signatures of all of the Parties. Delivery of a counterpart by facsimile or by email with a PDF or other electronic attachment shall be as effective as delivery of an original.

(c)     All Parties have participated substantially in the negotiation and drafting of this Agreement and no ambiguity herein shall be construed against the draftsman. Nothing contained in this Agreement or in any of the Schedules shall constitute or be interpreted or construed as an admission by any Party or any of its Affiliates of liability to Third Parties, whether under any Law, Contract or Permit, or otherwise, or as an admission to any Third Party that any Party or any of its Affiliates are in violation or breach of or default under, or have ever violated, breached or defaulted under, any Law, Contract or Permit.

(d)     Disclosure made in any Schedule with reasonable clarity and particularity as to matters covered, or required or contemplated to be covered, in any other Schedule is hereby incorporated by reference into all such other Schedules for which applicability of such disclosure is reasonably apparent on its face. The Schedules and the information and disclosures contained in such Schedules are intended only to qualify and limit the representations and warranties of the Sellers contained herein and shall not be deemed to expand in any way the scope of any such representation or warranty. The disclosure of any matter in the Schedules does not constitute an acknowledgment that such matter is required to be disclosed or is material within the meaning of the representations and warranties contained herein, or otherwise. The inclusion of any information in the Schedules shall not be deemed to be an admission or acknowledgment that such information is material or outside the Ordinary Course and the omission of any information from any Schedule or any representation or warranty shall not be deemed to be a statement or acknowledgement that such information is not material or is within the Ordinary Course. ACCORDINGLY, INVESTORS IN AND LENDERS AND CREDITORS TO THE BUYERS OR THE SELLERS SHOULD NOT RELY ON ANY REPRESENTATIONS, WARRANTIES OR SCHEDULES FOR ANY PURPOSE.

**Section 10.12. Severability**.  If any provision of this Agreement shall hereafter be held to be invalid, unenforceable or illegal, in whole or in part, in any jurisdiction under any circumstances for any reason, (a) such provision shall be reformed to the minimum extent necessary to cause such provision to be valid, enforceable and legal while preserving the intent of the Parties as expressed in, and the benefits to the Parties provided by, this Agreement or (b) if such provision cannot be so reformed, such provision shall be severed from this Agreement and an equitable adjustment shall be made to this Agreement (including addition of necessary further provisions to this Agreement) so as to give effect to the intent so expressed and the benefits so provided.  Such holding shall not affect or impair the validity, enforceability or legality of such provision in any other jurisdiction or under any other circumstances.  Neither such holding nor such reformation nor severance shall affect or impair the legality, validity or enforceability of any other provision of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the Parties have duly executed and delivered this Agreement as of the date first above written.

**BARZEL INDUSTRIES INC.**

By: _Karen G. Narwold_____

Name: Karen G. Narwold
Title: Vice President


**BARZEL HOLDINGS INC.**

By: _Karen G. Narwold_____

Name: Karen G. Narwold
Title: Vice President


**BARZEL FINCO INC.**

By: _Karen G. Narwold_____

Name: Karen G. Narwold
Title: Vice President


**BARZEL INDUSTRIES U.S. INC.**

By: _Karen G. Narwold_____

Name: Karen G. Narwold
Title: Vice President


[Asset Purchase Agreement]

**AMERICAN STEEL AND ALUMINUM CORPORATION**

By: _Karen G. Narwold_

Name: Karen G. Narwold
Title: Vice President

**NOVA TUBE AND STEEL, INC.**

By: _Karen G. Narwold_

Name: Karen G. Narwold
Title: Vice President

**NOVAMERICAN TUBE HOLDINGS, INC.**

By: _Karen G. Narwold_

Name: Karen G Narwold
Title: Vice President

**NOVA TUBE INDIANA, LLC**

By: _Karen G. Narwold_

Name: Karen G. Narwold
Title: Vice President

**BARZEL INDUSTRIES CANADA INC.**

By: _Karen G. Narwold_

Name: Karen G. Narwold
Title: Vice President

[Asset Purchase Agreement]

**4513614 CANADA INC.**

By: _____

Name: Lawrence Cannon

Title: CFO


**CHRISCOTT USA INC.**

By: _____

Name: D. Bryan Jones

Title: CEO