**EXHIBIT A**

Turnbull Declaration

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Barzel Industries Inc., et al., | : | Case No. 09-13204 (CSS) |
| Debtors.[1] | : | (Jointly Administered) |

**DECLARATION OF ANDREW TURNBULL IN SUPPORT OF THE APPLICATION OF THE DEBTORS FOR AN ORDER AUTHORIZING THEM TO RETAIN HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC. AS FINANCIAL ADVISORS**

STATE OF ILLINOIS )
) ss.:
COUNTY OF COOK )

I, Andrew Turnbull, being duly sworn, deposes and says:

1. I am a Managing Director of Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") and am duly authorized to make this Affidavit on behalf of Houlihan Lokey. The facts set forth in this Affidavit are personally known to me and, if called as a witness, I could and would testify thereto.

2. This Affidavit is submitted in support of the application of the above-captioned debtors and debtors in possession (the "Debtors") in these Chapter 11 cases for authorization of the employment and retention of Houlihan Lokey as Financial Advisors to the Debtors at the expense of the Debtor's estate.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Barzel Industries Inc. (0836), Barzel Holdings Inc. (1107), Barzel Finco Inc. (1010), Barzel Industries U.S. Inc. (6382), American Steel and Aluminum Corporation (2435), Nova Tube and Steel, Inc. (1790), Novamerican Tube Holdings, Inc. (3740) and Nova Tube Indiana, LLC (8275).

3. This Affidavit is also submitted as the statement required pursuant to §§ 328(a), 329 and 504 of Title 11, United States Code (11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")).

4. Houlihan Lokey is an international investment banking/financial advisory firm, with 14 offices worldwide and more than 800 employees. Houlihan Lokey provides corporate finance and financial advisory services, as well as execution capabilities, in a variety of areas, including financial restructuring. In 2008 Houlihan Lokey ranked as the No. 1 M&A advisor for U.S. transactions under $2 billion by Thomson Reuters. In addition, the firm advised in eight of the ten largest corporate bankruptcy cases and on over 500 restructuring transactions valued in excess of $1.25 trillion in the past ten years. Established in 1970, the firm has 14 offices in the United States, Europe and Asia. Houlihan Lokey annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations.

5. Through its Financial Restructuring Group, Houlihan Lokey is one of the leading financial advisors and investment bankers to troubled companies, both inside and outside of bankruptcy, as well as to their bondholders, banks, other secured and unsecured creditors, Official Creditor Committees, acquirers, equity sponsors and other parties-in-interest involved with financially challenged companies. Houlihan Lokey's Financial Restructuring Group has over 160 professionals worldwide dedicated to providing restructuring and other financial services to distressed companies.

6. Houlihan Lokey has agreed to provide investment banking services to the Debtors in the above-captioned Chapter 11 cases pursuant to the terms and conditions of the engagement letter agreement between the Debtors and Houlihan Lokey, as modified by the amendment to the

letter agreement dated May 22, 2009 (as modified, the "Engagement Letter"), a copy of which is attached hereto as Exhibit "1." Among other things, the Engagement Letter provides that the Debtors shall indemnify Houlihan Lokey against any and all losses, claims, damages or liabilities to which Houlihan Lokey may become subject in connection with services provided pursuant to the Engagement Letter. The Debtors shall pay Houlihan Lokey's fees and expenses, including counsel fees, as they are incurred in defending any such claim. In a case where it has been determined in a final judgment by a court of competent jurisdiction that the claim resulted from the gross negligence or willful misconduct of Houlihan Lokey, Houlihan Lokey shall repay the Debtors for any fees and expenses advanced by the Debtor pursuant to the preceding sentence. Notwithstanding a final judgment determining that a claim did not result from Houlihan Lokey's gross negligence or willful misconduct, the Debtor shall not pay any indemnification claim without further notice and a hearing before the Bankruptcy Court for approval of such payment.

7. In addition to me, the principal professionals who have rendered, and are expected to render, services to Debtors are set forth on Exhibit "2" hereto, and is incorporated herein by this reference.

8. By way of further disclosure:

a) From time to time, Houlihan Lokey's Financial Restructuring Group and Industrials Group, which are providing the services in this case, have provided services, and likely will continue to provide services to certain attorneys, other professionals, creditors (including lenders) and/or security holders of the Debtor and various other parties, some of whom may be providing services to, or may be adverse to, or may be otherwise connected to, the Debtor, in each case in matters unrelated to this Chapter 11 case.

b) In addition to its Financial Restructuring Group and the Industrials Group, Houlihan Lokey and the other subsidiaries of its direct parent company, Houlihan, Lokey, Howard & Zukin, Inc., that are engaged in providing investment banking and financial advisory services globally (collectively, the "Houlihan Lokey Group") provide services to a wide range of institutions and individuals and may in the past have had, and may currently or in the future have, financial

advisory or other investment banking relationships with parties that may have interests with respect to the Debtor. In the ordinary course of business, investment funds affiliated with the Houlihan Lokey Group and certain of the Houlihan Lokey Group's employees, as well as investment funds in which such employees may have financial interests, but over whose investment decisions such employees have no input or control, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including bank loans and other obligations) of, or investments in, the Debtor or other parties that may have an interest in this Chapter 11 case or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights in respect of such securities, financial instruments and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. Moreover, the Houlihan Lokey employees who are working on this Chapter 11 case are subject to compliance mechanisms and policies and procedures designed to prevent confidential, non-public information from being improperly shared.

c) The Houlihan Lokey Group's Hedge Fund and Derivatives Valuation Services Group provides valuation opinions on the securities and derivative holdings of various business development companies, private equity firms and hedge funds, which may include debt securities of the Debtors. This work is unrelated to the financial advisory services that Houlihan Lokey intends to provide in this Chapter 11 case. Moreover, the Houlihan Lokey Group, through the establishment of an "Information Wall" has separated its employees in the Hedge Fund and Derivatives Valuation Services Group from the rest of the employees of the Houlihan Lokey Group. This "Information Wall" includes physical and technological barriers, compliance mechanisms and policies and procedures designed to prevent confidential, non-public information and work product from being shared improperly.

d) Houlihan Lokey personnel may have business associations with certain creditors of the Debtor or counsel or other professionals involved in this Chapter 11 case on matters unrelated to this Chapter 11 case. In addition, in the ordinary course of its business, Houlihan Lokey may engage counsel or other professionals in unrelated matters who now represent, or in the future may represent, creditors or other interested parties in this Chapter 11 case.

e) Houlihan Lokey is indirectly majority-owned by ORIX USA Corporation, an affiliate of ORIX Corporation, a diversified financial services company based in Japan (collectively, "ORIX"), which has a wide-range of business interests in 26 countries. ORIX's businesses (other than the Houlihan Lokey Group) are not managed or controlled by the Houlihan Lokey Group or any of its employees and the Houlihan Lokey Group has no input into any of ORIX's decisions regarding its other businesses. While ORIX does control a majority of the equity of the Houlihan Lokey Group (approximately 48% of the common equity is held by Houlihan Lokey Group employees), the Houlihan Lokey Group is operated as a separate business from all other ORIX entities. As evidence of this separateness,

(i) the Houlihan Lokey Group is governed by a 15-person board of directors, eleven of whom are Houlihan Lokey Group employees and four are designated by ORIX, (ii) the activities of the Houlihan Lokey Group are managed on a day-to-day basis exclusively by Houlihan Lokey Group employees, (iii) only the profits and losses of the Houlihan Lokey Group businesses are taken into account in valuing the equity of the Houlihan Lokey Group and (iv) the aggregate annual compensation of Houlihan Lokey Group professionals is set by formula and ORIX has no input in determining that amount.

9. To determine its relationship with parties in interest in this Chapter 11 case, Houlihan Lokey has researched the client databases maintained with respect to the Houlihan Lokey Group to determine whether it has any relationships with the entities (individually an "Interested Party" and collectively, the "Interested Parties") that were identified to Houlihan Lokey by the Debtor. Such entities include:

(a) The Debtors and their affiliates;

(b) The Debtors' shareholders holding 5% more of the Debtors' equity securities;

(c) The Debtors' officers and directors, and their business affiliations;

(d) The Officers and directors of the Debtors' non-debtor affiliates;

(e) The Debtors' professionals;

(f) The Debtors' financing providers;

(g) The Lenders;

(h) Other general unsecured creditors on the top consolidated creditor list;

(i) The United States Bankruptcy Judges for the District of Delaware; and

(j) The U.S. Trustee.

In addition to checking the client data base maintained by the Houlihan Lokey Group, Houlihan Lokey checked this list of Interested Parties and determined that none of them is a

company controlled by ORIX outside the Houlihan Lokey Group.

10. The attached Exhibit "3" details the relationship check performed by Houlihan Lokey, and identifies any relationships discovered through such investigation that members of the Houlihan Lokey Group have with any Interested Parties in this Chapter 11 case.

11. To the best of my knowledge, information and belief after reasonable inquiry, other than as disclosed in this Affidavit, neither I, the Houlihan Lokey Group, nor any of our professionals or employees participating in or connected with Houlihan Lokey's engagement with the Debtors: (i) is related to the Debtor or any other party in interest herein, the United States Trustee for the District of Delaware or anyone employed in the United States Trustee's Office for this District; (ii) has any connection with or holds or represents any interest adverse to the Debtor, its estate, its creditors or any other Interested Party or their respective attorneys in the matters on which Houlihan Lokey is proposed to be retained; or (iii) has advised any Interested Party, except for the Debtors, in connection with this Chapter 11 case. In addition, Houlihan Lokey does not believe that any relationship that the Houlihan Lokey Group or any of our professionals or employees participating in or connected with Houlihan Lokey's engagement with the Debtors may have with any Interested Party in connection with any unrelated matter will interfere with or impair Houlihan Lokey's representation of the Debtors in this Chapter 11 case.

12. To the extent Houlihan Lokey discovers any facts bearing on the matters described herein during the period of Houlihan Lokey's retention, Houlihan Lokey undertakes to amend and supplement the information contained in this Affidavit to disclose such facts.

13. Based on all of the foregoing, Houlihan Lokey is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code.

14. No agreement presently exists to share with any other person or firm any compensation received by Houlihan Lokey for its services in this case. If any such agreement is entered into, Houlihan Lokey undertakes to amend and supplement this Affidavit to disclose the terms of any such agreement.

15. No promises have been received by Houlihan Lokey, or by any employee thereof, as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.

16. I am generally familiar with the Bankruptcy Code and the Bankruptcy Rules, and Houlihan Lokey will comply with them, subject to the Orders of this Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of September, 2009.

[signature]

Andrew Turnbull

Sworn to and subscribed before me on this 14th day of September, 2009

OFFICIAL SEAL
CATHERINE SCHWARTZ
Notary Public - State of Illinois
My Commission Expires Aug 19, 2013

Notary Public

CHI-1659201v2
40000/0598-5952203v3

# EXHIBIT 1

## *ENGAGEMENT LETTER*

HOULIHAN LOKEY

***Personal and Confidential***

May 2, 2009

Mr. Corrado De Gasperis
Chief Executive Officer
Barzel Industries Inc.
320 Norwood Park South, 2nd Floor
Norwood, MA 02062

Dear Mr. De Gasperis:

This letter agreement (this "Agreement") confirms the terms under which Barzel Industries Inc. ("Barzel" and, collectively with its subsidiaries, including without limitation Barzel Holdings Inc. ("Barzel Holdings"), Barzel Finco Inc. ("Barzel Finco"), Barzel Industries Canada Inc. (including the former Novamerican Steel Inc. ("Barzel Canada")), and Barzel Industries U.S. Inc. ("Barzel U.S."), the "Company") has engaged Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), effective as of the date indicated above (the "Effective Date"), as its exclusive financial advisor to provide financial advisory and investment banking services in connection with one of more potential "Transactions" (as defined below) for the Company and with respect to such other financial matters as to which the Company and Houlihan Lokey may agree in writing during the term of this Agreement.

1. <u>Services</u>. In connection with each potential Transaction (as defined below), Houlihan Lokey will assist and advise the Company with the analysis, evaluation, pursuit and effectuation of any such Transaction. Houlihan Lokey's services will include, if appropriate and if requested by the Company, (i) assisting the Company in the development, preparation and distribution of selected information, documents and other materials in an effort to create interest in and to consummate any Transaction(s), including, if appropriate, advising the Company in the preparation of an offering memorandum; (ii) soliciting and evaluating indications of interest and proposals regarding any Transaction(s) from current and/or potential lenders, equity investors, acquirers and/or strategic partners (collectively, "Investors"), except to the extent provided below; (iii) assisting the Company with the development, structuring, negotiation and implementation of any Transaction(s), including participating as an advisor of the Company in negotiations with creditors and other parties involved in any Transaction(s), except to the extent provided below; (iv) assisting the Company in valuing the Company and/or, as appropriate, valuing the Company's assets or operations, provided that any real estate or fixed asset appraisals will be undertaken by outside appraisers, separately retained and compensated by the Company; (v) providing expert advice and testimony regarding financial matters related to any Transaction(s), if necessary; (vi) advising and attending meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company and Houlihan Lokey determine to be necessary or desirable, except to the extent provided below; and (vii) providing such other financial advisory and investment banking services as may be agreed upon by Houlihan Lokey and the Company. In the event that, in order to accomplish a Transaction, the Company undertakes an "exchange offer" pursuant to Section 3(a)(9) of the Securities Act of 1933, as amended (a "3(a)(9) Offer") it is agreed and understood that Houlihan Lokey shall not engage, directly or indirectly, in the solicitation of the exchange.

2. **Exclusive Agency**. The Company agrees that it will inform Houlihan Lokey of any ongoing discussions regarding a Transaction that were initiated prior to the Effective Date, and that the Company and its management will coordinate with Houlihan Lokey, in advance, any discussions subsequent to the Effective Date regarding a Transaction during the term of this Agreement. In the event the Company or its management receives any inquiry regarding a Transaction from any party, the Company shall promptly inform Houlihan Lokey of such inquiry so that Houlihan Lokey can assist the Company in evaluating such party and its interest in a Transaction and in any resulting negotiations.

3. **Fees**. In consideration of Houlihan Lokey's acceptance of this engagement and performance of services pursuant to this Agreement, the Company shall pay the following:

(i) *Monthly Fees*: In addition to the other fees provided for herein, upon the Effective Date and thereafter on the first monthly anniversary of the Effective Date, and on every monthly anniversary of the Effective Date during the term of this Agreement, the Company shall pay Houlihan Lokey in advance, without notice or invoice, a nonrefundable cash fee of $165,000 ("Monthly Fee") for a minimum of three months. Notwithstanding anything contained herein to the contrary, the Monthly Fee shall be paid for a minimum of three months ("Minimum Monthly Fee"). Each Monthly Fee shall be earned upon Houlihan Lokey's receipt thereof in consideration of Houlihan Lokey accepting this engagement and performing services as described herein. If this Agreement is terminated before the end of three months from the Effective Date, the Company hereby agrees to pay to Houlihan Lokey, on the effective date of such termination, the amount of the Minimum Monthly Fee minus the Monthly Fees actually paid to Houlihan Lokey hereunder. Fifty percent (50%) of any Monthly Fees related to periods after three (3) months from the Effective Date shall be credited once against any Restructuring Transaction Fee payable under clause 3(ii)(a)(x) below, any Sale Transaction Fee and/or any Financing Transaction Fee (all as defined below), provided that such Transaction Fee cannot be reduced below zero. Fifty percent (50%) of any Monthly Fees related to periods after six (6) months from the Effective Date shall be credited once against any Restructuring Transaction Fee payable under clause 3(ii)(a)(y) below, provided that such Restructuring Transaction Fee cannot be reduced below zero; and

(ii) *Transaction Fee(s)*: In addition to the other fees provided for herein, the Company shall pay Houlihan Lokey the following transaction fee(s):

a. *Restructuring Transaction Fee*. Upon the earlier to occur of: (I) in the case of an out-of-court Restructuring Transaction (as defined below), the closing of such Restructuring Transaction; and (II) in the case of an in-court Restructuring Transaction, the date of confirmation of a plan of reorganization under Chapter 11 of the Bankruptcy Code pursuant to an order of the applicable bankruptcy court, Houlihan Lokey shall earn, and the Company shall promptly pay to Houlihan Lokey, a cash fee ("Restructuring Transaction Fee") of (x) $2,750,000 if such Restructuring Transaction occurs in conjunction with a Financing Transaction in which a majority of the funding (excluding undrawn funds under a revolving credit agreement) provided in connection therewith is provided by investors who are not Identified Investors (as defined below), or (y) $1,000,000 if such Restructuring Transaction does not occur in conjunction with a Financing Transaction as described in clause (x) above. A Restructuring Transaction Fee shall not be payable under a liquidation under Chapter 7 of the Bankruptcy Code. In no event shall more than one Restructuring Transaction Fee be payable hereunder.

An "Identified Investor" is hereby defined as (I) a "founder" of the Company as disclosed in the prospectus for Barzel's initial public offering dated March 7, 2007, an officer, director or employee of the Company or a 5% or greater stockholder of the Company as of March 1, 2009 as reported in the Company's Proxy Statement filed with the SEC on March 30, 2009 or who has become such a person between March 1, 2009 and the Effective Date as reported in filing by them with the SEC, or (II) on the Effective Date a holder of the Company's senior secured notes or a lender under the Company's asset based lending facility, each as described in the Company's Annual Report on Form 10-K for the fiscal year ended November 29, 2008, as of the Effective Date or (III) as of the Effective Date an Affiliate (as defined below) or related party (as defined below) of any of the persons described in clauses (I) and (II) above. An "Affiliate" is a person, as of the Effective Date, that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified. "Related Party" is any immediate family member of a director or executive officer, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such security holder, and any person (other than a tenant or employee) sharing the household of such director or executive officer.

b. *Sale Transaction Fee.* Upon the closing of each Sale Transaction (as defined below), Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Sale Transaction, as a cost of such Sale Transaction, a cash fee ("Sale Transaction Fee") based upon Aggregate Gross Consideration ("AGC"), calculated as follows:

| | |
|---|---|
| For AGC up to $150 million: | the greater of $2.0 million (the "Minimum Sale Transaction Fee") and 2.0% of AGC, plus |
| For AGC from $150 million to $200 million: | 3.5% of such incremental AGC, plus |
| For AGC above $200 million: | 5.0% of such incremental AGC; |

In the event the Company enters into an executed sale agreement within 60 days of the Effective Date with respect to a Sale Transaction in which Identified Investors collectively provide a majority of the equity capital (an "Identified Investor Sale Transaction"), the Sale Transaction Fee for such Identified Investor Sale Transaction shall be reduced by 25%. In addition, in the event the Company shall not have received a bona fide written indication of interest as to a Sale Transaction from an investor other than an Identified Investor, the above mentioned 60-day time limitation shall not apply and the Sale Transaction Fee for such Identified Investor Sale Transaction shall be reduced by 75%; provided, however, that if such Sale Transaction is also a Restructuring Transaction, than Houlihan Lokey shall be entitled to the greater of the Sale Transaction Fee as set out in this Section 3(ii)(b) or the Restructuring Transaction Fee as set out in Section 3(ii)(a).

Notwithstanding anything contained herein to the contrary, if the Minimum Sale Transaction Fee is due on the first Sale Transaction, the AGC from any subsequent Sale

Transactions shall be combined with the AGC from the prior Sale Transaction(s) for purposes of determining any additional Sale Transaction Fees (over and above the Minimum Sale Transaction Fee and the $300,000 minimum mentioned below) due to Houlihan Lokey upon completion of any subsequent Sale Transaction(s). However, in no event shall a Sale Transaction Fee payable to Houlihan Lokey for any subsequent Sale Transaction(s) be less than $300,000 nor shall more than one Minimum Sale Transaction Fee be payable hereunder.

c. *Financing Transaction Fee.* Upon the closing of each Financing Transaction (as defined below), or the funding or exercise thereof as provided below, Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Financing Transaction, as a cost of such Financing Transaction, a cash fee ("Financing Transaction Fee") equal to the sum of: (I) 2.0% of the gross proceeds of any indebtedness raised or unconditionally committed (except for customary drawdown conditions) that is senior to other indebtedness of the Company and secured by a first priority lien and unsubordinated, with respect to both lien priority and payment, to any other obligations of the Company (other than with respect to debtor-in-possession financing); (II) 3.0% of the gross proceeds of any indebtedness raised or unconditionally committed (except for customary drawdown conditions) that is secured by a lien (other than a first lien), is unsecured and/or is subordinated; and (III) 6.0% of the gross proceeds of all equity or equity-linked securities (including, without limitation, convertible securities and preferred stock) placed or unconditionally committed (except for customary drawdown conditions). Any warrants issued in connection with the raising of debt or equity capital shall, upon the exercise thereof, be considered equity for the purpose of calculating the Financing Transaction Fee, and such portion of the Financing Transaction Fee shall be paid upon such exercise and from the gross proceeds thereof, regardless of any prior termination or expiration of this Agreement. It is understood and agreed that if the proceeds of any such Financing Transaction are to be funded in more than one stage, Houlihan Lokey shall be entitled to its applicable compensation hereunder upon the closing date of each stage. The Financing Transaction Fee(s) shall be payable in respect of any sale of securities during the term of this Agreement or, to the extent provided in Section 4, after the term of this Agreement, whether such sale has been arranged by Houlihan Lokey, by another agent (or other issuer of the securities in such Financing Transaction) or directly by the Company. Any non-cash consideration provided to or received in connection with the Financing Transaction shall be valued for purposes of calculating the Financing Transaction Fee as equaling the number of securities issued in exchange for such consideration multiplied by the per security price paid in the then current round of financing. The fees set forth herein shall be in addition to any other fees that the Company may be required to pay to any investor or other purchaser of securities to secure its financing commitment. Houlihan Lokey shall earn, and the Company shall thereupon pay immediately and directly from the gross proceeds of such Financing Transaction, a Financing Transaction Fee for any debtor-in-possession financing that is raised (from persons other than Identified Investors) of $1,000,000 (in lieu of any other Financing Transaction Fee with respect to such debtor-in-possession financing). Funds invested by an Identified Investor as part of a Financing Transaction shall be excluded from calculation of any Financing Transaction Fee due to Houlihan Lokey. Notwithstanding the previous sentence, the Financing Transaction Fee payable hereunder shall be subject to a $1,000,000 minimum Financing Transaction Fee (a

"Minimum Financing Transaction Fee") payable upon the first closing of a Financing Transaction (except that there shall be no Minimum Financing Transaction Fee if a majority of the proceeds (excluding undrawn funds under a revolving credit agreement) are invested by Identified Investors).

To the extent that a Financing Transaction occurs substantially simultaneously with a Restructuring Transaction, sixty percent (60%) of the Financing Transaction Fee earned by Houlihan Lokey for such simultaneous Financing Transaction shall be credited once against the Restructuring Transaction Fee, provided that such Restructuring Transaction Fee cannot be reduced below zero.

Notwithstanding anything contained herein to the contrary, if the Minimum Financing Transaction Fee is due on the first Financing Transaction, the proceeds from any subsequent Financing Transaction shall be combined with those received in prior Financing Transactions for purposes of determining any additional Financing Transaction Fees (over and above the Minimum Financing Transaction Fee and the $300,000 minimum mentioned below) due to Houlihan Lokey. However, in no case shall the Financing Transaction fee payable to Houlihan Lokey for any such subsequent Financing Transaction(s) be less than $300,000 nor shall more than one Minimum Financing Transaction Fee be payable hereunder.

Any Restructuring Transaction Fee, Sale Transaction Fee and Financing Transaction Fee is each referred to herein as a "Transaction Fee" and are collectively referred to herein as "Transaction Fees." All payments received by Houlihan Lokey pursuant to this Agreement at any time shall become the property of Houlihan Lokey without restriction. No payments received by Houlihan Lokey pursuant to this Agreement will be put into a trust or other segregated account.

4. **Term and Termination.** This Agreement shall have an initial term of three (3) months, and thereafter shall be automatically extended on a month-to-month basis until either party provides thirty (30) days' prior written notice of termination to the other party. The expiration or termination of this Agreement shall not affect (i) any provision of this Agreement other than Sections 1 through 3 and (ii) Houlihan Lokey's right to receive, and the Company's obligation to pay, any and all fees, expenses and other amounts due in accordance with the terms of this Agreement.

Notwithstanding the expiration or termination of this Agreement, Houlihan Lokey shall be entitled to full payment by the Company of the Transaction Fees described in this Agreement: (i) so long as a Transaction is consummated during the term of this Agreement, or within ten (10) months after the date of expiration or termination of this Agreement ("Tail Period"), and/or (ii) if an agreement in principle to consummate a Transaction is executed by any entity comprising the Company during the term of this Agreement, or during the Tail Period, and such Transaction is consummated at any time following such execution with the counterparty named in such agreement, or with any executive employee of, or investor in, such counterparty, or any Affiliate of any of the foregoing. In connection with the immediately preceding sentence, a Transaction consummated within the Tail Period and agreements in principle to consummate a Transaction executed within the Tail Period shall only apply to parties that (i) Houlihan Lokey identified or contacted, or with whom Houlihan Lokey or the Company had discussions, regarding a potential Transaction during the term of this Agreement, (ii) reviewed the information memorandum or any other written materials prepared by Houlihan Lokey or by the Company with the assistance of Houlihan Lokey concerning the Company and/or any proposed Transaction or (iii) are in the capital structure of the Company (notwithstanding, but subject to, any reduction of fees for Transactions that include any Identified Investor(s) as discussed elsewhere in this Agreement). For the avoidance of doubt,

the qualifications set forth in the immediately preceding sentence shall apply only to a Sale or Financing Transaction and no other types of Transactions. If Houlihan Lokey is paid a Restructuring Transaction Fee under clause 3(ii)(a)(x) herein, then the Tail Period coverage provided in this paragraph shall cease. In addition, if Houlihan Lokey is paid a Financing Transaction Fee and the Company completes another Financing Transaction within the Tail Period but Houlihan Lokey did not negotiate or participate in the arrangement of the subsequent Financing Transaction, then Houlihan Lokey shall not be entitled to a fee for the subsequent Financing Transaction.

5. **Agreement from Secured Lenders.** At Houlihan Lokey's option, Houlihan Lokey's obligations to provide the services described herein are contingent upon, and expressly subject to, the execution of a waiver, subordination or similar agreement, in form and substance satisfactory to Houlihan Lokey, pursuant to which the Company's senior secured lenders consent to the performance of the Company's obligations under this Agreement, including, without limitation, the Company's payment of Houlihan Lokey's fees and expenses described in Sections 3 and 11 hereof, free and clear of such lenders' security interests in the Company's assets. Houlihan Lokey agrees that it will inform the Company prior to holding any discussions with the Company's lenders pursuant to this paragraph, which are expected to occur promptly after communications with such lenders commence.

6. **Transaction.** As used in this Agreement, the term "Transaction" shall mean any of the following:

(i) *Restructuring Transaction.* Any transaction or series of transactions that constitute a recapitalization or restructuring of a substantial portion of the equity and/or debt securities and/or other indebtedness (including, without limitation, preferred stock and partnership interests) of any entity comprising the Company, including accrued and/or accreted interest thereon, which are outstanding as of the Effective Date, including, without limitation, the Company's secured credit facilities and bonds, which recapitalization or restructuring is effected pursuant to an exchange transaction, tender offer, a plan of reorganization under the Bankruptcy Code, a solicitation of consents, waivers, acceptances or authorizations, any change of control transaction, any refinancing, sale, acquisition, merger, repurchase, exchange, conversion to equity, cancellation, forgiveness, retirement and/or a modification or amendment to the terms, conditions, or covenants of payment of any agreements or instruments governing any of the equity and/or debt securities and/or other indebtedness of any entity comprising the Company (such modification or amendment shall include, without limitation, any payment obligation forbearance for at least 12 months) or any combination of the foregoing transactions (each a "Restructuring Transaction");

(ii) *Sale Transaction.* Any transaction or series of related transactions that constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, and also including, among others, any of the existing owners, shareholders, employees, or creditors of any entity comprising the Company and/or the Affiliates of each) in one or a series of related transactions of (a) all or a majority of the outstanding equity securities of any entity comprising the Company and/or (b) all or a majority of the assets or operations of any entity comprising the Company, including, in either case, without limitation, through a sale or exchange of capital stock of Barzel's subsidiaries or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity, or any similar transaction, including, without limitation,

any sale transaction under Sections 363, 1129 or any other provision of Title 11, United States Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") (each a "Sale Transaction"); or

(iii) *Financing Transaction.* (a) Any transaction or series of related transactions that constitutes any refinancing of the Company's senior secured notes or asset based lending facility; and/or (b) the placement, raising or issuance of any form of equity, equity-linked or debt securities (including, without limitation, any convertible securities, preferred stock, unsecured, non-senior or subordinated debt securities, and/or senior notes or bank debt) or any loan or other financing, including any "debtor in possession financing" (other than a "debtor in possession financing" provided exclusively by an Identified Investor) or "exit financing" in connection with a case under the Bankruptcy Code by any entity comprising the Company, from any source including, without limitation, any of the existing owners, shareholders, employees, or creditors of any entity comprising the Company (whether or not such transaction is effectuated in-court, out-of-court, through the confirmation of a plan of reorganization or otherwise under the Bankruptcy Code, or whether the requisite consents to such transaction(s) are obtained in-court or out-of-court) (each a "Financing Transaction").

7. **Aggregate Gross Consideration ("AGC")**. For the purpose of calculating the Sale Transaction Fee, the AGC shall be the gross proceeds and other consideration paid to, or received by, or to be paid to or received by, any entity comprising the Company, or any of its equity or debt holders, or other parties in interest, including, without limitation, holders of warrants and convertible securities, and holders of options or stock appreciation rights, whether or not vested (collectively "Constituents"), in connection with the relevant Sale Transaction. Such proceeds and consideration shall be deemed to include, without limitation and without duplication: amounts in escrow and any deposits or other amounts forfeited by any Investor; cash, notes, securities, and other property; payments made in installments; amounts payable under above-market employment contracts, non-compete or severance agreements, consulting contracts or similar arrangements with any equity holder; and/or Contingent Payments (as defined below). Upon the closing of a Sale Transaction in which some but less than 100% of the ownership of the equity interests are sold, the AGC shall be calculated as if 100% of the ownership of the equity interests of the Company on a fully diluted basis (excluding "out-of-the money" warrants) had been sold by dividing (i) the total consideration, whether in cash, securities, notes or other forms of consideration, received or receivable by the Company and/or its Constituents by (ii) the percentage of ownership which is sold. If, in the Sale Transaction, no consideration is being paid in respect of the existing equity, AGC of the retained equity shall be determined by the good faith agreement of the parties as to the value of such retained equity implied by the Sale Transaction. In addition, but without duplication, if any of the liabilities of any entity comprising the Company are assumed, decreased, reinstated, satisfied or otherwise paid off in conjunction with a Sale Transaction other than with the proceeds from the Sale Transaction (in the form of "cure" payments or otherwise), or any of the assets of any entity comprising the Company are sold or otherwise transferred outside of the Company's ordinary course of business to another party prior to the closing of a Sale Transaction (including, without limitation, any dividends or distributions paid to security holders or amounts paid to repurchase any securities) or are retained for benefit of existing debt or equity holders of the Company after the closing of the Sale Transaction, the AGC will be increased to reflect the face value of any such liabilities and the fair market value of any such assets. Contingent Payments shall be defined as the consideration receivable by the Company, or any of its Constituents in the form of deferred performance-based payments, "earn-outs", or other contingent payments based upon future events, including the future performance of any entity comprising the Company, or any of its businesses or assets.

8. **Value of Consideration.** For the purpose of calculating the AGC received in a Sale Transaction, any securities, other than a promissory note, will be valued at the time of the closing of the Sale Transaction, without regard to any restrictions on transferability, as follows: (i) if such securities are traded on a stock exchange, the securities will be valued at the average last sale or closing price for the ten trading days immediately prior to the closing of the Sale Transaction; (ii) if such securities are traded primarily in over-the-counter transactions, the securities will be valued at the mean of the closing bid and asked quotations similarly averaged over a ten trading day period immediately prior to the closing of the Sale Transaction; and (iii) if such securities have not been traded prior to the closing of the Sale Transaction, Houlihan Lokey and the Company shall negotiate in good faith to agree on a fair valuation thereof, without regard to any restrictions on transferability, for the purposes of calculating the AGC. For any other consideration that is not freely tradeable or has no established public market, then the value of such property shall be the fair market value thereof as determined in good faith by Houlihan Lokey and the Company. If any consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable. The value of any purchase money or other promissory notes shall be deemed to be the face amount thereof. In the event the AGC includes any Contingent Payments, no Sale Transaction Fee shall be paid thereon until received and an additional Sale Transaction Fee shall be paid to Houlihan Lokey from, and on account of, such Contingent Payments at the same time that each of such Contingent Payments are received regardless of any prior termination or expiration of this Agreement.

9. **Characterization of Multiple and/or Complex Transactions.** In the event the Company and Houlihan Lokey are unable to agree in good faith upon the classification of any single Transaction as a Restructuring Transaction, Sale Transaction or Financing Transaction, or if a single transaction or series of transactions with only one third party or group shall consist of two, or more, of the foregoing types of Transactions, or elements thereof, Houlihan Lokey shall receive only one Transaction Fee in respect of such Transaction, which shall be equal to the greater of the Restructuring Transaction Fee, Sale Transaction Fee or Financing Transaction Fee, as applicable, as calculated in accordance with the terms of this Agreement. For the avoidance of doubt, if two or more single but separate Transactions occur simultaneously or at different times, whether or not they are related to one another, the Company shall pay Houlihan Lokey the Transaction Fee for each such Transaction in addition to, and not in lieu of, each other; provided, however, that such Transaction Fees are subject to the provisions of the second and third paragraphs of each of Section 3(ii)(b) and Section 3(ii)(c).

10. **Reasonableness of Fees.** The parties acknowledge that a substantial professional commitment of time and effort will be required of Houlihan Lokey and its professionals hereunder, and that such commitment may foreclose other opportunities for the firm. Moreover, the actual time and commitment required for the engagement may vary substantially, creating "peak load" issues for the firm. Given the numerous issues which may arise in engagements such as this, Houlihan Lokey's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Houlihan Lokey that will be required in this engagement, and the market rate for Houlihan Lokey's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Houlihan Lokey, and provides the requisite certainty to the Company.

11. **Expenses.** In addition to all of the other fees and expenses described in this Agreement, and regardless of whether any Transaction is consummated, the Company shall, upon Houlihan Lokey's request, reimburse Houlihan Lokey for its reasonable out-of-pocket expenses incurred from time to time in connection with its services hereunder. Without limiting the obligations herein, Houlihan Lokey will

provide a monthly invoice of such out-of-pocket expenses and reasonable backup relating to such expenses (except for the expenses in clause (ii) of the following sentence). Houlihan Lokey bills its clients for its reasonable out-of-pocket expenses including, but not limited to (i) travel-related and certain other expenses, without regard to volume-based or similar credits or rebates Houlihan Lokey may receive from, or fixed-fee arrangements made with, travel agents, airlines or other vendors, and (ii) research, database and similar information charges paid to third party vendors, and postage, telecommunication and duplicating expenses, to perform client-related services that are not capable of being identified with, or charged to, a particular client or engagement in a reasonably practicable manner, based upon a uniformly applied monthly assessment or percentage of the fees due to Houlihan Lokey.

Houlihan Lokey shall, in addition, be reimbursed by the Company for the fees and expenses of Houlihan Lokey's legal counsel incurred in connection with the performance of this Agreement and the matters contemplated hereby, but in no event greater than $5,000 without the Company's prior approval, which approval shall not be unreasonably withheld; provided, however, that such approval requirement shall not apply to the Company's indemnification obligations under Section 21, including the obligation to reimburse each indemnified Party for reasonable fees and expenses of counsel.

12. **Invoicing and Payment**. All amounts payable to Houlihan Lokey shall be made in lawful money of the United States in accordance with the payment instructions set forth on the invoice provided with this Agreement, or to such accounts as Houlihan Lokey shall direct in writing. All amounts invoiced by Houlihan Lokey shall be exclusive of value added tax, withholding tax, sales tax and any other similar taxes ("Taxes"). All amounts charged by Houlihan Lokey will be invoiced together with Taxes where appropriate.

13. **Information**. The Company will provide Houlihan Lokey with access to management and other representatives of the Company, as reasonably requested by Houlihan Lokey. The Company will furnish Houlihan Lokey with such Company information as Houlihan Lokey may reasonably request for the purpose of carrying out its engagement hereunder, all of which will be, to the Company's best knowledge, accurate and complete in all material respects at the time furnished. The Company further represents and warrants that any financial projections delivered to Houlihan Lokey have been or will be reasonably prepared in good faith on bases Company management believes reflect the best available estimates and judgments of the future financial results and condition of the Company at the time delivered. The Company will promptly notify Houlihan Lokey in writing of any material inaccuracy or misstatement in, or material omission from, any information previously delivered to Houlihan Lokey, or any materials provided to any interested party. Houlihan Lokey shall rely, without independent verification, on the accuracy and completeness of all information that is publicly available and of all information furnished by or on behalf of the Company or any other potential party to any Transaction or otherwise reviewed by Houlihan Lokey. The Company understands and agrees that Houlihan Lokey will not be responsible for the accuracy or completeness of such information, and shall not be liable for any inaccuracies or omissions therein. The Company acknowledges that Houlihan Lokey has no obligation to conduct any appraisal of any assets or liabilities of the Company or any other party. Any advice (whether written or oral) rendered by Houlihan Lokey pursuant to this Agreement is intended solely for the use of the Company in considering the matters to which this Agreement relates, and such advice may not be relied upon by any other person or used for any other purpose. Any advice rendered by, or other materials prepared by, or any communication from, Houlihan Lokey (including, without limitation, the Opinion (as defined below)) may not be disclosed, in whole or in part, to any third party, or summarized, quoted from, or otherwise referred to in any manner without the prior written consent of Houlihan Lokey. In addition, neither Houlihan Lokey nor the terms of this Agreement may otherwise be referred to without our prior written consent.

14. **Additional Provisions Regarding Financing Transaction**. The Company authorizes Houlihan Lokey to provide an information memorandum (or similar document) (as such document may be amended or supplemented and including any information incorporated therein by reference, the "Information Memorandum") and other pertinent information to prospective investors and other purchasers as approved by the Company, and agrees not to transmit the Information Memorandum to prospective investors or other purchasers without prior consultation with Houlihan Lokey. The Company will be solely responsible for the contents of the Information Memorandum and any and all other written or oral communications provided by or on behalf of the Company to any actual or prospective investor or other purchaser. The Company represents and warrants that the Information Memorandum and such other communications will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. If an event occurs as a result of which the Information Memorandum (as then supplemented or amended) would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, the Company will promptly notify Houlihan Lokey of such event and Houlihan Lokey will suspend solicitations of prospective investors and other purchasers until such time as the Company prepares (and the Company agrees that, if the solicitation of prospective investors and other purchasers has been so suspended after the Company has accepted orders from prospective investors or other purchasers, the Company will promptly prepare) a supplement or amendment to the Information Memorandum which corrects such statement(s) or omission(s). The Company will (i) make available to each bona fide offeree of securities such information (in addition to that contained in the Information Memorandum) concerning the offering of securities, the Company and any other relevant matters, as may be reasonably requested, and (ii) will provide each bona fide offeree the opportunity to ask questions of, and receive answers from, the officers and employees of the Company concerning the terms and conditions of the offering of securities.

The Company acknowledges that closing of a Financing Transaction is subject, among other factors, to acceptable documentation, market conditions, and satisfaction of the conditions set forth in one or more agreements to be entered into with any financier, lender, investor or other purchaser of securities. It is expressly understood that this engagement does not constitute any commitment, express or implied, on the part of Houlihan Lokey to acquire, and does not ensure the successful placement of, any securities. The Company further acknowledges and agrees that Houlihan Lokey is not acting as an underwriter of securities and shall have no responsibility or obligation to underwrite securities.

In connection with all offers and sales of the securities, the Company will cause to be addressed and delivered to Houlihan Lokey a written opinion of Company counsel acceptable to Houlihan Lokey containing (i) an opinion to the effect that the placement of securities was exempt from registration under the Securities Act of 1933, as amended (the "Act"). The Company also will cause to be furnished to Houlihan Lokey at or after each closing of a sale of securities copies (addressed to Houlihan Lokey, if requested and as appropriate) of such agreements, opinions, certificates and other documents (including, without limitation, accountant's letters) as Houlihan Lokey may reasonably request. The Company hereby acknowledges and agrees that Houlihan Lokey shall be entitled to rely upon the representations and warranties made (whether pursuant to a subscription agreement or in any other format) to investors or other purchasers of securities and the Company shall be deemed to have made such representations and warranties to and for the benefit of Houlihan Lokey.

It is understood that the offer and sale of securities in a Financing Transaction will be exempt from the registration requirements of the Act, pursuant to Section 4(2) thereof. Neither party hereto has taken, or will take, any action, directly or indirectly, so as to cause the transactions contemplated by this

Agreement to fail to be entitled to exemption under Section 4(2) of the Act. The Company will promptly from time to time take such reasonable action as necessary to qualify the securities as a private placement under the securities laws of such States and foreign jurisdictions as any prospective investor or other purchaser may reasonably request and will comply with applicable laws. The Company shall offer and sell securities only to investors and other purchasers of securities that it reasonably believes to be "accredited investors", as defined in Rule 501 of Regulation D under the Act. The Company will file in a timely manner with the Securities and Exchange Commission (the "SEC") and/or each other regulatory authority any notices or other filings with respect to the securities required by Rule 503 of Regulation D under the Act and/or other applicable law or regulation and will upon request furnish to Houlihan Lokey a signed copy of each such notice or filing promptly after its submission.

The Company represents and warrants that it has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended ("1934 Act") (all of the foregoing filed prior to the Effective Date and all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "SEC Documents"). To the knowledge and belief of the Company, as of their respective dates, all SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, and, as of their respective dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto.

15. **Limitations on Services as Advisor**. Houlihan Lokey's services are limited to those specifically provided in this Agreement, or subsequently agreed upon, in writing, by the parties hereto. Houlihan Lokey shall have no obligation or responsibility for any other services including, without limitation, any crisis management or business consulting services related to, among other things, the implementation of any operational, organizational, administrative, cash management, or similar activities. Houlihan Lokey is providing the Company with Houlihan Lokey's services hereunder as an independent contractor, and the parties agree that this Agreement does not create an agency, fiduciary, or third party beneficiary relationship between Houlihan Lokey, on the one hand, and the Company and/or its creditors or any other person, on the other hand. In performing its services pursuant to this Agreement, Houlihan Lokey is not assuming any responsibility for the Company's decision to pursue, or not to pursue, any business strategy, or to effect, or not to effect, any Transaction(s), which decision shall be made by the Company in its sole discretion.

16. **Bankruptcy Court Approval**. In the event that during the term of this Agreement, or during the Tail Period, the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, whether voluntarily or involuntarily, the Company shall seek an order authorizing the employment of Houlihan Lokey pursuant to the terms of this Agreement, as a professional person pursuant to, and subject to the standard of review of, Section 328(a) of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and applicable local rules and orders and not subject to any other standard of review under Section 330 of the Bankruptcy Code. In so agreeing to seek Houlihan Lokey's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Houlihan Lokey's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Transaction,

that the value to the Company of Houlihan Lokey's services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Transaction Fee(s) is reasonable regardless of the number of hours to be expended by Houlihan Lokey's professionals in the performance of the services to be provided hereunder. The Company shall submit Houlihan Lokey's employment application as soon as practicable following the Company's filing of a voluntary Chapter 11 case, or the entry of an order for relief in any involuntary case filed against the Company, and use its best efforts to cause such application to be considered on an expedited basis. The employment application and the proposed order authorizing such employment of Houlihan Lokey shall be provided to Houlihan Lokey as much in advance of such Chapter 11 filing as is practicable, and must be acceptable to Houlihan Lokey in its sole discretion. Following entry of the order authorizing such employment of Houlihan Lokey, the Company shall pay all fees and expenses due pursuant to this Agreement, as approved by the court having jurisdiction of the bankruptcy case involving the Company (the "Bankruptcy Court"), as promptly as possible in accordance with the terms of this Agreement and the order of such Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules and applicable local rules and orders, and will work with Houlihan Lokey to promptly file any and all necessary applications regarding such fees and expenses with the Bankruptcy Court. Houlihan Lokey shall have no obligation to provide services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Houlihan Lokey's retention under this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to Houlihan Lokey in all respects. If the order authorizing the employment of Houlihan Lokey is not obtained, or is later reversed or set aside for any reason, Houlihan Lokey may terminate this Agreement, and the Company shall reimburse Houlihan Lokey for all fees and expenses reasonably incurred prior to the date of expiration or termination, subject to the requirements of the Bankruptcy Code, Bankruptcy Rules and applicable local rules and orders. Prior to commencing a Chapter 11 case, the Company shall pay all amounts due and payable to Houlihan Lokey in cash. The terms of this Section are solely for the benefit of Houlihan Lokey, and may be waived, in whole or in part, only by Houlihan Lokey.

17. **Additional Services.** To the extent Houlihan Lokey is requested by the Company to perform any financial advisory or investment banking services which are not within the scope of this engagement (such as rendering a fairness opinion), the Company shall pay Houlihan Lokey such fees as shall be mutually agreed upon by Houlihan Lokey and the Company in writing, in advance, depending on the level and type of services required, and shall be in addition to the fees and expenses described hereinabove.

In the case of a fairness opinion (the "Opinion"), the Company shall pay Houlihan Lokey a fee (the "Opinion Fee") of $500,000 and the Company and Houlihan Lokey shall enter into a separate engagement agreement with respect thereto. The Opinion Fee shall be payable upon delivery of the Opinion, and shall be credited once against any Transaction Fee, provided that such Transaction Fee cannot be reduced below zero.

18. **Post-Termination Services.** If Houlihan Lokey is required to render material services not described herein, but which relate directly or indirectly to the subject matter of this Agreement (including, but not limited to, producing documents, answering interrogatories, attending depositions, giving expert or other testimony, whether by subpoena, court process or order, or otherwise), the Company shall pay Houlihan Lokey additional fees to be mutually agreed upon for such services, plus reasonable related out-of-pocket costs and expenses, including, among other things, the reasonable legal fees and expenses of Houlihan Lokey's counsel in connection therewith.

19. **Credit**. After the announcement or closing of any Transaction, Houlihan Lokey may, at its own expense, place announcements on its corporate website and in financial and other newspapers and periodicals (such as a customary "tombstone" advertisement, including the Company's logo or other identifying marks) describing its services in connection therewith. Furthermore, if requested by Houlihan Lokey, the Company agrees that in any press release announcing any Transaction, the Company will include in such press release a mutually acceptable reference to Houlihan Lokey's role as financial advisor to the Company with respect to such Transaction.

20. **Choice of Law; Jury Trial Waiver; Jurisdiction**. **THIS AGREEMENT SHALL BE DEEMED TO BE MADE IN NEW YORK. ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. EACH OF HOULIHAN LOKEY AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS EQUITY HOLDERS) IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THE ENGAGEMENT OF HOULIHAN LOKEY PURSUANT TO, OR THE PERFORMANCE BY HOULIHAN LOKEY OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT AND MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS, AND AGREES TO VENUE IN SUCH COURTS; PROVIDED THAT SUCH CONSENT AND AGREEMENT SHALL NOT BE DEEMED TO REQUIRE ANY BANKRUPTCY CASE INVOLVING THE COMPANY TO BE FILED IN SUCH COURTS, AND IF THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DURING ANY SUCH CASE, ANY CLAIMS MAY ALSO BE HEARD AND DETERMINED BEFORE THE BANKRUPTCY COURT. EACH PARTY FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION AND VENUE IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURTS, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. THE COMPANY AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, SUIT OR CLAIM BROUGHT IN ANY OF THE COURTS REFERRED TO ABOVE SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURTS HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT. THE COMPANY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE COMPANY AT 320 NORWOOD PARK SOUTH, 2ND FLOOR, NORWOOD, MA 02062.**

21. **Indemnification and Standard of Care**. As a material part of the consideration for the agreement of Houlihan Lokey to furnish its services under this Agreement, the Company agrees (i) to indemnify and hold harmless Houlihan Lokey and its affiliates, and their respective past, present and

future directors, officers, shareholders, partners, members, employees, agents, representatives, advisors, subcontractors and controlling persons (collectively, the "Indemnified Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, Houlihan Lokey's engagement under this Agreement, any Transaction or proposed Transaction, or any actions taken or omitted to be taken by an Indemnified Party or the Company in connection with this Agreement and (ii) to reimburse each Indemnified Party for all expenses (including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action), arising out of or relating to this Agreement, or such engagement, Transaction or actions. However, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Party and in such case, the Company shall be entitled to recover from the applicable Indemnified Party any expenses advanced by the Company to such Indemnified Party hereunder to the extent attributable to such loss, claim, damage or liability, subject to such Indemnified Party's rights of contribution.

If for any reason the foregoing indemnification or reimbursement is unavailable to any Indemnified Party or insufficient fully to indemnify any such party or to hold it harmless in respect of any losses, claims, damages, liabilities or expenses referred to in such indemnification or reimbursement provisions, then the Company shall contribute to the amount paid or payable by the Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, in connection with the matters contemplated by this Agreement. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Company shall contribute to such amount paid or payable by any Indemnified Party in such proportion as is appropriate to reflect not only such relative benefits, but also the relative fault of the Company, on the one hand, and such Indemnified Party, on the other hand, in connection therewith, as well as any other relevant equitable considerations. Notwithstanding the foregoing, in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the amount of fees actually received by Houlihan Lokey from the Company pursuant to this Agreement. Relative benefits received by the Company, on the one hand, and Houlihan Lokey, on the other hand, shall be deemed to be in the same proportion as (i) the total value paid or received or contemplated to be paid or received by the Company, and its security holders and creditors, as the case may be, pursuant to the transaction(s) (whether or not consummated) contemplated by the engagement hereunder, bears to (ii) the fees received by Houlihan Lokey under this Agreement. The Company shall not settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened action, suit, dispute, inquiry, investigation or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or potential party thereto), unless such settlement, compromise, consent or termination contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey. The Company shall not be required to indemnify any Indemnified Party for any amount paid or payable by such party in the settlement or compromise of any claim or action for which indemnification is sought hereunder, unless such settlement or compromise is consented to in writing by the Company, which consent shall not be unreasonably withheld. Notwithstanding the foregoing sentence, if at any time an Indemnified Party requests that the Company reimburse the Indemnified Party for fees and expenses as provided in this Section 20, the Company

agrees that it shall be liable for any settlement or compromise of any claim or action effected without its prior written consent if (a) such settlement is entered into more than forty five (45) days after receipt by the Company of the request for reimbursement, and (b) the Company shall not have reimbursed the Indemnified Party in accordance with such request prior to the date of such settlement or compromise.

The Company further agrees that neither Houlihan Lokey nor any other Indemnified Party shall have any liability (whether direct or indirect and regardless of the legal theory advanced) to the Company or any person or entity asserting claims on behalf of or in right of the Company related to or arising out of this Agreement, Houlihan Lokey's engagement under this Agreement, any Transaction or proposed Transaction, or any actions taken or omitted to be taken by an Indemnified Party or the Company in connection with this Agreement, except for losses, claims, damages or liabilities incurred by the Company which are finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Party. The indemnity, reimbursement, and other obligations and agreements of the Company set forth herein (i) shall apply to any services provided by Houlihan Lokey in connection with this engagement prior to the date hereof and to any modifications of this Agreement, (ii) shall be in addition to any obligation or liability which the Company may otherwise have to any Indemnified Party, (iii) shall remain operative and in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party or any person controlling any of them, and (iv) shall survive the completion of the services described in, and any expiration or termination of the relationship established by, this Agreement.

The Company shall cause any successor company that may be formed by the Company, for any purpose, to agree to all of the obligations in this Section to Houlihan Lokey in accordance with the foregoing provisions. Prior to entering into any agreement or arrangement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, in each case where the creditworthiness of the Company may be impaired compared to that in effect on the Effective Date, the Company will notify Houlihan Lokey in writing thereof (if not previously so notified) and, if requested by Houlihan Lokey, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, upon terms and conditions reasonably satisfactory to Houlihan Lokey. The Company agrees that Houlihan Lokey would be irreparably injured by any breach of this Agreement (including the agreement set forth in the immediately preceding sentence), that money damages alone would not be an adequate remedy for any such breach and that, in the event of any such breach, Houlihan Lokey shall be entitled, in addition to any other remedies, to pursue injunctive relief and specific performance.

22. **Miscellaneous.** This Agreement shall be binding upon the parties hereto and their respective successors, heirs and assigns and any successor, heir or assign of any substantial portion of such parties' respective businesses and/or assets, including any Chapter 11 or Chapter 7 trustee appointed on behalf of the Company. If appropriate, in connection with performing its services for the Company hereunder, Houlihan Lokey may utilize the services of one or more of its affiliates, in which case the references herein to Houlihan Lokey shall include such affiliates.

Nothing in this Agreement, express or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Parties and each of their respective successors, heirs and assigns, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Houlihan Lokey hereunder.

This Agreement and the Confidentiality Agreement dated April 23, 2009 are the complete and exclusive statement of the entire understanding of the parties regarding the subject matter hereof, and supersedes all previous agreements or understandings regarding the same, whether written or oral. This Agreement may not be amended, and no portion hereof may be waived, except in a writing duly executed by the parties hereto.

The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect pursuant to the terms hereof.

To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business as a condition to doing business with that person. Accordingly, the Company will provide Houlihan Lokey upon request certain identifying information necessary to verify the Company's identity, such as a government-issued identification number (e.g., a U.S. taxpayer identification number), certified articles of incorporation, a government issued business license, partnership agreement or trust instrument.

This Agreement may be executed in any number of counterparts, each of which will be deemed an original and all of which will constitute one and the same instrument. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts shall be valid for all purposes.

The Company has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder. This Agreement has been duly and validly authorized by all necessary action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms. This Agreement has been reviewed by the signatories hereto and their counsel. There shall be no construction of any provision against Houlihan Lokey because this Agreement was drafted by Houlihan Lokey, and the parties waive any statute or rule of law to such effect.

The Company agrees that it will be solely responsible for ensuring that any Transaction complies with applicable law. The Company understands that Houlihan Lokey is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice.

To the extent that the Company hereunder is comprised of more than one entity or company, the obligations of the Company under this Agreement are joint and several, and any consent, direction, approval, demand, notice or the like given by any one of such entities or companies shall be deemed given by all of them and, as such, shall be binding on the Company.

The Company understands and acknowledges that Houlihan Lokey and its affiliates, including ORIX USA Corporation and its subsidiaries and affiliates (collectively, the "Houlihan Lokey Group"), engage in providing investment banking, securities trading, financing, and financial advisory services and other commercial and investment banking products and services to a wide range of institutions and individuals. In the ordinary course of business, the Houlihan Lokey Group and certain of its employees, as well as investment funds in which they may have financial interests, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including bank loans and other obligations) of, or investments in, the Company or any other party that may be involved in the matters contemplated by this Agreement or have other relationships with such parties. With respect to any such securities, financial instruments and/or investments, all rights

in respect of such securities, financial instruments and investments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, the Houlihan Lokey Group may in the past have had, and may currently or in the future have, financial advisory or other investment banking relationships with parties other than the Company, including parties that may have interests with respect to the Company, a Transaction or other parties involved in a Transaction, from which conflicting interests or duties may arise. Although the Houlihan Lokey Group in the course of such other activities and relationships may acquire information about the Company, a Transaction or such other parties, the Houlihan Lokey Group shall have no obligation to, and may not be contractually permitted to, disclose such information, or the fact that the Houlihan Lokey Group is in possession of such information, to the Company or to use such information on the Company's behalf.

If the foregoing correctly sets forth our agreement, please sign and return to us a copy of this Agreement along with a check (or wire transfer confirmation) for $165,000 on account of the first Monthly Fee.

All of us at Houlihan Lokey thank you for choosing us to advise the Company, and look forward to working with you on this engagement.

Very truly yours,

HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.

By: ______________________
William G. Peluchiwski
Managing Director

Accepted and agreed to as of the Effective Date:
BARZEL INDUSTRIES, INC.,
on its own behalf, and on behalf of its subsidiaries and affiliates

By: ______________________
Corrado De Gasperis
Chief Executive Officer

HOULIHAN LOKEY

***Personal and Confidential***

May 2, 2009

Mr. Corrado De Gasperis
Chief Executive Officer
Barzel Industries Inc.
320 Norwood Park South, 2nd Floor
Norwood, MA 02062

First monthly fee $165,000.00

PAYMENT DUE UPON RECEIPT

**Please Send Checks To:**
Houlihan Lokey Howard & Zukin Capital, Inc.
Accounts Receivable Department
1930 Century Park West
Los Angeles, California 90067-6802

**Wire Transfer Instructions:**
Union Bank of California
Transit & ABA #122000496
fbo Houlihan Lokey Howard & Zukin Capital, Inc.
Account #3030160796
Swift Code (International Wires Only): BOFCUS33MPK

# *AMENDMENT TO THE ENGAGEMENT AGREEMENT*

This agreement shall serve as an Amendment to the engagement agreement between Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") and Barzel Industries Inc. ("Barzel" and, collectively with its subsidiaries, including without limitation Barzel Holdings Inc. ("Barzel Holdings"), Barzel Finco Inc. ("Barzel Finco"), Barzel Industries Canada Inc. (including the former Novamerican Steel Inc. ("Barzel Canada")), and Barzel Industries U.S. Inc. ("Barzel U.S."), the "Company") with an Effective Date of May 2, 2009 (the "Engagement Agreement"). In accordance with the third paragraph of Section 22 of the Engagement Agreement, this Amendment shall memorialize the terms upon which Houlihan Lokey and the Company have agreed to modify the terms of the Engagement Agreement. Capitalized terms not otherwise defined herein shall have the same meaning as ascribed in the Engagement Agreement.

A. Section 3(ii)(a) shall be amended by replacing the second last sentence of the first paragraph with "A Restructuring Transaction Fee shall not be payable under a liquidation under Chapter 7 or Chapter 11 of the Bankruptcy Code in which the Company will no longer continue as a going concern."

B. Section 3(ii)(b) shall be amended by replacing the words "bona fide written indication of interest" in the second paragraph with "bona fide written offer".

C. Section 4 shall be amended by inserting after the words "Transaction Fees described in this Agreement" in the first sentence of the second paragraph, "and at the times contemplated by this Agreement".

D. Section 4 shall be amended by replacing clause (iii) in the second paragraph with "(iii) are currently in the capital structure of the Company (notwithstanding, but subject to, any reduction of fees for Transactions that include any Identified Investor(s) as discussed elsewhere in this Agreement)"

This Amendment shall serve as an amendment to the Engagement Agreement and collectively the Engagement Agreement, as amended hereby embodies the entire agreement and understandings of the parties hereto. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each party.

This Amendment is effective as of May 22, 2009.

By signing below, the parties to the Engagement Agreement acknowledge the effectiveness of this Amendment to the Engagement Agreement:

BARZEL INDUSTRIES INC.
on its own behalf, and on behalf of its subsidiaries and affiliates

By: ______________________
Corrado De Gasperis
Chief Executive Officer

HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.

By: ______________________
William G. Peluchiwski
Managing Director

# CONSENT AND ACKNOWLEDGMENT

This consent and acknowledgment (this "Consent") between JPMorgan Chase Bank, N.A. and CIBC World Markets Corp. (individually and collectively, along with their successors and assigns, the "Senior Lenders") and Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey") references the attached (a) engagement agreement between Barzel Industries Inc. (the "Company") and Houlihan Lokey dated May 2, 2009 and (b) amendment dated May 22, 2009, (collectively the "Engagement Agreement"). All capitalized terms not defined herein have the meanings ascribed in the Engagement Agreement.

The Trustee, for the benefit of the Senior Lenders, has a perfected security interest in and lien against assets of the Company and proceeds from the disposition of such assets. In consideration for Houlihan Lokey's agreement to render financial advisory and investment banking services to the Company under the terms of the Engagement Agreement, each of the Senior Lenders severally and not jointly, on their own behalf and on behalf of each of their respective successors and assigns, agrees and acknowledges as follows:

1. Houlihan Lokey's fees and expenses shall be paid as a cost of each Transaction and funded to Houlihan Lokey at closing in the manner and at the times specified in the Engagement Letter, out of the proceeds of each such Transaction, which fees and expenses shall be paid to Houlihan Lokey free and clear of any lien, claim or interest that the Senior Lenders may have in the Company's assets or the proceeds thereof. The Senior Lenders hereby fully subordinate their right to payment of their debt (whether principal, interest or other costs or charges), or any other recovery on their claims against the Company, its assets and the proceeds thereof, to the payment, in full and in cash, of all fees and reasonable expenses due to Houlihan Lokey under the Engagement Agreement. The Senior Lenders shall, from time to time, execute and deliver, cause the Trustee to execute and deliver, or authorize Houlihan Lokey to execute and deliver, any and all instruments and agreements (including any amendment of any UCC financing statement) reasonably necessary to give notice of the foregoing subordination. To the extent that the Senior Lenders receive proceeds from a Transaction and Houlihan Lokey's fees and reasonable expenses are not fully and timely paid, the Senior Lenders shall turn over any such proceeds in such amount as is necessary to pay in full Houlihan Lokey's fees and expenses.

2. To the extent that the Senior Lenders obtain title to or control over the Company, and/or all or any material portion of the assets of the Company, consensually or non-consensually, by foreclosure or otherwise, and, thereafter during the Tail Period, the Senior Lenders sell the Company, or any such assets in a transaction or transactions which, if otherwise entered into by the Company in the absence of the Senior Lenders having obtained such title or control, would have given rise to a Transaction Fee(s) payable by the Company to Houlihan Lokey pursuant to the terms of the Engagement Agreement, the Senior Lenders shall pay Houlihan Lokey the Transaction Fee(s) that would otherwise have been payable by the Company, and shall make such payment(s) in accordance with the terms contained in the Engagement Agreement that would otherwise have been applicable to the Company. Notwithstanding the foregoing, to the extent that the Senior Lenders obtain title to or control over the Company, and/or all or any material portion of the assets of the Company,-as a result of the Senior Lenders bidding in all, or a portion, of the obligations of the Company held by the Senior Lenders, then the Senior Lenders shall, promptly following the Senior Lenders taking such title or control, pay Houlihan Lokey the Transaction Fee(s) that would have been payable to Houlihan Lokey by the Company, pursuant to the Engagement Agreement for Aggregate Gross Consideration equal to the amount bid in by the Senior Lenders; provided, however, any Transaction Fee paid pursuant to this sentence shall be credited towards any Transaction Fee payable pursuant to the first sentence of this paragraph, provided further however, that in no event shall Houlihan Lokey's Transaction Fee(s) be reduced below zero.

3. If any of the Senior Lenders ("Selling Lender") sells, refinances, liquidates or otherwise disposes (a "Disposition") of all or any portion of its liens, claims, or other interests in, with or against the Company ("Claims") to any person or entity (a "Claims Buyer"), such Claims Buyer shall agree to be bound by the terms of this Agreement from and after the date of such Disposition.

4. In the event that the Company becomes a debtor in a Chapter 11 proceeding (whether voluntarily or involuntarily), the Senior Lenders agree (i) to support Houlihan Lokey's retention as the Company's exclusive financial advisor pursuant to the Engagement Agreement; provided, however, that Houlihan Lokey's failure to be retained, or if retained on terms other than those set forth in the Engagement Agreement, in such Chapter 11 proceeding shall not affect the Senior Lenders' obligations hereunder (subject to the next paragraph), and (ii) that so long as Houlihan Lokey is retained in such capacity, any agreement pursuant to which the Senior Lenders (A) consent to cash collateral usage, (B) provide debtor-in-possession financing to the Company and/or (C) consent to the priming of their liens and such orders of the Bankruptcy Court related thereto shall contain a carve out provision whereby Houlihan Lokey's fees and expenses payable under the Engagement Agreement shall be senior to all other liens against the Senior Lenders' collateral, unless Houlihan Lokey agrees otherwise.

   Notwithstanding any provision herein or in the Engagement Letter to the contrary, (i) if the court presiding over such proceeding does not approve Houlihan Lokey's retention, (ii) another investment banker or other financial professional is retained by the Company to perform the services that would otherwise be performed by Houlihan Lokey under the Engagement Agreement (the "Other Investment Banking Firm"), and (iii) the Company consummates one or more Transactions on or after the date the Other Investment Banking Firm is retained (collectively, the "Post-Retention Transactions"), then the Senior Lenders' obligations under this Consent arising from the Post-Retention Transactions shall be offset and reduced dollar for dollar by an amount equal to any transaction fees paid to the Other Investment Banking Firm; provided, however, in no event shall Houlihan Lokey's Transaction Fee(s) be reduced below zero.

5. The Senior Lenders shall not affect any settlement or release from liability in connection with any matter for which an Indemnified Party would be entitled to indemnification from the Company, unless either (i) such settlement or release contains a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey, or (ii) the Senior Lenders have used commercially reasonable efforts to obtain a release of the Indemnified Parties reasonably satisfactory in form and substance to Houlihan Lokey and are unsuccessful in doing so.

THIS CONSENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO SUCH STATE'S RULES CONCERNING CONFLICTS OF LAWS. EACH OF HOULIHAN LOKEY AND THE SENIOR LENDERS (ON THEIR OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF THEIR EQUITY HOLDERS) WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF THIS CONSENT OR THE ENGAGEMENT OF HOULIHAN LOKEY PURSUANT TO, OR THE PERFORMANCE BY HOULIHAN LOKEY OF THE SERVICES CONTEMPLATED BY, THE ENGAGEMENT AGREEMENT.

By signing below, the Senior Lenders hereby agree to the terms herein, consent to the terms of the Engagement Agreement and agree that they shall not sell, transfer or otherwise dispose of all or any portion of their respective Claims unless contemporaneously therewith the Claims Buyer agrees in writing to be bound by the terms and provisions of this Consent.

This Consent shall be effective as of the Effective Date of the Engagement Agreement.

**HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.**

By: [signature]
Name: William G. Pelczarski
Title: Managing Director
An Authorized Signatory

**JPMORGAN CHASE BANK, N.A.**

By: ______________________
Name:
Title:
An Authorized Signatory

**CIBC WORLD MARKETS CORP.**

By: ______________________
Name:
Title:
An Authorized Signatory

The foregoing Consent and Acknowledgment is hereby acknowledged and approved by the Company.

**BARZEL INDUSTRIES INC.**

By: ______________________
Name: Corrado De Gasperis
Title: Chief Executive Officer
An Authorized Signatory

By signing below, the Senior Lenders hereby agree to the terms herein, consent to the terms of the Engagement Agreement and agree that they shall not sell, transfer or otherwise dispose of all or any portion of their respective Claims unless contemporaneously therewith the Claims Buyer agrees in writing to be bound by the terms and provisions of this Consent.

This Consent shall be effective as of the Effective Date of the Engagement Agreement.

**HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.**

By: ______________________________
Name:
Title:
An Authorized Signatory

**JPMORGAN CHASE BANK, N.A.**

By: ______________________________
Name: DOUGLAS A. JENKS
Title: MANAGING DIRECTOR
An Authorized Signatory

**CIBC WORLD MARKETS CORP.**

By: ______________________________
Name:
Title:
An Authorized Signatory

The foregoing Consent and Acknowledgment is hereby acknowledged and approved by the Company.

**BARZEL INDUSTRIES INC.**

By: ______________________________
Name:
Title:
An Authorized Signatory

By signing below, the Senior Lenders hereby agree to the terms herein, consent to the terms of the Engagement Agreement and agree that they shall not sell, transfer or otherwise dispose of all or any portion of their respective Claims unless contemporaneously therewith the Claims Buyer agrees in writing to be bound by the terms and provisions of this Consent.

This Consent shall be effective as of the Effective Date of the Engagement Agreement.

**HOULIHAN LOKEY HOWARD & ZUKIN CAPITAL, INC.**

By: ____________________________
Name:
Title:
An Authorized Signatory

**JPMORGAN CHASE BANK, N.A.**

By: ____________________________
Name:
Title:
An Authorized Signatory

**CIBC WORLD MARKETS CORP.**

By: ____________________________
Name: E. Lindsay Gordon
Title: Authorized Signatory
An Authorized Signatory

The foregoing Consent and Acknowledgment is hereby acknowledged and approved by the Company.

**BARZEL INDUSTRIES INC.**

By: ____________________________
Name:
Title:
An Authorized Signatory

## EXHIBIT 2

### *PRINCIPAL PROFESSIONALS*

William G. Peluchiwski

Mr. Peluchiwski is a Managing Director in Houlihan Lokey's Chicago office. He leads the firm's Industrials Group, in particular its efforts in the metal (manufacturing and distribution), transportation parts, chemicals, plastics and packaging, and diversified manufacturing sectors.

He specializes in advising clients on mergers and acquisitions, including sellside and buyside transactions, private placements of debt and equity, and financial restructuring. He consults on a wide variety of financial matters, including fairness opinions and solvency analyses. Over the past five years, he has initiated, structured, negotiated and closed more than 50 mergers and acquisitions, as well as several private placements.

Before joining Houlihan Lokey, Mr. Peluchiwski consulted on intellectual property and joint venture transactions. Earlier, he traded derivative equity securities on the Chicago Board Options Exchange and futures on the Chicago Board of Trade.

Mr. Peluchiwski received a B.S. in finance and accounting from the University of Illinois and an M.B.A. in finance and marketing from the University of Chicago Graduate School of Business. He is a Certified Public Accountant, holds the designation of Chartered Financial Analyst, and is registered with FINRA as a General Securities Principal (Series 7, 24 and 63).

Andrew Turnbull

Mr. Turnbull is a Managing Director with Houlihan Lokey and co-heads the Financial Restructuring Group in the Chicago office. Since 1994 he has specialized in helping companies, lenders, creditors and investors with financially distressed situations. He has helped clients raise various forms of debt financing, has negotiated the restructuring of private and public securities in Chapter 11 and out-of-court restructurings, and has participated in the acquisition and sale of various businesses in distressed situations.

Mr. Turnbull received a bachelor of science degree in biology from the University of Western Ontario and an honors business administration degree from the Ivey Business School at the University of Western Ontario. He is a member of both the American Bankruptcy Institute and the Turnaround Management Association and is registered with FINRA (formerly the NASD) as a General Securities Representative (Series 7 and 63).

Daniel P. Sullivan

Mr. Sullivan is a Director in Houlihan Lokey's Chicago office, where he is a member of the Industrials Group. His primary coverage responsibility is the metals industry, including integrated and mini-mill producers, service centers, ferrous and nonferrous scrap suppliers, and other raw material suppliers.

He has advised on more than 40 transactions at the firm, including sellside and buyside M&A transactions, fairness and solvency opinions, and corporate valuations. His notable recent transactions include the sale of Manoir Industries to Sun Capital Partners, the sale of Bayou Steel to Black Diamond Capital, and the merger of Ispat/LNM to Mittal Steel and the corresponding purchase of ISG. He also advised on the sales of Primary Steel and Scott Brass, the spinoff of Chaparral Steel from Texas Industries, the sale of Hugo Neu to Sims, and the sale of Western Industries to Worthington Industries.

Before joining Houlihan Lokey, Mr. Sullivan was a corporate finance associate in M&A, equity capital markets and private finance groups at ABN AMRO and J.P. Morgan. Earlier, he worked as a senior aide to former Virginia Governor Mark R. Warner.

Mr. Sullivan received a B.A. in English from Georgetown University and an M.B.A. with a concentration in finance from the Darden School of Business at the University of Virginia. He serves on the board of directors of the Chicago Children's Memorial Hospital Foundation. He is registered with FINRA as a General Securities Representative (Series 7 and 63).

Jeffrey Lewis

Mr. Lewis is a Vice President in Houlihan Lokey's Chicago office and is a member of the Financial Restructuring Group. Mr. Lewis has been involved in restructurings of private and public securities in Chapter 11 and out-of-court, distressed M&A transactions and recapitalizations since 1996. His experience includes representing debtors, creditors and investors in large and middle-market domestic and cross border companies.

Before joining Houlihan Lokey, Mr. Lewis led the New York restructuring practice of PricewaterhouseCoopers Corporate Advisory and Restructuring LLC.

Mr. Lewis received a B.A in government and B.B.A. in finance from the University of Texas and an M.B.A. in finance and accounting from Vanderbilt Owen Graduate School of Management. He is registered with FINRA as a General Securities Principal (Series 7, 24 and 63).

Matthew Bowersox

Mr. Bowersox is an Associate in Houlihan Lokey's Chicago office. As a member of the Industrials Group, he works on a wide range of M&A and financing transactions in the plastics and packaging, metals and diversified industrial sectors. He also began his career in this group, working on M&A and restructuring transactions as a financial analyst.

Before rejoining Houlihan Lokey, Mr. Bowersox was an associate at Sentinel Capital Partners, a $750 million, New York–based private equity firm, where he structured and executed middle-market private equity investments in various industries, including healthcare services, niche manufacturing, food and restaurants.

Mr. Bowersox received a B.B.A. in finance with honors from the University of Iowa, where he was a Hawkinson Institute of Business Finance scholar. He is registered with FINRA as a General Securities Representative (Series 7 and 63).

Nathan E. Zsolcsak

Mr. Zsolcsak is a Financial Analyst in Houlihan Lokey's Chicago office. As a member of the Industrials Group, he focuses on M&A and financing transactions in the metals, chemicals, transportation and diversified industrials sectors.

Before joining Houlihan Lokey, Mr. Zsolcsak worked as an associate in the alternative investments group at PricewaterhouseCoopers in New York, New York.

Mr. Zsolcsak graduated with a B.S. and an M.S. in accountancy from the Wayne Calloway School of Business and Accountancy at Wake Forest University. He is a Certified Public Accountant in the state of New York and is registered with FINRA as a General Securities Representative (Series 7 & 63).

# EXHIBIT 3

## *RELATIONSHIPS WITH INTERESTED PARTIES*

# PROJECT HAWK
# MASTER CONFLICT LIST OF POTENTIAL PARTIES-IN-INTEREST

**Debtors And Related Non-Debtors**

Barzel Industries Inc.
f/k/a Novamerican Steel Inc.
f/k/a Symmetry Holdings Inc.

Barzel Holdings Inc.,
f/k/a Novamerican Steel Holdings Inc.

Barzel Finco Inc.
f/k/a Novamerican Steel Finco Inc.

Barzel Industries U.S. Inc.
f/k/a Novamerican Steel U.S. Inc.
f/k/a Integrated Steel Industries, Inc.

American Steel and Aluminum Corporation

Nova Tube and Steel, Inc.

Novamerican Tube Holdings, Inc. /
Placements Novamerican Tube Inc.

Nova Tube Indiana, LLC

Barzel Industries Canada Inc. /
Industries Barzel Canada Inc.
f/k/a Novamerican Steel Canada Inc. /
Acier Novamerican Canada Inc.
f/k/a Novamerican Steel Inc. /
Acier Novamerican Inc.

632422 N.B. Ltd.

Chriscorp ULC

Delta Tube Inc. / Tubes Delta Inc.

Delta Tube and Company Limited /
Tubes Delta, Societé en Commandités

Hencorp LLC

**Current Officers And Directors**

Gilbert E. Playford (Director)
Corrado De Gasperis (Director and Officer)
Domenico Lepore (Director and Officer)
Martin Derek Powell (Director)
Scott C. Mason (Director)
Oded Cohen (Director)
Karen Narwold (Officer)

**Former Officers And Directors**

M. Ridgway Barker
Robert W. Ramage

**Current Lenders**

CIBC World Markets Corp.
JPMorgan Chase Bank, N.A.

**Insurers**

ACE American Insurance Co.
AIU Holdings Inc.
AXIS Insurance Company
Chubb Insurance Company of Canada
Federal Insurance Co. (Chubb)
Liberty Mutual Insurance Co.
National Union Fire Ins. Co. (AIG)
St. Paul Travelers
XL Specialty Insurance Co.
Zurich

**Professionals**

Cole, Schotz, Meisel, Forman & Leonard, P.A.
Davies Ward Phillips & Vineberg LLP
Grant Thornton LLP
Houlihan Lokey Howard & Zukin
Kelley Drye & Warren LLP
Laughlin Meghji & Company
Stroock & Stroock & Lavan LLP
Day Seckler LLP

**Noteholders**

CIBC World Markets Corp.
JPMorgan Chase Bank, N.A.

**Indenture Trustees**

The Bank of New York Mellon,
as successor to The Bank of New York,
as Trustee and Collateral Agent
(BNY Trust Company of Canada is not
an Indenture Trustee, but acts as Canadian
Collateral Agent)

**Note Underwriters**

CIBC World Markets Corp.
J.P. Morgan Securities Inc.

**Leaseholders**

170 University Avenue
Investments Inc.

3905624 Canada Inc.
(shareholders are Chiscott
Properties Inc. and Gestion
Gilles Leroux Inc.)

eEmerge, 28 West 44 LLC

Gestions Superbes Inc.

Immeubles Chriscott Inc. /
Chriscott Properties Inc.

Les Produits Tourval Inc.
(Sub-sublessor)

One Wallace Avenue, LLC

Patheon Inc. (Sub-sublessor)

Phoenix Technologies Ltd.

Regus

**Lienholders And Other Significant Lenders**

BNY Trust Company of Canada
CIBC World Markets Corp.
Citibank, N.A.
J.P. Morgan Securities Inc.
JPMorgan Chase Bank, N.A.
The Bank of New York Mellon

**Letter Of Credit Issuers And Beneficiaries**

Bank of America, N.A.

**Litigation Parties**

Maurice Hooks
Curtis E. O'Daniel
Steve Shaw

**Significant Customers**

Bath Iron Works
Volvo Construction Equipment
Stanley Fastening Systems
McJunkin Red Man Corp.
Acier Picard Inc.
Crawford Metal Corp.
Acier Leroux
Ken Miller Supply
Bouchard, Acier Inc.
SAF-Holland Canada, Ltd.

**Parties To Leases**

Immeubles Chriscott Inc. / Chriscott Properties Inc.
3905624 Canada Inc.
Les Produits Tourval Inc.
Gestions Superbes Inc.
Patheon Inc.
Regus
170 University Avenue Investments Inc.
eEmerge, 28 West 44LLC
One Wallace Avenue, LLC
Phoenix Technologies Ltd.

**Vendors / Suppliers**

Severstal Sparrows Point LLC
Nova Tube and Steel Inc.
Integro Insurance Brokers
Roanoke Electric Steel
Nova Steel Limited
Ansonia Copper & Brass Inc.
KPMG LLP
Yarde Metal, Inc.
Solomon Edwards Group, LLC
Ameristeel
Middletown Area Tax
Metals USA
American International Companies
Penske Truck Leasing

Vesl Transport Services LLC
Northeast Wholesale Lumber
Aerotek Commercial Staffing
Blue Cross/Blue Shield
Idealease of Maine
Blue Cross/Blue Shield of MA-PPO
Steel of West Virginia
Cotia Trading (USA) Ltd.
Steel Warehouse
Day Seckler LLP
Phoenix Technologies Ltd.
Fati Steel, Inc.
Ronson Technical Products
A588 & A572 Steel Co
Marmon/Keystone Corp
Stanpak
Penske Truck Leasing Co. L.P.
Sanzone & McCarthy, LLP
Rolled Alloys
Isaacson
One Wallace Ave. LLC
Aluminum Shapes
Healthkeepers, Inc.
McNichols Company
Houlihan Lokey Howard & Zukin
Peterson Steel Corp.
Bluecross Blueshield of MA-Dental
Tubular Steel, Inc.
Metal Suppliers Online
Paetec Communciations Inc.
Rowan, Arm, William T.
Online Freight Services Inc.
Symmetry Advisors
Valley Resources Inc.
Ta Chen International Corp.
Toyota Motor Credit Corporation
Stainless Tubular
Pettingill Ross Co.
Drew Pallet Company Incorporated
Strasburg Pallet Co.
Verizon
Lewis Industrial Supply Co.
Dayken Pallet Co., Inc.
Castle Metals
Ferguson Perforating & Wire
Metallurical Solutions Inc.
American Alloy Steel
Beacon Container Corp of PA
Jeff Lepisto Trucking LLC
Summit Stainless Steel/Formerly KG
Continental Stock Transfer & Trust
Jorgensen Steel & Aluminum
Constellation New Energy
Niles Expanded Metal
McAlevey, Stanley
Bell Atlantic
Gwaltney, John
Alliant Specialty Metals
Unifirst Corporation
F.W. Webb Co.
Waddey & Patterson, P.C.
Buschmann Inc., E.A.
Malrin Leasing Corp.
General Electric Service & Sales
Lucent Technologies, Inc.
Pennsylvania Steel, Lucas Division
Upstate Steel Inc.
Principal Mutual Life Insurance Co.
Connecticut Light & Power
C.B. Kenworth
Versatile Services
Smith, Allen
AT&T Communications
Malone Freight Lines, Inc.
Waste Management
Bragg, N.H.
Local Union 776
Maine Turnpike Authority
High Steel Service
Avaya, Inc.
Automatic Data Processing, Inc.
Coles Express
Coakley Landscape Company
Grainger, W.W. Inc.
Verizon Wireless
North Star Leasing Company
Shaw Jr., Jeremiah
G.M.A.C.
American Alarm & Communications Inc.
Rental Uniform Service
Aim National Lease
Maine Oxy
Forms for Business
US Cellular
Quality Flame Cutting Inc.
United Parcel Service
Mac-Tech, LL
Admiral Lewiston
Bank of American Leasing & Capital
Phillips Office Products
Office Equipment Finance Services
AT&T (GA)
U G I Corporation
Matteau, Crystal

Allen-Bailey Tag & Label Inc.
Quill-So Fast So Simple
Giancola, Robert
Great America Leasing Corp.
Chesapeake Optical
MSC Industrial Supply Co.
ARC Source Inc.
Ascom Hasler Leasing
Metals Inc.
Sound & Media Technologies
Airpark Medical
Comcast
Connecticut Natural Gas Corp.
New Penn Motor Express
Contel Cellular
Worcester Scale Company, Inc.
Jerome Fire Equipment Co.
Haas, Robert
Alltex
Masterman's
Leja, Tanya M.
Time Warner Cable of Maine
Syracuse Trailer Service
Business Equipment Unlimited
G E Capital
Roberts Lawncare
Farrington, Jeffrey
Great American Lines, Inc.
Oneida Air Systems Inc.
Officemax, Inc.
Gray, Dennis
Cleveland Steel Tool Co.
Con-Way Central Express
Barnes, Karen
NYS Child Support Processing Ctr.
Praxair
Office Supply Super Store
Sterling Software
Town of Clay
Teamsters Local #592
Miscellaneous Manual Checks
PTC E-Z Pass Customer Service Ctr.
Hamco Electric Service, Inc.
Murphy & Nolan Inc.
Kaman Industrial Technologies Corp.
Petty Cash
Spiller's Supplies & Equipment
Benefit Strategies, LLC
Omni Services, Incorporated
Truck-Courier, Inc.
Fastenal Company
Samuel, Son & Co., Ltd.
R/W Industrial Supply
Aramark Refreshment Services
Portland Water District
Burgon Tool Steel
Sam's Club
Abco Welding & Industrial Supply
Bemer Petroleum Corporation
Koffee King Vending Co., Inc.
PHSI Pure Water Finance
Miscellaneous Expense
Eagle Electric Supply Company
Mike Medical Service Co.
Modern Pest Control
Fast Lane Service Center
AAA Fire Extinguishers, Co., Inc.
Economy Paint
New York Telephone
Odorite Company Inc., The
Powell, Bernie
Nucor Steel South Carolina
Webb Company, F.W.
Pine Tree Waste
Sponaugle & Son, G. R.
Alpine Industrial
Idearc Media Group
Aero Oil Company
Dead River Company
Francotyp-Postalia, Inc.
Poland Spring Water Co.
W.B. Mason Company Inc.
Sprint
Amerinox Processing
E M J, Inc.
Holman Lend Lease Corp.
Main Steel Polishing
Bayou Steel Corporation
Pennsylvania Steel Company, Inc.
Nucor Steel Auburn
Empire Resources Inc.
Sapa Extrusion Delhi Inc.
Duferco Farrell Corporation
Midland Metals International USA

Nova Steel Processing Center
Barzel Industries
Northstar Bluescope Steel
Clayton H. Landis Co., Inc.
Dempsey Pipe & Supply
Aerotek Commercial Staffing
Kimberly Scarpiello, Tax Collector
Pruyn Bearing Co., Inc.
Barzel A/R Transfer

Reuter & Hanney Inc.
TMC Transportation
PME Automation LLC
Roll Kraft Inc.
DGI Supply – A Doall Company
Black Box Services
White Oak Transport Limited
Squeak Transport Inc.
TMS Precision Machining, Inc.
Quaker Chemical Corporation
ITW/Signode Metals
Ace Doran Hauling & Rigging C
Freight Broker International
HWC Transportation
Electrical Design Build Inc.
UPS SCS, Inc.
J F Millette Inc.
Unifrist Corporation
Process Technologies Inc.
Nelson Tool Corporation
Callahan Bearings Belting & D
McMaster-Carr
Lumbermen Associates, Inc.
Precision Tool & Engineering
Nelson Wire Rope Corporation
Ramball Testlab Inc.
S&S Cleaning
Dempsey Pipe & Supply
Valley National Gases, Inc.
American Carbide Saw Co.
Lockwood's Electric Motor Ser
Horizon Lawn & Landscaping
Tooling Etc., L.L.C. Wagner
M & C Trucking Co.
CRST International, Inc.
Griffith Electric Supply Co.
Worldclass Processing Corp.
MSC Industrial Supply Co. Inc.
Total Solutions Inc.
Gheorghe Mihailescu
Eastern Lift Truck Co., Inc.
American Steel & Aluminum Cor
K & S Hydraulics, Inc.
Maple Systems, Inc.
Roberts Transport
Cintas First Aid & Safety
Mackinnon Transport Inc.
Greenleaf Corp
Delaware Valley Packaging Gr.
Reit Lubricants
Simplex Grinnell LP
Ford Credit
Thomas Miller Co., Inc.
Abcor Fasteners Inc.
Tennant Sales
Seton Identification Prod
All Industrial-Safety Product
Kaman Industrial Technologies
Verizon Business
C & W Mechanical, Inc.
UPS Supply Chain Solutions
Novamerican Steel Canada Inc.
Mason & Dixon Lines, Inc.
Imac Systems Inc.
Kent Corporation
Staples Business Advantage
Victor Products Inc.
ADP Inc.
Electronic Heating Equipment
W. B. Mason Co., Inc.
Fastenal Company
Associated Building Specialti
Canacomp Systems, Inc.
Trident Plastics, Inc.
Trevose Family Shoes, Inc.
Micrographic Computer Service
Safety-Kleen Systems
Omni-Finishing Systems Inc.
Water to Go LLC
Shingle & Gibb
Pennsylvania SCDU
GT&S, Inc.
The Sherwin-Williams Co.
Fedex
Rumsey Electric
New Jersey Family Pymt Center
John Asta & Company
Grainger
Phila Occhealth/DBA Worknet
Sentury Pest Solutions, Inc.
Home Depot Commercial Credit
Pep Boys
Creston Hydraulics, Inc.
Wheeling Pittsburgh Steel Cor
Duferco Farrell Corporation
Thermatool Corp
Mid Atlantic Crane
Itipack Systems
Force Construction Co., Inc.
Inspectech Analygas Group Inc.
Ancam Solutions Company Ltd.
Star Electric Inc.
Rafter
Paco Manufacturing

Brock Solutions
Charles L. Yingst, Jr.
Planewhite, Inc.
Cintas Corporation
Verizon Wireless
Budget Janitorial & Lawncare
Crane America Services
Plumbers Supply Co., Inc.
Jeffersonville Sewage Dept.
ARC Weld Inc.
Black Diamond Pest Control
Pure Health Solutions, Inc.
Aramark Refreshment Services
Duplicator Sales & Service Inc.
Simplexgrinnel, LP
Bearing Headquarters Company
Fedex
Novamerican Steel Inc.
Arcelormittal Dofasco Inc.
Delta Tube
Tubes Delta Societe
General Motors of Canada
White Oak Transport Limited
W.J. Deans Transportation Inc.
Chrysler LLC
City of Hamilton
Laidlaw Carriers Flatbed LP
Missisauga Taxes
TSI Executive Search
Cole Carriers Corp.
Signode Canada
Horizon Utilities Corporation
McMillan Binch Mendelsohn LLP
Chriscott Properties Inc.
PCI Chemicals Canada Co.
3905624 Canada Inc.
Freight Brokers International
J.F. Millette Inc.
Luminart
Big Freight Systems Inc.
Workplace Safety & Ins. Board
Enersource Hydro Mississauga
Mackinnon Transport Ltd.
Meritor Design Inc.
Solution Express
Taberner Consulting Inc.
UPS SCS, Inc.
Transbec 1997 LTEE.
Russel Metals Inc.
McCarthy Tetrault LLP
Hydro Quebec
Accountemps
Robert Transport
Brant Corrosion Control Inc.
Tom Stearns
Green Group Interiorscapes Inc.
Davey Lumber & Bldg. Supplies
Pitney Bowes
Comite Gestion Taxe Scolaire
Federal Express Canada Ltd.
International Building Maint.
Cintas Canada Ltd.
Arvin Air Systems Limited
A. Veilleux Transport
C. H. Robinson Company (Canada)
Grand and Toy
Janco Steel Ltd.
Hamilton Plastic Fabricators
Securenet Information Service
Standard Machine & Manufacturing
Proscies Inc.
CBSC Capital Inc.
Allen S. Bowman Mfg.
Apex Precision Inc.
Universal Cleaning Services
Marina Trigub
Jay Travis
Bell Canada
Norvik Tooling Inc.
Fastenal Canada Company
National Leasing
Novipro
Sunshine Building Maintenance
Sterling Commerce – 3541
Hill Property Management Group
Honewell Limited
Kemira Water Solutions
CCH Canadian Limited
Kari Coffee Service Inc.
Credit Valley Steel
Iron Mountain Canada Corp.
Winsome Glover
Petro-Canada – Cash & Banking
Rims Corp.
All Star Taxi Services
Brad Elliott
Compare Canada
Beauchamp Babin & Ass. Inc.
De Lage Landen Financial
Kinecor LP
Mike Orosz
Groupe Ast
Ainsworth Inc.
Marc Gravel Locksmith

Weigh-Tronix Canada, ULC
Arlington Crane Service
A. Moura Landscaping
Oleyland, Inc.
IBM Canada Limited
Hewitt Equipment Ltd.
Coh Larco – Sertech Division
A & E Industries
BDI Canada
WSI Waste Services
Phoenix Fire Systems
Bell Conferencing Inc.
Neath Industrial Safety Corp.
Enbridge Gas Distribution
Bell Canada
G&K Services
Ford Credit Canada Leasing
Strongco Equipment
Siemens Water Technologies
Rhoda Baker
National Waste Services Inc.
T.A.G. Industries
Gianlucio Maci
Atelier 211 – Serge D'Aoust
Vidhi Uppal
D&L Saw Sharpening Ltd.
Praxair Distribution
Van Houtte Cafe Services Inc.
Bluewave Energy
Camion St-Henri
Air Liquide Canada Inc.
Bell Canada
Rogers
Sue Nicholls
Titan Scape Ltd.
Rundle Mail Service Limited
Crown Records Management
Prominent Fluid Controls Ltd.
Amtec Hydraclamp Inc.
Culligan
ADT Advanced Integration
Nicolas Cliche, Avocat
Jean-Francois Heroux
Courrier Duperron Inc.
Videotron (2)
O.S.S. Environmental Ltd.
Cafe Bouquet
B.R. Chisholm Industrial Ltd.
Charles Jones Industrial Ltd.
Mike Telus
Robert Tremblay
Courtyard Marriott
Shepell FGI-Division HRCO
Aramark Canada Ltd.
Videotron (3)
Vincent Roy
Trans Metropole Ltee.
Lucidlive.com Inc.
B&B Mini Storage
Abell Pest Control Inc.
J&L Master Window Cleaning
CDW Canada Inc.
Bell Mobility
Bell Mobility Inc.
Vendo Matic
C.E.O. Floral Services
Bodycote Canada Inc.
Bell Canada
Atlantic Liquid Meters
Securtek Monitoring Solutions
Jon's Jacks
Bell Mobilite Pagette
Wainbee Limited
Marni Hamilton
Jessica Angot
Hamilton Cab Company Inc.
407 ETR
Linde Canada Ltd.
Servicemaster Clean
Ministry of Revenue
General Motors of Canada Ltd.
Lumen
Videotron (1)
Les Systemes Canacomp Inc.
Ultramar
Canadian Tire Mastercard
Groupecho Collection
Nova Tube & Steel Inc.
North Star Bluescope
Symmetry Advisors
TSI Executive Search
TMC Transportation
Infor Global Solutions, Inc.
American Steel & Aluminum
Nova Tube and Steel Inc.
Hoovers, Inc.
American Transport Inc.
Jim Mair
Northern Steel
Tandem Transport Corp.
Ace Doran Hauling & Rigging
UPS-Supply Chain Solutions

**District of Delaware Bankruptcy Judges**

Kevin J. Carey
Kevin Gross
Judith K. Fitzgerald
Brendan L. Shannon
Christopher S. Sontchi
Mary F. Walrath
Peter J. Walsh

**Office Of The United States Trustee Region 3 (Delaware Office)**

Bonnie Anemone
David Buchbinder
Jane Leamy
Joseph McMahon
Mark Kenney
Richard Schepacarter
Roberta A. DeAngelis
Richard Schepacarter
William K. Harrington
Shakima L. Williams
Michael Panacio
Jeffrey Heck
Lauren O'Neal
James R. O'Malley
Ramona Vinson
Michael West
Dion Wynn

**Houlihan Lokey Relationships Identified with Potential Interested Parties**

Name (Engagement(s) Type)
ADP Inc. (Financial Advisory Services)
Aramark Corporation (Financial Advisory Services)
AT&T Communications (Financial Advisory Services)
Bayou Steel Corporation (Various Engagements)
Bell Atlantic (Financial Advisory Services)
Comcast (Various Engagements)
G E Capital (Financial Advisory Services)
G.M.A.C. (Financial Advisory Services – Active)
General Motors of Canada (Financial Advisory Services)
Infor Global Solutions, Inc. (Financial Advisory Services)
Iron Mountain Canada Corp. (Various Engagements)
J.P. Morgan Securities Inc. (Financial Advisory Services)
JPMorgan Chase Bank, N.A. (Various Engagements – Active)
KPMG LLP (Financial Advisory Services)
Lucent Technologies, Inc. (Financial Advisory Services)
McMaster-Carr (Financial Advisory Services)
National Union Fire Ins. Co. (AIG) (Financial Advisory Services)
Officemax, Inc. (Financial Advisory Services)
Paetec Communciations Inc. (Financial Advisory Services)
Pep Boys (Board of Directors)
Pitney Bowes (Various Engagements)
Rafter (Financial Advisory Services)
Safety-Kleen Systems (Financial Advisory Services)
Servicemaster Clean (Financial Advisory Services)
Sprint (Financial Advisory Services)
Stroock & Stroock & Lavan LLP (Various Engagements – Active)
The Bank of New York Mellon (Various Engagements – Active)
Verizon (Various Engagements – Active)
U G I Corporation (Corporate Finance)
Weigh-Tronix Canada, ULC (Financial Advisory Services)

Note: All relationships identified are unrelated to these Chapter 11 cases.