## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
                          :        Chapter 11

In re:                        :

                          :        Case No. 09-13204 (CSS)

BARZEL INDUSTRIES INC., *et al.*,[1]   :

                       Debtors.   :        Jointly Administered

                          :

-------------------------------------------------------x

---

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF LIQUIDATION

---

Dated: May 23, 2011

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 652-3131
(302) 652-3117 (Fax)
             - and-
Gerald H. Gline
25 Main Street
P. O. Box 800
Hackensack, NJ 07602-0800
(201) 489-3000
(201) 489-1536 (Fax)
*Counsel to Debtors and Debtors in Possession*

KELLEY DRYE & WARREN LLP
Benjamin D. Feder
101 Park Avenue
New York, New York 10178
(212) 808-7800
(212) 808-7897 (Fax)
*Special Corporate Counsel to Debtors and Debtors in Possession*

---

[1]     The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Barzel Industries Inc. (0836), Barzel Holdings Inc. (1107), Barzel Finco Inc. (1010), Barzel Industries U.S. Inc. (6382), American Steel and Aluminum Corporation (2435), Nova Tube and Steel, Inc. (1790), Novamerican Tube Holdings, Inc. (3740) and Nova Tube Indiana, LLC (8275).

**PLEASE REVIEW THIS DOCUMENT FOR IMPORTANT INFORMATION REGARDING:**

    \* Description of the Debtors
    \* Classification and Treatment of Claims and Interests
    \* Distribution to Holders of Allowed General Unsecured Claims
    \* Implementation and Execution of the Plan
    \* Treatment of Contracts and Leases and Procedures to Assert and Resolve Rejection Claims

**AND IMPORTANT DATES:**

    \* Date to Determine Record Holders of Claims and Interests – _____, 2011
    \* Deadline to Object to Final Approval of the Disclosure Statement – _____, 2011 at 4:00 p.m. (ET)
    \* Deadline to Submit Ballots – _____ at 4:00 p.m. (ET)
    \* Deadline to Object to Plan Confirmation – _____, 2011 at 4:00 p.m. (ET)
    \* Hearing on Plan Confirmation– _____, 2011 at _____ (ET)

**A COPY OF THIS DISCLOSURE STATEMENT AND THE DEBTORS' JOINT PLAN OF LIQUIDATION CAN BE FOUND AT http://www_____.**

# 1. INTRODUCTION.

## 1.1 Purpose of the Disclosure Statement.

Notice of this disclosure statement (as amended, modified or supplemented, the "**Disclosure Statement**") is being provided by Barzel Industries, Inc., et al. (collectively, the "**Debtors**") to the Office of the United States Trustee, and to all of the Debtors' known Creditors and stockholders pursuant to section 1125(b) of Title 11 of the United States Code (the "**Bankruptcy Code**") for the purpose of soliciting acceptances of the Debtors' Joint Plan of Liquidation (the "**Plan**"). The Plan has been filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") and the summaries of the Plan contained herein shall not be relied upon for any purpose other than to make a judgment with respect to, and determine how to vote on, the Plan. A copy of the Plan is attached hereto as **Exhibit A**. <u>All capitalized terms used within this Disclosure Statement which are not defined herein have the meanings set forth in the attached Plan.</u> **A hearing on final approval of the Disclosure Statement shall be held _____ (ET). The deadline to object to Plan Confirmation is _____(ET).**

PLEASE NOTE THAT MUCH OF THE INFORMATION CONTAINED HEREIN HAS BEEN TAKEN, IN WHOLE OR IN PART, FROM INFORMATION CONTAINED IN THE DEBTORS' BOOKS AND RECORDS AND PLEADINGS FILED BY THE DEBTORS. STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. ALTHOUGH THE DEBTORS HAVE ATTEMPTED TO BE ACCURATE IN ALL MATERIAL RESPECTS, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER RULES GOVERNING DISCLOSURE OUTSIDE THE CONTEXT OF CHAPTER 11.

NO REPRESENTATION CONCERNING THE DEBTORS OR THE VALUE OF THE DEBTORS' ASSETS HAS BEEN AUTHORIZED BY THE BANKRUPTCY COURT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS ARE NOT RESPONSIBLE FOR ANY INFORMATION, REPRESENTATION OR INDUCEMENT MADE TO OBTAIN YOUR ACCEPTANCE, WHICH IS OTHER THAN, OR INCONSISTENT WITH, INFORMATION CONTAINED HEREIN AND IN THE PLAN.

YOU ARE STRONGLY URGED TO CONSULT WITH YOUR FINANCIAL, LEGAL AND TAX ADVISORS TO UNDERSTAND FULLY THE PLAN AND DISCLOSURE

STATEMENT. THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GIVEN AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT DOES NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE SUCH DATE. THIS DISCLOSURE STATEMENT IS INTENDED, AMONG OTHER THINGS, TO SUMMARIZE THE PLAN AND MUST BE READ IN CONJUNCTION WITH THE PLAN AND ITS EXHIBITS, IF ANY. IF ANY CONFLICTS EXIST BETWEEN THE PLAN AND DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

IF A HOLDER OF A CLAIM WISHES TO CHALLENGE THE ALLOWANCE OR DISALLOWANCE OF A CLAIM FOR VOTING PURPOSES UNDER THE TABULATION RULES SET FORTH IN THE DISCLOSURE STATEMENT ORDER, SUCH ENTITY MUST FILE A MOTION, PURSUANT TO BANKRUPTCY RULE 3018(A), FOR AN ORDER TEMPORARILY ALLOWING SUCH CLAIM IN A DIFFERENT AMOUNT OR CLASSIFICATION FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN AND SERVE SUCH MOTION ON THE UNDERSIGNED COUNSEL TO THE DEBTORS SO THAT IT IS RECEIVED NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME, ON _____, 2011.** UNLESS THE COURT ORDERS OTHERWISE, SUCH CLAIM WILL NOT BE COUNTED FOR VOTING PURPOSES IN EXCESS OF THE AMOUNT DETERMINED IN ACCORDANCE WITH THE TABULATION RULES.

**THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO <u>ACCEPT</u> THE PLAN.**

## <u>TREATMENT AND CLASSIFICATION OF CLAIMS AND INTERESTS; IMPAIRMENT</u>

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. In addition, attached as Exhibit B to this Disclosure Statement is the Debtors' chart of estimated sources and uses and ranges of recoveries under the Plan.

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Administrative Claims | [    ] | *Unimpaired.* Except to the extent that a Holder of an Allowed Administrative Claim agrees to a different treatment, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim, either (i) as soon as reasonably practicable after the Effective Date or (ii) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim; <u>provided</u>, <u>however</u>, that Allowed Administrative Claims representing obligations incurred in the ordinary course of business of the | 100% |

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| | | Debtors and/or the Disbursing Agents may be paid by the Debtors and/or the Disbursing Agents, as may be appropriate, in the ordinary course, consistent with past practice of the Debtors and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions, without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court. All Administrative Claims, except the costs and expenses of the Barzel Unsecured Claims Disbursing Agent and its professionals, shall be paid from the cash held by the Barzel Disbursing Agent. The costs and expenses of the Barzel Unsecured Claims Disbursing Agent and its professionals shall be paid from the Barzel Unsecured Claims Cash. | |
| Priority Tax Claims | [      ] | *Unimpaired.* Except to the extent that any governmental unit entitled to payment of any Allowed Priority Tax Claim has previously agreed or agrees to a different treatment by stipulation or otherwise, pursuant to section 1129(a)(9) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim, except to the extent such Claim relates to real property or a proceeding seeking to recover a tax refund from the claimant is pending before a tax tribunal or court of competent jurisdiction, shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, Cash from the Cash held by the Barzel Disbursing Agent in an amount equal to such Allowed Priority Tax Claim, (i) as soon as reasonably practicable after the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim. | 100% |
| Class I: Miscellaneous Secured Claims | [      ] | *Impaired – Entitled to Vote.* The Holder of each Allowed Miscellaneous Secured Claim shall receive at the discretion of the Barzel Disbursing Agent, from the Cash held by the Barzel Disbursing Agent, (i) Cash in an amount equal to the lesser of (a) the amount of Allowed Secured Claim and (b) the value of the Debtors' property securing such Allowed Secured Claim or (ii) the property securing such Miscellaneous Secured Claim. | 100% |
| Class II: Prepetition Noteholders Secured Claims | [      ] | *Impaired – Entitled to Vote.* The Holder of each Allowed Prepetition Noteholders Secured Claim shall receive (i) within fifteen (15) days after the Effective Date, whatever Cash is remaining with the Barzel Disbursing Agent after (a) the payment of all Allowed Administrative Claims, Priority Tax Claims, Class I Miscellaneous Secured Claims, and Class III Priority Non-Tax Claims, and (b) the funding of the Wind-Down Reserve, and (ii) upon entry of a Final Decree in the Cases, whatever Cash is remaining with the Barzel Disbursing Agent (whether from the Wind-Down Reserve, excess professional fee retainers or otherwise) after the payment of all | [      ] |

| Class & Description | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| | | post-Confirmation United States Trustee fees and all fees and expenses of the Barzel Disbursing Agent and its professionals, if any. | |
| Class III: Priority Non-Tax Claims | [    ] | *Unimpaired.* Except to the extent that a Holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date or has previously agreed or agrees to a different treatment by stipulation or otherwise, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for such Holder's Allowed Priority Non-Tax Claim, Cash from the Cash held by the Barzel Disbursing Agent, in an amount equal to such Allowed Priority Non-Tax Claim as soon as reasonably practicable after the Effective Date or, to the extent such Priority Non-Tax Claim is not an Allowed Claim on the Effective Date, within thirty (30) days following allowance of such Claim. | 100% |
| Class IV: General Unsecured Claims | [    ] | *Impaired – Entitled to Vote.* The Record Holders of Allowed General Unsecured Claims (other than the Deficiency Claims, which shall not participate in the Class IV recovery of the Barzel Unsecured Claims Cash) shall share, on a pro-rata basis, in the Barzel Unsecured Claims Cash after taking into account any fees and expenses of the Barzel Unsecured Claims Disbursing Agent. | [    ] |
| Class V: Intercompany Claims, Insider Claims and Claims of the Canadian Entities | N/A | *Impaired – Deemed to Reject.* All Intercompany Claims and Insider Claims shall be deemed released. All Claims of the Canadian Entities shall be deemed subordinated to all other Allowed Claims upon Confirmation of the Plan. All Holders of Intercompany Claims, Insider Claims, and Claims of the Canadian Entities shall receive no distribution under the Plan. Class V Claims are deemed to reject the Plan. | 0% |
| Class VI: Equity Interests | N/A | *Impaired – Deemed to Reject.* Shareholders of the Debtors will retain no ownership interests in the Debtors under the Plan and such Interests shall be cancelled effective as of the Effective Date. | 0% |

**1.2**     **Disclosure Statement Enclosures**.

        **1.2.1**     **Disclosure Statement Approval Order**.     A copy of the Order of the Bankruptcy Court dated [June 27], 2011, approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, setting the deadline for objecting to the Plan, and scheduling the Confirmation Hearing.

        **1.2.2**     **Notice of Confirmation Hearing**.     A copy of the notice of deadline for submitting ballots to accept or reject the Plan (each, a "**Ballot**") and, among other things, the

date, time and place of the Confirmation Hearing, and the deadline for filing objections to confirmation of the Plan (the "**Notice**").

1.2.3   **Ballots.**  A Ballot for voting to accept or reject the Plan, if you are the Record Holder of a Claim in a Voting Class.

### 1.3   Final Approval of the Disclosure Statement and Confirmation of the Plan.

1.3.1   **Requirements.**  The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

1.3.2   **Approval of the Plan and Confirmation Hearing.**  To confirm the Plan, the Bankruptcy Court must hold the Confirmation Hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code.

1.3.3   **Effect of Confirmation.**  Except as otherwise provided in the Plan or in the Confirmation Order, confirmation will effect the Distribution of the Debtors' remaining assets and the dissolution of the Debtors.  Confirmation serves to make the Plan binding upon the Debtors, all Creditors, Interest Holders and other parties-in-interest, regardless of whether they cast a Ballot to accept or reject the Plan.

1.3.4   **Impaired Claims or Interests.**  Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving a payment or distribution under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims or Interests may be "Impaired" if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Interests treated in such Class.  The Holders of Claims not Impaired by the Plan (Class III – Allowed Priority Non-Tax Claims) are deemed to accept the Plan and do not have the right to vote on the Plan.  The Holders of Claims or Interests in any Class which will not receive any payment or distribution or retain any property pursuant to the Plan (Class V – Intercompany Claims, and Class VI – Equity Interests) are deemed to reject the Plan and do not have the right to vote on the Plan.

1.3.5   **Eligibility to Vote on the Plan.**  Unless otherwise ordered by the Bankruptcy Court, only Record Holders of Allowed Class I Claims, Allowed Class II Claims and Allowed Class IV Claims may vote on the Plan.

1.3.6   **Voting Procedure and Ballot Deadline.**  To ensure your vote is counted you must (i) complete the Ballot, (ii) indicate your decision either to accept or reject the Plan in the boxes provided in Item 3 of the Ballot, and (iii) sign and return the Ballot to the address set forth on the Ballot (please note that envelopes and prepaid postage have not been included with the Ballot) so that it is actually received no later than 5:00 p.m. (prevailing Eastern time) on June [   ], 2011. **BALLOTS SENT BY FACSIMILE TRANSMISSION OR ELECTRONIC MAIL ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

### 1.4   Acceptance of the Plan.
As a Creditor, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims)

must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan. **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ATTACHED TO THE NOTICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT [_____].**

**PLEASE NOTE THAT ANY RETURNED BALLOT THAT FAILS TO INDICATE ACCEPTANCE OR REJECTION OF THE PLAN WILL BE COUNTED AS AN ACCEPTANCE OF THE PLAN.**

**1.5** **Confirmation Hearing**. The Bankruptcy Court has scheduled the Confirmation Hearing on [August __], 2011 at __:__ (prevailing Eastern time) in Courtroom 6 of the United States Bankruptcy Court for the District of Delaware, 5th Floor, 824 Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date or by the Debtors filing a notice of adjournment.

## 2. **THE DEBTORS.**

**2.1** **Debtors' History and Business**. Headquartered in Norwood, Massachusetts, the Debtors operated an integrated system of fifteen (15) strategically located metal processing, manufacturing and distribution facilities throughout the Northeastern, Mid-Atlantic and Mid-Western United States and the Canadian provinces of Ontario and Québec. From these locations, the Debtors employed approximately 600 people in the United States and Canada.

**2.2** **Debtors' Pre-Petition Corporate Structure**. Debtor Barzel Industries, Inc. ("**BII**") (then Symmetry Holdings Inc.) was formed in 2006 as a Delaware development stage company to acquire one or more operating businesses. In March 2007, BII completed a firm commitment, registered, initial public offering of common stock and warrants, for gross proceeds of $150 million. On November 15, 2007, BII acquired Novamerican Steel, Inc. ("**NSI**") and various NSI subsidiaries (collectively "**Novamerican**") for $585.2 million. The acquisition of Novamerican (and related transaction costs) was financed by (a) $112 million of the net proceeds from the initial public offering of BII's common stock and warrants, (b) $15 million from a private placement sale of additional common stock and warrants of BII, (c) debt financing consisting of $315 million of senior secured notes issued by Barzel Finco Inc. ("**Barzel Finco**") and $67 million of borrowings under an asset based lending facility, each of which is discussed more fully below, and (d) cash held by Novamerican at closing. On December 6, 2007, Symmetry Holdings Inc. changed its name to Novamerican Steel, Inc. and on February 13, 2009, Novamerican Steel, Inc. changed its name to Barzel Industries Inc. BII is the direct or indirect parent of the other Debtors and Barzel Industries Canada Inc. ("**Barzel Canada**").[2]

---

[2]      On the Petition Date Barzel Canada filed an application with the Ontario Superior Court of Justice (the "**Canadian Court**") under the Companies Creditors Arrangement Act, R.S.C. 1985, c. C-36, seeking protection from its creditors in Canada (the "**Canadian Proceedings**"). The Canadian Proceedings are ongoing and are not

(Continued . . .)

### 2.3 Debtors' Pre-Petition Debt Structure.

2.3.1 **The Notes.** On November 15, 2007, Barzel Finco issued $315 million of 11.5% Senior Secured Notes due 2015 (the "**Notes**") pursuant to an Indenture dated as of November 15, 2007 as supplemented, (the "**Indenture**"), among Barzel Finco, as issuer of the Notes, Bank of New York Mellon, f/k/a The Bank of New York, as Trustee (the "**Trustee**") and BNY Trust Company of Canada, as Canadian collateral agent. The proceeds of the Notes were used to help fund BII's acquisition of Novamerican.

As of the Petition Date, two-thirds of the Notes were held by JPMorgan Chase Bank, N.A. ("**JPM**"), and one-third of the Notes were held by CIBC World Markets Corp. ("**CIBC**").

2.3.2 **The ABL Facility.** On November 15, 2007, BII obtained additional financing for the Novamerican acquisition and general operations pursuant to the Credit Agreement dated as of November 15, 2007 (as amended, the "**Credit Agreement**"), by and among BII, Barzel Finco and Barzel Canada as borrowers, JPM, CIBC Inc. and other lender parties thereto (collectively, the "**Prepetition Lenders**"), as lenders, and various entities as agents thereunder. Pursuant to the Credit Agreement, the Prepetition Lenders extended to the Debtors a five (5) year revolving credit facility of up to $175 million (the "**ABL Facility**"). The ABL Facility was guaranteed by each of the non-borrowing Debtors, and Barzel Canada's borrowings under the ABL Facility were also guaranteed by 632422 N.B. Ltd, a non-debtor. In June 2009, the ABL Facility was amended to, among other things, reduce the commitments thereunder to $20 million, to release all of the lenders thereunder other than JPM and to add CIBC Inc. as a lender thereunder.

As of the Petition Date, JPM and CIBC Inc. were the sole remaining Prepetition Lenders. Approximately $17.6 million was outstanding under the ABL Facility as of the Petition Date and there were approximately $900,000 in undrawn letters of credit under the ABL Facility as of the Petition Date. The ABL Facility was fully repaid during the Cases.

The Notes are (and the ABL Facility was) secured by substantially all of the assets of the Debtors and Barzel Canada.

### 2.4 Events Leading to Chapter 11.
The Debtors suffered increasing operating losses during 2008 and 2009. The Debtors' losses were due, in large part, to the global economic recession and credit crisis, and the resulting dramatic downturn in the automotive, transportation, manufacturing and construction industries in the United States and Canada—which accounted for many of the Debtors' and Barzel Canada's customers.

The reduced demand and lowered prices for the Debtors' goods and services resulted in a significant decrease in revenue. The Debtors' declining operating performance

---

(. . . continued)
impacted by the Plan, which governs only the Debtors. Conclusion of the Canadian Proceedings will be addressed separately pursuant to the applicable procedures under Canadian law.

reduced liquidity and limited their ability to borrow under the ABL Facility or obtain new financing to fund their operations.

Despite the Debtors' efforts to reduce expenses and improve operations, they were not able to make the interest payment due under the Notes on May 15, 2009. Accordingly, on May 14, 2009, the Debtors and the Holders entered into a Deferral Agreement (as amended, the "**Deferral Agreement**") with respect to the Notes. Under the Deferral Agreement, the Debtors agreed to use their best efforts to consummate either (i) a recapitalization or restructuring of a substantial portion of their equity and/or debt securities and/or other indebtedness, (ii) a disposition of all or a majority of their outstanding equity securities and/or all or a majority of their assets or operations, or (iii) a refinancing of, and/or the placement, raising or issuance of equity, equity-linked or debt securities in connection with, the Debtors (each or any of the foregoing, a "**Transaction**").

On May 2, 2009, the Debtors engaged Houlihan Lokey Howard & Zukin Capital, Inc. to assist it in identifying potential purchasers/investors and pursuing a Transaction. Ultimately, the Debtors received 12 offers to pursue a Transaction involving the sale of substantially all of the Debtors' assets.

After carefully reviewing the final round offers, BII's Board of Directors selected Chriscott USA Inc. and 4513614 Canada (the "**Buyers**") to serve as a stalking horse purchaser of substantially all of the Debtors' and Barzel Canada's assets (the "**Assets**"). On September 14, 2009, the Debtors and the Buyers executed an asset purchase agreement (the "**APA**") pursuant to which the Buyers agreed to purchase the Assets for $65 million, subject to certain adjustments and the assumption of certain limited liabilities.

## 3. ACTIVITIES DURING THE CASE.

**3.1** **First Day Orders**. On September 17, 2009, the Bankruptcy Court entered a number of orders granting the Debtors various forms of interim and permanent relief, including the following:

**3.1.1** **Order Approving Cross-Border Court-to-Court Protocol**. The Bankruptcy Court approved a protocol for the coordination of the Cases and the Canadian Proceedings on matters of concern to both the Bankruptcy Court and the Canadian Court.

**3.1.2** **Order Authorizing Payment of Prepetition Employee Wages, Salaries, Commissions and Other Compensation**. The Bankruptcy Court authorized the Debtors to pay certain employee related claims and continue their employment practices postpetition.

**3.1.3** **Order Authorizing the Payment of Prepetition Claims of Shippers, Warehousemen, Brokers and Other Lien Claimants**. The Bankruptcy Court authorized the Debtors to pay certain prepetition claims of shippers, vendors, warehousemen, brokers and other lien claimants in the ordinary course of business.

**3.1.4** **Order Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services**. The Bankruptcy Court approved an interim order, and

subsequently a final order, (i) prohibiting utility providers from altering, refusing, or discontinuing service to the Debtors on account of prepetition invoices, (ii) providing that utility providers had "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, and (iii) establishing procedures for resolving requests for additional adequate assurance and authorizing the Debtors to provide adequate assurance of future payment to utility providers.

3.1.5 **Order Authorizing Continued Use of Existing Cash Management System.** The Bankruptcy Court approved an order, among other things, authorizing the Debtors' continued use of their existing cash management system, and authorizing the Debtors to continue using their existing bank accounts and business forms.

**3.2 Appointment of Creditors' Committee.** On September 30, 2009, the United States Trustee appointed Severstal Sparrows Point LLC, Northstar Bluescope Steel, LLC, and Ansonia Copper & Brass, Inc. to serve on the official committee of unsecured creditors in these Cases (the "**Creditors' Committee**").

**3.3 Sale of the Debtors' Assets.** The Debtors, together with Barzel Canada, executed the APA with the Buyers to provide for the sale of the Assets and for the Debtors' assumption and assignment to the Buyers of the Assigned Contracts and the Assigned Leases. On September 17, 2009, the Debtors filed a motion, and in coordination with the Canadian Proceedings pending for Barzel Canada, the Debtors requested that the Court enter a proposed order approving sale procedures and certain bidding protections for the Buyers, the Auction and Sale Hearing Notice and scheduling the Sale Hearing (the "**Procedures Order**"). On October 6, 2009, the Court approved the Procedures Order.

An auction occurred pursuant to the Procedures Order on October 28-29, 2009 (the "**Auction**"), at which the bid of the Buyers, as evidenced by the APA and as amended at the Auction (the "**Amended and Restated APA**"), was determined to be the highest and best offer for the Assets. On November 3, 2009, the Court entered an order approving the sale of the Assets for $75 million (the "**Sale**") to the Buyer (D.I. 248) (the "**Sale Order**").

**3.4 DIP Financing.** The Prepetition Lenders agreed to extend debtor in possession financing to the Debtors and Barzel Canada to support the Debtors' operations during the sale process and to provide for the means to wind-down the Cases and the Estates. On the Petition Date, the Debtors filed a motion seeking approval of a debtor-in-possession financing facility (the "**DIP Facility**") from JPM and CIBC Inc. (the "**DIP Motion**"). The DIP Facility provided up to a $30,000,000 secured revolving credit facility. The proceeds of the DIP Facility were used, among other things, to provide postpetition working capital to the Debtors and Barzel Canada, and to pay off the outstanding amounts due under the ABL Facility. The Bankruptcy Court approved an interim order, and subsequently a final order (the "**Final DIP Order**"), approving the DIP Facility.

The Final DIP Order provided, among other things, for the payment pursuant to the Approved Budget (as defined in the Final DIP Order) of certain reasonable expenses and obligations incurred in the Debtors' Cases through the closing of the Sale (the "**Pre-Sale Closing Expenses**"). The Final DIP Order further provided for the DIP Facility to be repaid in full

immediately upon the closing of the Sale and for all remaining proceeds to be paid over to the Prepetition Lenders and applied to the partial repayment of amounts due under the Notes, except for $2,250,000 for the funding of reasonable and necessary expenses in connection with the wind-up of the Cases. The Secured Lenders additionally provided funds to wind-up the Canadian Proceedings and to pay the professional fees and expenses of the Debtors and the Creditors' Committee incurred but not paid prior to the closing of the Sale. To date, the amount provided by the Secured Lenders for the foregoing is in excess of $8.0 million for the Cases alone.

### 3.5 Settlements.

3.5.1 **DIP Financing Settlement**. The Creditors' Committee filed an objection to the DIP Motion. Following negotiations among the Debtors, the Prepetition Lenders and the Creditors' Committee, the Prepetition Lenders, among other things, agreed, to the extent any availability under the Approved Budget with respect to Pre-Sale Closing Expenses existed as of the closing date of the Sale, to make such unspent funds available to pay any allowed claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "**Contingent 503(b)(9) Arrangement**"), and the Creditors' Committee withdrew its objection.

3.5.2 **Sale Settlement**. In connection with the Sale, the Buyers proposed to include language in the APA (the "**Release**") whereby the Debtors would release the Buyers and their affiliates from any claims, rights or other causes of action (other than any claims incurred pursuant to the APA), including any claims relating to a series of transactions in 2007 whereby affiliates of the Buyers sold Novamerican to the Debtors and Barzel Canada (the "**2007 Transaction**"). Affiliates of the Buyers were selling shareholders in connection with the 2007 Transaction. The proceeds of the ABL Facility and the Senior Notes were used, in part, to fund the 2007 Transaction. The Committee filed an objection to the Sale due to the proposed Release.

Following negotiations among the Debtors, the Buyers, the Agents, the Postpetition Lenders, the Prepetition Lenders and the Creditors' Committee at the Auction, the parties agreed to enter into a stipulation with respect to the Sale, the Release and the 2007 Transaction (the "**Stipulation**"). The Stipulation was approved by the Bankruptcy Court on November 13, 2009. In summary, under the Stipulation:

a. The Creditors' Committee agreed to the inclusion of the Release in the Amended and Restated APA;

b. The Debtors, the Postpetition Lenders and the Creditors' Committee agreed to carve-out $500,000 out of the purchase price under the Amended and Restated APA from the Prepetition Lenders' collateral for unsecured creditors of the Debtors (other than any deficiency claims of the Prepetition Lenders or the Postpetition Lenders) (the "**Reallocation**");

c. The Postpetition Lenders agreed to pay, out of the proceeds of the Sale, any allowed claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claims**") not ultimately satisfied

by the Contingent 503(b)(9) Arrangement in an amount equal to the lesser of (a) $300,000 or (b) 50% of the total allowed 503(b)(9) Claims before application of the Contingent 503(b)(9) Arrangement; and

d.    The Reallocation constitutes a contribution by the Prepetition Lenders of the proceeds of their collateral, reallocated for the benefit of allowed prepetition general unsecured claims (other than the deficiency claims of the Prepetition Lenders or the Postpetition Lenders) and does not constitute property of the Debtors or their estates under section 541 of the Bankruptcy Code.

**3.6    Activities Subsequent to the Sale.**

3.6.1  **Bar Dates.** On January 5, 2010, the Court entered an order fixing February 25, 2010 as the last date by which holders of (i) certain prepetition claims against the Debtors, including 503(b)(9) Claims, and (ii) administrative claims arising from the Petition Date through December 31, 2009, were required to file proofs of claim. On April 4, 2011, the Court entered an order fixing May 13, 2011 as the last date by which holders of administrative claims arising from January 1, 2010 through March 31, 2011, were required to file proofs of claim.

3.6.2  **Sale of Miscellaneous Properties.** Subsequent to the closing of the Sale, the Debtors marketed and sold certain properties which were not included among the Assets.

a.    **Norwood Property.** On November 12, 2009, the Court entered an order (the "**Norwood Sale Order**") approving a sale by the Debtors of certain non-residential real property located in Norwood, Massachusetts (the "**Norwood Property**") to M S International, Inc. ("**MS**"). The Debtors initially sought approval of a private sale of the Norwood Property, which was subject to the liens of the Prepetition Lenders, to MS for $2,875,000. At the hearing on the approval of the sale of the Norwood Property to MS, Debtors' counsel inadvertently represented to the Court that notice of the proposed sale to MS had been provided to all other parties who had previously expressed an interest in purchasing the Norwood Property. Upon realization of the error, Debtors' counsel immediately informed the Court and requested that the Court not enter the form of order submitted. After contacting the other parties who had previously expressed interest in the Norwood Property and receiving a competitive offer from one such party, the Debtors determined to conduct an auction for the Norwood Property. The auction ultimately resulted in the submission of a revised offer from MS in the amount of $3,063,275, which the Debtors determined to be the highest and best offer for the Norwood Property. Under the Norwood Sale Order, the net proceeds of the sale of the Norwood Property were paid over to the

Prepetition Lenders and applied to the partial repayment of amounts due under the Notes.

b. **Albany Property**. On August 19, 2010, the Court entered an order (the "**Albany Sale Order**") approving a sale by the Debtors of certain non-residential real property and equipment located in the County of Albany, New York (the "**Albany Property**") to Samuel Son & Co. Inc. ("**Samuel**"). The Albany Property, which was subject to the liens of the Prepetition Lenders, was leased to and occupied by Samuel pursuant to a Lease dated February 13, 2009 (the "**Albany Lease**"). Under the Albany Lease, Samuel held both a right of first refusal with respect to the Albany Property, and an option to purchase the Albany Property under certain conditions for $1,000,000. Following the receipt by the Debtors of an offer for the Albany Property in the amount of $850,000, Samuel sought to invoke its right of first refusal. Following negotiations between the Debtors and Samuel, the parties agreed on a deal whereby the Debtors would assume the Albany Lease and Samuel would exercise its purchase option for the sale of the Albany Property to Samuel for $1,000,000. Under the Albany Sale Order, the net proceeds of the sale of the Albany Property were paid over to the Prepetition Lenders and applied to the partial repayment of amounts due under the Notes.

c. **Hartford Property**. On November 24, 2010, the Court entered an order (the "**Hartford Sale Order**") approving a sale by the Debtors of certain non-residential real property located in Hartford, Connecticut (the "**Hartford Property**"). Following the marketing of the Hartford Property, which was subject to the liens of the Prepetition Lenders, the Debtors entered into an agreement with Robert F. Judge and Toni L. Judge for the sale of the Hartford Property for $475,000, subject to higher and better offers. Under the Hartford Sale Order, the proceeds of the sale of the Hartford Property were paid over to the Prepetition Lenders and applied to the partial repayment of amounts due under the Notes.

3.6.3 **Payment of 503(b)(9) Claims**. Following the approval of the Stipulation with respect to the 503(b)(9) Claims, the Debtors, the Prepetition Lenders and the Creditors' Committee agreed that the total amount of funds available for payment of any allowed 503(b) Claims pursuant to the Contingent 503(b)(9) Arrangement was $650,000. The Debtors and their advisors subsequently undertook the process of reconciling the 503(b)(9) Claims and determined that there was approximately $490,756.47 in allowable 503(b)(9) Claims filed against the Debtors' estates. The Debtors filed a motion on November 9, 2010, seeking authorization to pay such allowed 503(b)(9) Claims, and on November 24, 2010, the Court entered an order granting such relief. Such amounts were paid to the holders of the allowed 503(b)(9) claims on or about [December 10], 2010.

**3.7** **Tax Refund**. The Debtors have taken advantage of recent changes in the Internal Revenue Code to carryback and deduct net operating losses incurred in their taxable year 2009 from taxable income recognized in tax years 2005 through 2007. In their fiscal year ending November 28, 2009, the Debtors suffered a net loss, and on their consolidated federal corporate income tax return for their taxable year ending November 28, 2009, filed on or about February 9, 2011, the Debtors reported an aggregate net operating loss of $82,305,253 (the "**2009 NOL**"). In order to benefit from the new law, the Debtors elected to carryback and deduct the 2009 NOL from taxable income recognized in tax years 2005 through 2007. As a result, the Debtors requested tax refunds in the aggregate amount of $18,590,231 (the "**Tax Refunds**"). Final resolution of the disposition of the Tax Refunds is a condition to the implementation of the Plan. The Tax Refunds are subject to IRS review for a period that could extend through 2014, a process that injects uncertainty over the Debtors' rights to the funds. Accordingly, in view of the Court's express authority pursuant to section 505(a)(2)(B) of the Bankruptcy Code, on April 13, 2011, the Debtors filed a motion (the "**505 Motion**") requesting that the Court finally determine the Debtors' rights with respect to the Tax Refunds. The 120-day period pursuant to section 505(a)(2)(B)(i) that limits the Court's ability to make such determination will expire on June 15, 2011, which is before the 505 Motion is set to be heard on June 27, 2011. The Tax Refund, when received, will be paid over to the Prepetition Lenders in accordance with the Plan and applied to the partial repayment of amounts due under the Notes.

**3.8** **Environmental Claims**. The United States Environmental Protection Agency (the "**US EPA**") and the State of Rhode Island Department of Environmental Management ("**RI DEM**") have each filed proofs of claim relating to response costs incurred and to be incurred at the Peterson-Puritan Superfund site in Cumberland, Rhode Island (the "**Site**"). The US EPA and RI DEM have each filed claims seeking recovery of response costs incurred and to be incurred in remediating the J.M. Landfill portion of the Site. The US EPA estimated the value of its claim at $65,250,000, based on joint and several liability pursuant to the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 96 U.S.C. 9601 *et seq*. The RI DEM estimated the value of its claim at $30 million, based on CERCLA and various state statutes and common law.

**3.8.1** **United States Claim**. The US EPA alleges that the Debtors arranged for the shipment of wastes that included hazardous substances to the Site over a 19-year period. Since most of the past remediation costs have already been resolved in prior settlements, the US EPA's claim consists almost entirely of costs expected to be incurred in the future, which the US EPA contends is likely to be at least $71 million. If the government prevails in such a claim, it intends to assert a right of setoff against the Tax Refunds. The Debtors believe that any right of setoff held by the US EPA would, at most, be applicable only to that portion of the Tax Refunds attributable to American Steel and Aluminum Corporation.

The Debtors believe, based on data concerning the volume of the Debtors' waste streams to the Site in comparison with that of other potentially responsible parties, that the actual comparative volume attributable to the Debtors is substantially lower than what the US EPA has assumed and that the Debtors' waste streams did not contain any hazardous substances. The Debtors believe that their liability in connection with the remediation of the Site accordingly should only be a small percentage of the US EPA's estimated future costs.

Settlement discussions with the US EPA are ongoing. If a timely and reasonable settlement cannot be reached, the Debtors will file an objection against the claim of the US EPA.

3.8.2 **Rhode Island Claim**. The RI DEM's proof of claim alleges the same harm as the US EPA claim and therefore appears to be duplicative of it. Unless the RI DEM can demonstrate that the state will incur response costs of its own separate from those of the US EPA, the Debtors intend to object to this claim.

Settlement discussions with the RI DEM are ongoing. If a timely and reasonable settlement cannot be reached, the Debtors will file an objection against the claim of the RI DEM.

3.8.3 **The Debtors' Notice of Claim to Chubb**. Simultaneously with the Debtors' investigation of the claims made by the US EPA and RI DEM and the ongoing settlement discussions with such parties, the Debtors have made claims against old Comprehensive General Liability insurance policies that are believed to have been issued by the Federal Insurance Company to the Debtors during the same time frame as the waste shipments are alleged to have been shipped to the Site (the "**Policies**"). Chubb (which has assumed responsibility for the Federal Insurance Company policies) has acknowledged that the Policies were likely to have been issued to the Debtors and has acknowledged what their terms and conditions likely contained. Nonetheless, Chubb believes that it has significant defenses to liability under the Policies and has denied coverage under all but two Policy years.

Settlement discussions with Chubb are ongoing. If a timely and reasonable settlement cannot be reached, the Debtors will commence litigation in order to enforce their claims under the Policies.

## 4. SUMMARY OF THE PLAN.

4.1 **Purpose of the Plan.** The Debtors are proposing the Plan over the alternative of converting the Debtors' bankruptcy cases to Chapter 7 of the Bankruptcy Code because the Debtors believe that (i) the Plan provides a more orderly liquidation and a greater recovery to creditors than a Chapter 7 liquidation, (ii) the Plan avoids unnecessary costs to the Debtors' estates which would accrue should the Debtors' bankruptcy cases be converted to Chapter 7 of the Bankruptcy Code.

4.2 **Classification of Claims and Interests under the Plan.** All Allowed Claims and Interests, except the Allowed Unclassified Claims, are placed in the Classes set forth in Article III of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

4.2.1 **Administrative Claims.** Except to the extent that a Holder of an Allowed Administrative Claim agrees to a different treatment, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim, either (i) as soon as reasonably practicable after the Effective Date or (ii) if the Administrative

Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim; provided, however, that Allowed Administrative Claims representing obligations incurred in the ordinary course of business of the Debtors and/or the Disbursing Agents may be paid by the Debtors and/or the Disbursing Agents, as may be appropriate, in the ordinary course, consistent with past practice of the Debtors and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions, without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court. All Administrative Claims, except the costs and expenses of the Barzel Unsecured Claims Disbursing Agent and its professionals, shall be paid from the Cash held by the Barzel Disbursing Agent. The costs and expenses of the Barzel Unsecured Claims Disbursing Agent and its professionals shall be paid from the Barzel Unsecured Claims Cash.

4.2.2 **Priority Tax Claims**. Except to the extent that any governmental unit entitled to payment of any Allowed Priority Tax Claim has previously agreed or agrees to a different treatment by stipulation or otherwise, pursuant to section 1129(a)(9) of the Bankruptcy Code, each Holder of an Allowed Priority Tax Claim, except to the extent such Claim relates to real property or a proceeding seeking to recover a tax refund from the claimant is pending before a tax tribunal or court of competent jurisdiction, shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, Cash from the Cash held by the Barzel Disbursing Agent in an amount equal to such Allowed Priority Tax Claim, (i) as soon as reasonably practicable after the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.

4.2.3 **Class I (Miscellaneous Secured Claims)**. The Holder of each Allowed Miscellaneous Secured Claim shall receive at the discretion of the Barzel Disbursing Agent, (i) from the Cash held by the Barzel Disbursing Agent, Cash in an amount equal to the lesser of (a) the amount of such Allowed Secured Claim and (b) the value of the Debtors' property securing such Allowed Secured Claim or (ii) the property securing such Miscellaneous Secured Claim. Class I Claims are impaired under the Plan and are entitled to vote to accept or reject the Plan.

4.2.4 **Class II (Prepetition Noteholders Secured Claims)**. The Holder of each Allowed Prepetition Noteholders Secured Claim shall receive (i) within fifteen (15) days after the Effective Date, whatever Cash is remaining with the Barzel Disbursing Agent after (a) the payment of all Allowed Administrative Claims, Priority Tax Claims, Class I Miscellaneous Secured Claims, and Class III Priority Non-Tax Claims and (b) the funding of the Wind-Down Reserve, and (ii) upon entry of a Final Decree in the Cases, whatever Cash is remaining with the Barzel Disbursing Agent (whether from the Wind-Down Reserve, excess professional fee retainers or otherwise) after the payment of all post-Confirmation United States Trustee fees and all fees and expenses of the Barzel Disbursing Agent and its professionals, if any. The Prepetition Noteholders Secured Claims shall be Allowed in the amount of $[_____]. Class II Claims are impaired under the Plan and are entitled to vote to accept or reject the Plan.

4.2.5 **Class III (Allowed Priority Non-Tax Claims)**. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date or has previously agreed or agrees to a different treatment by stipulation or

otherwise, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for such Holder's Allowed Priority Non-Tax Claim, Cash from the Cash held by the Barzel Disbursing Agent, in an amount equal to such Allowed Priority Non-Tax Claim (i) as soon as reasonably practicable after the Effective Date or (ii) to the extent such Priority Non-Tax Claim is not an Allowed Claim on the Effective Date, within thirty (30) days following allowance of such Claim. Class III Claims are not impaired under the Plan and are not entitled to vote to accept or reject the Plan.

4.2.6 **Class IV (Allowed General Unsecured Claims)**. The Record Holders of Allowed General Unsecured Claims (other than the Deficiency Claims, which shall not participate in the Class IV recovery of the Barzel Unsecured Claims Cash) shall receive, in full and complete satisfaction, settlement and release of and in exchange for such Holder's Allowed General Unsecured Claim, its pro rata share of the Barzel Unsecured Claims Cash after taking into account any fees and expenses of the Barzel Unsecured Claims Disbursing Agent. Class IV Claims are impaired under the Plan and are entitled to vote to accept or reject the Plan.

4.2.7 **Class V (Intercompany Claims, Insider Claims and Claims of the Canadian Entities)**. All Intercompany Claims and Insider Claims shall be deemed released. All Claims of the Canadian Entities shall be deemed subordinated to all other Allowed Claims upon Confirmation of the Plan. All Holders of Intercompany Claims, Insider Claims, and Claims of the Canadian Entities shall receive no distribution under the Plan. Class V Claims are deemed to reject the Plan.

4.2.8 **Class VI (Equity Interests)**. Shareholders of the Debtors will retain no ownership interests in the Debtors under the Plan and such Interests shall be cancelled effective as of the Effective Date. Class VI Interests are deemed to reject the Plan

**4.3    The Disbursing Agents.**

4.3.1 _Transfers of Assets_. The Debtors shall transfer, or cause to be transferred, (i) the Barzel Unsecured Claims Cash to the Barzel Unsecured Claims Disbursing Agent, and (ii) all of their other remaining Assets to the Barzel Disbursing Agent, on the Effective Date. Such transfers of assets shall be free and clear of all liens, claims, interests, rights of offset and encumbrances, other than the right to receive a distribution of such assets pursuant to the Plan.

4.3.2 _Authority and Role of the Disbursing Agents_. In furtherance of and consistent with the purposes of the Plan, the Barzel Disbursing Agent shall be deemed to be the judicial substitute for each of the Debtors as the party-in-interest in these Bankruptcy Cases, under the Plan or in any judicial proceeding or appeal to which any Debtor is a party, consistent with section 1123 (b)(3)(B) of the Bankruptcy Code and section 303 of the Delaware General Corporation Law, and is appointed as the representative of the Estates for all purposes (other than with respect to the Barzel Unsecured Claims Cash and allowance or disallowance of the Claims of Holders of General Unsecured Claims (other than the Deficiency Claims)), including for the retention and enforcement of all claims and rights, known and unknown, which arose prior to the Confirmation Date. In furtherance of and consistent with the Plan, the Barzel Unsecured Claims Disbursing Agent shall be deemed to be the judicial substitute for each of the Debtors as the party-in-interest in these Bankruptcy Cases, under the Plan or in any judicial

proceeding or appeal to which any Debtor is a party, consistent with section 1123(b)(3)(B) of the Bankruptcy Code and section 303 of the Delaware General Corporation Law, and is appointed as the representative of the Estates for the purposes of holding and distributing the Barzel Unsecured Claims Cash and reconciling and seeking the allowance or disallowance of the Claims of Holders of General Unsecured Claims (other than the Deficiency Claims). On the Effective Date, the current officers and directors of each of the Debtors shall be deemed to have resigned and shall be fully discharged from their responsibilities and duties as officers and directors of the Debtors. In general and subject to the protective provisions in the Plan, the Barzel Disbursing Agent shall act for the Debtors and their respective estates in a fiduciary capacity as applicable to a board of directors and the Barzel Unsecured Claims Disbursing Agent shall act as a fiduciary to holders of Allowed General Unsecured Claims in distributing the Barzel Unsecured Claims Cash.

4.3.3 <u>Authorization</u>. The Disbursing Agents shall be empowered and authorized to, among other things: (a) liquidate the Debtors' remaining Assets, as specified in this Plan; (b) make the Distributions required under the Plan; (c) retain and/or employ professionals; (d) exercise all power and authority that may be exercised by any officer, director or Holder of an Interest in such Debtor with like effect as if authorized, exercised and taken by unanimous consent of such officers, directors or Holders of Interests including, without limitation, amending any Debtor's organizational documents or dissolving any Debtor; (e) pursue objections to, and estimations and settlements of, Claims; (f) calculate and implement all Distributions to be made under this Plan to Creditors holding Allowed Claims; (g) market, sell, lease or otherwise dispose of or realize the value of all Assets; (h) file all required tax returns and pay taxes and all other obligations on behalf of the Debtors; (i) file required operating reports; and/or (j) take all other actions required under the Plan to complete the liquidation, dissolution and wind-up of the Debtors in accordance with Section 2.5 of the Plan; <u>provided</u> that the items set forth in clauses (a), (d), (g), (h), (i) and (j) shall be performed by the Barzel Disbursing Agent only. The Disbursing Agents may also be authorized and directed to review, object to, prosecute, negotiate, settle or otherwise compromise any Claims or pending causes of action, in each case in accordance with Bankruptcy Rule 9019. The powers granted to the Disbursing Agents shall be exercisable without further approval of the Court. Notwithstanding anything herein, such duties and powers shall be limited and apportioned between the Disbursing Agents in accordance with their respective roles as described in section 2.2.2 hereof and otherwise in the Plan.

4.3.4 <u>Liquidation of Assets</u>. The Disbursing Agents shall pursue recovery of Assets under the Plan in a commercially reasonable manner.

4.3.5 <u>Compensation of the Disbursing Agents</u>. The Disbursing Agents shall be entitled to reasonable compensation in an amount consistent with that of similar professionals in similar types of bankruptcy proceedings. The costs and expenses of the Disbursing Agents, including the fees and expenses of the Disbursing Agents and their retained professionals, shall be paid out of the respective Assets transferred to the Disbursing Agents pursuant to section 2.2.1 of this Plan and shall be considered administrative expenses of the Debtors' estates. The Disbursing Agents shall maintain appropriate reserves to fund confirmation administrative expenses, post-confirmation administrative expenses, and operating expenses during the implementation of the Plan.

4.3.6 <u>Execution of Documents</u>. The Debtors (or the Disbursing Agents on behalf of the Debtors, as the case may be appropriate) may execute any and all documents and instruments necessary to effectuate the Plan.

4.3.7 <u>Cash</u>. The Disbursing Agents may invest Cash (including any earnings thereon); <u>provided, however</u>, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

4.3.8 <u>Retention of Professionals by the Disbursing Agents</u>. The Disbursing Agents may retain and reasonably compensate counsel and other professionals to assist in their duties on such terms as the Disbursing Agents deem appropriate without Bankruptcy Court approval. The Disbursing Agents may retain any professional who represented parties in interest in the Cases.

**4.4 <u>Delivery of Distribution</u>.** Any Distribution shall be made to Record Holders of Allowed Claims: (i) at the address set forth on the proof of claim Filed by such Holder, (ii) at the address set forth in any written notices of address change Filed by such Holder, (iii) at the addresses reflected in the Schedules if neither a proof of claim nor a written notice of address change has been Filed, (iv) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtors' books and records, or (iv) in the case of the Prepetition Noteholders, via wire transfer to the Indenture Trustee. Except as otherwise provided for herein, ordered by the Bankruptcy Court, or otherwise, Distributions under the Plan shall be made as soon as is practicable on the later to occur of (a) the Effective Date, (b) when a Claim becomes an Allowed Claim, or (c) when Cash is available for a Distribution to a particular Class pursuant to the treatment of such Class under the Plan. The Barzel Disbursing Agent shall make the Distribution to Holders of Allowed Administrative Claims; Allowed Priority Tax Claims; Allowed Class I Miscellaneous Secured Claims; Allowed Class II Prepetition Noteholders Secured Claims; Allowed Class III Priority Non-Tax Claims, and to any Disputed Administrative Claim; Disputed Priority Tax Claim; Disputed Class I Miscellaneous Secured Claims or Disputed Class III Priority Non-Tax Claim that becomes an Allowed Claim. The Barzel Unsecured Claims Disbursing Agent shall make Distributions in accordance with the Plan to Allowed Class IV General Unsecured Claims.

The Barzel Disbursing Agent and Barzel Unsecured Claims Disbursing Agent shall each establish a reserve of Cash, which is estimated to be sufficient to satisfy incurred and anticipated Post-Effective Date Claims incurred by the Barzel Disbursing Agent and Barzel Unsecured Claims Disbursing Agent and to fund the relevant Distribution Reserve(s). The Disbursing Agents may make any additional Distribution after the initial Distribution is made on or about the Effective Date. Such additional Distribution may be made at such time(s) and in such amount(s) as determined by the Disbursing Agents.

If a distribution to any Creditor is returned as undeliverable, no further distributions to such Creditor shall be made unless and until the appropriate Disbursing Agent is notified of such Creditor's then-current address, at which time all missed Distributions shall be made to such

Creditor without interest. All claims for undeliverable Distributions shall be made on or before the ninetieth (90th) day after the final Distribution under the Plan. After such date, all property unclaimed by a Creditor shall revert to the Barzel Disbursing Agent and Barzel Unsecured Claims Disbursing Agent, as appropriate, to be distributed in a subsequent Distribution made to Creditors in accordance with the Plan or as otherwise authorized pursuant to further Order of the Bankruptcy Court. In the event that after the ninetieth (90th) day after the final Distribution under the Plan the Barzel Unsecured Claims Disbursing Agent is holding an amount of Barzel Unsecured Claims Cash insufficient (in the sole discretion of the Barzel Unsecured Claims Disbursing Agent) to make an additional Distribution that provides a material benefit to Holders of Allowed General Unsecured Claims, the Barzel Unsecured Claims Disbursing Agent may donate such funds to a charity of his choice.

**4.5** **Procedures for Treating and Resolving Disputed Claims**. No payments or Distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim. All objections to Claims must be filed by the Disbursing Agents on or before the Claims Objection Deadline.

4.5.1 **Distribution Reserve.** The Disbursing Agents will each withhold their respective Distribution Reserve from the property to be distributed under the Plan to Creditors. The Disbursing Agents may request estimation for any Disputed Claim that is contingent or unliquidated, and the Disbursing Agents will each withhold their respective Distribution Reserve based upon the estimated amount of each such Claim as determined by the Bankruptcy Court. If the either of the Disbursing Agents elects not to request such estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, then such Disbursing Agent will withhold their Distribution Reserve based upon the appropriate pro rata percentage distribution of the Face Amount of such Claim.

4.5.2 **Distributions After Allowance**. Payments and Distributions from the Distribution Reserves on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, will be made in accordance with provisions of the Plan that govern the Class in which such Claim is classified. Promptly after the date when the order or judgment of the Bankruptcy Court allowing all or part of such Claim becomes a Final Order, the appropriate Disbursing Agent shall distribute to the Holder of such Claim any Cash allocated to such Claim in the appropriate Distribution Reserve that would have been distributed on the dates Distributions were previously made on account of Allowed Claims had such Claim been an Allowed Claim on such dates. All Distributions made under this Section of the Plan on account of an Allowed Claim shall be made as if such Claim had been an Allowed Claim on the dates Distributions were previously made to Allowed Claims.

**4.6** **Dissolution of the Debtors**. On the Effective Date or as soon thereafter as is reasonably practicable, the Barzel Disbursing Agent shall be authorized to take all take all actions necessary to effect the dissolution of any of the Debtors and any subsidiaries of the Debtors as corporate entities without the need for any further action or approval; provided, however, that the entry of the Final Decree in these Chapter 11 Cases shall effect such dissolution of all remaining Debtors to the extent permissible under applicable law.

**4.7** **Substantive Consolidation**. For the purposes of the Cases and the Plan only, all Assets of and Claims against the Debtors will be deemed to be substantively consolidated. As a result, Claims filed against multiple Debtors seeking recovery of the same debt shall be treated as one non-aggregated Claim against the consolidated Debtors' estates to the extent such Claim is an Allowed Claim. Intercompany Claims will be disregarded for both voting and Distribution purposes.

**4.8** **Subordination of Claims.** All Claims of the Canadian Entities against the Debtors shall be deemed subordinated to all other Allowed Claims upon Confirmation of the Plan.

**4.9** **Waiver of Insider Claims.** All Insider Claims shall be deemed waived upon Confirmation of the Plan.

**4.10** **Records**. Pursuant to section 554 of the Bankruptcy Code, the Debtors shall be authorized to abandon all originals and/or copies of documents and business records upon order of the Bankruptcy Court obtained on motion on twenty days negative notice to the Debtors' Bankruptcy Rule 2002 service list.

**4.11** **Effectuating Documents.** The officer(s) and director(s) of each Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such other actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.

**4.12** **Objections to Claims.** Except as provided herein, any objection to the allowance of a Claim not Filed within sixty (60) days after the Effective Date shall be deemed waived, and the Claim shall be an Allowed Claim in the amount set forth on the proof of claim Filed by the Holder of such Claim. Subject to the provisions of section 2.4 of the Plan, the Disbursing Agents, in their discretion, may make Distributions to the Holders of Allowed Claims within any particular Class of Creditors before all Disputed Claims within that particular Class become Allowed or Disallowed in full or in part (either by (i) agreement between the appropriate Disbursing Agent and the Record Holder of the Disputed Claim or (ii) by Final Order).

**4.13** **Term of Injunctions or Stays.** Unless otherwise provided, all injunctions or stays provided for in the Cases pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the close of the Cases. Except as otherwise expressly provided in the Plan or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all entities, creditors and Holders of Interests who have held, hold, or may hold Claims against or Interests in the Debtors, are permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim or Interest, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Debtors, on account of any such Claim or Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtors, or

against the property or interests in property of the Debtors, unless such Holder has filed a motion requesting the right to perform such setoff before the Confirmation Date, notwithstanding any indication in a proof of claim that such Holder asserts or intends to preserve any right of setoff.

**4.14    Abandonment of Causes of Action.** Except as set forth in this section, any and all Causes of Action accruing to the Debtors and Debtors in Possession, including but not limited to Avoidance Actions, shall be deemed abandoned on the Effective Date. The Disbursing Agents shall retain the Causes of Action, including the Avoidance Actions, for the sole purpose of using Causes of Action defensively in connection with objections to Disputed Claims, including pursuant to section 502(d) of the Bankruptcy Code, and transfers shall not be deemed non-avoidable under that section merely because of the abandonment of Avoidance Actions under the terms hereof.

**4.15    Executory Contracts and Unexpired Leases.** As stated in Article IV of the Plan, the Debtors believe that all executory contracts and unexpired leases of the Debtors were assumed and assigned, or rejected, during the Cases. Accordingly, Article IV of the Plan is included out of an abundance of caution and (i) provides that all executory contracts and unexpired leases of the Debtors which are not assumed and assigned, or rejected, prior to the Confirmation Date, if any, shall be deemed rejected and (ii) sets forth procedures for asserting and resolving Rejection Claims, if any.

**4.16    Conditions Precedent to Confirmation and Consummation of the Plan.** Article V of the Plan sets forth the conditions that must occur prior to both Confirmation of the Plan and the occurrence of the Effective Date. Article V also describes the Debtors' ability to waive such conditions, as well as the effect of non-occurrence of the conditions to the Effective Date, including the vacation of the Confirmation Order. If the Confirmation Order is vacated pursuant to section 5.4 of the Plan, (i) the Plan shall be null and void in all respects; and (ii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

**4.17    Miscellaneous Provisions.** Article VI of the Plan contains several miscellaneous provisions, including: (i) the retention of jurisdiction by the Bankruptcy Court over certain matters following the Confirmation Date; (ii) the Debtors' payment of statutory fees pursuant to 28 U.S.C. § 1930; (iii) the dissolution of the Creditors' Committee; and (iv) the termination of Logan & Company, Inc. in its capacity as claims, noticing and balloting agent.

**4.18    The Professional Fee Claim Bar Date.** Any and all applications for the final allowance of Professional Fee Claims shall be Filed and served upon counsel to the Debtors, counsel to the Creditors' Committee, the United States Trustee, and all Persons on the Debtors' Bankruptcy Rule 2002 service list on or before the Professional Fee Claim Bar Date.

**4.19    Final Fee Hearing.** A hearing on final allowance of Professional Fee Claims (the "**Final Fee Hearing**") shall be held as soon as practicable after the Professional Fee Claim Bar Date. The Debtors' counsel shall File a notice of the Final Fee Hearing. Such notice shall be posted on the Noticing Agent Website, and served upon counsel for the Creditors'

Committee, all Professionals, the United States Trustee and all parties on the Debtors' Bankruptcy Rule 2002 service list.

**4.20 Release and Exculpation. Additionally, please note that sections 6.14 and 6.15 of the Plan govern the release, exculpation and limitation of liability of certain parties with respect to the Cases. Please review these provisions carefully.**

## 5. FEASIBILITY.

### 5.1 Financial Feasibility Analysis.

**5.1.1 Bankruptcy Code Standard.** The Bankruptcy Code requires that, in order to confirm a plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

**5.1.2 No Need for Further Reorganization of Debtors.** The Plan provides for the liquidation and distribution of all of the Debtors' Assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## 6. BEST INTERESTS OF CREDITORS AND ALTERNATIVES TO PLAN.

### 6.1 Chapter 7 Liquidation.

**6.1.1 Plan is in the Best Interests of Creditors.** Notwithstanding acceptance of the Plan by a Voting Class, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such Voting Class which has not voted to accept the Plan. Accordingly, if a Voting Class does not vote unanimously to accept the Plan, the best interests test under section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to find that the Plan provides to each member of such Voting Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under Chapter 7.

The Debtors believe that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to Holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a Chapter 7 liquidation.

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens. If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured

creditors with the same priority. Finally, equity interest Holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtors' Assets have already been liquidated during the Cases through the Sale and subsequent sales of real property. Although the Plan effects a liquidation of the Debtors' remaining Assets and a Chapter 7 liquidation would have the same goal, the Debtors believe that the Plan provides the best source of recovery to Holders of Prepetition Lender Secured Claims and Allowed General Unsecured Claims. Liquidating the Debtors' estates under Chapter 7 would not provide a timely Distribution to Holders of such Claims and would likely provide a smaller Distribution to Holders of such Claims because of the fees and expenses which would be incurred during a Chapter 7 liquidation, including potential added time and expense incurred by the Trustee and any retained professionals in familiarizing themselves with the Cases. Attached as Exhibit C to this Disclosure Statement is a liquidation analysis performed by the Debtors which substantiates the Debtors' view that the Debtors' Plan provides greater recoveries to creditors than a Chapter 7 liquidation.

Furthermore, the Debtors do not have any unencumbered assets with which to formulate a plan or pursue a case under Chapter 7 of the Bankruptcy Code without the consent of their secured lenders. Their secured lenders have consented to the Plan described in this Disclosure Statement. It is not clear that the secured lenders will consent to a different alternative for winding up the Debtors' Cases and Estates.

Accordingly, the Debtors believe that the Plan is in the best interests of Creditors.

**6.2** **Alternative Plan(s).** The Debtors do not believe that there are any alternative plans. The Debtors believe that the Plan, as described herein, enables Holders of Claims to realize the greatest possible value under the circumstances, and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## 7. **RISK FACTORS.**

Holders of Claims who are entitled to vote on the Plan should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the Plan, before deciding whether to vote to accept or reject the Plan.

**7.1** **Certain Bankruptcy Considerations.**

Even if the Voting Classes vote to accept the Plan, the Court may exercise substantial discretion and may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of Distributions to dissenting Holders of Claims or Interests may not be less than the value such Holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such requirement, there can be no assurance that the Court will reach the same conclusion.

**7.2** **Claims Estimation.**

There can be no assurance that the estimated amount of Claims set forth in this Disclosure Statement is correct, and the actual allowed amounts of Claims may differ from the estimates. The Debtors are in the process of reconciling Claims. Any value given as to the Claims against and the Assets of the Debtors is based upon an estimation of such value.

**8.** **TAX CONSEQUENCES OF THE PLAN**.

THE DEBTORS HAVE NOT REQUESTED A RULING FROM THE IRS OR AN OPINION OF COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

NO STATEMENT IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE. THE DEBTORS AND THEIR PROFESSIONALS DO NOT ASSUME ANY RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES THE HOLDER OF A CLAIM MAY INCUR AS A RESULT OF THE TREATMENT AFFORDED ITS CLAIM UNDER THE PLAN AND DO NOT REPRESENT WHETHER THERE COULD BE ADDITIONAL TAX EXPOSURE TO THEMSELVES OR THEIR NON-DEBTOR AFFILIATES AS A RESULT OF THIS PLAN.

## 9. CONCLUSION.

It is important that you exercise your right to vote on the Plan. It is the Debtors' belief and recommendation that the Plan fairly and equitably provides for the treatment of all Claims against and Interests in the Debtors.

IN WITNESS WHEREOF, the Debtors have executed this Disclosure Statement this 23rd day of May, 2011.

Barzel Industries Inc. (for itself and on behalf of the other Debtors, as Debtors and Debtors in Possession)

By: _____
Name: Wayne Day
Title: Chief Restructuring Officer

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 652-3131
(302) 652-3117 (Fax)
    - and-
Gerald H. Gline
25 Main Street
P. O. Box 800
Hackensack, NJ 07602-0800
(201) 489-3000
(201) 489-1536 (Fax)
*Counsel to Debtors and Debtors in Possession*

KELLEY DRYE & WARREN LLP
Benjamin D. Feder
101 Park Avenue
New York, New York 10178
(212) 808-7800
(212) 808-7897 (Fax)
*Special Corporate Counsel to Debtors and Debtors in Possession*